# UNITED STATES DISTRICT COURT
# DISTRICT OF VERMONT



KENDALL WARE,
SYDNEY PARTIN,
and HALEY SOMMER,

*Plaintiffs,*

v.

THE UNIVERSITY OF VERMONT AND
STATE AGRICULTURAL COLLEGE, THE
BOARD OF TRUSTEES OF THE
UNIVERSITY OF VERMONT AND STATE
AGRICULTURAL COLLEGE, NICHOLAS
STANTON, KATHERINE SPENCE, TARYN
MORAN, JEFFREY SCHULMAN, KRISTA
BALOGH, JOSEPH RUSSELL, and OTHER
UNIDENTIFIED DEFENDANTS,

*Defendants.*

Civil Action No. _____ 2Y _____

**JURY TRIAL DEMANDED**

2:22-cv-212

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Kendall Ware, Sydney Partin, and Haley Sommer (collectively, "Plaintiffs"), by and through their undersigned attorneys, file this complaint against defendants University of Vermont and State Agricultural College ("UVM"), the Board of Trustees of the University of Vermont and State Agricultural College ("Board of Trustees"), UVM employees Stanton, Spence, Moran, Schulman, Balogh, and Russell, and other unidentified defendants (collectively, "Defendants"), and respectfully allege as follows:

## PRELIMINARY STATEMENT

1.      The three Plaintiffs each chose to attend the University of Vermont as undergraduates for different reasons.  Kendall Ware, a star high school athlete, was offered an

gravel &
shea
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

athletic scholarship and the opportunity to compete as a Division I swimmer for UVM. Sydney Partin fell in love with the Burlington campus, nestled between the rolling Vermont mountains and striking Lake Champlain, and what she initially viewed as a progressive, accepting culture. Haley Sommer was a passionate environmentalist, drawn to the school's academically rigorous environmental studies program. The women had little in common before beginning their undergraduate programs at UVM.

2.      Plaintiffs now have at least two things in common. First, they are survivors of sexual assault, each having been raped while a student at UVM. Second, they are suing UVM, alongside various individual administrators and staff, because Defendants' deliberate indifference to student-on-student harassment, sexual assault, and drugging created a discriminatory and sexually hostile environment in which female students faced a heightened risk of sexual assault and, once assaulted, lacked any meaningful avenue of redress.

3.      Defendants contributed to and ignored known and obvious conditions that substantially increased Plaintiffs' risk of campus sexual assault by fellow students. Despite repeated demands to better protect students from sexual violence and hold perpetrators accountable, Defendants failed to promptly investigate credible reports that assailants, particularly within fraternity and athletic groups, drugged and assaulted women on campus. Even when appropriate individuals had actual notice of rapes and assaults, Defendants ignored official Title IX procedures and failed to offer appropriate accommodations, explain survivors' options to them, or sanction their assailants.

4.      For over a decade, UVM has been on notice that underage alcohol abuse, drugging incidents, and sexual assault were widespread on and off campus, particularly among its athletics department, sports teams, and fraternities.

5.      In March 2019, a male UVM fraternity member drugged Partin at a party. Later that evening, Partin was raped in her UVM dorm room. What UVM knew, but Partin did not learn until after she attended that party, was that her assailant's "unrecognized" fraternity had a long rap-sheet of alcohol and drug infractions. In the ensuing months, Partin began to suffer from debilitating panic attacks, depression, suicidal ideation, and anxiety. Ultimately, these symptoms would cause her to withdraw from UVM for a full academic year.

6.      In May 2019, at the urging of survivors' advocacy groups concerned about poor in-state university responses to sexual misconduct, the Vermont Legislature passed Act 77, creating a Campus Sexual Harm Task Force ("Task Force") to address known issues at state universities related to "transparency, safety, affordability, accountability of outcomes, and due process in campus conduct adjudication processes for sexual harm." Over the next nine months, the Director of UVM's Office of Affirmative Action and Equal Opportunity ("AAEO" or "Title IX Office"), Nick Stanton, served on the Task Force, which tackled topics including Vermont higher education's "institutional responses" to sexual assault and "current practices for preventing and responding to sexual based harm."

7.      In October 2019, Stanton summarized UVM's Title IX reporting processes for the Task Force ("Stanton Memo"). Stanton noted that, although UVM does not generally "formally investigate against the wishes of the Complainant," under certain circumstances, including in cases where the alleged conduct is sufficiently serious, an informal resolution may be deemed inappropriate to address the charges alleged. The Stanton Memo also acknowledged that "forms of informal resolution that involve face-to-face meetings between parties . . . are not available in cases involving a report of sexual assault," and included a broad list of employees who were

gravel &
  shea
.......... .. .. ......
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 3 -

"mandated to report incidents of sexual harassment and misconduct involving members of the UVM community," encouraging students to come forward to such responsible individuals.

8.      That same month, Ware reported to the Title IX Office that, in September 2019, she had been anally raped by a popular athlete from one of UVM's most profitable official sports teams. Although Ware's allegations were serious, UVM's Intake and Outreach Coordinator, Taryn Moran, and investigator Kate Spence, alongside UVM Athletics staff including Jeffrey Schulman and Krista Balogh, dissuaded Ware from seeking a formal investigation. As a result, Ware's assailant never faced any meaningful consequences for his actions. Adding insult to injury, UVM promoted a favorable press article about Ware's rapist throughout campus and on the students' myUVM portal homepage.

9.      In January 2020, Partin reported her drugging, and indicated that she had blacked out and been denied a date rape kit the next morning, to a UVM mandatory reporter in the Dean of Student's Office, Joseph Russell. Although Russell reported Partin's assault to Moran at the Title IX Office, nobody followed up with Partin about her assault for over a year.

10.     In February 2020, a student named Athena Hendrick[1] reported to the Title IX Office that they had been raped by a UVM student and club sports athlete named Austin Weiland. On information and belief, UVM conducted a flawed investigation that did not discover that Weiland had a history of predatory sexual behavior before he raped Hendrick. As a result, UVM's Title IX Office found Weiland not responsible for Hendrick's rape.

11.     In November 2020, Weiland raped Sommer. He pressured Sommer to drink excessively at a party and, once she was incapacitated and unable to consent to sexual activity, assaulted her in her own apartment.

---

[1] On information and belief, Hendrick uses they/them pronouns

gravel &
    shea
74 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 4 -

12.     In April 2021, frustrated by UVM's institutional indifference towards their sexual assault, Hendrick posted about their rape on Instagram. Later that week, Partin also publicly shared her assault (and Title IX Office's dismal response) on Instagram. Only then did Moran reach out to Partin, with a boilerplate email summarizing UVM's Title IX procedure, in a clear attempt at damage control.

13.     Through Hendrick's post, Sommer learned of UVM's flawed investigation, which allowed Weiland unfettered access to campus and the opportunity to rape her. Sommer posted about her assault in solidarity. Again, Moran sent her the same boilerplate email summarizing policies and procedures. With no trust in UVM's Title IX Office, Sommer opted not to report her assault and, ultimately, dropped out of UVM.

14.     The posts by Hendrick, Partin, and Sommer triggered a broader protest movement, where students have posted their own accounts of sexual assault and UVM's feeble response in a social media campaign known as @ShareYourStoryUVM. Over the past year, the account has documented hundreds of stories of sexual assault on UVM's campus, many of which prominently feature failures of UVM's broken and ineffective Title IX process.

15.     Defendants' deficient responses to Ware and Partin's sexual assault complaints, alongside their unreasonable response to Hendrick's complaint against Sommer's assailant, systemically deprived Plaintiffs of equal access to educational opportunities in violation of Title IX of the Education Amendments of 1972 ("Title IX") and the United States Constitution, pursuant to 42 U.S.C. § 1983. Defendants' behavior also violated state common law, inflicted emotional distress, breached contracts, and caused the Plaintiffs significant emotional, physical, and economic harm.          •

gravel &
  shea
.  .   .   .  .   ..
76 St. Paul Street
Post Office Box 369                                                    - 5 -
Burlington, Vermont 05402-0369

## PARTIES

16.     Plaintiff Ware is a female who was, at all material times, a resident of Burlington, Vermont.  At the time of the events complained of herein, Ware was an undergraduate student attending UVM.

17.     Plaintiff Partin is a female and was, at all material times, a resident of Burlington, Vermont, and tenant of UVM, from Fall 2018 to Spring 2019, during which time she was drugged by a UVM fraternity member and, later that evening, raped in her UVM dorm room.  From Fall 2019 to Spring 2020, Partin took a leave of absence due to the traumatic impact of her assaults.  In August 2020, Partin resumed her undergraduate coursework at UVM and is again a resident of Burlington.

18.     Plaintiff Sommer is a female and was, at all material times, a resident of Burlington, Vermont.  At all material times, Sommer was an undergraduate and graduate student at UVM.  In August 2021, Sommer withdrew from her accelerated master's program as a result of the experiences described herein.

19.     Defendant UVM is a public educational institution organized under the laws of the State of Vermont and located in Burlington, Vermont.  During all material times, UVM received federal funding for its academic programs and activities, within the meaning of Title IX, 20 U.S.C. § 1681(a).

20.     Defendant Board of Trustees is composed of twenty-five members who, as an entity, is responsible for the management of UVM and is in control of its property and policies.  The Board operates in keeping with UVM's corporate bylaws, which are governed by the laws of the State of Vermont.

21.     Defendant Stanton is an individual who was, at all material times, a resident of the State of Vermont.  At all material times, Stanton was the Director of UVM's Title IX Office, the Office of Affirmative Action and Equal Opportunity ("AAEO" or "Title IX Office"), and acted or failed to act within the scope, course and authority of his employment and employer.  He is sued in his individual capacity.

22.     Defendant Spence is an individual who was, at all material times, a resident of the State of Vermont.  At all material times, Spence was an Investigator and Alternative Resolution Facilitator with UVM's Title IX Office and acted or failed to act within the scope, course and authority of her employment and employer.  She is sued in her individual capacity.

23.     Defendant Moran is an individual who was, at all material times, a resident of the State of Vermont.  At all material times, Moran was the Title IX Office Intake and Outreach Coordinator and acted or failed to act within the scope, course and authority of her employment and employer.  She is sued in her individual capacity.

24.     Defendant Schulman is an individual who was, at all material times, a resident of the State of Vermont.  At all material times, Schulman was the Director of Athletics at UVM and acted or failed to act within the scope, course and authority of his employment and employer.  He is sued in his individual capacity.

25.     Defendant Balogh is an individual who was, at all material times, a resident of the State of Vermont.  At all material times, Balogh was the Associate Athletic Director for External Relations and Communications at UVM, and acted or failed to act within the scope, course and authority of her employment and employer.  She is sued in her individual capacity.

26.     Defendant Russell is an individual who was, at all material times, a resident of the State of Vermont.  At all material times, Russell was Assistant Dean of Students for Retention and

gravel &
  shea    . . . . . . .
ATTORNEYS AT LAW   BURLINGTON
76 St Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369                                   - 7 -

a Deputy Title IX Coordinator and acted or failed to act within the scope, course and authority of his employment and employer. He is sued in his individual capacity.

27.     Other unidentified defendants may be discovered in the course of this litigation, and Plaintiffs reserve the right to amend this Complaint to add them as Defendants as they become known.

## JURISDICTION

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, law, and treaties of the United States.

29.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343.

30.     Plaintiffs bring this action in part to redress discrimination and a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as more fully set forth herein. This action is also brought, in part, pursuant to 42 U.S.C. § 1983 and § 1988, and the Fourth Amendment to the United States Constitution, made applicable to Defendants through the Fourteenth Amendment to the United States Constitution, to address the deprivation of Plaintiffs' constitutional rights.

31.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), as the claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

32.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the Plaintiffs are residents of the State of Vermont, Defendants UVM and the Board of Trustees are situated in this

gravel &
shea   . . . . . . . . .
ATTORNEYS AT LAW P.L.L.C.
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 8 -

district, all individual defendants are residents of Vermont, and the events or omissions giving rise to the claims occurred in this district.

## FACTS

33.     UVM is a large public university located in Burlington, Vermont. Its 460-acre campus is home to over 11,000 undergraduate students and over 1,400 graduate students.

34.     UVM has been the subject of numerous media reports concerning sexual assault and the use of date rape drugs on campus, often perpetrated by fraternity members and student athletes. These reports are further detailed in Section II.

## I.     The Plaintiffs Are Sexually Assaulted At UVM

### A.  Kendall Ware

#### i.     UVM's Star Athlete Rapes Ware

35.     Kendall Ware enrolled at UVM in Fall 2018.  She is an accomplished swimmer who was actively recruited by UVM's Division I Women's Swimming and Diving team and awarded an athletic scholarship.  She fell in love with the swim team and its coaches, and was excited by UVM's program in her chosen field of study, Communication Sciences and Disorders.

36.     In January 2019, Ware met and began dating Anthony Lamb, a fellow athlete at UVM.

37.     Lamb was a junior at the time, playing small forward for the UVM Men's Basketball team, one of UVM Athletics' most popular and financially successful sports. From the beginning of his career, Lamb piled on the accolades for UVM Basketball, winning several individual awards as well as critical games for the team.

38.     UVM Athletics doted on Lamb.   Teammates and coaches described him as "tremendous" and their "best player" embodying the team's "toughness" as a "team leader." Lamb



now plays for the Golden State Warriors in the NBA. In September 2022, Lamb represented the United States in the 2022 FIBA AmeriCup international basketball tournament.

39.     Ware and Lamb dated for roughly six months before breaking up in Summer 2019. On September 7, 2019, Ware attended an off-campus Men's Basketball party hosted at the house where Lamb lived. Later that evening, Lamb began screaming and insulting Ware in the driveway outside the house. Ware and Lamb went together to Lamb's bedroom, where Ware believed that they would be discussing Lamb's rage that night. In the process of discussing their relationship and making up from the fight, Lamb began to have sex with Ware.

40.     During the encounter, without Ware's consent, Lamb forcefully anally penetrated Ware as she repeatedly pleaded with him to stop, telling him "no" over and over. Ignoring her unequivocal demands, he told her to "just take it" and continued to rape her.

41.     In the aftermath, Ware felt frozen. At first, she dissociated from her body. Then, she began to cry uncontrollably. One thought played through her mind on loop: "I think Anthony just sexually assaulted me."

42.     Ware attempted to leave Lamb's room, but he forced her back inside. She spent the night in his room, forced to lie inches away from him until the morning. Ware was sore and in pain.

43.     The assault shattered Ware. Over the next few days, Ware suffered from suicidal ideation and, at one point, reached out to a suicide hotline.

44.     Ware contemplated "driving to the New York border and jumping off" the Lake Champlain Bridge. She fell into a deep depression and isolated herself from friends and family. Usually confident and cheerful, Ware withdrew from all attempts at outreach. She stopped

gravel &
shea
ATTORNEYS AT LAW PLC
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 10 -

responding to friends' text messages or invitations for social events and appeared quiet, withdrawn, and hopeless.

### ii.   Ware Reports Her Assault to Title IX

45.     On September 9, Ware dragged herself to the gym for her required morning weightlifting session with the swim team. She was deeply depressed and emotionally fragile. At some point, she began crying and shaking uncontrollably. Her friends tried to cheer her up, but she could not regain composure. Her tears were so relentless that she could barely string a sentence together.

46.     Ware's swim coaches and friends were deeply concerned. Five of Ware's friends submitted "C.A.R.E." – "Concerning And/Or Risky Event" – forms on her behalf, in order to alert school authorities to her crisis. Ware's friends, and one of her coaches, also contacted her mother, Marcie Ware, who drove six hours from New York to Burlington to be with her daughter. A distraught Ware repeatedly told her mother that she "did not want to be here anymore." By "here," she meant: "alive."

47.     Together, Ware's mother, friends, and coaches convinced her to seek medical attention. Ware met with a doctor on September 11, 2019, and was prescribed antidepressants. Ware was not yet ready to discuss the assault and did not share it with the doctor.

48.     Ware was terrified of reporting Lamb. In such a small state, to many, Lamb was a bona fide celebrity both on and off campus. Ware was afraid of the repercussions of reporting him to the school authorities, let alone to the police.

49.     Ware was depressed, lost her appetite, and barely left her room except for required swim team trainings and classes. She regularly ran into Lamb in the gym, which caused her immense anxiety. The memories of the rape ran on a constant loop in her mind. Eventually, the

gravel &
shea     .   .   . .  . .
. . . . . . . . . . . . . . . .
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 11 -

stress and pressure of constantly encountering her assailant around campus pushed Ware to seek help from UVM's administration.

50.     On October 7, 2019, Ware went to Judy Rickstad, the campus victim's advocate, and told her about the rape. Rickstad informed Ware that she could either report the incident to the police, or request a formal investigation through UVM's Title IX Office.

51.     As Ware began processing her rape, she also began to recognize that the relationship had been abusive and toxic even before Lamb raped her. She would eventually go on to report three separate incidents to the Title IX Office: the September 2019 rape, as well two prior incidents, one where Lamb had removed his condom, non-consensually, during sexual intercourse; and another, at Lamb's family home, where Lamb had filmed her during sexual intercourse without her consent.

52.     Ware worried that because she had not gone to the police to get a rape kit immediately after the fact, no one would believe her. At the time, she had more trust in UVM's administration than the police, who she worried would not be neutral given her assailant's position of popularity and power.

53.     On October 15, 2019, Ware asked Rickstad to pursue a formal investigation of Lamb. Rickstad reported the rape to the Title IX Office.

### iii.     UVM Inexplicably Involves the Athletic Department

54.     That same day, Ware met with her coaches to tell them that she had been assaulted and would be going through a formal reporting process. Ware's coaches told her that because they were mandatory reporters, she would need to speak with Krista Balogh, the Athletics Department's Associate Athletic Director for External Relations & Communications.

55.    On information and belief, there is no UVM policy or mandated reporting law that required a survivor to tell the Athletics Department Communications Director about their rape.

56.    Nonetheless, Ware was brought to Balogh's office and directed to tell Balogh about her rape. After Ware told Balogh about her rape and her intention to request a formal investigation, Balogh left to speak with Jeff Schulman, the Director of UVM's Athletics Department, and Cathy Osmers Rahill, the Associate Director of Athletics for Student Athlete Development. Ware sat alone in a conference room within the Athletic Administration Office, crying. Balogh then brought Ware into Schulman's office, where she was again required to explain that she had been raped at a party and was filing a Title IX complaint. As Ware left the Athletic Administration Office, she saw John Becker, the UVM Men's Basketball coach, sitting in the waiting room. Someone in the UVM Athletics Department must have called him immediately.

57.    On October 16, 2019, UVM's Title IX Intake and Outreach Coordinator, Taryn Moran, contacted Ware over email. Moran reiterated Rickstad's statement that her only options were a formal Title IX investigation ("Formal Process"), or a police report. In her nearly 750-word email to Ware, Moran, like Rickstad, never mentioned any alternative resolution process. Indeed, Moran outlined that according to the Sexual Harassment and Misconduct Policy ("SHM Policy"), there are circumstances "under which the University may have to pursue an investigation even if [Ware did] not wish to make a formal complaint," stating that she would "let [Ware] know should the University decide to proceed in this manner."

58.    Following Moran's email, UVM assigned Katherine Spence to be the "neutral" Title IX investigator for Ware's complaint. On October 17, 2019, Spence spoke with Ware and walked her through her options under Title IX. Spence informed Ware that there were actually not only two options, but also a third: an "informal resolution" process ("Informal Process"), which

gravel &
shea    .  .... . ..
.    .  ..  ..  .  ..  ...  ...  .
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 13 -

would be more flexible and take less time, but that Lamb would face only minimal consequences if found responsible. Specifically, Spence told Ware that if Lamb were found "guilty" under the Informal Process, his only punishment would be mandatory counselling.

59.     Ware knew that she would not be satisfied with mandatory counselling as the only potential outcome. Even though she clearly understood that the Formal Process would be more time consuming and onerous, she knew that it was the only way she could get what she sought: punishment proportionate to the wrong; justice for herself; and protection for fellow female students.

60.     In that meeting, Ware told Spence that she wanted to move forward with the Formal Process and provided her statement. Rickstad also attended the meeting with Ware, and Spence recorded the conversation.

61.     After the meeting, Ware realized that she had a few questions about the potential sanctions from the Informal Process. She sent Balogh a text telling her about the meeting with Spence and asking a few follow-up questions about the process. Then, she went to the gym.

62.     As she was leaving the gym, Ware noticed a missed call and a voicemail from Spence. On the voicemail, Spence urged Ware to reconsider her decision to formally investigate Lamb, on the grounds that Ware didn't seem to know what she wanted.

63.     Spence repeated this message in a subsequent email, writing that it "had come to [her] attention" that Ware's "goal" was "not necessarily to get [Lamb] in trouble." The only way that any information about Ware's thought process could have "come to [Spence's] attention" was through Ware's earlier text to Balogh, which Balogh must have circulated. Spence outlined the potential pitfalls of the Formal Process, including severe sanctioning for Lamb that would "impact

gravel &
  shea

his ability to play basketball and/or remain at UVM, either temporarily or permanently." It was then that Ware began to feel the school was pressuring her to change her mind.

64.    Ware spoke with her mother and a few close friends. She was determined to pursue an option that offered meaningful consequences, but she also worried about being responsible for someone's expulsion from school, and about backlash from a community where she intended to live and study for the next four years.

### iv.    UVM Misleads Ware to Protect Her Assailant

65.    Mistakenly believing that Balogh could provide some clarity about the different Title IX processes, Ware asked to speak with her again. Balogh suggested that Ware meet with Title IX Office staff to review her options.

66.    On October 18, 2019, Balogh, Ware, and Moran met at the Title IX Office.

67.    In direct contradiction to everything Spence had told Ware previously, Balogh and Moran reassured Ware that the Informal Process actually *could* result in meaningful consequences for Lamb. Specifically, Balogh and Moran told Ware that an informal investigation could lead to game suspensions in addition to mandatory counselling. They also told Ware that she would be allowed to confront Lamb and read him a victim impact statement during any such proceeding.

68.    Moran forwarded notes documenting this meeting to several members of UVM Athletics, including Team Physician Matthew Lusner, Schulman, and Rahill.

69.    Ware believed Balogh and Moran. Relying specifically on their promises that she would be allowed to read Lamb a victim impact statement and that he could face game suspensions, she dropped her previous request for a formal investigation, and elected the Informal Process.

70.    UVM brought in a consultant attorney, Peter Lim, to serve as the impartial mediator for the Informal Process.

gravel &
shea
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 15 -

71.    On November 4, 2019, Ware, Lim, and Balogh met for almost four hours.  UVM
had seemingly assigned Balogh, a UVM Athletics employee, to take the role of Ware's informal
victim's advocate.  Ware was never asked whether she agreed to this role for Balogh.

72.    Ware told Lim about her rape and asked questions about the Informal Process.  Lim
told Ware that her case was strong and expressed surprise that she was not pursuing the Formal
Process after enduring such an abusive relationship and rape.    The Informal Process, Lim
explained, could *not* legally include any of the consequences she had explicitly been promised by
Balogh and Moran were available.  He told Ware that not only were game suspensions impossible
within the Informal Process, but the school could not even order Lamb to undergo mandatory
counselling.  Critically, he also explained that UVM policies would not allow her to read Lamb
her victim impact statement.  Ware was crushed.

73.    Eventually, Lim told Ware that delivering a video statement to Lamb might be
possible.  Ware said she would consider this route if UVM would promise that she could deliver
the statement live.  Lim again told Ware that UVM policy would not allow her to personally
confront Lamb with her statement through any medium.  Her statement would have to be read to
Lamb by a proxy, or through pre-recorded audio.

74.    Ware was at her wit's end.  She had already recounted the story of her sexual assault
multiple times.  She felt as though she was committed to the path of the Informal Process—Lim
had been hired and brought in from out of state and Lamb had already been interviewed.  Despite
this, she considered abandoning all the work she had put into pursuing the Informal Process and
start over with the Formal Process.

75. Ware's mother called Balogh on or around November 5, 2019, demanding to know why Lim had stated that certain outcomes were not available within the Informal Process, when UVM staff had explicitly promised Ware that they were available.

76. Balogh used the conversation with Ware's mother to pressure her to convince Ware not to switch back to the Formal Process. Balogh told Ware's mother that the Formal Process could take "as long as five months." Ware later learned that UVM's own internal procedural guidelines outline the process as generally taking 60 days.

77. Balogh also told Ware's mother that the Formal Process would result in Lamb's immediate and indefinite suspension, and that he would be automatically banned from the campus gym. When Ware learned this, she worried that her athletic community would blame and ostracize her for causing them to lose their star player.

78. This was apparently exactly the reaction Balogh wanted. In her conversation with Ware's mother, Balogh bemoaned that, if Lamb were suspended, it would "have a negative impact on the community" which was eager to see him play. She also stated that it would be "unfair" to Lamb's teammates to lose his talent.

79. Ware was at a crossroads: either choose the Formal Process, which would have irreversible and drastic consequences for both Lamb and herself, or choose the safer option of the Informal Process. With the pressure mounting, Ware decided to continue with the Informal Process she had been steered into under false pretenses.

80. On November 7, 2019, while Ware agonized over this choice, UVM published an article about Lamb on its website. The article, titled "Can, Will, Must," showered praise on Lamb. Ware texted Balogh, expressing how hurt she felt by UVM's publication of the article and decision

gravel &
shea

ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 17 -

to feature it on the website. Balogh responded that Ware should remember that nobody except Balogh and Schulman knew about Ware's allegations.

81. On November 13, 2019, Lim and Ware spoke on the phone. During this conversation, Lim told Ware that she would not be allowed to read the victim impact statement to Lamb, either on Zoom or in person.

82. On November 14, 2019, Ware's frustration boiled over and she angrily protested that she was being repeatedly denied remedies she had been clearly promised were available. Lim ultimately conceded that Ware could read her impact statement to Lamb over Zoom.

83. UVM Athletics remained concerned that Ware would change her mind. On November 15, 2019, Schulman insisted that Ware meet with him. He told Balogh that he wanted to "put his eyes on her." Schulman was challenging to schedule with, and, after Ware spent the entire day trying to find a time to accommodate him, he insisted that she meet him at his office during a jam-packed evening hockey game.

84. Schulman came late anyway, meaning Ware had to wait outside his office while many students and staff of the Athletics Department passed by. The noise of the crowd was clearly audible during their conversation. Ware did not feel like Schulman expressed any concern about her assault, and he was clearly focused on not losing his prize asset Lamb. The context once again made Ware feel improperly pressured, when the decision about the investigation should have been hers and hers alone.

85. On November 18, 2019, after a two-week pressure campaign from Balogh, Schulman and others, Stanton asked Ware to commit to an informal resolution in writing ("Resolution Agreement"). Feeling like she had no choice, on November 19, 2019, Ware signed the Resolution Agreement.

gravel &
shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 18 -

86.     Lamb also signed the Resolution Agreement, which allowed him to escape any meaningful consequences for his actions. Instead of facing game suspensions or mandatory counselling, the Resolution Agreement merely required Lamb to not contact Ware, refrain from using the athletic facilities for certain limited hours, complete a generic "healthy masculine identity program," and refrain from attending a handful of isolated sports related events, including the UVM sports celebration event (that was ultimately held virtually due to the global pandemic). The Resolution Agreement then closed the investigation into Lamb "without making any finding as to whether he violated UVM Policy." At the virtual sports celebration event, UVM presented Lamb multiple awards.

87.     With the Resolution Agreement delivering no satisfactory justice to Ware in response to her ordeal, she grew increasingly frustrated by the many misrepresentations UVM staff had made to her. On December 2, 2019, Ware met with Balogh, Stanton, and Moran to detail all of the ways that she believed the Title IX process had retraumatized her. Moran thanked her for what she termed constructive "feedback."

88.     On January 6, 2020, Ware presented a powerful and heartrending victim impact statement over video to Lamb. In that statement, Ware described how Lamb had hurt her when she was at her most vulnerable. She described how she had to see him in the same training room, exhausted after sleeping in a friend's dorm room because her community was worried she would attempt suicide if left alone. She described seeing Lamb around campus: unbothered, nonchalant, laughing and joking around. She insisted he acknowledge what he had done, stating: "Did you ever think that I didn't want to exist because of you? Because you raped me?" Ware also expressed her hope that that the Informal Process would "help [Lamb] to see what [he does] hurts people," so that what he did to her would never happen again.

89.     Ware explained her fears about reporting: that she wouldn't be believed; that the Athletics Department wouldn't protect her; and that she would face retaliation.   Ware also described the pressure she felt to choose the Informal Process: UVM "play[ed] a tug-of-war game with my emotions and decisions, pulling me towards the way that protected their best interest: you."   Ware shared copies of her statement with Schulman and UVM Athletics, hoping that they would understand the depth of the trauma her rapist had caused, and the role they had played in exacerbating it.

90.     Minutes after hanging up the Zoom call and while still sitting in the Title IX Office, Balogh commented to Ware that her swim team "wouldn't be at UVM" without UVM's basketball team, implying that Ware should be grateful for everything Lamb and his team had done for her and her team.

91.     On January 10, 2020, Ware met with Schulman in his office.   Ware asked Schulman why, if she had pursued the Formal Process, Lamb would have been immediately suspended from games and banned from the gym as Balogh had said.   She said that this extreme sanction had presented her with a Hobson's choice because the backlash to her would have been severe. Schulman told her that Lamb would never have been suspended just because she used the Formal Process; this would only happen in cases of an arrest or public crime.

92.     Emotionally defeated by yet another conflicting representation, Ware challenged Schulman, saying that at least the Resolution Agreement proved that Lamb had accepted responsibility for raping her.   Schulman was unmoved, responding in a matter-of-fact tone: "you're wrong."   Schulman did not believe Lamb accepted any responsibility for his actions, and he wanted Ware to know it.

gravel &
shea

.  .   .   .  .   .  .   .  .  .
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 20 -

93.     Ware was so angry that she left the meeting shaking.  The next day, she told both Balogh and her swim coach about how much the meeting had upset her.

94.     Desperate to believe that the reporting process had not been for nothing, Ware contacted Stanton on January 11 to ask if he agreed with Schulman. When they spoke later on January 13, Stanton replied only that it was "reasonable to assume" that Lamb had accepted responsibility by signing the Resolution Agreement, but that this was "case by case" and "subjective."

95.     On January 15, 2020, one of Ware's friends contacted Balogh to alert her to the fact that UVM was advertising a press article featuring Lamb prominently on campus.  Alongside his picture, the advertisement said, "Lead by Example."  The ad was displayed on televisions throughout campus and on the MyUVM student portal homepage.  Ware and her fellow students asked UVM to pull the advertisement, which seemed to publicly affirm that UVM did not care about, or did not believe, its own student survivors of sexual assault.  Balogh said that "given the process chosen," there was "nothing [she] could do" about the advertisement, in which Ware's rapist became the face of UVM Athletics.

96.     Around that same time, UVM placed a poster featuring Lamb prominently in the gym, such that Ware had to walk by it whenever she used the athletic facilities.  As of filing, the poster still hangs there, and Ware has to walk by it whenever she uses the UVM gym.

97.     Ware and her mother tried to contact Stanton, Balogh and Schulman to demand accountability for the Athletics Department's inappropriate intervention in the Title IX process.

98.     On January 22, 2020, Ware's mother wrote an email to Stanton, Schulman and Balogh requesting a meeting to discuss UVM's lack of transparency and unacceptable handling of her daughter's case.  Ware's mother noted several policy documents—including UVM's SHM

gravel &
shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

- 21 -

Policy, UVM's procedural guidelines for handling and resolving discrimination complaints, and the Stanton Memo—that UVM appeared to have violated, and demanded answers to the questions these documents raised about the type of Title IX investigation that UVM had conducted in Ware's case.

99.     Under UVM's policies, UVM may not recommend an allegation for "alternative," or informal resolution unless it finds it appropriate given, *inter alia*: "the nature of the conduct reported and whether it presents an ongoing safety risk to the UVM community"; "the level and type of harm reported, subjectively and objectively"; and "the severity of conduct reported, subjectively and objectively." Although Ware had reported three extremely serious incidents of non-consensual sexual conduct, including anal rape, demonstrating a pattern, UVM had not found this serious enough to find the Informal Process inappropriate.

100.    Schulman and Balogh, who had been in constant contact with Ware while they were anxious that she might choose the Formal Process, ignored Ware's mother's email. Only Stanton wrote back, ignoring the substantive questions posed, and stating only that because UVM Athletics "does not and did not have a role in the AAEO" (Title IX) process, "it would not be productive to hold a meeting with Jeff Schulman and Krista Balogh." Stanton did not offer to meet with Ware or her mother.

### v.    Ware Tells Her Story

101.    In Summer 2020, Ware decided to speak publicly to the Burlington Free Press about her Title IX experience at UVM. Though Schulman had refused to speak to Ware's mother after the Informal Process concluded, he found time to respond to the Burlington Free Press article, which examined whether the Athletics Department had influenced the handling and outcome of Ware's complaint against Lamb. Schulman declined to comment on Ware's case, but admitted

that the Athletics Department provides "personal support" both when student athletes report sexual misconduct or are accused of it, and that the "administrator-student athlete relationship" can be "very tight."

102.    Schulman also defended the practice of allowing Athletics staff to "advise students through the [Title IX] process," including those accused of misconduct, arguing that "it "[didn't] feel aligned" with UVM athletics' policies to "push them away."

103.    That fall, a group of UVM students created an Instagram account, @JusticeForKendall, highlighting the injustices that she had endured. Other female athletes reported feeling "helpless, terrified, and betrayed" by UVM's actions.

104.    While Ware has taken strength from the support of other students, UVM's decision to protect Lamb at her expense has damaged her mental health. As a direct and proximate result of UVM's actions, Ware has experienced acute emotional and physical distress, depression, insomnia, isolation, anxiety and suicidal ideation. Ware still experiences frequent panic attacks as a result of her post-traumatic stress disorder, and withdrew for the 2019-2020 season, in part because she was terrified that any panic attacks while she was swimming would put her life in danger. Ware's difficulty in pursuing swimming eventually blocked her from renewing her swimming scholarship to partially fund her masters' degree. Her anxiety and depression resulted in a decline in her grades, and she was forced to withdraw from a minor in Spanish as a result. Ware struggled with eating and everyday activities, and found it challenging to get out of bed.

105.    In the years after the assault, Ware's body entered "fight or flight" mode each time she entered the UVM gym. She was always on high alert that she might see administrators like Schulman, Balogh, or Rahill at sports events or in the gym while training for the swim team. Every time a swim meet was scheduled, she asked her coaches whether she needed to anticipate seeing

these administrators. She lost joy in a sport that she loved, and felt betrayed by a community that she had loved representing as a student-athlete.

106.    Ware's negative experiences with the Athletic Department's administrators also put a strain on her relationship with her teammates. End of year banquets and award ceremonies became something to dread, because she knew Schulman and Balogh would be present.

107.    The anniversary of Ware's assault brings up deep anxiety for her, in part because of the stress that the mangled Title IX investigation added to her sophomore year.

108.    At bottom, Ware feels as though she lost the opportunity to be a "college kid." She lost much of her sophomore year to the investigation, and much of the joy of college life evaporated for her.

109.    Ware continues to suffer through the trauma caused not only by her rape, but also UVM's callous mishandling of her investigation.

110.    UVM's priorities were transparent throughout Ware's Title IX investigation: its star athlete had to be protected, no matter the cost. For Ware, the cost was her safety and well-being, accountability, and justice.

## B. Sydney Partin

### i.    Dean Russell Gains Partin's Trust

111.    Sydney Partin grew up in Waterford, Virginia. She visited UVM during her senior year of high school and fell in love with the beautiful campus and its seemingly tolerant and accepting culture. After receiving a scholarship, she finally convinced her parents to let her attend an out-of-state college and enrolled in Fall 2018 intending to study English.

112.    In October 2018, early in her freshman year, a middle-aged Burlington man stalked Partin on UVM's campus. Partin and her friends ordered a car through a ridesharing service and

gravel &
shea   ...........
.. .. ...   .. ...
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 24 -

got out at their destination. Hours later, Partin ordered another car through a different ridesharing service to return to campus. The same driver pulled up alongside her and insisted that he was her driver again. Partin did not think much of it until, once she was inside his car, the man engaged her in sexually explicit conversation, including asking if Partin was a virgin, offering to pay her for sex and nude photos of her, and putting his hand on her thigh without her consent.

113.    Shaken, Partin reported the encounter to Joseph Russell ("Dean Russell"), the Assistant Dean of Students for Retention and a Deputy Title IX Coordinator. During orientation, Partin and other students had been encouraged to reach out to Dean Russell and the Student Affairs Office staff with safety issues. Although UVM's SHM Policy commits UVM to conducting an inquiry, and "taking steps to provide appropriate remedies and support" for acts of sexual harassment, including "gender-based stalking," even, in some instances, if the perpetrator is not affiliated with the University, Dean Russell informed Partin that as her stalker was not a student, her best option for redress was to file a police report with campus police. Despite the SHM Policy's guidance, he did not direct Partin towards any other resources or support UVM could offer her as a victim of harassing behavior.

114.    UVM Police, too, were reticent to offer any help at all to Partin. The officer was dismissive of Partin's experiences from the outset, interviewing her in a public campus dining area without regard for her privacy. The officer told Partin that her stalker was likely "just an asshole" and that they could do nothing further to help. However, Partin later learned that the UVM Police had received several other complaints about the same man, and UVM issued a six-month ban on him driving on campus.

115.    On information and belief, neither UVM nor campus police monitored or kept a record of individuals driving onto campus, rendering the ban functionally useless.

gravel &
shea
[illegible]
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 25 -

### ii.   Partin Is Drugged and Raped

116.   In March 2019, Partin left her dorm room to attend an off-campus party attended by members of the Alpha Epsilon Pi fraternity ("AEPi"). Partin, like many college students, did not keep her dorm room organized and never made her bed. The night that she attended the party, she left her room in its typical untidy state.

117.   Unbeknownst to Partin, AEPi was not a sanctioned fraternity at UVM, having received a five-year suspension in 2014 after several members were hospitalized for excessive alcohol and drug use. AEPi also has a long history of being a dangerous place for women, with at least six separate posts on the @ShareYourStoryUVM page documenting incidents of alcohol- or drug-related sexual assaults at AEPi parties, going back as far as 2015.

118.   Before Partin arrived at the AEPi party, she drank two or three low-alcohol canned drinks, which she had opened herself. Partin and her friends regularly drank these same beverages and, based on her alcohol tolerance at the time, this amount of alcohol would only leave her feeling a slight alcohol "buzz."

119.   At the party, Partin poured herself a small glass of alcoholic juice from a large Gatorade cooler and was approached by a member of AEPi she had never met before named Nolan Donovan ("Donovan"). After starting a conversation, he put his arm around her. At that time, Partin was able to speak as if she were sober, stand and walk normally, and think clearly. Partin sipped only a small amount of the juice. Shortly thereafter, she began stumbling, and was unable to stand, slurring her speech, experiencing a disorienting change in eyesight, and losing her grasp on her surroundings.

120.   Though admittedly unable to recall all details with clarity, she remembers being approached by Donovan, groped, and forcibly kissed. Friends have since confirmed to Partin that

they observed Donovan kissing and groping her, but had not intervened because they had mistakenly believed it was consensual. Feeling nauseous and dazed, Partin struggled to find her friends, who eventually accompanied her to the bathroom. Partin recalls vomiting repeatedly and being helped by strangers when she attempted to leave the party. She was later informed by another party attendee that when outside, she fell face first into the snow and was unable to get up. Even when pulled up, Partin was too incapacitated to stay upright on her feet.

121.    The next morning, Partin awoke on top of her dorm bed, shaking violently, with a powerful headache, covered in bruises and caked in dirt, and feeling a distinct physical sensation that something had roughly touched her vagina the night prior.  Partin's clothes and shoes were on, but she was disheveled, her body and face were bruised and covered in dirt, and she had a $150 Uber charge on her phone. The bed beneath her was neatly made, although she was certain that she had left the bed unmade before going to the party. She threw up several times that morning. She felt scared and vulnerable, feeling physical pain and distress after a night that she could not, for the most part, recall.

122.    After an emotional phone call with her mother, Partin called a friend, who accompanied her to the UVM Medical Center's Emergency Room.  Partin explained to the triage nurse that she was sure that Donovan had drugged her at the fraternity party.  She also explained that she believed the drugging was motivated by his intent to commit sexual assault.

123.    The triage nurse recommended she receive IV fluids and be tested for date rape drugs such as Rohypnol.  Rohypnol "can only be detected by a test within less than 24 hours of being administered." The triage nurse also suggested a rape kit was available if there was an instance of sexual assault. The triage nurse asked Partin if she had been raped, to which she

answered she did not know. The friend who accompanied Partin to the hospital told the nurse she did not think Partin was raped.

124.    The triage nurse called Deborah Governale, the on-call Physician Assistant. Governale asked Partin a few dismissive questions, and then refused to order a blood test for the common date rape drug Rohypnol, informing Partin that conducting a positive drug test would be unnecessarily onerous, as it would involve sending a sample out-of-state, and that it "would not change anything."  Governale also did not offer Partin a rape kit, despite Partin's indication that the drugging was motivated by an intent to commit sexual assault, and despite UVM's long history of sexually-motivated drugging incidents and drug-induced sexual assaults.

125.    Governale also suggested that Partin had simply been drinking excessively, even though Partin had not been meaningfully intoxicated before her sudden severe inebriation soon after arriving at the party. She told Partin, and also noted in her discharge papers, that it is "unlikely" Partin was exposed to a substance "because she was holding her drink the whole time."

126.    Governale diagnosed Partin with a "feeling of being drugged," and discharged her without treatment or referral to additional campus services.  At that time, Partin believed that the hospital and UVM were sufficiently linked that a report to one of the UVM hospital's medical staff was equivalent to a report made directly to UVM.  She also believed that Governale was a mandated reporter.

127.    Partin felt deeply distressed, and spent several days unable to get out of bed, unable to sleep unless the lights were on. Seeking help, Partin approached UVM's student therapy office ("CAPS"), but there were no open appointments. She tried going to the same day, walk-in appointments, but after being turned away five times because they were closed that day, she stopped trying. Even over a year later following her gap year, when Partin did finally get access to

gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

- 28 -

a therapist through CAPS, CAPS repeatedly cancelled her appointments or required several weeks in between sessions due to understaffing, and Partin struggled to receive the full support she required to process her experiences.

128.   Partin spoke with friends about the evening, even though she found it difficult. Two women had attended the party with her and remained there after she left. They saw Partin change quickly from seemingly sober to violently ill. These women also saw Donovan kiss and grope Partin repeatedly.

129.   Without mental health support from UVM in the months following her assault, Partin developed severe anxiety and depression. When she returned home for the summer, her parents were deeply worried about her. They suggested that she take time off from school and remain home. Partin's mental health continued to decline, and she fell into a serious depression that left her bedridden.

130.   Partin also developed anxious compulsions, such as checking if all the doors in her house were locked multiple times before going to sleep, sleeping with her lights on, and experiencing panic attacks when watching movie or TV scenes depicting sexual content. She eventually developed trichotillomania, a disorder that involves hair pulling, and agoraphobia, a panic disorder where the victim is terrified of places and situations where they might be entrapped. Partin also struggled to form and hold on to relationships, engage in sexual contact, or even lie down in positions where she felt vulnerable, such as on her back. At the end of that summer of 2019, Partin conceded that her deteriorating mental health did not allow her to return to UVM, and took both the Fall 2019 and Spring 2020 terms off.

131.   On July 27, 2020, Partin attempted suicide. After a severe panic attack, during which she was unable to speak or breathe steadily, sobbing profusely, and feeling severe mental

gravel &
   shea    · · ·· · ···
· · · ···· ·· ··· ····· ·····
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

- 29 -

and physical distress, Partin had decided she never wanted to experience such a debilitating attack again, and overdosed on her prescribed tranquilizer pills.

132.    Fortunately, Partin did not experience any lasting physical impact from her attempt, but it only served to compound her trauma after the frightening and vulnerable situation she had been put in at UVM.

133.    During Partin's time off, she began working with off-campus therapists, footing the expensive co-pay bill herself because she saw no other choice. She was diagnosed with Post Traumatic Stress Disorder.

134.    Partin struggled not only with her mental health after the drugging, but all forms of physical and emotional intimacy, struggling both to date men, and also to be in their physical presence, even platonically. Since the night of her attack, Partin has regularly replayed the events of the evening, trying to retrieve some of the missing pieces, until her mind goes numb, in an effort to locate the source of her bodily trauma.

135.    After extensive discussion with another therapist, almost three years later in Spring 2022, Partin discovered, to her horror, the memory she had been repressing. She began to recall a silhouette of a man leaning against her bed, and a weight pressed on her body when she was too incapacitated to register what was happening. She began to piece together why she had woken up with such severe distress, why she had felt that morning that she had been violated, and that like something had been inserted into her vagina the night prior, and why she had felt consistently unable to feel safe engaging in sexual intimacy ever since. She realized that in addition to being drugged and assaulted that night by Donovan, she had also been raped in her campus dorm. To this date, Partin cannot confirm the identity of her rapist.

### iii.   The Title IX Office Fails to Act

136.   UVM's SHM Policy promises, among other things, to: "commit to conducting an inquiry into what occurred, and taking steps to provide appropriate remedies and support, as appropriate" in response to incidents of "Sexual Harassment and Sexual Misconduct." Off-campus events are included in certain instances, for example when the off-campus conduct threatens the safety of a UVM community member, or creates a hostile environment on campus. When sexual harassment/misconduct incidents are disclosed to a "Responsible Employee," AAEO is supposed to "provide [individuals who have experienced sexual harassment and misconduct] written information about UVM's complaint and resolution processes"; "conduct a thorough, prompt and impartial investigation" into any reports made to AAEO or investigations initiated by UVM; and "offer reasonable and appropriate measures to protect" students who allege "Sexual Harassment and Sexual Misconduct" and "facilitate [their] continued access to University . . . educational programs and activities," "regardless of whether [they] pursue[] a complaint, investigation or resolution" under the SHM policy.

137.   Under UVM's SHM Policy, the definition of "Sexual Harassment and Sexual Misconduct" includes, without limitation: "Gender-Based Stalking," defined as "engaging in a course of conduct directed at a specific person based on their gender, sexual orientation, gender identity, and/or gender expression that would cause a reasonable person to (1) fear for their safety or the safety of others; or (2) suffer substantial emotional distress"; and "Sexual Exploitation," including "[c]ausing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give consent to sexual activity."

138.   As described above, the drugging continued to haunt Partin through her year away from UVM.  With time, Partin decided she wanted redress for her mistreatment by UVM Hospital.

gravel &
shea

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

139.   On January 13, 2020, Partin emailed Dean Russell.  Because Dean Russell had previously assisted her with the stalking incident, Partin naively believed that he would help her seek justice and accountability within UVM.

140.   In her email, Partin told Dean Russell that she had experienced a "series of traumatic events" that resulted in her "taking this whole year off of school because of intense emotional anguish." She related that she had been drugged at a party, "completely blacked out," "could barely stand up or walk" and that she had no memories of the rest of the evening, until she woke up, "confused and scared," the next morning. She also told Dean Russell that the UVM emergency department staff had refused to test her for anything, and had offered her neither drug testing, nor a rape kit.

141.   Partin's email put a mandatory reporter at UVM on notice that she had been drugged, which under UVM's SHM Policy constitutes sexual exploitation, and indicated that she had possibly been raped as well.

142.   Dean Russell unhelpfully told Partin that, since the hospital was a separate entity from the university, there was nothing UVM could do to help.  By doing so, Dean Russell misinformed Partin as to her options to further report the incident, accommodations she was entitled to under Title IX, and further investigatory actions that could be taken by UVM.  Dean Russell also failed to inquire further into whether Partin had been sexually assaulted, although her email (and common sense) suggested that this was likely.

143.   Dean Russell did tell Partin, however, that he was a mandatory reporter and would pass the incident on to the Title IX Office.  He also told her that she could expect to be contacted by the Title IX Office within the week.  Finally, on January 16, 2020, Dean Russell sent Partin a link for a UVM Medical Center complaint form and told her that she could submit a complaint

gravel &
    shea
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 32 -

about Governale online and "see how" the Patient and Family Advocacy Office at UVM Medical Center could "be of assistance."

144.    Partin submitted the complaint form to UVM Hospital, prompting Kelly Holland, the Manager of Patient and Family Experience at the UVM Medical Center, to contact her. Partin and Holland spoke by phone. Once again, Holland suggested that a positive drug test would not have "changed" anything. She told Partin that Governale occasionally needed reminders to "be more compassionate."

145.    Neither AAEO nor UVM's Title IX staff contacted Partin in 2020. Sexual harassment and misconduct complaints made to "Responsible Employees," such as Dean Russell, should trigger a response from AAEO including "written information about the University's complaint and resolution processes," and an "invit[ation] to make a report." No such options were offered to Partin. Partin would later learn that the Title IX Office became aware of her assault in January 2020, but took no action.

146.    Although putting Rohypnol in a drink is not only a violation of UVM's policies, but also a state crime, neither UVM police nor Burlington police were called to take a report.

147.    The lack of knowledgeable staff and the failure of the Title IX Office to contact Partin substantially impaired her education experience, physical and mental health and well-being.

148.    Partin returned to UVM for her sophomore year in Fall 2020. Soon after her return, she learned that one of her roommates had been drugged by the same AEPi member that had drugged Partin. This realization triggered immense anxiety and prompted Partin to seek emergency support from CAPS. It was only after she explained the extent of her distress, anxiety, and suicidal ideation that CAPS finally offered her access to therapy. Indeed, CAPS acknowledged that Partin's need was so great that she could bypass the usual limit of six CAPS sessions per

gravel &
shea
a professional corporation
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 33 -

student. It was only through conversations with her CAPS-appointed therapist, albeit on an inconsistent and frequently disrupted basis, that Partin could finally begin to process the assault and come face to face with what had happened.

### iv.   UVM Students, Including Partin, Share Their Stories

149.   On April 26, 2021, a UVM student named Athena Hendrick shared their "story of sexual assault and UVM's consequent mishandling of her report to her Instagram."

150.   Hendrick turned to social media after reaching a point of utter exhaustion with UVM's Title IX Office.   Hendrick reported that, on February 1, 2020, a UVM student named Austin Weiland ("Weiland") had raped them.  On February 12, 2020, Hendrick reported the assault to their RA, who is a mandatory reporter, but the RA did not connect them with Title IX.  Over the next few weeks, desperately seeking guidance and support, Hendrick contacted the Women's Center, Student Legal Services, and the UVM Police.  Finally, in early March, Hendrick received an email from a Title IX representative stating that a meeting would be scheduled after the upcoming spring break.

151.   According to Hendrick's social media post, UVM's Title IX Office began an investigation on April 16, 2020, but, even though Weiland originally "admit[ted] to lack of consent" in his first statement, UVM closed the investigation in August 2020 due to a "lack of evidence."  UVM granted Hendrick a No Contact order, which Weiland broke on April 24, 2021 by walking up to Hendrick and trying to engage them in conversation when they were walking their dog on campus.  When Hendrick reported the violation to the Title IX Office, staff told Hendrick that they would call Weiland in case he had "forgotten" about the order, and then put the onus on Hendrick to call the police, file an incident report, "or never walk without a friend."  On information and belief, no further action was taken to discipline Weiland for the violation.

Weiland remained a student at UVM until he transferred voluntarily to Northern Michigan University in Fall 2021.

152. Hendrick's story infuriated UVM's student body, and "a staggering number of other survivors at UVM and other Burlington colleges [came] forward" with their own stories of rape and assault. Students formed an anonymous Instagram account, @ShareYourStoryUVM, that allowed assault survivors at UVM to post their narratives publicly.

153. On April 29, 2021, Partin shared the full story of her assault on her personal Instagram account. In her post, Partin described how she woke up "uncontrollably shaking" the morning after her assault, with "dirt smeared on [her] face" and "random bruises on [her] body." Partin then provided a timeline of events, from Governale's refusal to perform a "drug test or rape kit," to AAEO's failure to reach out to her following her report.

154. Only then, over a year after Partin had first emailed Dean Russell about her assault, did Moran, UVM's Title IX Intake & Outreach Coordinator, finally contact her and offer to meet with her. The offer came in the form of a boilerplate email, completely devoid of any personalization, listing AAEO's resources and support options on April 29, 2021.

155. On May 7, 2021, Partin responded saying she would like to have a call over Teams. Partin spoke with Moran on May 11, 2021.

156. By this time, protests were galvanizing UVM's campus, with multiple survivors setting out stories about the Title IX Office's incompetence. Although Partin agreed to meet with Moran, she no longer had any faith in UVM's ability to protect her and elected not to pursue an investigation.

157. On their call, which Partin recorded from her parents' home in Virginia, Moran admitted that she had received the report about Partin's assault from Dean Russell in January 2020.

gravel &
shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 35 -

Moran claimed to have mistakenly believed that Partin only wanted to know how to file a complaint against a doctor at UVM Medical Center. She asserted that she had spoken with Dean Russell about Partin's options, but admitted that "in retrospect [she] should have" reached out to Partin in 2020.

158.    Moran's year-late explanation was little consolation to Partin. UVM's failure to engage with her request for help to Dean Russell, and its inefficient and understaffed CAPS program, meant that Partin spent her leave of absence struggling to process her trauma with little professional help.

159.    Partin's assault, and UVM's failure to provide timely supports or reporting options, caused Partin to withdraw from UVM for a full academic year. Although she is now back in school finishing her degree, Partin's academic performance has continued to be hurt by her anxiety, depression, and PTSD.

160.    Since returning to UVM as a full-time student, Partin has struggled to maintain grades at the level required of her scholarship due to her heavy anxiety and depression. Partin, whose grade average was over 3.7 in the semester prior to her assault, dropped to a 3.3, and she was forced to drop several classes she was passionate about because her trauma rendered her incapable of handling a regular course load. Partin also received a D in a Global History class and had to sacrifice her minor in Gender, Sexuality and Women's Studies as a result.

161.    Although she performed as a bright, capable and highly intelligent student when she began at UVM, Partin has become unable to finish a semester without withdrawals or "incomplete" grades due to the mental and physical health issues that arise from her PTSD. UVM has never offered her meaningful additional accommodations or support.

162.    Partin's PTSD, which will require medication for the rest of her life, has caused several mental and physical health problems. She now suffers from agoraphobia, obsessive compulsive tendencies, panic attacks, sexual dysfunction, anxiety, depression, night terrors, sleep paralysis, insomnia, intense travel anxiety, and anger issues, all of which are linked directly to her traumatic assault. Partin has also suffered from suicidal ideation and the desire to self-harm. Partin's drugging has also triggered in her a deep-seated fear of medication, which has caused her to skip critical doses of prescribed drugs, and experience violent withdrawal symptoms as a result.

163.    Partin also suffers from acute physical conditions triggered by her post-traumatic stress, including dermatillomania, a compulsive skin picking disorder, and trichotillomania, a compulsive hair pulling disorder, both of which are commonly linked to trauma. In June 2022, Partin was also diagnosed with vaginismus, a condition associated with fear of, and physical pain during, vaginal penetration and also linked to unpleasant or non-consensual sexual experiences. Several recommended treatments for Partin's medical conditions, including pelvic floor therapy and dermatological treatment, are not covered by her insurance, or require expensive co-pays to cover the cost of treatment.

164.    Partin's year-long leave of absence also delayed her graduation, causing her lost earning potential for the year when she should have graduated, and reduced lifetime earning potential due to the gap year on her resume.

165.    Partin has also suffered anxiety related to the media controversy about UVM's rampant policy of ignoring sexual violence. Although she has taken part in public protests, she suffers depression and anxiety over UVM's failure to take effective action.

### C. Haley Sommer

#### i.  Weiland Rapes Sommer

166.    Haley Sommer enrolled in the Rubenstein School of Environment and Natural Resources ("Rubenstein") at UVM in Fall 2017. Although Sommer grew up abroad, moving from Beijing, China to attend high school in South Africa, Sommer held a deep affection for the school since childhood because both her parents and sister are UVM alumni.

167.    In Fall 2020, Sommer began an accelerated master's program in Natural Resources, which required her to remain at UVM for an additional year after finishing her undergraduate coursework. She was excited to begin the program, as she loved UVM and was not yet ready to leave Burlington.

168.    In November 2020, the day before Thanksgiving break, Sommer attended a small party in her neighbor's apartment. Weiland, the same student who had assaulted Hendrick, also attended the party. Sommer had seen Weiland before in her neighbor's apartment, but they had never engaged in one-on-one conversation. All she knew about him was that he was a club tennis member at UVM.

169.    There was drinking at the party, but Sommer did not regularly drink to excess. Weiland quickly took an interest in Sommer, encouraging her to play beer pong with him and pressuring her to drink large amounts. By the end of the night, Sommer was incapacitated and her memories began to blur.

170.    Sommer remembers that it had gotten to be quite late, and there were only four people left in her neighbor's apartment: their host, one other woman, Weiland, and Sommer. At some point after midnight, Sommer remembers that Weiland seemed to be annoying their host.

gravel &
  shea

°6 St Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 38 -

Sommer suggested that maybe their host wanted to be alone with the woman, and stepped out of her neighbor's apartment. This is one of her last memories of the night.

171.    Though Sommer does not remember how, Weiland ended up in her apartment. Sommer made them both drinks, but Weiland did not drink his. At this point, Sommer's memories go largely blank.

172.    Sommer remembers regaining consciousness while Weiland was having penetrative sex with her. Distressed, Sommer remembers that she struggled to stand and made her way to the bathroom. When she returned from the bathroom, Weiland had disappeared.

173.    The next morning, Sommer was distraught and uncomfortable, but, due to the amount of alcohol Weiland had encouraged her to drink at the party, did not immediately classify the incident as an assault. She knew that something about the sexual encounter had been wrong, but did not yet know how to name it.

174.    Soon, Sommer developed an intense and sudden fear of walking alone at night. She had never been afraid of walking alone before, and the phobia seemed to her like it came out of nowhere. She also entered a deep depressive state, unhappy and unsure why. Months later, she would connect these subconscious physical reactions to her assault.

175.    In April 2021, Sommer ran into Weiland at a beach on Lake Champlain with another male club tennis team member. Weiland and Sommer said hello to each other and then continued on the beach. Sommer felt uncomfortable about the interaction. One month later, a crowd-sourced list of UVM students who had been accused of sexual assault surfaced online. The male club tennis player who accompanied Weiland at the beach was on the list. So was Weiland.

176.    On April 26, 2021, Hendrick publicly shared that Weiland had raped them.  When Sommer read about Hendrick's experience, she felt physically ill.  Sommer had a horrifying realization: he had raped her too.

177.    In the days following Hendrick's post, Sommer would learn that Weiland had a history of predatory behavior even before he raped Hendrick. After the furor following Henrick's public revelation, the Student Government Association held a meeting condemning Weiland's behavior. Multiple students, including Sommer, submitted experiences of abuse at the hands of Weiland. Hendrick read each of these experiences out loud at the meeting.

178.    Sommer began to come to terms with the true nature of the rape, and, a few days later, she decided to post her own story.  In her April 29, 2021 post, Sommer recounted how, after Weiland assaulted her, she had initially blamed herself, but through the publication of numerous stories that resembled hers, came to realize that Weiland's behavior was a pattern.

179.    A few weeks remained in the semester.  Sommer was furious at UVM.  Weiland's pattern of assault with other victims was so similar to her own, yet UVM had ignored it.  She also worried that her classmates viewed her differently because she had shared her story.  Sometimes she felt so overwhelmed that she had to walk out of class early.

180.    Like Partin, Sommer received a message from Moran after publishing her Instagram post. Moran emailed Sommer on April 29, 2021, the same date she had contacted Partin, with near identical boilerplate text regarding AAEO's reporting options and policies.  The email did not acknowledge the fact that UVM had received a prior complaint about Sommer's rapist. Nor was the email personalized in any manner for Sommer.

181.    As a student who had grown up abroad, Sommer knew nothing about Title IX, AAEO's role on campus, or UVM's sexual assault policies and procedures.  All she knew was that

this was the same organization that had dismissed Hendrick's rape report and allowed Weiland to return to campus and rape her. Unsurprisingly, Sommer did not trust Moran or the Title IX Office.

182.    Like Partin, Sommer had read many stories about UVM's incompetent Title IX Office. She also knew that it had found Weiland not responsible for Hendrick's rape. In her response to Moran, Sommer noted that her "assailant, Austin Weiland, assaulted [her] after already having gone through the Title IX process and being found not responsible....I'm sure you can understand my frustration over knowing that this could have been prevented if he had been found responsible and expelled the first time around."   She continued, "[a]ll of the women who have shared their stories of sexual assault on campus have shared negative experiences about the Title IX process."   She said she had concluded that going through a Title IX process in light of all this would "further her trauma."   She also noted to Moran that she would be at UVM "for another year" to complete her Master's Program.

183.    Moran responded by expressing her regret that Sommer did not "feel comfortable working with [her] or the Office of Affirmative Action and Equal Opportunity," and assuring her that she "take[s] [her] work very seriously."   She did not directly acknowledge or address any of Sommer's substantive criticisms.

184.    On information and belief, Defendants UVM and Moran never conducted an investigation into Sommer's rape, and Weiland could have returned to campus in Fall 2021 had he not chosen to transfer of his own accord out of state.

185.    Due to these revelations about Weiland and UVM, Sommer struggled to focus on her year-end assignments, many of which were due in the next few weeks. She felt constantly nauseous and anxious. For weeks, she could barely bring herself to eat. Sommer contacted Anna Smiles-Becker, the Director of Student Success and Experiential Learning.   Smiles-Becker

contacted some of Sommer's professors for her, but overall, Sommer felt unsupported, alone, and betrayed by a community and school for which, as a legacy student, she had previously held deep respect.

186.    Sommer wrote her end of year reflection for one of her classes about her assault and her desire to hold UVM accountable for its Title IX failures.   On information and belief, although the professor who read this essay would have been a mandatory reporter, it does not seem that the essay was passed on to Title IX, because Moran never reached out again.

### ii.    Sommer Learns the Depths of Title IX's Incompetence

187.    Through the @ShareYourStoryUVM account, Sommer learned that Weiland had exhibited worrisome, predatory behavior even before he raped Hendrick.

188.    In addition to Sommer and Hendrick's accounts, several other students have since spoken out about assaults by Weiland.   Three separate posts on the @ShareYourStoryUVM page, for example, reported sexual assaults by Weiland.

189.    In Fall 2018, according to a @ShareYourStoryUVM post, a female UVM student attended a party with Weiland.   Weiland "had a backpack full of beer" and was "constantly offering it" to the student.   Although the student does "not remember the events" that led to the incident, she left the party upset after Weiland slapped her "in the face."

190.    In Spring 2019, according to a @ShareYourStoryUVM post, Weiland met a female UVM student at a party.   He offered her a drink, but she politely declined because she did not know him.   The student ended up drinking more at the party, becoming intoxicated, and going back to Weiland's apartment.   In retrospect, she believes that she was "in a much deeper" state of intoxication than Weiland was in.   The two began having consensual sex, at which point Weiland asked if he could engage in anal sex.   The student said no.   Weiland persisted.   The student said

gravel &
shea
.................................
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369                   - 42 -

she was not comfortable with anal sex. Weiland did not take no for an answer. He "'accidentally slipped' in there and he continue despite [the student] telling him to stop." When Weiland refused to respond to her verbal instructions, the student "dissociated" and lay there, in "shock of what was happening." When "he finished," she got up and left, returning to her dorm room where she "cried in the shower with blood covering [her] lower half." The student "never reported" the rape because she "couldn't believe it actually happened," and tried to "pretend it hadn't."

191.    Also in 2019, according to another social media post, a UVM student attended her "first college party" at UVM's "tennis club." Somehow the student ended up "in the tennis club shower" with Weiland. The student was intoxicated and "audibly said no" as Weiland "crossed multiple physical boundaries." The student remembers that Weiland "didn't care" about her objections and "brushed [them] off." She can still "easily recall how it felt to have his hands roam [her] body without [her] consent." Luckily, the student's "friend found [them]," "shut the situation down," and took her home. Weiland responded by harassing the student on Snapchat about how she was "rude" and a "tease," until she blocked him.

192.    On May 5, 2021, Sommer sent an email about her sexual assault to, among others, Defendants Stanton and Moran, detailing her anger and disappointment with UVM for failing to protect her, and explaining the trauma that it had inflicted on her to learn that her "assailant ha[d] assaulted at least three students within the Rubenstein school." Sommer explained that as a result, she was "increasingly frustrated over [her] decision to extend [her] education" at UVM.

193.    Sommer hoped that the email would spur a longer dialogue with UVM about how the Title IX and AAEO offices could better address gender-based violence, harassment, and sex discrimination on campus. Instead, Sommer received only a perfunctory response thanking her for "having the courage to share [her] story," and again reminding her that she could reach out

gravel &
shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 43 -

should she require access to the very resources that her email had cogently explained were failing students.

194.     That summer, Sommer worried that she would see Weiland around campus again in the fall.  She had multiple nightmares about running into him on campus.

195.     Sommer decided to leave her master's program in August 2021.  UVM's failure to prioritize her safety, and the administration's tone-deaf responses to her pleas for help, created a hostile environment that Sommer could no longer endure.

196.     On October 29, 2021, Sommer and Partin spoke at a UVM Board of Trustees meeting about their rape experiences.  Both Partin and Sommer found the Board of Trustees apathetic and the presentation incredibly traumatic.

197.     Once she withdrew from UVM, Sommer began to search for a job.  She contacted Smiles-Becker and another UVM Professor, Amy Seidl, to see if they would help her with her job search or serve as references.  Neither professor replied.  Both knew that Sommer had spoken out publicly about how the school handled sexual assault cases, and Smiles-Becker had been copied on the Sommer's May 5 email detailing UVM's failures to Stanton and Moran.

198.     Prior to Sommer's public statements regarding UVM's failures and subsequent withdrawal from the school, Sommer held deep admiration for Smiles-Becker and Seidl, and considered them professional and personal mentors. She was in frequent contact with them for academic and professional advice.  Smiles-Becker and Seidl usually replied promptly to Sommer's emails, but pointedly ignored her once she had spoken up and dropped out of the program.

199.     As a result of UVM's actions, Sommer was unable to use any references from UVM in her job search after withdrawing from her graduate program.  This greatly impacted Sommer's ability to find and retain suitable employment.

200. On information and belief, UVM retaliated against Sommer by failing to provide her job-seeking support because of her decision to be vocal about her experiences with the Title IX Office and because of her status as a sexual assault survivor.

201. Sommer struggles with anxiety and depression due to the memory of her assault, as well as the knowledge that UVM neglected their responsibility in controlling and sanctioning her rapist.

202. Sommer has also suffered from suicidal ideation.

203. As a direct and proximate result of the educational environment created by Defendants' deliberately indifferent response to Hendrick's Title IX report, Sommer was raped and suffered substantial psychological damage, emotional distress, damage to her reputation, and loss of self-confidence. Sommer was deprived of a normal graduate school experience and was damaged by missed educational opportunities, due to Defendants' conduct and the resulting hostile educational environment they caused.

204. Sommer has also suffered financially as a result of her rape. After dropping out of the UVM master's program, Sommer briefly worked in a restaurant in Burlington. She could not secure full-time employment. She moved back home with her parents and spent six months applying to jobs. Without a master's degree, she could not compete for the jobs she had hoped and had to settle for lower-paying generalist roles. Having to drop out of her master's program also denied her access to alumni networks, relationships with professors, and job opportunities to which she would otherwise have had access as a UVM graduate student.

205. Defendants knew why Sommer felt forced to withdraw from her graduate program, but failed to offer her any meaningful medical or psychological support.

## II.    UVM Ignores Known and Obvious Risks To Female Students

### A.  Federal and State Investigations

206.    UVM has been the subject of multiple Department of Education ("DOE") and Office of Civil Rights ("OCR") investigations for failing to follow Title IX policies and for violating the reporting requirements established by the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act").

### i.    Federal Investigations

207.    In 2009, the DOE began a compliance audit of UVM's Clery Act reporting data dating back to 2007.

208.    In 2012, the DOE fined UVM $65,000 for Clery Act violations including a failure to include 20 sex offenses in its publicly reported sexual assault statistics. UVM had misclassified these sexual offenses as having been reported to professional counsellors, which do not have to be publicly disclosed. In reality, these assaults had been reported to staff at the Women's Center who were not licensed counsellors and UVM should have publicly reported them.

209.    In 2013, a UVM student filed a complaint with the DOE alleging "that one of her male professors had sexually harassed her during a conference they attended the previous year." At the time of the conference, the professor was already under investigation because of another student's claim of sexual harassment. The OCR investigated and, in June 2013, UVM and the complaining student "signed a voluntary resolution agreement" ("VRA"), under which UVM was able to avoid further Title IX scrutiny by agreeing to "review its processes for investigating complaints of sexual harassment brought forward by students." On information and belief, UVM has never publicly elaborated on exactly what types of changes it implemented.

gravel &
shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 46 -

210.    In the years directly following the 2009 Clery Act audit and 2012 DOE fine, UVM reported a notably higher number of forcible sexual offenses than in previous years.  In 2014, UVM reported 27 rapes on campus that year, compared with only 15 in 2013.  This put UVM in the top ten schools in the United States for the number of rapes reported on main campuses for 2014 and generated significant negative press.

211.    In 2015, the American Psychological Association published an article—relying in part on data from UVM—concluding that campus sexual assault reports increase by approximately 44% when schools are under investigation or audit for Clery Act violations ("2015 Study").  The 2015 Study concluded that its results were "consistent with the hypothesis that the ordinary practice of universities is to undercount incidents of sexual assault."

212.    During its investigation for Clery Act violations, UVM exhibited a large increase in reported sexual assaults—from 99.9% of the national average to 305.9% of the national average—corroborating the author's view that higher educational institutions were systemically underreporting (and only properly reporting once forced by auditing scrutiny).

213.    The 2015 Study also found that after audits are completed, the number of sexual assaults universities report tends to decrease "to levels statistically indistinguishable from the preaudit time frame," and that there was "no long-term effect on the reported levels of sexual assault."  Consistent with this, UVM did not sustain its audit-era spike in reported rapes, which fell sharply in its post-audit years: 19 in 2015; 19 in 2016; 13 in 2017; 22 in 2018; 16 in 2019; and 9 in 2020 (likely due to the pandemic).

214.    UVM publicly attributed the 2014 spike in rape numbers to improved reporting practices, even going so far as to instruct its student tour guides give potential students and their parents this explanation.  This damage-control message—that the high reports were "due to an

increase in media coverage on sexual assaults and the quality of support UVM provides to victims"—has been repeated by UVM across various mediums. In reality, as demonstrated by the 2015 Study, it is much more likely that UVM had systematically underreported sexual assaults before the audit caught them red-handed.

215.    Despite attributing the spike in rape reports to substantive changes in its own policies, on information and belief, UVM has provided little public information on what these policy changes were or how they were implemented. The Burlington Free Press noted in 2016 that, three years after the VRA, UVM officials had declined to confirm that any policy changes had been implemented after the 2013 investigation. As late as 2019—five years after UVM's alleged policy improvements—UVM still exhibited a "severe lack of resources for survivors of sexual assault and harassment," falling well below comparator institutions. Indeed, as late as 2021, UVM told students campaigning for sexual harm reduction policy improvements that it was "just too expensive" to improve UVM's sexual assault policies, and directed them to off-campus resources.

216.    UVM has since been subject to a further Title IX sex discrimination charge. In August 2017, the OCR opened an investigation "when an individual filed a complaint" stating "that UVM failed to respond promptly and equitably" to an allegation of sexual violence by a UVM student.

### ii.    State Legislative Action

217.    In April 2019, advocacy groups such as the Vermont Network Against Domestic and Sexual Violence urged the Vermont legislature to insist upon greater accountability from state higher education institutions about campus sexual violence.

218.    In May 2019, the Vermont legislature responded by creating the Campus Sexual Harm Task Force ("Task Force"). The legislature charged the Task Force with tackling known issues at state universities related to "transparency, safety, affordability, accountability of outcomes, and due process in campus conduct adjudication processes for sexual harm." Stanton participated in the Task Force as UVM's representative.

219.    At an early meeting, the Task Force said it would focus on Vermont higher education's "institutional responses" to sexual assault and "current practices for preventing and responding to sexual harm."

220.    During the time that Stanton and the Task Force were discussing the widely known deficiencies in Vermont's higher education campus sexual harm policies, Ware and Partin sought support from UVM after their assaults, and Sommer was raped by an assailant known to UVM. To Plaintiffs, the deficiencies that spurred the Vermont legislature to create the Task Force were all too clear.

221.    In October 2019, Stanton summarized UVM's Title IX reporting processes for the Task Force in the Stanton Memo. The Stanton Memo noted several stated policy imperatives of the Title IX Office from which Plaintiffs did not benefit in practice: formal investigations into sufficiently serious allegations of sexual misconduct; mandatory reporting responsibilities; and necessary procedural requirements to be followed when sexual misconduct is alleged. The Stanton Memo also listed the Dean of Student's Office as one of UVM's official resources for students, and included a broad list of employees who were "mandated to report incidents of sexual harassment and misconduct," including directors, deans, and employees with "oversight" responsibilities.

gravel &
shea

ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 49 -

222.   The Task Force released a final report in May 2020 that pointed to several problems with the way Vermont colleges and universities handled campus sexual assault, including lack of transparency in investigations, poor preventative measures, and inadequate training for staff to "effectively implement violence prevention programming and initiatives to impact students." It also noted that Vermont lacked "any publicly available data on higher education campus sexual harm, either by institution or statewide."

## B. Sexual Assault Within UVM Student Activities

223.   UVM sponsors at least 18 official sports, all of which compete at the NCAA Division I level, as well as around 60 club sports and roughly 15 affiliated fraternities and sororities. UVM's Department of Student Life, which oversees Club Sports and Greek Life, notes that Greek Life enhances the "UVM experience by contributing to students' development of . . . life-long friendships." Similarly, some UVM club sports "host events and travel to competitions on weekends," which helps student to "establish a great social network with other students." Unsurprisingly to anyone familiar with college "social networks," UVM's club sports and fraternities regularly host parties for participants.

### i.   Fraternities

224.   It is well known among UVM students that the school's fraternity culture is unsafe for women. Rather than attack this problem at the root, UVM engages in a dangerous game of suspending particularly troublesome fraternities from campus, only to allow them to continue to operate elsewhere in an "unrecognized" capacity.

225.   Students report that UVM's Sigma Phi fraternity members are widely known to drug female students at their parties. On information and belief, Sigma Phi even refers to their

fraternity house's attic space as "the chicken coop"—a place where fraternity brothers take "chicks" attending their parties for sex – with or without their consent.

226.     UVM knows about the dangers fraternities present in terms of drinking, drugs and sexual assault, but chooses to ignore it.   Students complain that UVM's monitoring lacks "transparency and clarity."   For example, in 2021 the Fraternity and Sorority Life Chapter Misconduct webpage was "outdated" and mistakenly listed some fraternities as not in good standing and another as unrecognized.  Even this official university site could not be relied upon by students to tell them what fraternities were officially sanctioned by UVM.   Given that fraternities that are "on probation" or unaffiliated with the university may continue to conduct their events off-campus, this causes significant "confusion" for students.

227.     Dean of Students David Nestor acknowledged these reporting errors, explaining that the "system in place to address fraternity misconduct is still fairly new and remains a work in progress."

228.     Students also claim that UVM uses "vague language" with respect to fraternity sanctioning and was not transparent with the student body or the sanctioned fraternities about the details of alleged infractions.  As a result, it is challenging for even well-intentioned fraternities to take meaningful action to prevent further violations, and students are left largely unable to avoid dangerous fraternity events.

229.     On information and belief, off-campus activities, including those of suspended fraternities, are not monitored or regulated by UVM.   There is also no formal process in place to deter students from attending such events.   For example, AEPi, which has been suspended since 2014 for alcohol and drug infractions, throws parties and recruitment events each year.

230.    UVM has been on long-standing notice of the obvious risk of alcohol abuse, drugging, and sexual assault at these parties. As early as 2002, the "use of date rape drugs" was "steadily on the rise throughout Vermont." The UVM student newspaper acknowledged that the "targets of these debilitating drugs are, generally, young women of college age or in their early 20s."

231.    In 2004, a UVM campus advice column, "Tuesdays with Martha," advised students who believed they may have been drugged with Rohypnol to "get medical attention immediately" and to make "sure that your urine is tested for the presence" of drugs. In 2004, Seven Days Vermont reported on a UVM student who had likely been drugged, but could not secure the appropriate date-rape-drug testing to prove it.

232.    In 2008, fraternity Lambda Iota was alleged to have been "distributing date rape drugs at parties" as far back as 2003. In 2006, in likely connection with the same fraternity, "Burlington and UVM Police reported on 'several incidents' where females drank only a small amount of alcohol and became unconscious shortly after," which was suggestive of Rohypnol drugging.

233.    In 2013, UVM's Collegiate Recovery Community Director, Amy Boyd Austin, noted that female students often binge drank before going out to ensure that the "alcohol they're drinking hasn't been doped with a 'rape drug' such as Rohypnol."

234.    On information and belief, in 2019, UVM's administration admitted that UVM was "well aware" of the existence of the "chicken coop" and the drugs in the jungle juice at certain fraternities.

235.    In December 2019, according to a @ShareYourStoryUVM post, UVM's Fraternity and Sorority Life Coordinator encouraged a student to come to his apartment, where he "ejaculate[ed] in [the student's] mouth," when the student was too intoxicated to consent.

236.    In 2021, a Pi Kappa Phi member reported that his fraternity had circulated a "survey about brotherhood" to test the members' loyalty, with an "entire section of ... questions centered around sexual assault." The survey included questions like the following, with a five-point scale for responses: "If a member of a sorority accused one of my fraternity brothers of raping her, and he promised she was lying, I would believe him and support him." A public Instagram post on @ShareYourStoryUVM stated that this survey was brought to the attention of UVM, but the University took no action in response.

237.    In 2022, the UVM Police received an anonymous report of multiple Rohypnol druggings by an unknown perpetrator at an off-campus, "unrecognized" fraternity party.   In response, UVM Police Chief Tim Bilodeau acknowledged that "A party where there's a drug dropped into a drink impacts, historically, young women." He also stated that he didn't "think [he had] seen" something like "this for a couple of years." As described in above in Section I(B), Partin was drugged at an off-campus party in March 2019, but UVM, Russell, and Moran never reported the incident to UVM Police.

### ii.    Club Sports

238.    UVM club sports operate much like fraternities, throwing ticketed parties in designated "sports houses" and serving "jungle juice" that is known to be dangerous to drink.  On popular online forums like Reddit, students warn incoming freshmen that "[s]ome sports/frat houses are known to sometimes be a little weird...(ie: guys are being really creepy)," and before

attending a party at one, the students should "make sure [they] or someone with [them] can get [them] out if the vibe just feels off."

239.    It is common knowledge among students and the administration alike that many students join club sports teams not only for the athletic opportunities, but also to find a social group on campus.  Many students have come to favor the parties hosted at the sports houses, as reflected in their answers to questions posed by incoming freshman about social life at UVM.

240.    As with fraternities, while all the "sports houses" are social hubs, some are known to throw particularly wild parties.

241.    One of these club sports parties, hosted by the Rugby Club, became the center of a lawsuit filed against UVM in 2017, when a male club sports player was found responsible for sexual assault and punished with a one-month suspension.

242.    The Ski and Snowboarding Club is also well-known for a culture of heavy drinking and assault.  In 2018, a freshman was raped by a fellow member of the club ski team following a party.  When the survivor ultimately told the club President about what had happened, she responded that stories of assault could hurt the team's reputation and shouldn't be shared.  She went on to tell the survivor that she may have misremembered the encounter since she had been drinking.  The message was clear that the club prioritized its reputation over her safety.  The survivor concluded she could not share her story without risking her position as a skier and significantly harming her social standing in the club.

243.    As noted above, in Paragraph 191 at least one social media report suggests that Weiland used alcohol-fueled tennis club events to assault women.

244.    Because club sports operate with little adult oversight, their parties and trips breed cultures that encourage sexual assault.  UVM knows this, but the clubs remain largely self-

regulating. Although the Club Sports Coordinator is responsible for "ensur[ing] that clubs operate in a safe manner" and "adhere to the policies of the school," there is no clear system for identifying clubs known for violating codes of conduct akin to the one that exists for fraternities and sororities which, while flawed, does at least implicitly acknowledge the potential dangers of Greek life.

### iii.   Official Athletics

245.   As with most Division 1 NCAA programs, UVM's varsity athletics are a financial focal point for the university, both in terms of the revenue they bring in and the prestige they confer. As a result, some students perceive that star athletes get dispensation from the rules that restrict other students.

246.   UVM's "history of covering up controversies rather than fixing the underlying problems with the [Athletics] department" is commonly known to "[a]nyone who attended UVM and was involved in athletics," and discussed on online forums devoted to the broad topic of college basketball. Athletes on the more well-regarded teams, such as Men's Basketball, are allowed to continue playing and participating in school activities despite multiple widely circulated accounts naming different team members as perpetrators of sexual assault.

247.   The problem goes well beyond basketball and extends throughout the culture of the UVM Athletics Department. Similar to club sports, some of the varsity sports teams have unofficial houses, many of which are known to be dangerous for women. In online blog posts, freshwomen are warned that they should "look out for the hockey parties," where "[u]ndergrad girls are said to make some of their finest mistakes" while "drinking with the team." Other students have warned incoming freshman to "NEVER go to the varsity [lacrosse] house," because they "WILL get roofied."

gravel &
shea
ATTORNEYS AT LAW PROFESSIONAL
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

248.    The @ShareYourStoryUVM Instagram account has received dozens of posts describing assaults committed by varsity athletes.  For example, in November 2021, according to a @ShareYourStoryUVM post, a female student was drugged and raped at a UVM Men's Lacrosse team event.  She later tested positive for gamma hydroxybutyric acid, a common date rape drug.

249.    In many of these posts, students name not only their assailants, but the Athletics staff who consistently sweep allegations under the rug to protect their players' futures over other students' safety.

250.    Many of the posts document assault and coercion from Men's Basketball players. Posts include descriptions and reports of: multiple sober UVM Men's Basketball players coercing "intoxicated" woman into having sex with them; Anthony Lamb being a "serial abuser who was protected by" UVM; a UVM Men's Basketball player pushing a woman's head and shoulders down to his penis; a UVM Men's Basketball player removing a condom mid-sexual intercourse; multiple reports of UVM Men's Basketball players aggressively sexually harassing and attempting to sexually assault women; a potential drugging and assault by a UVM Men's Basketball player; UVM Men's Basketball staff, including former assistant coach Kyle Cieplicki and former head coach John Becker engaging in a "smear campaign" to silence Ware, including telling alumni that Ware "lied and made it up."

251.    On February 18, 2022, UVM posted on its official Instagram account that it "congratulate[d] its men's basketball team on their sixth straight America East Regular Season Title."  In the same post congratulating its male players, UVM wrote that sexual assault "accusations on social media" posts "are not helpful to victims or to anyone impacted by sexual violence." Needless to say, the post outraged UVM survivors and activists, who believe it reflected the UVM Athletics Department's focus on protecting its male players at the expense of victims.

### C. UVM Students Begin to Organize

252.    In 2017, a UVM student was arrested for repeatedly assaulting female students.  In the wake of the arrest, students and survivors spoke out against UVM's systemic failure to provide sexual assault survivors meaningful resources or support.  The students reported that they did not feel that the school "represented" their interests "at all" while they were seeking support.

253.    In 2018, a UVM sophomore named Sydney Ovitt founded an organization to advocate for campus sexual assault policy reform after she was raped and UVM inadequately responded to her Title IX report.  Ovitt's experience bears sharp similarity to those of Plaintiffs. Ovitt was pressured into intoxication, and then forcibly raped by her assailant. When Ovitt reported the rape, in February 2018, to UVM's Title IX office and Defendant Spence, she found that her investigation was not conducted effectively, and the process did not give her vindication or justice.

254.    Despite the flawed investigation, the Title IX Office offered to issue a No Contact and No Trespass order for Ovitt's assailant, as he lived in off-campus housing.  The order was ineffective, as Ovitt regularly saw her assailant on UVM's campus.  Whenever she reported his violations, UVM demanded time-stamped photos or videos before it would take her reports seriously.  Spence also made comments to Ovitt during the investigation that suggested Spence did not find her credible.  Additionally, although her assailant had a lawyer, UVM staff discouraged Ovitt from seeking counsel.  The Title IX Office found Ovitt's assailant not responsible for her rape.

255.    Over the next year, Ovitt's organization became highly visible on campus and pressured the administration to provide additional resources to sexual assault prevention and investigatory processes on campus.

### D. Ongoing UVM Protests

256.    Because UVM has continued to fail to address this rape culture, students took matters into their own hands.

257.    Hendrick's Instagram post in April 2021 galvanized the student body. As of filing, the @ShareYourStoryUVM account has accumulated 515 posts, each detailing an individual student's experience of sexual assault in various contexts, including but not limited to drugging and alcohol fueled sexual abuse, harassment, and rape occurring at UVM fraternity and club sports parties. After the original @ShareYourStoryUVM founders graduated, other students took over leadership roles to continue publishing stories on the Instagram page.

258.    That same month, UVM students began to circulate student demands in response to UVM's "systemic" failure to "support survivors and prioritize the safety of all students."

259.    In 2021, thousands of UVM students "participated in one of the largest protests the institution [had] seen in recent years." The students were protesting the "widely-perceived repeated administrative mishandling of sexual assault cases at UVM."

260.    Students also issued a petition, noting UVM's Title IX Office's repeated failings, including: employing only one Campus Victims advocate for 11,000 undergraduate students, unlike similar institutions, lacking a campus sexual violence response team and a 24/7 hotline for survivors, and inadequate trainings for staff.

261.    After months of sustained student pressure, UVM finally agreed to an independent investigation to "restore the UVM student body's trust" in its Title IX process.

262.    UVM hired Grand River Solutions, a company that advertises itself as committed to lowering the "cost of compliance," to conduct the audit of its Title IX "policies and procedures."

263. While UVM initially agreed to release its independent investigation, it back-pedaled a few months later. The news outraged students. Caroline Shelley, the chair of the Title IX Student Advisory Committee, said, "I think the failure to release this report to the public does beg the question, what is the university hiding?" Shelley continued, "If you have nothing to hide, you should release the report to the public."

264. Although UVM never released a thorough audit, it did bow to the pressure and released a two-and-a-half-page summary of "recommendations." In that document, Grand Rivers Solutions concluded that "[a]lmost all students" that it interviewed "did not fully understand" UVM's Title IX investigation process. Almost "all cases" were delayed "beyond the target timeline of 60 days." Title IX reports were written in a "complicated and legalistic manner," and some of the language in the reports "caused significant confusion."

265. Students continue to express frustration with UVM's broken sexual violence reporting and investigatory processes. In February 2022, hundreds of students gathered on campus to protest UVM's continued reluctance to improve its Title IX procedures, which "yet again show[ed]," in the words of one student, that UVM "only care[s] about protecting rapists and sexual assault perpetrators."

266. UVM played with fire for decades: it underreported sexual assaults, failed to promptly investigate accused assailants, turned a blind eye to organizations that hold dangerous and alcohol and drug fueled events, and engaged in flawed Title IX process that "repeatedly mishandle[d] survivors' cases." This has created a culture on campus where students are left to fend for themselves. Students did not and do not trust the Title IX Office *for good reason*. UVM's deliberate indifference fueled this consequence-free environment, creating the known and obvious conditions that led to Plaintiffs' sexual assaults.

## CLAIMS FOR RELIEF

### COUNT I

### Title IX: Deliberate Indifference to Known and Obvious Risks Of Unlawful Sex Discrimination
### (20 U.S.C. § 1681 *et seq.*)

### (All Plaintiffs Against Defendant UVM)

267.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

268.    Defendant UVM is an educational institution that has, at all times relevant to this Complaint, received federal financial assistance from the United States government.

269.    Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is a critical tool in fighting against campus sexual harms.

270.    Plaintiffs who have experienced sex discrimination have a private right of action against such recipients of federal funds.

271.    Universities that are recipients of federal funds are liable pursuant to Title IX for student-on-student sexual harassment and assault if they maintain policies of deliberate indifference to reports of sexual misconduct, which create a heightened risk that was known or obvious, in a context subject to the school's control, that results in harassment on the basis of sex that is so severe, pervasive, and objectively offensive that it deprives the victims of that harassment or discrimination of access to the educational opportunities or benefits provided by the school.

272.    Plaintiffs experienced harassment because of their sex that was so severe, pervasive, and objectively offensive that it deprived them of access to educational opportunities and benefits provided by Defendant UVM.

gravel &
    shea . . . . ..
. . . . . . . . . . . . .
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369                                                - 60 -

273. Defendant UVM maintained an official policy, custom, and/or practice of deliberate indifference to a known overall risk of sexual misconduct against female undergraduate students. Defendant UVM failed to adequately train its employees to report, investigate, or correct sexual misconduct and its effects; failed to adequately investigate reports of sexual exploitation and assault; failed to adequately respond to known risks of sexual violence on campus; and failed to follow its own Title IX reporting and investigation policies. This has systemically deprived female students of the benefits, privileges, and services available to male students.

274. Plaintiffs' assaults occurred in a context that was subject to Defendant UVM's control, and in which Defendant UVM could have taken remedial action. Defendant UVM had actual knowledge of the university's obvious systematic failures and could have chosen to prevent or respond to instances of sexual assault, sexual violence, sexually motivated drugging, and sexual harassment. Instead, Defendant UVM failed to act, which was clearly unreasonable under these known circumstances.

275. Defendant UVM was on notice that its existing procedures and practices surrounding sexual assault were deficient in holding assailants accountable for their actions and disciplining them appropriately.

276. Relevant actions demonstrating Defendant UVM's official policies of deliberate indifference and notice of the obvious risks that these policies created for Plaintiffs, include, but are not limited to, the following:

- UVM was investigated by the OCR, entered into a VRA, and had to pay a DOE fine for, among other things, underreporting sexual assaults;

- Stanton took part in the Task Force as UVM's representative to discuss higher educational failings and UVM policies in regard to campus sexual harm while at the same time failing to apply those very same policies in practice;

- UVM has failed to proactively and transparently discuss its policy changes in response to investigations and fines;

- UVM, Russell, Spence, and Moran, at minimum, were on actual notice of sexually motivated druggings on campus at club sports and fraternity parties, on information and belief, the "chicken coop," and the risks posed by AEPi and Weiland in particular, but failed to properly regulate, monitor, or increase oversight;

- UVM and Russell, at minimum, were on actual notice of gender-motivated stalking on campus;

- UVM required survivors to carry the onus and responsibility for their own safety, such as when Hendrick and Ovitt's rapists violated No Contact Orders;

- On information and belief, by 2018, UVM and Schulman were on notice of actual risks posed to female students by specific Men's Basketball players;

- As early as 2017, UVM had actual knowledge of vast student discontent and distrust regarding its Title IX Office and policies, indicating that its Title IX reporting, investigation, and redressal processes were not fit for purpose, but unreasonably failed to improve or modify its sexual assault policies and procedures.

277.    As a direct and proximate result of UVM's systematic and deliberately indifferent failures to respond to the known risk of sexual assault and violence on campus, Plaintiffs were sexually assaulted.

278.    UVM has systematically failed to respond to student demands; mitigate known risks for female students of sexual assault and sexually motivated druggings by Weiland (specifically), and fraternity and male athletes (generally); and hold assailants accountable for their actions. UVM's failures to hold assailants accountable were so clearly unreasonable that they amounted to an unofficial policy of deliberate indifference to sexual misconduct on campus that created a heightened risk of sexual assault.

279.    As a direct and proximate result of UVM's deliberate indifference toward these known and obvious heightened risks of sexual misconduct (male athletes, AEPi fraternity members, and Weiland), Ware and Sommer were raped and Partin was drugged in a sexually motivated attack, sexually assaulted, and raped.

280.    As a direct and proximate result of her assault, Ware suffered physical, emotional, educational, and financial damages, including emotional distress, physical injury, loss of fundamental constitutional rights, and loss of earning potential. She suffers from panic attacks, depression, insomnia, isolation, anxiety and suicidal ideation.   Ware sustained injuries and damages, including but not limited to loss of her fundamental constitutional rights, and physical, emotional, educational, and financial harm.  Due to UVM's actions, Ware had to withdraw from classes due to trauma-induced lack of focus and also withdrew for a season from a sport she had been dedicated to for years to in order to look after her mental health.

281.    As a direct and proximate result of UVM's deliberate indifference, Partin suffered physical, emotional, educational, and financial damages, including emotional distress, physical injury, loss of fundamental constitutional rights, and loss of earning potential.  Partin also began to suffer from severe PTSD, and medical conditions such as dermatillomania, trichotillomania and vaginismus.  She has also had to delay graduation for a year because she had to take a leave of

gravel &
 shea

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 63 -

absence after she struggled to complete educational requirements. Partin experienced physical pain and bruising after the assault, developed acute PTSD symptoms, including insomnia, night terrors, agoraphobia, anxiety, depression, and suicidal ideation.

282.    As a direct and proximate result of her assault, Sommer suffered physical, emotional, educational, and financial damages, including emotional distress, physical injury, loss of fundamental constitutional rights, and loss of earning potential. Sommer had to drop out of her accelerated master's program, and suffered physical, emotional, educational, and financial damages, including emotional distress, physical injury, and loss of earning potential. She also developed a severe fear of walking alone at night and suffers from anxiety, depression and has experienced suicidal ideation.

283.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT II

### Title IX: Deliberate Indifference to Unlawful Sex Discrimination and Hostile Educational Environment
### (20 U.S.C. § 1681 *et seq.*)

#### (Plaintiffs Ware and Partin Against Defendant UVM)

284.    Ware and Partin repeat and reallege the foregoing paragraphs as if fully set forth herein.

285.    UVM is an educational institution that, at all relevant times, received federal financial assistance from the United States government.

286.    Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of or be subjected to

gravel &
   shea
. . . . . . . . . . . .
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

discrimination under any education program or activity receiving Federal financial assistance. . ." 20 U.S.C. § 1681(a).

287.    Plaintiffs who have experienced sex discrimination have a private right of action against such recipients of federal funds.

288.    Universities that are recipients of federal funds are liable for student-on-student sexual harassment and assault when they have actual knowledge of sexual harassment and exhibit deliberate indifference to the misconduct by failing to adequately respond or take appropriate action.

289.    Ware and Partin experienced harassment because of their sex that was so severe, pervasive, and objectively offensive that it deprived them of access to educational opportunities and benefits provided by UVM.

290.    UVM created and/or subjected Ware and Partin to a hostile educational environment in violation of Title IX because:

- Ware and Partin were members of a protected class;

- Ware and Partin were subjected to sex discrimination in the form of sexual assault;

- Ware and Partin were subjected to discrimination because of sex; and

- Ware and Partin were subjected to a hostile educational environment created by the Defendants' lack of effective action to properly prevent, investigate, address and remedy the sex discrimination.

291.    Ware and Partin were assaulted and, subsequent to their assaults, put UVM on actual notice (Ware through Balogh, Schulman, Rahill, Rickstad, Moran, and Spence, and Partin through Russell and Moran) of their assaults.

292.     UVM's responses were so offensively lax that they amounted to deliberate indifference.

293.     Defendants' failure to promptly and appropriately respond to the sex discrimination experienced by Ware and Partin resulted in their being excluded from participation in, denied the benefits of, and subjected to discrimination, on the basis of their sex, in UVM's education program in violation of Title IX.

294.     Defendants engaged in a pattern and practice designed to discourage and dissuade students who had been sexually assaulted and/or harassed from seeking assistance and protection. This was especially true if the perpetrator was a student-athlete, as in Ware's case, or if the student claimed to have been drugged, as in Partin's case.

295.     This pattern and practice of behavior constitutes disparate treatment of female students and has a disparate impact on female students.

296.     Relevant actions include, but are not limited to, the following:

- Allowing the Athletics Department to improperly involve itself in and exert influence over Ware's Title IX investigation, from requiring Ware to tell Balogh, Schulman, and Rahill about her rape, to assigning Balogh as Ware's victim's advocate, to repeatedly engaging in a sustained campaign of pressure and disinformation to stop Ware from formally investigating her rape (including by intimidating her by referencing the community's reverence for Lamb) and demanding meaningful sanctions for her assailant;

- Allowing Title IX and the Athletics Department, through Moran, Balogh, Schulman, and Spence, to mislead Plaintiff about her Title IX options, from belatedly raising the option of an informal resolution process, which is blatantly inappropriate for the claims

at issue in Ware's complaint, to misrepresenting the consequences of a formal investigation, to further misguiding Ware as to the sanctions available through the informal resolution process;

- Continuing to demonstrate to Ware, through retaliatory press articles, posters, advertisements, statements, and social media posts, that UVM does not believe that she was raped and values her assailant, Lamb, over her;

- Allowing Russell and Moran to fail to ask Partin whether she would like to make a Title IX Report or provide the required information about complaint and resolution processes, or to provide her with an invitation to make a Title IX report, until over a year after she put UVM on notice of her assault;

- Failing to provide Partin meaningful support after being put on notice of her assault;

- Failing to follow its official Title IX policies, as described in further detail in Count VII (Breach of Contract) which required that Title IX and staff: recommend informal resolution as inappropriate when allegations concerned conduct that is sufficiently serious, dangerous, and/or harmful to the survivor; separate UVM Athletics from UVM's Title IX process; and view sexually motivated drugging as a form of "Sexual Exploitation," and follow up with appropriate remedial action, including offering written information to the survivor about their options, as per the SHM Policy.

297.   UVM's actions, as further detailed herein, were independently and cumulatively so clearly unreasonable under the known circumstances that they amounted to institutional deliberate indifference.

298.    UVM's deliberately indifferent response barred Ware and Partin from access to meaningful educational opportunities and benefits including academics and on-campus events and activities and inflicted damages as described in Paragraphs 280 and 281.

299.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

**COUNT III**
**Title IX: Retaliation by Withholding Protection Otherwise Conferred by Title IX**
**(20 U.S.C. § 1681 *et seq.*)**

**(Plaintiffs Ware and Sommer Against Defendant UVM)**

300.    Ware and Sommer reallege and incorporate by reference the allegations contained in the previous paragraphs, as if fully set forth herein.

301.    This action is brought pursuant to Title IX of the Educational Amendments of 1982, 20 U.S.C. § 1681, *et seq.*

302.    Title IX and its interpretive regulations prohibit retaliation against any person who complains about what she reasonably believes to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

303.    Plaintiffs Ware and Sommer engaged in protected activity when they reported their assaults to UVM. Ware engaged in a protected activity when she reported her sexual assault allegation to the Title IX Office and requested a formal investigation. Sommer engaged in a protected activity when she reported her sexual assault allegation to Moran and spoke publicly regarding UVM's failures to protect her from sexual assault, including when she: posted on Instagram on April 29, 2021, emailed Stanton and Moran on May 5, 2021, and spoke at the Board of Trustees' meeting on October 29, 2021.

304.     UVM had knowledge of Ware and Sommer's protected reporting activities when it received or viewed these various communications.

305.     UVM engaged in adverse, school-related retaliatory action, including, but not limited to, the following:

- Providing Ware misleading information regarding available sanctions, warning her that she would face social consequences from the community as a result of a formal investigation, repeatedly lying to her about the consequences of a formal investigation, improperly pressuring her into foregoing a formal investigation under UVM's Title IX procedures, and continuing to publicly laud, advertise, and defend its star athlete, Lamb, on campus and to alumni;

- Failing to provide Sommer references when she requested job-seeking supports and professional recommendations from Smiles-Becker and Seidl, who both had actual knowledge of Sommer's assault and statement to the Board of Trustees.

306.     UVM's adverse actions were causally connected to Ware and Sommer's protected reporting activities.

307.     As a direct and proximate result of UVM's acts and omissions, Ware and Sommer have sustained injuries and damages, including, but not limited to, those described in Paragraphs 280 and 282 above.

308.     Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

gravel &
   shea

ATTORNEYS AT LAW
76 St Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 69 -

## COUNT IV
## Unlawful Sex Discrimination Under the Vermont Public Accommodations Act
### (9 V.S.A. § 4502 *et seq.*)

### (Plaintiffs Ware, Partin, And Sommer Against Defendant UVM)

309.    Ware, Partin, and Sommer repeat and reallege the foregoing paragraphs as if fully set forth herein.

310.    Under the Vermont Public Accommodations Act ("VPAA"), "an owner or operator of a place of public accommodation or an agent or employee of such owner or operator shall not, because of the race, creed, color, national origin, marital status, sex, sexual orientation, or gender identity of any person, refuse, withhold from, or deny to that person any of the accommodations, advantages, facilities, and privileges of the place of public accommodation."

311.    Public educational institutions, including UVM, fall within the meaning of "place[s] of public accommodation" under the VPAA. Vermont courts have held that the VPAA encompasses hostile school environment claims based on peer-on-peer sexual harassment.

312.    Parties can bring suit against educational institutions under the VPAA for peer-on-peer sexual harassment when they are the victim of harassing conduct so severe, pervasive, and objectively offensive that it deprived them of access to the educational opportunities or benefits provided by the school and they exhaust the administrative remedies available. For a VPAA claim to succeed, the educational institution must have actual knowledge of the alleged conduct and fail to take prompt and appropriate remedial action reasonably calculated to stop the harassment.

313.    The VPAA offers a private right of action to individuals discriminated against under the statute.

314.    UVM's SHM Policy defines sexual assault, including rape and sodomy, as a form of "Sexual Harassment and Misconduct." It also requires UVM to conduct a "thorough, prompt and impartial investigation" to any allegations of sexual misconduct.

315.    UVM's internal policies and procedures require, in certain instances, that "alternative," or "informal" resolution should not be found appropriate in instances where the nature and type of conduct alleged is highly severe, dangerous or harmful.

316.    UVM also defines sexually motivated drugging in its own SHM Policy as a form of "Sexual Harassment and Sexual Misconduct." It also requires that, in response to allegations of sexual misconduct, UVM conduct an inquiry into what occurred, take steps to provide appropriate remedies and support, provide victims with written information about complaint and resolution processes and offer reasonable and appropriate measures to protect students.

317.    Ware, Partin, and Sommer's assaults were so severe and objectively offensive that they deprived them of access to the educational opportunities or benefits provided by UVM.

318.    UVM failed to take appropriate remedial action in response to Ware's allegations. UVM did not guide Ware through a formal resolution process and did not recommend against informal resolution as inappropriate given the nature, severity and harmfulness implicated in Ware's rape allegation. Instead, it lied to, misled, and pressured Ware until she opted for informal resolution. UVM's subsequent informal resolution was inappropriate, neither thorough nor impartial, and directed an outcome that caused Ware further distress.

319.    Ware exhausted any internal administrative remedies available to her. Ware expressed her desire for a formal investigation, an in-person victim statement, and mandatory counselling and game suspension. Ware repeatedly spoke to several officials within UVM's Athletics and Title IX Offices and made these requests abundantly clear. Instead of working with

gravel &
shea
"6 St Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 71 -

Ware's reasonable requests, UVM actively allowed its Athletics Department and Title IX Office to improperly collude and ensure she could not get the remedial action which she sought.

320.    UVM failed to take timely and appropriate remedial action in response to Partin's harassment and complaint.  UVM, despite having actual knowledge of Partin's experience and allegations, failed to provide her written information about its complaint and resolution processes, failed to conduct an inquiry into what occurred and failed to take any steps to provide appropriate remedies and support.  Indeed, for over a year, UVM failed to take any action at all.

321.    Partin exhausted any internal administrative remedies available to her to seek redressal for her drugging and assault.  Partin informed Russell, a "Responsible Employee" and mandatory reporter, in writing about the sexually motivated drugging, and later had an oral conversation with him about the same incident.  Russell informed Moran, who acknowledged that UVM's Title IX Office received Partin's report, should have responded to it in an appropriate and prompt manner, and instead, inexplicably failed to act.

322.    UVM failed to take timely and appropriate remedial action regarding Weiland in response to Sommer's Instagram post.  UVM, the Board of Trustees, and Moran were aware of and in direct contact with Sommer after her posts but failed to take any meaningful steps to protect UVM students from Weiland or provide Sommer genuine supports.  Due to UVM's prior mishandling of Hendrick's report, exhausting administrative remedies would have been futile for Sommer.

323.    UVM's breach of the VPAA directly and proximately caused injury to Ware, Partin and Sommer, who suffered damages as described in Paragraphs 280, 281, and 282.

324.     Plaintiffs are entitled to all legal and equitable remedies available for violations of

the VPAA, including compensatory damages, injunctive relief, punitive damages, attorneys' fees

and costs, and other appropriate relief.

**COUNT V**
**Negligence**
**(Vermont Common Law)**

**(Plaintiff Ware Against Defendants UVM, Stanton, Balogh, Moran, and Spence)**

**(Plaintiff Partin Against Defendants UVM, Moran, and Russell)**

**(Plaintiff Sommer Against Defendant UVM)**

325.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

326.     In Vermont, to establish a cause of action for negligence, a plaintiff must show a

legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a

causal link between the breach and the injury. *Stopford v. Milton Town Sch. Dist.*, 2018 VT 120,

¶ 12, 209 Vt. 171, 177-78 (Sup. Ct. Vt. Nov. 16, 2018) (citation omitted).

327.     UVM encouraged students to reach out to certain services and organizations on

campus for support in relation to issues of campus sexual harm.  As stated in the Stanton Memo,

those services included UVM's Responsible Employees, Campus Security Authorities, the Title

IX Office, the Dean of Student's Office, CAPS, and the Campus Victim's Advocate.

328.     In reliance on this encouragement, Ware reached out to Rickstad, who contacted

Moran and Stanton.  Moran then assigned Spence as the neutral investigator.  Ware also reached

out to her coaches, who contacted Balogh.  The Title IX Office then allowed and encouraged

Balogh to serve as a victim's advocate to Ware.

329.     Similarly, in keeping with encouragement from UVM, Partin reported her gender-

motivated stalking to UVM through Russell in 2018.  Russell's encouragement and apparent

support made Partin believe he was a reliable party to whom she could report her subsequent

sexually motivated drugging in January 2020. After she did so, Russell subsequently led Partin to

believe that he would inform the Title IX Office, and that she would be given the information

needed to make a report or open an investigation into her sexual harassment and exploitation.

Russell contacted Moran, who did not reach out to Partin for over a year.

330.    In creating official institutional mechanisms through which sexual assault could be

reported and remedied, encouraging students to report allegations sexual misconduct through these

channels and taking affirmative steps to control and supervise its sexual assault reporting policies

and practices, UVM created for itself and owed a special duty to students, including Ware,

Sommer, and Partin, to reasonably, promptly and appropriately investigate reported acts of sexual

assault.

331.    Defendants UVM, Stanton, Balogh, Moran, Spence, and Russell breached these

special duties towards Plaintiffs and acted negligently with actions including, but are not limited

to, the following:

- Allowing Spence, Moran, and Balogh to give Ware incorrect advice about the Title IX
  formal and informal processes;

- Allowing the Athletics Department to unduly influence Ware's investigation;

- Authorizing an informal process against Lamb despite countervailing UVM guidance;

- Allowing Ware to be retraumatized by posters and advertisements featuring her rapist;

- Failing to respond to Ware's report in a just, appropriate, and impartial manner;

- Failing to respond to Partin's report in a reasonable manner;

- Failing to respond to Hendrick's report in a reasonable manner, and in the process failing to recognize Weiland's obvious pattern of abuse and predation, thereby putting Sommer at foreseeable risk;

- Failing to respond to, despite actual knowledge of, sexually motivated druggings and sexual assaults on campus committed by fraternities (including AEPi) and club sports members;

- Applying a different set of rules to important male athletes accused of sexual assault than to other accused assailants.

332.    Once Plaintiffs Ware and Partin reported their assault, Defendants owed them a special duty of care to reasonably, promptly and appropriately investigate reported acts of sexual assault.

333.    Defendants' breach of these obligations directly and proximately caused Plaintiffs injuries, as described in Paragraphs 280, 281, and 282.

## COUNT VI
## Negligent Infliction of Emotional Distress
## (Vermont Common Law)

### (Plaintiffs Against Defendants UVM, The Board Of Trustees, Stanton, And Moran)

334.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

335.    In Vermont, to prove a claim of negligent infliction of emotional distress, plaintiffs must first make a threshold showing that they or someone close to them suffered a physical impact from an external force. If there has been such an impact, plaintiffs may recover for emotional distress stemming from the incident during which the impact occurred. *Brueckner v. Norwich Univ.*, 169 Vt. 118, 125 (Sup. Ct. Vt. 1999).

gravel &
shea

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 75 -

336.     Defendants UVM, the Board of Trustees, Stanton, and Moran were on actual notice of the known and foreseeable risks presented by certain actors and groups on its campus, including: known risks of sexual abuse among UVM athletes, the known risks of drugging and assault in fraternity and club sports parties, and the known risk of credibly accused repeat assailants, such as Weiland.

337.     Despite such actual knowledge of foreseeable risks, as further described herein and in Count V (Negligence), Defendants failed to act reasonably to improve sexual assault monitoring policies and practices, monitor and regulated unauthorized fraternity activity, increase oversight over club sports, or investigate and discipline credibly accused assailants.

338.     As a result of Defendants' negligent actions, Plaintiffs each suffered physical injury which amounts to physical impacts from an external force, in the form of sexual assault.  As a result of these injuries, Plaintiffs experienced damages as described in Paragraphs 280, 281, and 282.

339.     In addition, Plaintiffs experienced physical symptoms in the wake of their assaults.

## COUNT VII
## Breach Of Contract
## (Vermont Common Law)

### (Plaintiffs Ware and Partin Against Defendant UVM)

340.     Ware and Partin hereby reallege and incorporate the allegations of the preceding paragraphs herein.

341.     Ware and Partin were, at all times relevant to this action, enrolled students at UVM.

342.     Vermont courts have long accepted that between a student and a college is a relationship which is contractual in nature.  The terms of the contract are contained in the

gravel &
    shea
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 76 -

brochures, course offering bulletins, and other official statements, policies, and publications of the institution. *Merrow v. Goldberg*, 672 F. Supp. 766 at 24-25.

343.     When Ware and Partin were accepted by UVM for enrollment, matriculated from UVM, paid their tuition fees, completed their relevant educational requirements and complied with terms contained in the university's bulletins, circulars, and regulations, they performed under the terms of their contract with UVM.

344.     UVM's SHM Policy, and all procedures and policies therein incorporated by reference, formed part of a binding contract with Ware and Partin. Guidance on the institutional procedures with respect to sexual misconduct made within the SHM Policy represent express promises made to Ware and Partin as to how UVM will act in the unfortunate event that they experience sexual assault, exploitation, and harassment.

345.     UVM failed to perform its contractual obligations by, *inter alia*:

- Finding alternative resolution appropriate for Ware's complaint given the severity and nature of the conduct reported and high level of harm;

- Failing to conduct a thorough investigation into Ware's report of sexual misconduct;

- Failing to conduct an official inquiry following Partin's report of Gender-Based Stalking;

- Failing to provide Partin written information about UVM's complaint and resolution processes after her report of drugging and possible sexual assault;

- Failing to conduct a thorough and prompt investigation into Partin's report of sexual misconduct and exploitation;

gravel &
shea            
·········       
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369

- 77 -

- Failing to offer Partin reasonable and appropriate measures to facilitate her continued access to UVM's educational programs and activities.

346.    UVM's breaches of contract have caused Ware and Partin substantial consequential and expectation damages, including, but not limited to, physical, emotional, educational, and financial injuries and lost future earnings.

## COUNT VIII
## Denial of Equal Protection

### (42 U.S.C. § 1983 And The Fourteenth Amendment Of The U.S. Constitution)

### (All Plaintiffs Against Stanton, Spence, Moran, Schulman, Balogh, And Russell)

347.    Plaintiffs hereby reallege and incorporate the allegations of the preceding paragraphs herein.

348.    Upon information and belief, complaints of sex discrimination, including sexual assault, are treated differently than other types of complaints filed at UVM.

349.    Defendants knew or should have known that female students are more likely to suffer sexual harassment and sexual violence by a significant margin.

350.    Defendants' unequal treatment of Ware, Partin, and Sommer's complaints disparately impacts female students in violation of Plaintiffs' right to equal protection under the law.

351.    Defendants' denial of Plaintiffs' constitutional right to equal protection under the law caused Plaintiffs to forego educational opportunities, thereby limiting their ability to participate in, and benefit from, the Defendants' educational programs and activities.

352.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs suffered damages as described in Paragraphs 280, 281, and 282.

## Exemplary Damages

### (All Plaintiffs Against All Defendants)

353.    The actions of Defendands as described in this Complaint were done by Defendants recklessly or wantonly without regard for the rights of Plaintiffs, were outrageously reprehensible, had the character of outrage frequently associated with a crime and were done with malice, thereby entitling Plaintiffs to exemplary damages.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiffs hereby demand a trial by jury for all issues triable of right by a jury in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

a) assume jurisdiction over this action and all parties;

b) award Plaintiffs economic and noneconomic compensatory damages against each Defendant in an amount to be established at trial, including, without limitation, damages for past, present, and future physical, mental, educational, and financial harm;

c) award Plaintiffs general, special, incidental, and consequential damages against each Defendant in an amount to be established at trial, including, without limitation, damages for past, present, and future physical, mental, educational, and financial harm;

d) award Plaintiffs punitive damages against each Defendant;

e) award Plaintiffs any appropriate statutory damages against each Defendant;

f) award Plaintiffs the reasonable incurred attorneys' fees, pre- and post-judgement interest, and litigation costs and expenses associated with prosecuting this matter;

gravel &
shea   . . . . . .
. . . . . . . . . . . . . . . .
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

- 79 -

g) order declaratory judgement that UVM's policies, practices and procedures challenged herein are illegal and in violation of the rights of the Plaintiffs under, *inter alia*, Title IX, the Vermont Public Accommodations Act and other applicable Vermont state law and doctrines as set forth above;

h) award Plaintiffs injunctive relief against UVM's improper policies and procedures and order UVM to put in place and abide by appropriate and legal policies; and

i) award Plaintiffs any such other and further relief as the Court may deem just and proper.

Dated: Burlington, Vermont
December 6, 2022

Respectfully submitted,

Celeste E. Laramie, Esq.
GRAVEL & SHEA PC
76 St. Paul Street, 7th Floor
Burlington, VT  05401
(802) 658-0220
claramie@gravelshea.com

and

John F.O. McAllister, Esq.*
Meghna Sridhar, Esq.*
MCALLISTER OLIVARIUS
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 433-3456

and

Karen Truszkowski*
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
(844) 534-2560
karen@temperancelegalgroup.com

*Attorneys for Plaintiffs*

\* *Pro Hac Applications Forthcoming*