UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| KENDALL WARE, | ) | |
| SYDNEY PARTIN, and | ) | |
| HALEY SOMMER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-CV-212 |
| | ) | |
| THE UNIVERSITY OF VERMONT | ) | |
| AND STATE AGRICULTURAL | ) | |
| COLLEGE, THE BOARD OF | ) | |
| TRUSTEES OF THE UNIVERSITY | ) | |
| OF VERMONT AND STATE | ) | |
| AGRICULTURAL COLLEGE, | ) | |
| NICHOLAS STANTON, KATHERINE | ) | |
| SPENCE, TARYN MORAN, JEFFREY | ) | |
| SCHULMAN, KRISTA BALOGH, | ) | |
| JOSEPH RUSSELL, and OTHER | ) | |
| UNIDENTIFIED DEFENDANTS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS

Defendants, by and through their attorneys, Dinse P.C., move to dismiss the Complaint in this case pursuant to Fed. R. Civ. P. 12(b)(6).  Because Plaintiffs have failed to state any claim upon which relief can be granted, the entire Complaint should be dismissed.

## INTRODUCTION

Addressing the epidemic of sexual misconduct by and against undergraduate students has posed formidable challenges to colleges and universities nationwide.  In responding to reports of sexual misconduct, schools must balance the institutional interest in maintaining a safe learning environment, the rights and interests of complainants—which may vary significantly depending on the individual and the circumstances—the rights and interests of respondents, and the demands of a transparent and fair process.  University of Vermont and State Agricultural College

(UVM) has a policy of strongly encouraging and removing barriers to reporting sexual harassment, assault, and other misconduct, and consistently strives to strike the right balance between these interests when investigating and resolving such reports.  UVM has weighty and important responsibilities to all of its students and employees, regardless of their identity or role in the process.  Because of the consequential and emotionally fraught nature of the subject matter, it is inevitable that participants—whether they be complainants or respondents—are sometimes disappointed or frustrated.  It is a rare case indeed that leaves a complainant and respondent equally satisfied at the end.

The present lawsuit is a manifestation of that dissatisfaction.  Each of the three Plaintiffs alleges that she was sexually assaulted while enrolled as a student at UVM, and that the University's response—both to their individual situations and the problem of sexual assault generally—came up short.  Without minimizing the seriousness of the underlying events that these three individuals have alleged, their misgivings about the University's response do not provide a colorable basis for their legal claims.  The Plaintiffs take aim at UVM's alleged failure to rigorously investigate their own and other reports of sexual assault, and yet two of the Plaintiffs—Sydney Partin and Haley Sommer—elected not to engage with or participate in the University's intake and resolution processes at all.  The third Plaintiff, Kendall Ware, agreed to and signed an alternative resolution with the explicit knowledge that she could opt for a formal investigation.

To a large extent, this lawsuit seeks to impose a strict liability standard for colleges and universities when sexual assaults occur on their campuses or involve their students.  Such expansive liability finds no support in the law, nor does it make sense from a policy perspective to expose schools to liability for the independent actions of perpetrators over whom schools

exercise limited supervision.  UVM as an institution, and the named Defendants individually,

cannot eliminate sexual misconduct everywhere at all times, notwithstanding their ongoing,

concerted efforts to engage in education and outreach around prevention of sexual assault.

While Defendants acknowledge the significant harm these women state they have experienced,

Defendants are not legally responsible for it.  Accordingly, Defendants ask the Court to grant this

motion and dismiss the Complaint in its entirety.

## FACTUAL ALLEGATIONS AND BACKGROUND

**I.      UVM's Policy and Procedures**[1]

At all times relevant to the allegations in the Complaint, UVM has maintained

comprehensive policies and procedures regarding discrimination, harassment, and sexual

misconduct in compliance with Title IX.  *See* Ex. A to K (UVM Policies and Procedures).[2]

---

[1] The Court may consider documents that are necessarily incorporated by reference into the Complaint without converting this Motion into a motion for summary judgment.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *see also* 5B Wright & Miller, *Federal Practice & Procedure* § 1357 (3d ed.) (explaining that federal courts are "not limited to the four corners of the complaint").  The University's policies and procedures, if nothing else, form the basis of Plaintiffs' breach of contract claims and the Court may therefore take judicial notice of them.  *See* Section III.E *infra.*

[2] The policies include:

- Exhibit A, Sexual Harassment and Misconduct Policy effective August 26, 2016 ("2016 SHM Policy");
- Exhibit B, Sexual Harassment and Misconduct Policy with May 1, 2020 update ("May 2020 SHM Policy");
- Exhibit C, Discrimination, Harassment, and Sexual Misconduct – Interim Policy effective August 13, 2020 ("August 2020 Interim DHSM Policy");
- Exhibit D, Discrimination, Harassment, and Sexual Misconduct Policy with interim status removed December 16, 2020 ("December 2020 DHSM Policy");
- Exhibit E, Current Discrimination, Harassment, and Sexual Misconduct Policy ("Current DHSM Policy");
- Exhibit F, Procedural Guidelines for Handling and Resolving Discrimination Complaints 2017-2018 ("2017-2018 Procedural Guidelines");

UVM's policies are nuanced and each speaks for itself, but, to simplify their contents for purposes of this Motion, the process begins with a report of some kind. *Id.* Obviously, UVM and its employees cannot know what has not been reported. A complainant may report directly, or another individual may make a report concerning them. *See, e.g.*, Ex. A (2016 SHM Policy) at 9-12; Ex. C (August 2020 Interim DHSM Policy) at 7-10. After a report is made, the complainant is offered information about their options and supportive measures. *Id.* UVM's policies do not compel any complainant to make a report to law enforcement for criminal investigation and response, but complainants are advised of this option and provided information to pursue it if they so wish. *Id.* If the complainant chooses to move forward and participate in the UVM process, there are generally two paths: the standard "formal" investigation path or, where appropriate, alternative resolution. *See, e.g.*, Ex. A (2016 SHM Policy) at 12-15; Ex. C (August 2020 Interim DHSM Policy) at 11-13; Ex. H (2019 Procedural Guidelines) at 2-8; Ex. I (August 2020 Interim Resolution Procedure) at 2-8. A formal investigation involves gathering evidence, interviewing witnesses, assessing credibility, and (at the time of the events relevant to this lawsuit) making findings of fact in a written report. *Id.* At the end of the process, the respondent is found responsible or not responsible for violating a UVM policy. *Id.* If the respondent is responsible for a policy violation, then appropriate and proportional sanctions are

---

- Exhibit G, Procedural Guidelines for Handling and Resolving Discrimination Complaints effective October 4, 2018 ("2018 Procedural Guidelines");
- Exhibit H, Procedural Guidelines for Handling and Resolving Discrimination Complaints effective January 10, 2019 ("2019 Procedural Guidelines");
- Exhibit I, Handling and Resolving Discrimination, Harassment, and Sexual Misconduct Complaints – Interim effective August 14, 2020 ("August 2020 Interim Resolution Procedure");
- Exhibit J, Handling and Resolving Discrimination, Harassment, and Sexual Misconduct Complaints with interim status removed December 15, 2020 ("December 2020 Resolution Procedure"); and
- Exhibit K, Current Handling and Resolving Discrimination, Harassment, and Sexual Misconduct Complaints ("Current Resolution Procedure").

imposed—up to and including permanent separation from UVM.  *Id.*  UVM's policies also allow

UVM, in appropriate situations, to move forward with an investigation even where a

complainant does not wish to proceed, but such decisions are extraordinary and are committed to

UVM's discretion.  *See* Ex. A (2016 SHM Policy) at 3, 12; Ex. C (August 2020 Interim DHSM

Policy) at 11.

If a complainant would like UVM to render a determination that a policy was violated

and allow for discipline to be imposed, UVM's policies call for it to pursue the formal

investigatory process detailed above, but both the complainant and respondent may voluntarily

opt into participating in an alternative resolution, historically referred to as "informal" resolution.

*See, e.g.*, Ex. A (2016 SHM Policy) at 12-15; Ex. C (August 2020 Interim DHSM Policy) at 11-

13; Ex. H (2019 Procedural Guidelines) at 2-8; Ex. I (August 2020 Interim Resolution

Procedure) at 2-8.  This path is more like a mediation and has elements of a restorative justice

model.  The informal resolution process is intended to be flexible and address an individual's

situation in the most effective and expeditious manner possible.  *See, e.g.*, Ex. G (2018

Procedural Guidelines) at 6-7, Ex. H (2019 Procedural Guidelines) at 5-6, Ex. I (August 2020

Interim Resolution Procedure) at 4-5.  The intended outcome of this process is a resolution that

allows for the parties to express and recognize the harms that may have occurred, and

educationally address those harms.  *Id.*  The final resolution must be acceptable to the parties and

to the University.  *Id.*  Both the complainant and respondent are permitted to withdraw from the

voluntary alternative process at any time.  *Id.*

In short, UVM has robust processes available for people who want to participate in them,

but respects and values individuals' choices and agency to the maximum extent possible.  The

University does not force any complainant to be retraumatized or participate if they do not want

to engage with its process for their own reasons, nor does it assume a report is true just because it has been made.  UVM can and does investigate against a complainant's wishes in some circumstances, but disciplinary consequences and other sanctions are not imposed on a respondent without an investigation and factual findings supporting a finding of responsibility for a policy violation.

## II.    Kendall Ware

The Complaint alleges three wholly distinct factual narratives pertaining to each of the three Plaintiffs.  The first of the three, Kendall Ware, was a UVM athlete.[3]  Compl. ¶ 35.  She had a romantic relationship with a fellow UVM athlete, Anthony Lamb, from January 2019 until the summer of 2019.  *Id.* ¶¶ 36, 39.  Ms. Ware alleges that on September 7, 2019, Mr. Lamb sexually assaulted her at his off-campus house.  *Id.* ¶¶ 39-40.  On October 15, 2019, Ms. Ware decided to make a report concerning that incident to the Title IX Office[4] through Judy Rickstad, the campus victim's advocate.  *Id.* ¶¶ 50, 53.  Ms. Ware also reported, at an unspecified time, that two additional incidents occurred prior to September 2019: (1) Mr. Lamb removed a condom without consent at an unspecified location, and (2) Mr. Lamb filmed Ms. Ware during sexual intercourse without her consent at his family's home.  *Id.* ¶ 51.

On October 15, 2019, Ms. Ware reported the assault to her coaches, who told her to speak to Krista Balogh, the Athletics Department's Associate Athletic Director for External Relations

---

[3] Defendants assume for purposes of this Motion only that all factual allegations in the Complaint are true, as the Court must when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Defendants reserve all rights to dispute Plaintiffs' allegations in this litigation, and in fact do vigorously dispute the accuracy of a number of the allegations set forth in the Complaint.

[4] Defendants reference the "Title IX Office" as a shorthand in this memorandum of law because that is the language used in the Complaint.  UVM's policies, procedures, and personnel address compliance with Title IX, but they have other content and functions as well.  UVM uses this phrase for consistency and the Court's convenience but does not intend to narrow any of its policies or procedures, which speak for themselves.

and Communications.  *Id.* ¶ 54.  Ms. Balogh spoke to Ms. Ware, and then Ms. Balogh spoke to

Jeff Schulman, the Director of UVM's Athletics Department, and Cathy Osmers Rahill, the

Associate Director of Athletics for Student Athlete Development (and Deputy Title IX

Coordinator for Athletics.  *Id.* ¶ 56.  Ms. Ware, Ms. Balogh, and Mr. Schulman also met in Mr.

Schulman's office.  *Id.*

 The next day, October 16, 2019, UVM's Title IX Intake and Outreach Coordinator,

Taryn Moran, contacted Ms. Ware to provide information about her options.  *Id.* ¶ 57.  The day

after that, October 17, 2019, Katherine Spence was assigned as the investigator for Ms. Ware's

report and spoke with Ms. Ware again about her options, including informal resolution.  *Id.* ¶ 58.

Rather than pursue a formal investigation, Ms. Ware decided to move forward with the informal

resolution process.  *Id.* ¶ 69.  UVM engaged an attorney, Peter Lim, Esq., to serve as an impartial

facilitator.  *Id.* ¶ 70.  After that process began, Ms. Ware considered changing her mind and

moving back to the formal process, but she decided to continue with the informal process.  *Id.* ¶

79.

 After several weeks of discussions, Ms. Ware signed an informal resolution agreement on

November 19, 2019.  *Id.* ¶ 85; Ex. L (Informal Resolution Agreement).[5]  Mr. Lamb signed as

well.  Compl. ¶ 86.  As a result, Mr. Lamb was required, among other things: to have no contact

with Ms. Ware, to refrain from using the UVM athletic facilities at particular times, to complete

a healthy masculine identity program, and to refrain from attending sports-related events,

including an end-of-year UVM sports celebration event.  *Id.* ¶ 86.  On January 6, 2020, Ms.

Ware presented her "victim impact statement" live over video to Mr. Lamb.  *Id.* ¶ 88.

---

[5] *See supra* note 1.  This resolution agreement is a transactional document necessarily incorporated by
reference in the Complaint and an integral part of the claims by Ms. Ware.  Portions of the agreement that
do not refer to Ms. Ware have been redacted.

Ms. Ware alleges that she continues to suffer trauma caused not only by her rape but also "UVM's callous mishandling of her investigation." *Id.* ¶ 109.

### III.   Sydney Partin

The claims of the second of the three Plaintiffs, Sydney Partin, rest on two separate alleged incidents.  First, in October 2018, a driver for a ridesharing service unaffiliated with UVM (a "middle-aged Burlington man") made sexual comments and put his hand on her thigh without her consent. *Id.* ¶ 112.  Ms. Partin reported this incident to Joseph Russell, the Assistant Dean of Students for Retention and a Deputy Title IX Coordinator. *Id.* ¶ 113.  The Complaint alleges that, given the nature of the report, he suggested that her best option was to file a report with campus police, which she did. *Id.* ¶¶ 113-114.

Second, in March 2019, Ms. Partin attended an off-campus party that was also attended by members of a particular fraternity, Alpha Epsilon Pi (AEPi). *Id.* ¶ 116.  At that time, AEPi was not a sanctioned fraternity or recognized by the university.[6] *Id.* ¶ 117.  Before she arrived at the party, Ms. Partin drank two or three drinks. *Id.* ¶ 118.  At the party, Ms. Partin drank alcohol that she retrieved from a large Gatorade cooler and began to stumble, slurred her speech, and became disoriented. *Id.* ¶ 119.  She alleges that she was subsequently kissed and groped by Nolan Donovan. *Id.* ¶ 120.  Ms. Partin does not recall every detail of what happened to her, but she woke up on her bed the next morning. *Id.* ¶¶ 120-21.  Ms. Partin went to UVM Medical Center's emergency department with a friend and described what had happened as well as her belief that she had been drugged. *Id.* ¶ 122.  The friend who accompanied Ms. Partin to the hospital told the triage nurse there that she did not think that Ms. Partin had been raped. *Id.* ¶ 123.

---

[6] It still is not. *See* Fraternity & Sorority Life – Chapter Misconduct, https://www.uvm.edu/studentlife/fsl /unrecognized_chapters.

Approximately ten months after the party, on January 13, 2020, Ms. Partin emailed Dean Russell (who is a Deputy Title IX Coordinator) stating that she had been drugged at a party, but that the emergency department staff had refused to test her for anything and had not offered her a rape kit. *Id.* ¶¶ 113, 139-140; Ex. M (Email from Sydney Partin).[7]  Dean Russell responded that the hospital was a separate entity from the university and sent her a link for a UVM Medical Center complaint form.  Compl. ¶¶ 142-43.  Ms. Partin alleges that no other Title IX staff member contacted her in 2020, and the Complaint does not include any other details about her contact with Dean Russell.  *Id.* ¶¶ 142-145.  There is no allegation that Ms. Partin reached out to Dean Russell to ask for any additional assistance or for any specific support or accommodations after he shared the complaint form with her.  *See generally* Compl.

On April 29, 2021 (more than a year after her contact with Dean Russell regarding the hospital staff), Ms. Partin posted a story about her experience after the March 2019 party on her personal Instagram account.  *Id.* ¶ 153.  UVM received notice of the post, and Ms. Moran contacted her that same day.  *Id.* ¶ 154.  Ultimately, after speaking with Ms. Moran on May 11, 2021, Ms. Partin chose not to pursue any type of resolution process.  *Id.* ¶¶ 155-56.  Ms. Moran told Ms. Partin that at the time she became aware of Ms. Partin's email to Dean Russell in 2020, she thought Ms. Partin only wanted to know how to file a complaint against a doctor at UVM Medical Center.  *Id.* ¶ 157.

Almost three years after the off-campus party and about a year after her Instagram post, in Spring 2022, Ms. Partin recovered a repressed memory of a silhouette of a man leaning against her bed and concluded she had been raped the night of the party in her campus dorm.  *Id.*

---

[7] *See supra* note 1.  This email is the report that allegedly put UVM on notice of Ms. Partin's sexually motivated drugging.  It is incorporated by reference and an integral part of the claims, or, at a minimum does not contradict the description of this email in the Complaint.

¶ 135.  At the time Ms. Partin emailed Dean Russell in January 2020, she herself did not yet know that she had been raped.  *See id.*

## IV.    Haley Sommer

The third Plaintiff, Haley Sommer, alleges that she attended a party in November 2020 with a UVM student named Austin Weiland at her neighbor's apartment.  *Id.* ¶ 168.  She drank a large amount of alcohol there.  *Id.* ¶ 169.  Although Ms. Sommer does not remember how, Mr. Weiland ended up in her apartment.  *Id.* ¶ 171.  Ms. Sommer's memories are blank after that until she recalls regaining consciousness while Mr. Weiland was having penetrative sex with her. *Id.* ¶ 171-72.  She did not immediately classify the incident as an assault.  *Id.* ¶ 173.

On April 26, 2021, non-party Athena Hendrick made an Instagram post stating that Austin Weiland had raped them on February 1, 2020 and that they reported the rape to an RA on February 12, 2020.  *Id.* ¶¶ 149-150.  The Instagram post also stated that the Title IX Office began an investigation on April 16, 2020 but closed it in August 2020 due to a lack of evidence.  *Id.* ¶ 151.  The Instagram post came to Ms. Sommer's attention, and, after reading the post and running into Mr. Weiland at a beach on Lake Champlain, she concluded that Mr. Weiland had raped her too.  *Id.* ¶¶ 175-76.

On April 29, 2021, Ms. Sommer posted her own story on Instagram.  *Id.* ¶ 178.  That same day, the post came to UVM's notice, and she received an email from Ms. Moran providing her with reporting options and policies.  *Id.* ¶ 180.  Ms. Sommer declined to participate in any process or speak substantively with Ms. Moran.  *Id.* ¶¶ 181-82.

The Complaint refers to other social media posts reportedly concerning Mr. Weiland, but they all were posted after Ms. Sommer's post.  *See id.* ¶¶ 187-191.  None of the posts referred to

in the Complaint includes a description of a report on behalf of a complainant to UVM or an investigation by UVM, and at least one affirmatively states the poster did not report.  *Id.*

Ms. Sommer decided to leave her master's program in August 2021.  *Id.* ¶ 195.  After she withdrew, she alleges two UVM employees did not respond to her outreach to see if they would help her with her job search or serve as references.  *Id.* ¶ 197.

## V.    Alleged "Official Policy" of Deliberate Indifference

The Complaint includes scattershot allegations from 2002 (Compl. ¶ 230) to the present generally asserting that UVM was aware of risks regarding the possibility of drugging and sexual assault against its students by other students.  As described below, these allegations are only possibly relevant to each Plaintiff's "pre-assault" claim under Title IX, in which Plaintiffs assert UVM's "official policy" of deliberate indifference caused each of them to be sexually assaulted. Accordingly, incidents that post-date the last assault alleged in the Complaint are irrelevant to **all** of the claims, and incidents that post-date the last assault alleged by each individual Plaintiff are irrelevant to that Plaintiff.  The last assault alleged in the Complaint was November 2020.  *Id.* ¶ 168.   Notably, every post associated with the @ShareYourStoryUVM social media account came many months after.  *See id.* ¶¶ 149-52.

Very few allegations in the Complaint referring to events or incidents before November 2020 ascribe awareness to UVM as an institution beyond generalizations or conclusory statements.  *See, e.g.*, *id.* ¶ 224 (it is "well known" fraternity culture is unsafe); ¶ 226 (UVM knows about "the dangers fraternities present in terms of drinking, drugs, and sexual assault"), ¶ 230 (date rape drugs were on the rise in Vermont in general as of 2002); ¶ 239 (it is "common knowledge among students and administration" that students favor parties hosted at sports houses); ¶ 244 (UVM "knows" club sports parties "breed cultures that encourage sexual

assault"); ¶ 247 (varsity sports have unofficial houses "many of which are known to be dangerous for women").  Others concern geographic locations and circumstances UVM could not possibly control or exert influence over, such as activities at private off-campus residences and unknown and unidentified alleged perpetrators.  *See, e.g.*, *id.* ¶¶ 229, 237, 247.  The allegations in Paragraphs 206 to 266 boil down to an assertion that UVM was aware that its students could potentially be drugged or sexually assaulted, particularly off campus.

## **STANDARD**

"On a [Rule 12(b)(6)] motion to dismiss, the Court will accept all well-pleaded facts as true and consider those facts in the light most favorable to the plaintiff."  *Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, No. 1:08-CV-186, 2009 WL 1545829, at *1 (D. Vt. May 29, 2009) (citing *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007)).  However, the Court is not required to accept conclusory allegations, unsupported conclusions, or unwarranted inferences, even if cast in the form of factual allegations, when considering a motion to dismiss.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive dismissal, the plaintiff must provide the grounds upon which [her] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Smugglers Notch Homeowners' Ass'n*, 2009 WL 1545829, at *1 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  The complaint must contain sufficient factual matters to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  at 678.  Although the "plausibility standard is not akin to a 'probability requirement,'" it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint

that pleads facts that are "merely consistent with" a defendant's possible liability does not satisfy the plausibility standard. *Id.* (citing *Twombly*, 550 U.S. at 557). Rather, a plaintiff must make a **showing** of entitlement to relief; "naked assertions" are not enough. *Brown v. Castleton State Coll.*, 663 F. Supp. 2d 392, 396 (D. Vt. Oct. 7, 2009) (quoting *Iqbal*, 556 U.S. at 678); Fed. R. Civ. P. 8(a)(2) (complaint must contain "a short and plain statement of the claim **showing** that the pleader is entitled to relief") (emphasis added).

## ARGUMENT

### I.   Each of Plaintiffs' Claims Under Title IX Must Be Dismissed.

#### A.   Plaintiffs' "pre-assault" claims fail because even if this Court were to recognize such a claim, the allegations in the Complaint are insufficient.

While UVM strives to prevent, eliminate, address, and redress sexual misconduct to the maximum extent possible as an institution, a university cannot directly control the actions of individual human beings—nor does the law require it. As the Supreme Court has emphasized, Title IX "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment," but instead requires that they "merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999). The legal theory Plaintiffs seek to pursue in Count I of their Complaint, however, would establish a rule of strict liability for colleges and universities for acts of sexual assault and sexual harassment where there is any history of prior offenses on their campus or involving their students—whether or not those prior offenses gave the school any notice of a risk specific to an identifiable individual or group. Such a sweeping theory of liability is inconsistent with the standards governing Title IX claims and the Court should decline to adopt it.

Plaintiffs allege in Count I that, for an undefined period of time, UVM had an "official policy" of deliberate indifference to sexual misconduct against **all** female undergraduate students, which caused each of the Plaintiffs to be sexually assaulted. *See* Compl. ¶ 273. This is sometimes referred to as a "pre-assault" Title IX claim. Assuming *arguendo* that such a claim is even viable under Title IX—and there is good reason to doubt that it is—Plaintiffs would still necessarily have to demonstrate a connection between UVM's actual knowledge of a specific, identifiable risk preceding the assault and the circumstances of each assault. Without one, there can be no **deliberate** indifference as a matter of law.

But Plaintiffs make no effort to identify specific risks known to UVM that presaged their assaults. Instead, they rely on broad, conclusory allegations that UVM as an institution was aware that sexual misconduct had occurred on its campus or against its students previously and failed to completely eradicate all sexual misconduct by the time each of them was assaulted. Under any plausible formulation of a "pre-assault" Title IX claim, Plaintiffs' allegations are insufficient and their claims should be dismissed.

> **1. The Court should decline to recognize a "pre-assault" claim or, at a minimum, require a specific connection to the assaults alleged for such a claim to survive a motion to dismiss.**

The Court of Appeals for the Second Circuit has not directly addressed a "pre-assault" claim under Title IX. *See, e.g.*, *JD1 v. Canisius Coll.*, No. 1:21-CV-521, 2022 WL 2308902, at *8 (W.D.N.Y. June 27, 2022) (Crawford, J.). While the Tenth and Ninth Circuits have each recognized some form of "pre-assault" claim under Title IX, the reasoning of the decisions recognizing such claims is in tension with controlling Supreme Court precedent. UVM urges this Court to decline to recognize a "pre-assault" claim or, at a minimum, follow other district courts in this circuit that have adopted a much narrower formulation of the theory.

An understanding of the "pre-assault" claims must begin with the United States Supreme

Court's decision in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), as

both the Ninth and the Tenth Circuits relied on an isolated phrase from *Gebser* in recognizing the

"pre-assault" theory of liability under Title IX.  In *Gebser*—a case arising from a claim against a

school district by a student who alleged sexual harassment by her teacher—the Court defined the

contours of the implied private right of action for damages under Title IX.  Specifically, the

Court held that no such implied right of action would be permitted absent evidence that the

school had actual notice of the harassment at issue and responded (or failed to respond) in a

manner amounting to deliberate indifference, stating:

> Because the express remedial scheme under Title IX is predicated upon notice to
> an "appropriate person" and an opportunity to rectify any violation, we conclude,
> in the absence of further direction from Congress, that the implied damages
> remedy should be fashioned along the same lines. . . .  Consequently, in cases like
> this one that do not involve official policy of the recipient entity, we hold that a
> damages remedy will not lie under Title IX unless an official who at a minimum
> has authority to address the alleged discrimination and to institute corrective
> measures on the recipient's behalf has actual knowledge of discrimination in the
> recipient's programs and fails adequately to respond.

*Id.* at 290 (citation omitted).   The Court also rejected the argument that the school's alleged

failure to promulgate and publicize an effective policy and grievance procedure for sexual

harassment claims could establish the requisite deliberate indifference.  *Id.* at 291-92.

*Gebser* was closely followed by the Supreme Court's decision in *Davis*, which

recognized that a cause of action for damages under Title IX may lie for peer-on-peer harassment

in certain narrow cases where a school has "actual knowledge" of and is deliberately indifferent

to the harassment, and the harassment is so "severe, pervasive, and objectively offensive that it

can be said to deprive the victims of access to the educational opportunities or benefits provided

by the school."  526 U.S. at 650.  The Court emphasized that schools would be "deemed

'deliberately indifferent' to acts of student-on-student harassment only where the recipient's

15

response or lack thereof is clearly unreasonable in light of the known circumstances" and that Title IX did not require schools to "purg[e] [themselves] of actionable peer harassment." *Id.* at 648.

In *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007) and *Karasek v. Regents of University of California*, 956 F.3d 1093 (9th Cir. 2020), the Ninth and Tenth Circuits significantly expanded the scope of the private right of action for peer-on-peer harassment.[8]  Both courts seized on *Gebser*'s passing reference (in the passage quoted above) to the fact that the case did not involve an "official policy" of the institution and held that, in cases where a plaintiff does allege an "official policy" of deliberate indifference, an implied right of action for damages could lie based on "pre-assault" indifference **even where the institution had responded adequately upon receiving notice of the specific acts of harassment against the plaintiff**.  This new theory of liability stands in significant tension with the carefully delimited scope of the implied right of action for damages articulated by the Supreme Court in *Gebser* and *Davis,* both of which emphasized the importance of actual notice.  It is doubtful, based upon the narrow approach charted by those decisions, that the Supreme Court would endorse the Circuit Courts' expansion of Title IX damages liability.  UVM submits that creating an entire new category of private action on the basis of one isolated phrase overreads *Gebser* and overreaches the appropriate bounds of the statute, and for that reason requests that the Court decline to recognize liability based upon "pre-assault" deliberate indifference.

Even if the Court were inclined to allow the "pre-assault" claim to proceed, however, there are important differences in the way the courts have delineated the scope of such claims—

---

[8] Defendants focus on these two cases, as they appear to be the most widely discussed by other courts considering "pre-assault" claims, but acknowledge other courts have permitted some version of a "pre-assault" claim.

and both reason and the law favor a narrower approach.  The Tenth Circuit's decision in *Simpson* was closely tied to its facts, which arose from alleged sexual assaults by football players and football recruits at the University of Colorado Boulder.  Central to the court's decision was the fact that the University was alleged not only to have had clear knowledge but also to have been complicit in a specific pattern of sexual misconduct in the football recruiting program: the University allegedly "sanctioned, supported, even funded a program (showing recruits a 'good time') that, without proper control, would encourage young men to engage in opprobrious acts." 500 F.3d at 1177.

In holding that these facts supported a viable Title IX claim, the Tenth Circuit distinguished *Gebser* and *Davis* by explaining that "there was no element of encouragement of the misconduct" by the defendant in either of those cases.  *Id.*  The court also acknowledged that an inherent risk of sexual harassment exists just by virtue of operating a college or university "because, unfortunately, some flawed humans will engage in such misconduct when they are in the company of others."  *Id.*  That risk could not be eliminated and would not, on its own, be sufficient to state a claim.  *See id.*  In short, the Tenth Circuit's reasoning in *Simpson* makes clear that there must be some specific type of active encouragement, support, or sanctioning by the college or university for a "pre-assault" claim to be viable.  The mere existence of the risk of sexual misconduct in general was insufficient.

The Ninth Circuit's decision in *Karasek* reflects a much more expansive approach than *Simpson*.  The court recognized in that case a "pre-assault" claim broader than a "specific problem in a specific program" that was known to and encouraged by the university (as was alleged in *Simpson*).  956 F.3d at 1113.  But even the *Karasek* court recognized that a "university is not responsible for guaranteeing the good behavior of its students" and "adequately alleging a

17

causal link between a plaintiff's harassment and a school's deliberate indifference to sexual misconduct across campus is difficult." *Id.* at 1114; *see also Doe v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 35 F.4th 459, 466 (6th Cir. 2022), *cert. denied* No. 22-423, 2023 WL 124074 (U.S. Jan. 9, 2023) ("Put differently, in a successful 'before' claim, a school's deliberate indifference to known past acts of sexual misconduct must have caused the misconduct that the student currently alleges.")

Trial courts in the Second Circuit have taken the narrower view of "pre-assault" claims in peer harassment cases.[9]  Generally, "in order for a university to violate Title IX through a policy of deliberate indifference, it must have actual knowledge of a heightened risk that is specific enough to allow it to remedy such a policy." *Tubbs v. Stony Brook Univ.*, No. 15 CIV. 0517 (NSR), 2016 WL 8650463, at *8 (S.D.N.Y. Mar. 4, 2016); *see also Canisius Coll.*, 2022 WL 2308902 at *8.  This makes sense because there can be no **deliberate** indifference without actual knowledge.  *See Tubbs*, 2016 WL 8650463 at *8 n.7; *see also Posso v. Niagara Univ.*, 518 F. Supp. 3d 688, 698-99 (W.D.N.Y. 2021) (explaining where the university had actual knowledge of "rampant sexual misconduct" in its swimming program, a jury could interpret its actions as an official decision not to remedy the risk of assault by a male swimmer); *see also Gebser*, 524 U.S. at 290 (explaining the "premise" of deliberate indifference is "an official decision by the recipient not to remedy the violation").  The trial courts in the Second Circuit have held that plaintiffs must allege facts that go further than the mere existence of past incidents of assault on campus or the claim will be dismissed.  *Tubbs*, 2016 WL 8650463 at *9; *Roskin-Frazee v. Columbia Univ.*, No. 17 CIV. 2032 (GBD), 2018 WL 6523721, at *5 (S.D.N.Y. Nov. 26, 2018)

---

[9]  In *Alexander v. Hunt*, No. 5:16-CV-192, 2018 WL 3801240, at *7 (D. Vt. Aug. 9, 2018) (Crawford, C.J.), a case that involved alleged racial discrimination in traffic stops rather than peer-on-peer harassment, the Court applied the standard in *Simpson* and other cases to a Title VI claim without a significant elaboration of its reasoning beyond a statement that they were "persuasive."  *Id.*

(holding allegations supporting an inference that a university is generally aware of the problem of sexual misconduct on campus and a deficiency in response to such a problem are insufficient as a matter of law for asserting pre-assault Title IX liability); *see also Doe v. Union Coll.*, No. 119CV284GLSCFH, 2020 WL 1063063, at \*5-\*6 (N.D.N.Y. Mar. 5, 2020) (dismissing claim that defendants were on notice that the college's policies were deliberately indifferent to sexual violence against women, defendants failed to remedy these policies, and plaintiff was harmed and subjected to further harassment as a consequence); *cf. Posso*, 518 F. Supp. 3d at 698-99 (explaining the magistrate judge had not relied on a "a campus-wide or constructive-knowledge theory to find Doe-2 pleaded a cognizable pre-assault claim").

The bottom line is that absent something more concrete and specific than the general existence of past incidents of assault (which, unfortunately, have not been and cannot be totally eliminated), a pre-assault claim must fail.  A contrary ruling would effectively create a strict liability standard for any assault on any campus or against any student.  This cannot be what Congress intended and is contrary to *Davis* and *Gebser*.

## 2. Plaintiffs have not plausibly alleged a policy of deliberate indifference to sexual assault with sufficient specificity for their claims to survive.

Applying those standards, Plaintiffs have not alleged sufficient facts to proceed with their "pre-assault" claims.  Plaintiffs have not asserted that UVM had actual knowledge of a heightened risk of sexual assault that is more specific than the general risk that sexual misconduct may occur on a university campus or against its students.  Nor does the Complaint allege that UVM encouraged, sanctioned, supported, or funded any misconduct against female undergraduate students.  Accordingly, each of Plaintiffs' claims must be dismissed.

While generalized allegations of the risk of sexual assault may not be legally sufficient to support "pre-assault" claims, Plaintiffs' allegations on this issue nonetheless deserve a brief

19

word.  Plaintiffs stitch together a mélange of disparate allegations in an attempt to paint a picture of UVM as a place where sexual harassment and assault are rampant and inadequately addressed, but the individual allegations and facts do not support the story Plaintiffs would tell.  The bulk of these allegations concern conduct that is alleged to have occurred in contexts over which UVM has no control (e.g., off-campus apartments and other housing), are entirely conclusory (e.g., it is "known" that parties are dangerous), are not probative of deliberate indifference (e.g., referring to Nick Stanton's participation in a legislative task force, or the existence of student protests), or occurred after the alleged sexual assaults and therefore cannot be used to bootstrap a pre-assault "official policy" of deliberate indifference (e.g., the "Share Your Story" social media campaign).  Moreover, many of the allegations concern anonymous reports made on the Internet or elsewhere and unattributed quotes, which have little probative value and preclude any meaningful response.  It is also important to note that there has been no finding by any governmental agency that UVM has failed to appropriately respond to allegations of sexual misconduct under Title IX.  *Cf. Karasek*, 956 F.3d at 1113 (describing report by the California State Auditor concluding that over a five-year period, the University of California had resolved 76% of complaints in an inadequate manner).  While UVM disagrees with Plaintiffs' characterization of the Department of Education's compliance audit and fine referred to in the Complaint, even taking the characterization alleged by Plaintiffs as true, a failure to properly count sexual offenses reported to unlicensed counselors under the Clery Act would not be the same as a violation of Title IX, nor would it be evidence of an "official policy" of deliberate indifference to the risk of sexual misconduct against all female students.  *Cf.* Compl. ¶ 208.

Regardless, focusing individually on each of the Plaintiffs' alleged assaults, Plaintiffs have each failed to state a viable "pre-assault" claim because they cannot connect their alleged assaults to any sufficiently specific knowledge of UVM.

### a. Kendall Ware

Ms. Ware alleges that during and after her romantic relationship with Anthony Lamb, he filmed her without her consent at his parents' home, removed a condom without her consent at an unspecified time at an unspecified location, and raped her in September 2019 in his off-campus apartment after they had an argument.  Compl. ¶¶ 39-40, 51.  The Complaint does not include **any** specific allegations about conduct by Mr. Lamb, the men's basketball team, or even male athletes in general that occurred and were known to UVM prior to these three events and could have possibly put UVM on notice that there was a particular risk of sexual misconduct to which UVM was deliberately indifferent and resulted in Mr. Lamb's actions.  Ms. Ware and Mr. Lamb had a romantic relationship and the alleged sexual misconduct occurred solely within that context—not at an "unofficial house[] . . . known to be dangerous for women."  *Id.* ¶ 247.  The Complaint's vague allegations regarding rumors of athletes preying on students at house parties are not relevant to alleged misconduct within a long-term dating relationship.

Nor, even if they were relevant, could the Complaint's generalized allegations regarding UVM athletes bear the weight of Ms. Ware's claim.  The Complaint refers to Internet gossip through a conclusory statement about "online forums devoted to the broad topic of college basketball" at an unspecified time, and social media posts regarding basketball players and other male athletes long after Ms. Ware made a report concerning Mr. Lamb to UVM.  *Id.*  ¶¶ 246, 250.  These allegations are neither sufficient nor adequate evidence in the context of this claim.  Likewise, the bare allegation that "UVM and Schulman were on notice of actual risks posed to

female students by specific Men's Basketball players as early as 2018" is entirely conclusory, unsupported by any specific evidence alleged in the Complaint, and falls far short of the pleading standard required under *Iqbal* and *Twombly*.  *Id.* ¶ 276.

### b.  Sydney Partin

Ms. Partin makes two sets of allegations.  First, she alleges that in October 2018, a non-student driver for a ridesharing service made sexual comments and put his hand on her thigh without her consent.  *Id.* ¶ 112.  There is no allegation that UVM had any notice whatsoever about the offensive driver or ridesharing service drivers in general before his interaction with Ms. Partin,[10] and there can be no dispute that a Burlington man with no UVM affiliation is not a harasser or context UVM controls.[11]

Second, Ms. Partin alleges that in March 2019, she was drugged at an off-campus party attended by members of a fraternity no longer recognized by the university and that she was later raped by an unknown individual in her dorm room.  Compl. ¶¶ 116, 119, 122, 135.  Ms. Partin acknowledges that AEPi was not a recognized fraternity at UVM at the time of her drugging.  Compl. ¶ 117.  UVM had already done what it could to address risks posed by the fraternity itself[12]—and, indeed, suspending a fraternity is the opposite of sanctioning or supporting its

---

[10] The Complaint alleges that Ms. Partin later learned there were other complaints concerning the same man but does not state that any preceded her complaint.  *See* Compl. ¶ 114.

[11] This claim would also be barred by the statute of limitations.  *See* Section I.B.2 *infra.*

[12] To be clear, the known risks to which UVM was responding did not include sexual assault.  As the Complaint alleges, the derecognition of AEPi came after "several members were hospitalized for excessive alcohol and drug use."  Compl. ¶ 117.  There is no allegation that AEPi was derecognized for anything related to sexual assault or drugging students.  Moreover, the Complaint's assertion that AEPi had a "long history of being a dangerous place for women" is supported only by the allegation that there were "at least six separate posts on the @ShareYourStoryUVM page documenting incidents of alcohol- or drug-related sexual assaults at AEPi parties, going back as far as 2015."  *Id.*  Taking that as true, there is no allegation that UVM had notice of these claimed assaults prior to Ms. Partin's alleged assault in 2019—as the Complaint alleges, the @ShareYourStoryUVM posts began in April 2021.  *See id.* ¶¶ 149-52.

activities.  *Cf. Simpson*, 500 F.3d at 1177.  There need not be a "formal process in place to deter students from attending" off-campus activities, including "those of suspended fraternities," to comply with Title IX, nor does the absence of such a process equate to actual knowledge of a specific risk of sexual assault.  Compl. ¶ 229.  Finally, UVM could not have anticipated the conduct of an individual whose identity is still not known to Ms. Partin herself.

### c.  Haley Sommer

Ms. Sommer alleges that Austin Weiland raped her in November of 2020.  *Id.* ¶ 168, 172, 176.  The Complaint states that a student who is not a Plaintiff, Athena Hendrick, posted on Instagram that they reported that they had been raped by Mr. Weiland in February 2020, but that Mr. Weiland was not found responsible for violating any UVM policy.  Compl. ¶¶ 10, 149-151.  Not every report and investigation ends in a finding of responsibility—and, indeed, there are no specific facts alleged regarding the alleged assault of Athena Hendrick that could plausibly lead to the conclusion that UVM's process reached the wrong result.  UVM must conduct a process that is impartial and fair to both parties, and, as in litigation, one party is inevitably disappointed.  The fact a complainant disagrees with the outcome of an investigation is not evidence of an official policy of deliberate indifference to all complainants, let alone all female students.  It might be a different story if UVM was alleged to have found Mr. Weiland responsible for a policy violation and failed to impose an appropriate sanction to address the harm and prevent its reoccurrence, or if Ms. Sommer had alleged some specific bias or error in an investigation process involving him, but colleges and universities  have to be able to rely on the finality of their decisions where credibility determinations can be difficult to make and the facts can be nuanced.

It would put colleges and universities in an impossible position if a plaintiff could use a non-party's bare public expressions of dissatisfaction with the outcome of their own process to bootstrap that into a fact demonstrating an "official policy" of deliberate indifference just because the alleged perpetrator in a subsequent claim of assault was the same person.  UVM's students have privacy rights under law and UVM's policies.  UVM should not have to prove in this litigation why a decision in a non-party's Title IX process was correct—and, moreover, UVM might be limited in the evidence that could be used if non-parties do not consent to their confidential student records being released.  Again, Ms. Sommer has not alleged any reason **why** UVM's decision to decline to find Mr. Weiland responsible for a policy violation was wrong or incorrect other than the bare disagreement expressed by Athena Hendrick in an Instagram post. Disputing the outcome of a prior process, without more, is not enough to show UVM was on notice that Mr. Weiland was supposedly at risk of sexually assaulting someone.

### B.  Ms. Ware's and Ms. Partin's claims for "post-assault" deliberate indifference fail as a matter of law.

In Count II, Ms. Ware and Ms. Partin allege that UVM was deliberately indifferent to their reports of sexual misconduct under Title IX.[13]  The relevant standard for a claim against a university under Title IX by a student alleging another student harassed them is "narrow" and requires a plaintiff to establish: (1) substantial control over both the harasser and the context in which the known harassment occurred, (2) severe, pervasive, and objectively offensive discriminatory harassment, (3) actual knowledge by someone with authority to take corrective action to end the discrimination, and (4) deliberate indifference.  *Zeno v. Pine Plains Cent. Sch.*

---

[13] To the extent Plaintiffs are alleging a pattern or practice of discouraging students from seeking assistance or protection, that allegation is entirely conclusory and unsupported in the Complaint.  Compl. ¶¶ 294-95.

*Dist.*, 702 F.3d 655, 665 (2d Cir. 2012); *Davis*, 526 U.S. at 643-50.  The university's decision

must amount to "an official decision . . . not to remedy the violation."  *Gebser*, 524 U.S. at 290.

     Deliberate indifference is a higher standard than negligence, laziness, or carelessness.

*Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006); *see also Davis*, 526 U.S. at 649

("This is not a mere 'reasonableness' standard."); *Sanches v. Carrollton-Farmers Branch Indep.*

*Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011) ("Title IX does not require flawless investigations

or perfect solutions.").  As discussed above, colleges and universities are not required to "purg[e]

their schools of actionable peer harassment," nor is any "particular disciplinary action" required.

*Davis*, 526 U.S. at 648.  Universities must "merely respond to known peer harassment in a

manner that is not clearly unreasonable."  *Id.* at 648-49.  Courts, on a motion to dismiss, may

identify a response as "not 'clearly unreasonable'" as a matter of law.  *Id.* at 649.  Such is the

case here.  As Ms. Ware and Ms. Partin have failed to plausibly allege facts that could make out

deliberate indifference, their claims must be dismissed.

### 1.  Kendall Ware

     Ms. Ware's claim fails for two independent reasons.  First, as noted above, UVM may be

liable only to the extent that it exercised control over the location in which the alleged

harassment occurred.  Two out of the three incidents alleged by Ms. Ware took place at off-

campus residences (Mr. Lamb's off-campus apartment and his family home), and the third

occurred at an undisclosed location.  There is no allegation in the Complaint that even hints that

any of these three incidents occurred in a context over which UVM had any control.  Because

UVM did not have control over the context in which the alleged harassment occurred, Ms.

Ware's claim should be dismissed.[14]

Second, UVM's response to Ms. Ware's report was not clearly unreasonable even in the

light most favorable to Ms. Ware.  UVM did not have actual knowledge of Ms. Ware's report

regarding Mr. Lamb until she asked Judy Rickstad, a confidential victim's advocate, to help her

make a report to the UVM Title IX Office.  Compl. ¶ 53.  Ms. Ware acknowledges that UVM's

Title IX Intake and Outreach Coordinator contacted her the day after Ms. Rickstad made a report

on Ms. Ware's behalf.  *Id.* ¶ 57.  The very next day, UVM's assigned investigator walked Ms.

Ware through her options in detail, including the informal resolution process.  *Id.* ¶ 58.  There is

no dispute that Ms. Ware at all times understood that she had the option to pursue the formal

investigation process, and that the informal resolution process was entirely voluntary.  *See id.* ¶

74; Ex. L (Informal Resolution Agreement).

---

[14] *See, e.g.*, *Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) ("On the facts of this case there was no evidence that the University had control over the student conduct at the off campus party."); *Rudman v. Okla. ex rel. Bd. of Regents for the Reg'l Univ. Sys. of Okla.*, No. CIV-22-0091-F, 2022 WL 17083406, at *9 (W.D. Okla. Nov. 18, 2022) ("Here, Rudman's factual allegations are not sufficient to establish a meaningful nexus between the UCO and the off campus sexual harassment at the Cheer Team members' private residence, so as to render the Board liable under Title IX for the alleged sexual harassment."); *Doe v. Univ. of Mo.*, No. 19-CV-04229-NKL, 2022 WL 4043458, at *15 (W.D. Mo. Aug. 30, 2022) ("Case law has consistently held that peer to peer sexual harassment that occurs off campus is not 'under the control' of the University, unless it is at an off-campus facility under the control of the university . . . or during an off-campus activity facilitated by a university . . . ."); *Doe v. Univ. of Scranton*, No. 3:19-CV-01486, 2020 WL 5993766, at *9 (M.D. Pa. Oct. 9, 2020) ("Absent any indication that Defendant exercises substantial control over the off-campus housing in which Plaintiff lived, the amended complaint fails to state a valid Title IX claim."); *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1170 (D. Kan. 2017), *aff'd sub nom. Farmer v. Kan. State Univ.*, 918 F.3d 1094 (10th Cir. 2019) ("At one end, peer sexual assaults that occur at on-campus dormitories clearly implicate Title IX. At the other end, peer sexual assaults that occur off-campus, in private settings, and within contexts that have little or no connection to the funding recipient do not trigger Title IX liability."); *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1131-32 (D. Or. 2016), *aff'd*, 725 F. App'x 598 (9th Cir. 2018) ("Ms. Samuelson's harasser drugged Ms. Samuelson at an off-campus party.  OSU had no control over an off-campus party at an apartment that simply happened to be located in the same city as the university.  And Ms. Samuelson's rape occurred not on campus, where the OSU might exert some control over the comings and goings of students or guests, but at another off-campus apartment.").

Ms. Ware describes being conflicted between wanting consequences for Mr. Lamb that she would experience as meaningful and the risk that Mr. Lamb could be expelled if he were found responsible for violating a UVM policy under the formal investigation process. *Id.* ¶ 64. She implicitly acknowledges that the informal process was a way for her to process her experiences with Mr. Lamb that avoided formal disciplinary consequences. *Id.* ¶¶ 64, 77, 79. It also avoided the possibility that after completion of an investigation, Mr. Lamb was determined to be **not** responsible.[15] There were practical reasons the informal resolution process had appeal to Ms. Ware, and it was not clearly unreasonable to rely on Ms. Ware's decision to participate in it.

Ms. Ware does not deny that she understood she had the option to pursue a formal investigation before deciding to move forward with the informal process, or that she could change that determination at any time and begin an investigation but, ultimately, did not do so. *Id.* ¶¶ 74, 79. UVM engaged a consultant attorney, Peter Lim, to serve as an impartial facilitator and there is no dispute that he alone conducted the resolution process. *Id.* ¶ 70. Moreover, Ms. Ware acknowledges that there were consequences for Mr. Lamb in the informal process: he was required to have no contact with her, to refrain from using the athletic facilities at particular times, to complete a healthy masculine identity program, and to not attend sports-related events (including an annual UVM sports celebration event). *Id.* ¶ 86. Ms. Ware also admits that she ultimately was able to present her "victim impact statement" as she desired to Mr. Lamb via video. *Id.* ¶ 88. Nowhere does Ms. Ware allege—nor could she—that she ever asked to stop the informal process, or that some reasonable request of hers during that process was not granted.

---

[15] Mr. Lamb has publicly denied the allegations contained in the Complaint concerning him. *See e.g.*, Derek Brouwer & Chelsea Edgar, *Lawsuit: UVM Mishandled Rape Allegations Against Basketball Star Anthony Lamb*, Seven Days (Dec. 7, 2022), *available at* https://www.sevendaysvt.com/vermont/lawsuit-uvm-mishandled-rape-allegation-against-basketball-star-anthony-lamb/Content?oid=37097413.

She acknowledges that she signed the informal resolution agreement the day after she received it. *Id.* ¶ 85; *see also* Ex. M (Informal Resolution Agreement).

The facts alleged in the Complaint demonstrate that UVM's response was not clearly unreasonable. Although UVM disputes that any of its employees improperly pressured Ms. Ware into making one choice or another and that it violated any UVM policy to permit Ms. Ware to move forward with an informal process given the allegations she had reported and concerns she expressed, it is not deliberate indifference as a matter of law to provide the type of process to an individual that they have chosen. *Cf. Roskin-Frazee*, 2018 WL 6523721 at *8 (holding it was not clearly unreasonable to act in a manner that merely respected the plaintiff's wishes). The standard for deliberate indifference is very narrow. Even accepting Ms. Ware's allegations that UVM's response was imperfect, it was certainly reasonable, and the law demands nothing more.

### 2. Sydney Partin

As described above, Ms. Partin has alleged two distinct incidents. It is unclear from the Complaint whether Ms. Partin is alleging that UVM was deliberately indifferent to her report regarding the first—her encounter with the lascivious ride-share driver—but, to the extent she is, any such claim must fail for multiple reasons. First, UVM does not have substantial control over the harasser a ("Burlington man" unaffiliated with the university) or the context in which the harassment occurred (off campus in the driver's vehicle). *Zeno*, 702 F.3d at 665; *Davis*, 526 U.S. at 645. Second, while what occurred was understandably upsetting, it was not severe, pervasive, and objectively offensive sexual harassment even in the light most favorable to Ms. Partin. *Id.* Third, it was not clearly unreasonable for Dean Russell to recommend that Ms. Partin file a police report with campus police. Compl. ¶ 113. Finally, that incident and corresponding

28

report would be outside the statute of limitations.[16]   Accordingly, to the extent that this incident is a part of Count II, it should be dismissed.

As for Ms. Partin's report to Dean Russell regarding her experience at the off-campus party and UVM Medical Center emergency department, these too were contexts over which UVM exercised no control.  *See* Section I.B.1 *supra.*  There are no allegations in the Complaint suggesting otherwise.  *See generally* Complaint.  Accordingly, Ms. Partin's claim should be dismissed on this basis.

Lastly, Ms. Partin alleges that her January 13, 2020 email to Dean Russell regarding her experience at UVM Medical Center should have put UVM on notice that she was making a report of sexual exploitation.  Compl. ¶¶ 140-41.  A copy of the email is included as Exhibit M.[17] Ms. Partin's email states that she was drugged at a party, but does not indicate that she was sexually assaulted or even that she was drugged for the purpose of sexual exploitation.  Ms. Partin does not mention that a male student had groped and kissed her, nor does the Complaint include an allegation that she ever told Dean Russell about Mr. Donovan's alleged conduct.  *See* Compl. ¶¶ 139-47.  At the time of the email, Ms. Partin had not yet recovered the repressed memory that led her to conclude she had been raped in her dorm room.  Her focus was entirely on "appropriate consequences for the doctor" who had refused to test her for "date rape drugs," not a report of sexual misconduct.  Ex. M (Email from Sydney Partin).

---

[16] Title IX does not contain a specific statute of limitations so federal courts apply the most analogous state law.  The Court should apply Vermont's three-year statute of limitations applicable to personal injury actions.  *See* 12 V.S.A. § 512(4); *Morse v. Univ. of Vt.*, 973 F.2d 122, 127 (2d Cir. 1992).

[17] The email can be considered without converting this motion to one for summary judgment because it is quoted and incorporated by reference into the Complaint.  *See supra* note 1.  Alternatively, the allegations in the Complaint as drafted are consistent with the email.

While UVM disputes Ms. Partin's characterization of Dean Russell's response, at that point, UVM did not have actual notice of discriminatory harassment as a matter of law. Dean Russell and Ms. Moran reasonably understood that Ms. Partin wanted to report that she had been drugged only and wanted assistance with addressing the conduct of the emergency department staff. A report of a drugging, without a sexual element, would not trigger any specific obligation under Title IX or UVM policy.

Moreover, Dean Russell's response to Ms. Partin's report regarding the drugging incident was not clearly unreasonable under the circumstances even in the light most favorable to her. The Complaint does not allege that the UVM Medical Center employee was an employee of UVM or that UVM had any ability to directly redress Ms. Partin's concerns with the employee's handling of the emergency department visit. Nevertheless, Dean Russell still tried to address the core of Ms. Partin's report and provided her with support and resources, including an explanation as to how she could make a complaint. The Complaint does not state Ms. Partin wanted some specific accommodation or support at that time that she did not receive.

UVM did not have actual notice that there was a potential sexual element to Ms. Partin's reported drugging until her Instagram post, which the University was made aware of and she acknowledges it promptly responded to. Ms. Partin declined to participate in UVM's process. It was not clearly unreasonable for UVM to decline to conduct an investigation against Ms. Partin's wishes as a matter of law.

### C. Ms. Ware's and Ms. Sommer's claims of retaliation must be dismissed for lack of any plausible allegations of cognizable retaliation.

In Count III, Ms. Ware and Ms. Sommer each allege that UVM retaliated against them for engaging in activity protected under Title IX. Both of their claims fail as a matter of law because neither can establish a prima facie case of retaliation.

A plaintiff claiming retaliation under Title IX must establish a prima facie case by showing: "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action." *Sutton v. Stony Brook Univ.*, No. 21-2055, 2022 WL 4479509, at *3 (2d Cir. Sept. 27, 2022).  An adverse action is one "of a nature that would deter a reasonable [student] from making or supporting a discrimination claim." *Doe v. Syracuse Univ.*, No. 521CV977GLSATB, 2022 WL 4094555, at *5 (N.D.N.Y. Sept. 7, 2022) (internal quotation and citation omitted); *see also Bailey v. N.Y. Law Sch.*, No. 16 CIV. 4283 (ER), 2019 WL 4640230, at *6 (S.D.N.Y. Sept. 24, 2019), *aff'd*, No. 19-3473, 2021 WL 5500078 (2d Cir. Nov. 24, 2021) ("To establish a prima facie case of retaliation, a plaintiff must show that a reasonable person would have deemed the defendant's action 'materially adverse,' which means that it could have discouraged a reasonable person from making a complaint.).

### 1.  Kendall Ware

Ms. Ware alleges that after making a report regarding Mr. Lamb, she received misleading information, was pressured into the informal process, and was forced to observe UVM "continuing to publicly laud, advertise, and defend its star athlete[.]"  Compl. ¶¶ 303, 305.  These allegations may be relevant to Ms. Ware's claim of deliberate indifference to her report under Title IX (which should be dismissed as set forth above), but they are not adverse school-related actions in the context of a claim for retaliation.  *Cf. Morin v. Fordham Univ.*, No. 21 CIV. 7909 (NSR), 2022 WL 4586042, at *8 (S.D.N.Y. Sept. 28, 2022) (distinguishing the institutional response to an incident of sexual misconduct reported by the plaintiff and an individual defendant's refusal to grant the plaintiff a time extension, issuing a failing grade, and withholding course availability information causing a delay in graduation).

31

### 2.   Haley Sommer

Ms. Sommer alleges that her former professor and director failed to respond to her request that they help with her job search or serve as references.  Title IX's reach is limited to education programs and activities.  20 U.S.C. § 1681.  When Ms. Sommer voluntarily departed the graduate program that she was previously participating in, she was no longer participating in any education program or activity to which Title IX applies.

Moreover, Plaintiff has not alleged facts that would permit causality to be inferred under the circumstances, even if Title IX applied.  The Complaint is silent with respect to the timing of her outreach to Director Smiles-Becker and Professor Seidl and the length of time that had passed since her alleged protected activity.  *See Shalom v. Hunter Coll. of City Univ. of New York*, 645 F. App'x 60, 62-63 (2d Cir. 2016)  ("While causality can be inferred where an adverse action follows closely after protected activity, Shalom received her failing grade at the end of the fall 2010 semester, at least five months after her first complaint, and her leave-of-absence request was denied over a year after her final complaint and the commencement of her Article 78 proceedings.").  For all of these reasons, the retaliation claims must be dismissed.

## II.   Count VIII (Equal Protection) Must Be Dismissed Because the Complaint Fails to Allege Disparate Treatment of Similarly Situated Individuals.

Plaintiffs' Equal Protection claim rests on several unsupported leaps in logic.  Plaintiffs begin with the contention—made solely "on information and belief"—that UVM treats complaints of sexual harassment and assault "differently than other types of complaints," Compl. ¶ 348.  Other than this bald assertion, Plaintiffs offer no specific, plausible supporting allegations that bear this out or illustrate how UVM handles other types of complaints.  Regardless, Plaintiffs then go on to suggest that this supposed differential treatment of complaints disparately affects female students because they are more likely to be victims of sexual harassment and

assault.  What is missing here is any allegation that Plaintiffs, when compared to **similarly situated** students—i.e., other students making complaints of sexual harassment or assault—were subject to disparate treatment on account of their membership in a protected class.  Additionally, Plaintiffs ground their claim in an alleged pattern or practice of handling complaints **by UVM**, but they have asserted the claim only against individual Defendants.  In the absence of any specific allegation of disparate treatment by the individual Defendants, Plaintiffs provide no basis for individual liability.  Each of these deficiencies is fatal to Plaintiffs' claim and requires dismissal.

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Claims of disparate treatment in violation of the Equal Protection Clause thus "require plaintiffs to show that the person 'was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'" *Spring v. Allegany-Limestone Cent. Sch. Dist.*, 655 F. App'x 25, 28 (2d Cir. 2016) (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)).  Moreover, individual liability for an Equal Protection Clause violation "requires personal involvement by [the named] defendant, who must act with discriminatory purpose." *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012).  A showing of "purposeful discrimination requires more than intent as volition or intent as awareness of consequences," but "instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* (quoting *Iqbal*, 556 U.S. at 676) (internal alterations omitted).

Here, Plaintiffs have failed to plausibly allege an Equal Protection claim for three reasons, each independently dispositive.  First, Plaintiffs fail to allege that they were treated

differently from other similarly situated complainants.  *See Hu v. City of N.Y.*, 927 F.3d 81, 91

(2d Cir. 2019) (Equal Protection claim requires showing that "the person, compared with others

similarly situated, was selectively treated").[18]  In order to "succeed on an equal protection claim

in the harassment context, a student must show that he [or she] was afforded a lower level of

protection as opposed to other students, and that this lower level of protection was the result of

his [or her]" protected status.  *Preston v. Hilton Cent. Sch. Dist.*, 876 F. Supp. 2d 235, 244

(W.D.N.Y. 2012) (quoting *T.K. v. N.Y. City Dep't of Educ.*, 779 F. Supp. 2d 289, 314 (E.D.N.Y.

2011)).  In *Preston*, the court granted dismissal of an Equal Protection disparate treatment claim

where the plaintiff made "boilerplate allegations that the defendants treated male same-sex

sexual harassment complainants differently from female complainants, and that the [school

district] maintained a policy or practice to that effect" but otherwise "failed to set forth any

supporting facts that would render these conclusory allegations plausible, such as facts

identifying similarly-situated students or describing the treatment of female complainants by the

defendants in like circumstances." *Id*. at 244.  The grounds for dismissal are even more

compelling here: Plaintiffs have not even made **a single** allegation, boilerplate or otherwise, that

the individual Defendants treated their alleged reports of harassment differently from reports by

similarly situated male students.  *See also Spring*, 655 F. App'x at 28 (affirming dismissal of

Equal Protection claim where complaint "contain[ed] no allegations regarding disparate

treatment between [plaintiff] and similarly situated students").

---

[18] *See also Bizzaro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (Equal Protection claim requires "adverse
treatment of individuals compared with other similarly situated individuals [and a showing that] such
selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or
punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person" (citation
and emphasis omitted)).

In place of specific allegations of disparate treatment, Plaintiffs offer only the generalized assertion that "female students are more likely to suffer harassment and sexual violence by a significant margin." Compl. ¶ 349. Accepting this as true for purposes of the present motion, the fact that women are statistically more likely than men to suffer harassment and sexual violence does not make out a claim for violation of Equal Protection. In *Austin v. University of Oregon*, 925 F.3d 1133 (9th Cir. 2019), a group of male plaintiffs made an analogous (albeit converse) argument that a university's pattern of disciplining only male students for sexual misconduct supported a claim for selective, gender-based enforcement under Title IX. The Ninth Circuit rejected the argument and affirmed dismissal of the plaintiffs' claims,[19] explaining:

> [T]his allegedly disparate impact, even assuming it is true, claims too much. Significantly, the complaint does not claim that any female University students have been accused of comparable misconduct, and thus fails to allege that similarly situated students—those accused of sexual misconduct—are disciplined unequally. The district court also recognized the lack of parallelism and reasoned "[s]imply because enforcement is asymmetrical does not mean that it is selectively so." We agree. Without nonconclusory allegations that the male students were treated any differently than similarly situated female students based on sex, the selective enforcement theory fails.

*Id.* at 1138. So too here: the lack of any specific allegation that female complainants of sexual harassment or assault have been treated differently than male complainants is dispositive of the claim.

Second, even if Plaintiffs were able to make out a viable Equal Protection claim based on the theory that sexual harassment and assault complaints are treated differently than other types of complaints, resulting in a disparate impact to female students, the claim would nonetheless fail for lack of sufficiently specific supporting allegations. It is well established that "generalized

---

[19] While the decision on appeal did not specifically address Equal Protection, the district court had dismissed a disparate treatment claim by the plaintiffs under the Equal Protection Clause on identical grounds. *See Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1227 (D. Or. 2016).

allegations do not make out an equal protection claim." *Sound Aircraft Servs., Inc. v. Town of E. Hampton*, 192 F.3d 329, 335 (2d Cir. 1999).  Here, out of the 353 numbered paragraphs in the Complaint, only a single paragraph addresses the supposed disparate treatment of sexual harassment and assault complaints, stating: "Upon information and belief, complaints of sex discrimination, including sexual assault, are treated differently than other types of complaints filed at UVM."  Compl. ¶ 348.  The Complaint does not identify the "other types of complaints" to which sexual harassment complaints are compared, nor does it allege how treatment of those complaints differs or what classes of students are making the "other types of complaints." Absent any such supporting allegations, the generalized assertion of disparate treatment is far too cursory to credit.  *See M.P. v. Hartford Bd. of Educ.*, No. 3:12CV01540 (AVC), 2013 WL 12318553, at *6 (D. Conn. Sept. 26, 2013) (dismissing Equal Protection claim where "plaintiffs merely make conclusory statements that the defendants adopted and enforced a policy of treating complaints of harassment by female and/or disabled students differently from those by other students"); *see also Burrell v. Annucci*, No. 922CV0701GTSATB, 2022 WL 4618737, at *9 (N.D.N.Y. Sept. 30, 2022) ("Conclusory allegations of disparate treatment . . . are patently insufficient to plead a valid claim under the Equal Protection clause." (citation and quotation omitted)).

Third, Plaintiffs have failed to allege any plausible basis upon which the individual Defendants against whom the Equal Protection claim is asserted could be found liable.  Again, claims asserted against an individual—and Plaintiffs have only brought their Equal Protection claim against the individual Defendants in their personal capacities—require "personal involvement" and a plausible allegation of "discriminatory purpose" by each named defendant. *Reynolds*, 685 F.3d at 204.  For this reason, the Second Circuit has rejected efforts "to import the

pattern-or-practice framework" used in Title VII employment discrimination claims into the

Equal Protection context for claims against individual defendants, as to do so "would

substantially circumvent the plaintiffs' obligation to raise a prima facie inference of individual

discriminatory intent."  *Id.*  It is clear that this is exactly what Plaintiffs seek to do here.

Plaintiffs allege only that UVM—as an institution—has engaged in supposed pattern or practice

of treating sexual harassment complaints differently from other types of complaints; they make

no specific allegations that the **individual Defendants** subjected them to selective treatment vis-

à-vis other similarly situated individuals or acted with discriminatory intent.  Absent specific

allegations upon which the individual Defendants could be found liable for a denial of Equal

Protection, the claim must be dismissed.

### III.  The Court Should Decline Supplemental Jurisdiction over the State Law Claims or, in the Alternative, Dismiss Them for Failure to State a Claim.

#### A.  Absent the federal anchor claims, Plaintiffs' state law claims should be decided by Vermont's state courts.

It is well settled that "in the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered . . . will point toward declining to exercise

jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S.

343, 350 n.7 (1988).  Because Plaintiffs' Title IX and Equal Protection claims must be dismissed

and the balance of pertinent factors weighs against retaining jurisdiction over their state-law

claims, the Court should decline supplemental jurisdiction and dismiss the remainder of the

Complaint.

Section 1367 provides federal district courts with supplemental jurisdiction over claims

"that are so related to the claims in the action within such original jurisdiction that they form part

of the same case or controversy[.]"  28 U.S.C. § 1367(a).  Courts have discretion to "decline to

exercise supplemental jurisdiction" over related claims in certain circumstances, including where "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). Even if the statutory prerequisites for discretion are met, the court must also analyze whether the exercise of supplemental jurisdiction would "promote the values" of "economy, convenience, fairness, and comity" (the so-called *Gibbs* factors). *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). This analysis "'usually' point[s] toward a declination" of supplemental jurisdiction "[o]nce all federal claims have been dismissed." *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 118 (citing *Carnegie -Mellon Univ.*, 484 U.S. at 350 n.7) (internal alteration omitted).

Plaintiffs' Title IX and Equal Protection claims provide the only basis for federal jurisdiction. *See* Compl. ¶ 31. Once the federal claims are properly dismissed, no claims over which this Court has original jurisdiction would remain, and the four *Gibbs* factors do not support the exercise of supplemental jurisdiction.

When considering the first *Gibbs* factor, judicial economy, courts take into account "their familiarity with the facts, the timing of the case, the number of parties and claims, the amount of discovery, and whether there is ongoing parallel litigation[.]" *Chenensky v. New York Life Ins. Co.*, 942 F. Supp. 2d 388, 392 (S.D.N.Y. 2013). These considerations do not merit supplemental jurisdiction here. This case is in its earliest stages, with no discovery completed. All of Plaintiffs' claims are legally flawed and subject to dismissal. Economy therefore would not be served through the exercise of supplemental jurisdiction. *See Catzin*, 899 F.3d at 83 (observing that supplemental jurisdiction may be appropriate for "long-pending cases" in which "discovery had been completed, dispositive motions had been submitted, and the case would soon be ready

for trial" (citation omitted)).

"In weighing convenience, courts ask whether the case is easily resolvable and, if it is, whether it is more appropriate to resolve the case than decline to exercise jurisdiction." *Chenensky*, 942 F. Supp. 2d at 392.  While Plaintiffs' claims as currently pled are "easily resolvable" because they fail to satisfy the applicable legal standards and should be dismissed, neither the parties nor the Court can predict how the case will develop if any of Plaintiffs' claims survive.  *Id.*  A full and final resolution will only occur if the Court grants Defendants' motion in its entirety, and there is little convenience benefit to be gained from federal supplemental jurisdiction over Plaintiffs' state-law claims if they are not dismissed.

The fairness factor entails "questions of equity" including whether the parties will be prejudiced if the Court declines jurisdiction and, if so, "are the parties responsible for any such prejudice?"  *Id.*  Plaintiffs stand to suffer no unfair prejudice here.  There is no barrier that prevents them from pursuing their claims in state court upon dismissal.  Furthermore, if Plaintiffs suffer any prejudice in having to replead their claims before this Court or re-file them in another jurisdiction, that prejudice results exclusively from their own inadequate pleading.  As such, no fairness concerns militate in favor of supplemental jurisdiction.

The final *Gibbs* factor, comity, goes to "the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims."  *Id.* (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).  The Second Circuit has instructed that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law[.]"  *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Gibbs*, 388 U.S. at 726).  Following this rule, the Vermont state courts could

offer Plaintiffs a full adjudication of their state law claims. This factor additionally weighs in favor of state-court jurisdiction to the extent that Plaintiffs' claims raise questions of law that have not yet been squarely addressed by the Vermont Supreme Court, such as what duty a university owes to students under the particular circumstances alleged here. Without federal claims, and without support based on any of the other factors relevant to supplemental jurisdiction, it would indeed be "needless" for the Court to adjudicate Plaintiffs' state-law claims. *Id.*

In sum, Plaintiffs have failed to present a plausible federal-law claim for the Court to resolve, and any considerations that might tip the scales in favor of supplemental jurisdiction are absent. The Court should decline jurisdiction over Plaintiffs' state-law claims.

In the alternative, each state-law claim should be dismissed for the reasons set forth below.

**B. Plaintiffs have failed to allege a viable claim for violation of Vermont's Public Accommodations Act.**

In Count IV, Plaintiffs claim that UVM violated the Vermont Public Accommodations Act ("VPAA"). While the facts of each Plaintiff's claim require separate analysis, none has successfully alleged that UVM is liable for creating a hostile school environment in violation of the VPAA.

The VPAA is a broad antidiscrimination and antiharassment statute. Among other things, it provides that the owner of a public accommodation may not refuse, withhold, or deny the accommodation's advantages, facilities, or privileges to any person on the basis of certain protected traits, including sex. *See* 9 V.S.A. § 4502(a). Schools are public accommodations within the meaning of the statute. *See id.* § 4501(1) (defining "place of public accommodation" to include "any school"). The VPAA applies to harassment in schools, including colleges and

universities, through application of a separate statute, 16 V.S.A. § 570f.  *See* § 570f(b)-(c) (outlining requirements for VPAA claim based on harassment at an educational institution); *id.* § 570f(d)(2) (defining "educational institution" to include "a postsecondary school that offers or operates a program of college . . . in Vermont").  Pursuant to Section 570f, a school that "receives actual notice of alleged conduct that may constitute harassment" is required to "promptly investigate to determine whether harassment occurred" and to provide a copy of its harassment policy and investigation procedure to the reporting party and the responding party. *Id.* § 570f(a)(1).  If the school finds, after receiving notice, "that the alleged conduct occurred and that it constitutes harassment," it must "take prompt and appropriate remedial action reasonably calculated to stop the harassment."  *Id.* § 570f(a)(2).  Importantly, Section 570f imposes an administrative exhaustion requirement on school harassment claims.  The reporting party must either exhaust all administrative remedies available under the school's policy or demonstrate that one of five exceptions applies.  *See id.* § 570f(b).

To prevail on a VPAA claim based on school harassment, the student bears the burden of proving both that they suffered "unwelcome conduct" based on their perceived or actual membership in a protected class under 9 V.S.A. § 4502, and:

> The conduct was either:
>
> (A) for multiple instances of conduct, so pervasive that when viewed from an objective standard of a similarly situated reasonable person, it substantially and adversely affected the targeted student's equal access to educational opportunities or benefits provided by the educational institution; or
>
> (B) for a single instance of conduct, so severe that when viewed from an objective standard of a similarly situated reasonable person, it substantially and adversely affected the targeted student's equal access to educational opportunities or benefits provided by the educational institution.

*Id.* § 570f(c).

Even accepting the allegations in the Complaint as true, each Plaintiff has failed to assert a plausible VPAA claim in Count IV for different reasons.

### 1.   Kendall Ware

Ms. Ware claims that UVM violated the VPAA by failing "to take appropriate remedial action in response to her allegations," including by allowing her to pursue an informal resolution even though that is what she chose, and by failing to provide specific remedies Ms. Ware claims she desired but were not a part of the resolution agreement she signed.  Compl. ¶¶ 318-19.  These allegations are insufficient because the facts alleged in the Complaint demonstrate that UVM fulfilled its statutory obligations.  After receiving notice of Ms. Ware's report, UVM—with her participation—promptly initiated a resolution process regarding her report, as detailed in the Complaint.  *See* Compl. ¶¶ 57-88 (describing UVM's resolution process).  While it is clear that Ms. Ware takes issue with numerous aspects of that process, the VPAA does not provide a statutory guarantee of any particular procedural steps.  *See generally* 9 V.S.A. § 4502; 16 V.S.A. § 570f; *see also Blondin v. Milton Town School Dist.*, 251 A.3d 959, 977 (Vt. 2021).  Crucially, the VPAA also does not promise any particular outcome or remedy.

The school's obligation under § 570f, **if** it finds that the alleged conduct occurred and constituted harassment, is to "take prompt and appropriate remedial action reasonably calculated to stop the harassment."   16 V.S.A. § 570f(a)(2).  UVM never made any factual findings regarding the alleged conduct, nor did it conclude that harassment had occurred.  But even if it had, Ms. Ware's complaints that she received incorrect information at some points in the process and that informal resolution was inadequate do not establish that UVM failed to act, or that completing the informal resolution process with the participation of both Ms. Ware and Mr. Lamb was not a remedial action reasonably calculated to stop the alleged harassment.  Indeed,

Ms. Ware does not allege that she experienced any further unwelcome conduct from Mr. Lamb after she made her report and completed the resolution process.  To the contrary, the Complaint explicitly acknowledges that UVM promptly responded to Ms. Ware's report and followed the steps of its established process to address the alleged harassment.  There is no disagreement that there were remedial actions required for Mr. Lamb to which Ms. Ware agreed by signing the agreement.  Accordingly, Ms. Ware has not plausibly alleged a failure to comply with the VPAA's requirements.

### 2. Sydney Partin

Ms. Partin's allegations fail to meet the statutory requirements of the VPAA for two reasons.  First, she fails to allege that she gave notice of harassment within the meaning of the statute.  "Notice" for purposes of the VPAA "means a written complaint or oral information that harassment may have occurred[.]"  16 V.S.A. § 570f(d)(3).  Ms. Partin alleges that in January 2020, she reported to Dean Russell that she "had been drugged at a party, 'completely blacked out,' 'could barely stand up or walk,' and that she had no memories of the rest of the evening."  Compl. ¶ 140.  She further alleges that she reported the UVM Medical Center emergency department "refused to test her for anything" and "had offered her neither drug testing, nor a rape kit."  *Id.*  Ms. Partin does not allege, however, that she reported to Dean Russell that she had been sexually assaulted, or that she expressed concern that she might have been sexually assaulted.  *See id.*  As described in Section I *supra*, UVM did not have notice in January 2020 that there was any sexual element to Ms. Partin's reported drugging.   Based on Ms. Partin's awareness at the time of her email to Dean Russell in January 2020, it makes sense that she did not report that she had been raped or sexually assaulted, as she did not yet realize what had occurred.  *See* Compl. ¶¶ 123, 135.

The implication of the Complaint is that Ms. Partin's report to Dean Russell that she had been drugged, and that UVM Medical Center had not offered her drug testing or a rape kit, satisfied the notice requirement and should have triggered an investigation by the university.  But Ms. Partin does not allege that she reported she had been sexually assaulted, harassed, or raped— only that she believed she had been drugged and could not remember the remaining events of the night.  *See id.* ¶ 140.  The Vermont Supreme Court has construed the VPAA's definition of notice strictly in applying the statute's exhaustion requirement.  As it observed, the aim of the notice element of exhaustion is to "avoid exactly what plaintiff wants the courts to do here— examine her report of sexual assault and determine whether university officials should have understood it to be a claim of harassment" within the meaning of the VPAA.  *Allen v. Univ. of Vt.*, 973 A.2d 1183, 1188 (Vt. 2009).  In the absence of a report of harassment within the meaning of the VPAA, Ms. Partin failed to satisfy the statutory exhaustion requirements and cannot proceed with her claim.  *See id.* at 1190 (holding plaintiff could not pursue VPAA claim where her report of assault did not satisfy VPAA notice requirement for exhaustion).

Second, Ms. Partin openly admits that she declined to proceed with pursuing an investigation or informal resolution of her reports when offered the chance to do so.  *See* Compl. ¶ 156.  The Complaint alleges that Ms. Partin posted on social media about the incident at the party in April 2021, partially in response to social media posts by other UVM students about their own experiences with sexual assault, which provided more context for the incident.  *See id.* ¶ 153.  That day, she received an outreach email from UVM's Title IX Office.  *See id.* ¶ 154. Ultimately, Ms. Partin "elected not to pursue an investigation" of any report.  *Id.* ¶ 156.  Thus, her conclusory assertion in Count IV that she "exhausted any internal remedies available to her to seek redressal for her drugging and assault," *id.* ¶ 321, is flatly contradicted by her own

admissions and cannot support her claim.  Under the plain terms of § 570f, "[a] claim may be brought under [the VPAA] . . . only after the administrative remedies available to the claimant . . . pursuant to the harassment policy of a postsecondary school have been exhausted."  16 V.S.A. § 570f(b).  In this case, it is undisputed that Ms. Partin elected not to pursue the administrative remedies available to her through UVM's policies and procedures.

Ms. Partin does not allege that any of the five recognized statutory exceptions to the exhaustion requirement apply to her.  *See* 16 V.S.A. § 570f(b)(1)-(5) (providing a plaintiff need not demonstrate exhaustion if (1) the school did not maintain a harassment policy; (2) the school failed to render a decision within statutory time limits; (3) the complainant's health or safety would have been jeopardized; (4) exhaustion would be futile; or (5) exhaustion would subject the complainant to "substantial and imminent retaliation").  She alleges only that she opted not to pursue an investigation because she "no longer had any faith in UVM's ability to protect her," which does not align with any of the statutory exceptions.  Compl. ¶ 156.  In the absence of any allegation that "adequate remedies [were] not reasonably available or that the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process, at least one of which is required to establish futility," Ms. Partin has failed to plausibly assert that she complied with the requirements to pursue a VPAA claim or that any exception to those requirements applied.  *G.B. v. Orange Sw. Supervisory Dist.*, 838 Fed. App'x 570, 573 (2d Cir. 2020) (citing *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205 (2d Cir. 2007)).

### 3.  Haley Sommer

Like Ms. Partin, Ms. Sommer acknowledges that she did not exhaust her administrative remedies under UVM's established process; in fact, she declined to even report her alleged assault to any UVM employee.  While Ms. Sommer asserts that exhaustion would have been

futile, she too fails to satisfy the high bar of plausibly alleging the necessary facts, requiring dismissal of her VPAA claim.

Ms. Sommer alleges that she was assaulted by a UVM student she met at a party after a night of heavy drinking. *See* Compl. ¶¶ 168-69. Although Ms. Sommer was uncomfortable about her experience at the time, she did not immediately identify it as an assault. *See id.* ¶ 173. Shortly after she had the "realization" that Mr. Weiland raped her, Plaintiff Sommer "decided to post her own story" on social media. *Id.* ¶¶ 176-78.

Ms. Moran contacted Ms. Sommer after she made her Instagram post, explaining "AAEO's reporting options and policies." *Id.* ¶ 180. Ms. Sommer alleges that she "knew nothing about Title IX, AAEO's role on campus, or UVM's sexual assault policies or procedures," but that she "did not trust Moran or the Title IX Office." *Id.* ¶ 181. Ms. Sommer responded to Ms. Moran by expressing "substantive criticisms" of the Title IX Office, but did not request to pursue an investigation or any other form of resolution through the Office. *See id.* ¶¶ 182-83. When Ms. Sommer reached out to Ms. Moran and Nick Stanton again a few days later to "detail[] her anger and disappointment," she was again offered the option of pursuing a resolution process. *Id.* ¶ 193. Ms. Sommer decided not to pursue those options, and ultimately decided to leave her graduate program and UVM. *See id.* ¶ 195.

In support of her VPAA claim, Plaintiff Sommer alleges that "[d]ue to UVM's prior mishandling of" Athena Hendrick's report involving the same alleged assailant, "exhausting administrative remedies would have been futile for Sommer." *Id.* ¶ 322. This allegation misapprehends the exhaustion exception and fails for lack of factual support. As alleged, UVM responded to the earlier report involving Mr. Weiland by conducting a formal investigation. *See id.* ¶¶ 150-51; 182. Ms. Sommer's allegations amount to a dispute with the outcome of UVM's

process as applied to a completely separate report by another student.  They do not demonstrate

that "adequate remedies [were] not reasonably available or that the wrongs alleged could not or

would not have been corrected by resort to the administrative hearing process, at least one of

which is required to establish futility." *Orange Sw. Supervisory Dist.*, 838 Fed. App'x at 573

(citing *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205 (2d Cir. 2007)).  The

Complaint contains no allegation as to why the outcome of the investigation process involving

Mr. Weiland reached the wrong conclusion or was otherwise unreliable apart from a non-party

complainant's bare disagreement with the result.  Another complainant's dissatisfaction with a

process that did not find the respondent responsible for violating any policy, without more, does

not establish the wrongs alleged by Ms. Sommer would not have been corrected.  Indeed, to find

a colorable argument for futility on these facts would effectively vitiate the VPAA's exhaustion

requirement, as there will always be participants in the University's resolution processes

dissatisfied with the outcome.  The Court should therefore decline to recognize a claim for

futility under these circumstances.

### C.  Plaintiffs' negligence claim fails as a matter of law because UVM owed them no legal duty.

Plaintiffs' negligence claim fails for a simple reason.  Plaintiffs allege that UVM and

individual defendants owed them a duty to "reasonably, promptly, and appropriately investigate

reported acts of sexual assault," contending that Defendants assumed this "special duty" by

creating reporting channels and "taking affirmative steps to control and supervise its sexual

assault reporting practices."  Compl. ¶ 330.  But no such duty, whether born out of the ordinary

standard of care or a special relationship, has ever been recognized under Vermont law.  Because

Plaintiffs' theory of duty conflicts with Vermont precedent governing the relationship between a

university and its students, their negligence claims in Count V of the Complaint must be

dismissed for failure to state a claim.  *See, e.g.*, *Montague v. Hundred Acre Homestead, LLC*, 208 A.3d 609, 614 (Vt. 2019) ("The existence of a duty is a question of law to be decided by the court." (internal quotation and citation omitted)); *Lenoci v. Leonard*, 21 A.3d 694, 697 (Vt. 2011) (same).

There are no Vermont cases that recognize the "special duty" alleged by Plaintiffs here.  The Complaint relies on *Stopford v. Milton Town School District*, 202 A.3d 973 (Vt. 2018), but that case only undercuts Plaintiffs' claim: *Stopford* concerned the duties of a public secondary school district—not a university—and held that "under Vermont law there is **no special relationship** between a school district and its student population," and "schools owe their students a duty of ordinary care, not a heightened duty of care."  202 A.3d at 979 (emphasis added).  Moreover, the *Stopford* court also opined that, while a student's "age, circumstances, and . . . disposition" may inform the exercise of reasonable care, none of those factors can impose a heightened duty on the school district.  *Id.* at 980.  While Plaintiffs have not articulated how *Stopford* analogizes to the higher-education context as opposed to public primary and secondary schools, the decision clearly establishes that schools generally do not owe heightened or special duties of care to their students.  *Cf. Karasek v. Regents of the Univ. of California*, No. 15-cv-03717, 2015 WL 8527338, at *21 (N.D. Cal. Dec. 11, 2015) (dismissing university students' negligence claim based on failure to train, warn, or educate in light of "the emphasis that California courts have repeatedly placed on the differences in the duties of protection owed to university versus elementary and secondary students, and the long line of cases rejecting attempts to impose on universities a duty to protect their students from the wrongful acts of third parties").

*Smith v. Day*, 538 A.2d 157 (Vt. 1987) is more squarely on point, directly addressing the scope of a university's duties to its students.  There the plaintiffs alleged—much like Plaintiffs here—that "a special relationship existed . . . because of the degree of control exerted" by the defendant university over the students.  *Id.* at 158.  According to the plaintiffs, the existence of this special relationship was supported by their factual allegations regarding the university's "numerous rules and regulations," and that their alleged harm resulted from "the breakdown in the enforcement of these rules and regulations[.]"  *Id.* at 158-59.  The Vermont Supreme Court disagreed.  *Id.*  It held that a university's control over student activities "does not, of itself, impose a legal duty upon the university to control the volitional criminal acts of its students," nor a more general special duty to protect students from the volitional acts of others.  *Id.* at 159.  Likewise, the university's "rules and regulations fail to give rise to a legal duty, no matter how much 'control' may be exerted therein by [the university]."  *Id.* at 159 n.3.

Other courts to consider the question have reached the same conclusion on facts much like those presented here, in which a plaintiff alleges a university's duty arises out of its power to control a campus social group, such as a fraternity, or out of a university's adoption of policies and regulations governing student conduct.  *See Humphries v. Penn. State Univ.*, 492 F. Supp. 3d 393, 407 (M.D. Pa. 2020) (holding that "simply enacting policies," such as defendant's antihazing policies, Code of Student Conduct, and Administrative Policies, "does not create new duties for entities"); *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1180 (D. Kan. 2017) ("KSU's control of its fraternity system does not create a special relationship between the parties beyond that of a university and its students.").  Vermont law is therefore in accord with the law of other states in limiting the duties of a university and rejecting broad or special duties arising out of institutional policies, rules, or putative control over student activities of the sort alleged by

49

Plaintiffs here.  Indeed, to recognize a negligence claim under these circumstances would dramatically expand the scope of liability for colleges and universities for the actions of their students and would have immense policy implications for schools.  There is no indication that Vermont's courts have ever contemplated such a significant expansion of the State's tort law.

*Smith* also acknowledged that the existence of a duty is informed by the foreseeability of a particular risk or harm.  In *Stopford*, the Vermont Supreme Court emphasized that the defendant school district had no prior knowledge of misconduct "directed at [plaintiff's decedent] or any other student, by the perpetrators of the assault" in finding that the alleged assault was unforeseeable.  202 A.3d at 981.  Vermont law thus requires a showing that the defendant knew or should have known of the **specific** risk posed by a particular individual to the plaintiff in order for any duty to protect against that risk to accrue.  *See id.* at 982 ("[A] generalized risk can contribute to establishing foreseeability, but only when it is accompanied by some knowledge of specific, similar acts or incidents of harm.").  In addition, "crimes committed by a third party" generally "fall within the realm of the unforeseeable, and therefore cannot form the basis for liability" unless the defendant "had special knowledge or notice which would allow it to anticipate the wrongful act."  *Id.* at 981 (citing *Estate of Sumner v. Dep't of Soc. & Rehab Servs.*, 649 A.2d 1034, 1036 (Vt. 1994) (mem.)).

This construction is consistent with cases from other jurisdictions addressing a university's duty to its students, which have drawn the lines of foreseeability to exclude generalized risk, including generalized awareness of the possibility of sexual assault as opposed to knowledge of a specific risk posed to a particular student.  *See Doe v. Emerson Coll.*, 153 F. Supp. 3d 506, 515 (D. Mass. 2015) ("Furthermore, even assuming that Emerson should have been aware as a general matter that its students may be subject to sexual assaults, it does not

follow that Emerson could reasonably be expected to anticipate and prevent a sexual assault occurring at an off-campus party."); *Doherty v. Am. Int'l Coll.*, No. 17-cv-10161, 2019 WL 1440399, at *11 (D. Mass. Mar. 31, 2019) (holding plaintiff failed to allege her injury was foreseeable based on claims of university's purported failure to follow its own policies regarding sexual assault reporting and training for faculty).  Applying this analysis, Plaintiffs' allegations of negligence based on UVM's supposed failure to "respond to" sexually motivated drugging and sexual assaults on campus (and particularly those that occur off-campus) must fail because generalized risk cannot substitute for a specific risk to an individual student sufficient to impose a duty on the university.

Vermont law and other federal precedents are therefore aligned that universities generally do not owe their students the duty alleged by Plaintiffs in Count V.  Plaintiffs have framed their negligence claim in the broadest possible terms, presumably for strategic reasons.  *See* Compl. ¶ 331 (asserting breach of duties through actions "including, but []not limited to" nine alleged acts or omissions).  But where Plaintiffs have identified particular instances of negligent conduct, several of the purported breaches of duty fail to support negligence as a matter of law.  For example, it is well established that a negligence claim cannot survive where the duty of care asserted "is nothing more than the claim [the plaintiff] is entitled to receive that which is due [her] under [a] contract." *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1029 (2d Cir. 1995) (citing *Breslauer v. Fayston Sch. Dist.*, 659 A.2d 1129, 1132-33 (Vt. 1995)).  Thus, Plaintiffs cannot premise negligence claims on alleged failures by UVM to adhere to or enforce its policies and procedures, as those claims sound in contract, not tort.  *See Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 708-09 (D. Vt. 2012), *aff'd*, 570 Fed. App'x 66 (2d Cir. 2014) (explaining that under Vermont law "the relationship between a student and his or her college is 'contractual'

in nature" and "the terms of the contract are contained in the . . . official statements, policies and publications of the institution" (citation and quotation omitted); *see also* Section III.E *infra*.  As for Plaintiffs' assertion that UVM breached a duty by "[a]pplying a different set of rules to important male athletes accused of sexual assault than to other accused assailants," their Complaint is devoid of any factual allegations to nudge that bald assertion across the line from possible to plausible.  *See* Section II *infra* (discussing grounds for dismissal of Plaintiffs' Equal Protection claim).  On the whole, Plaintiffs fail to articulate a legally cognizable duty that UVM owed to them and breached, and their negligence claim must be dismissed as a result.

But even taking the alleged duty at face value, Defendants did "reasonably, promptly, and appropriately investigate reported acts of sexual assault."  Compl. ¶ 330.  As described above in more detail and incorporated by reference here, the process that Ms. Ware received was reasonable, prompt, and appropriate, even if it was not perfect as alleged.  Ms. Ware voluntarily chose the informal process and signed a resolution agreement at the end of it, with the full and complete understanding she could have changed her mind and "start[ed] over" with the formal process.  Compl. ¶ 74.  Even construing the Complaint generously in her favor, Ms. Partin did not report an "act[] of sexual assault" until April 2021, and then declined to pursue or participate in the investigation or informal resolution process offered.  Ms. Sommer likewise declined to participate.  A reasonable, prompt, and appropriate response does not equate to formal investigation and resolution against an individual's wishes and without their involvement.

### D. Plaintiffs' claim for negligent infliction emotional distress fails because the claim for negligence fails.

Count VI of the Complaint asserts a claim of negligent infliction of emotional distress ("NIED") against UVM, the Board of Trustees, and Nick Stanton and Taryn Moran individually. According to Plaintiffs, these Defendants had "actual notice of the known and foreseeable risks

52

presented by certain actors and groups on [UVM's] campus" but failed to "act reasonably to improve sexual assault monitoring policies and practices, monitor and regulate[] unauthorized fraternity activity, increase oversight over club sports, or investigate and discipline credibly accused assailants."  Compl. ¶¶ 336-37.  As with Plaintiffs' negligence claim in Count V, they have failed to plausibly allege that Defendants owed them any legal duty sufficient to sustain a claim for NIED.

A viable NIED claim requires the same elements as a claim of garden variety negligence, with the additional requirement that the plaintiff either "suffered a physical impact from an external force" or was present in the zone of danger leading to a reasonable fear of physical injury.  *See Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1092 (Vt. 1999).  In this case, Plaintiffs allege that they "suffered physical injury which amounts to physical impacts from an external force, in the form of sexual assault" and subsequent physical symptoms, "[a]s a result of" Defendants' alleged negligence.  Compl. ¶¶ 338-39.  However, even accepting the assertion that Plaintiffs can meet the physical impact element, their failure to allege a duty violated by Defendants is fatal to Plaintiffs' NIED claim.

As discussed above, the Vermont Supreme Court has been clear that universities do not have a duty to protect their students from intentional criminal conduct of others.  *See Smith*, 538 A.2d at 159.  Thus, no matter how Plaintiffs attempt to frame and reframe the duty or duties allegedly owed by Defendants, by asserting that Defendants' negligence proximately caused them to be drugged or assaulted by other students (or unknown individuals), they are asking the Court to impose liability that is beyond the bounds of any duty recognized under Vermont law. "Absent a duty of care, an action for negligence fails," and with it, any derivative claim of NIED. *Lenoci*, 21 A.3d at 697; *see also id.* (holding NIED claim "sound[s] in negligence" and requires a

showing of duty); *Taylor v. Fletcher Allen Health Care*, 60 A.3d 646, 651 (Vt. 2012) (noting that "a claim for negligent infliction of emotional distress is premised on a finding of negligence" and requires the establishment of a duty of care); *Emerson Coll.*, 153 F. Supp. 3d at 517 ("Because the Court has indicated that the defendants are entitled to judgment on Doe's negligence claim, her claim for negligent infliction of emotional distress must also fail.").  The Court should dismiss Count VI on that basis.

### E.  Plaintiffs have failed to allege a viable claim for breach of contract.

The contract claims asserted by Ms. Ware and Ms. Partin likewise must be dismissed.  To a significant degree, both Ms. Ware and Ms. Partin base their contract claims on UVM's failure to proceed with formal investigatory processes that they themselves declined.  While UVM may have discretion under its policies to pursue an investigation where a complainant opts not to proceed, Ms. Ware and Ms. Partin have failed to point to any specific provision that contractually **obligated** UVM to proceed with a formal investigation under the circumstances here.  For those and other reasons explained below, the claims fail.

Vermont's courts have recognized a contractual relationship between a student and their college, the terms of which "are contained in the brochures, course offering bulletins, and other official statements, policies and publications of the institution."  *Reynolds v. Sterling Coll., Inc.*, 750 A.2d 1020, 1022 (Vt. 2000) (quoting *Merrow v. Goldberg,* 672 F. Supp. 766, 774 (D. Vt. 1987)).  However, "[n]ot all terms in a student handbook are enforceable contractual obligations, . . .  and courts will only enforce terms that are 'specific and concrete.'"  *Knelman*, 898 F. Supp. 2d at 709 (quoting *Reynolds*, 750 A.2d at 1022); *see also Charleston v. Bd. of Trs. of Univ. of Ill. at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013) ("[T]he student's complaint must be specific about the source of this implied contract, the exact promises the university made to the student,

and the promises the student made in return"); *Mooers v. Middlebury Coll.*, No. 2:20-CV-00144, 2021 WL 4225659, at *7 (D. Vt. Sept. 16, 2021) (granting dismissal of contract claim for failure to identify specific and concrete promise that had been breached). And, as with any contract action, to make out a colorable claim a student must adequately allege not only the existence of a specific contractual obligation that has been breached but also that the breach resulted in damages. *See Mooers*, 2021 WL 4225659, at *5 (citing *Lapoint v. Dumont Constr. Co.*, 258 A.2d 570, 571 (Vt. 1969)).

Ms. Ware and Ms. Partin have alleged violations UVM's Sexual Harassment and Misconduct Policy ("SHM Policy")[20] and "all procedures and policies therein incorporated by reference," Compl. ¶¶ 344, 345, but do not specifically and clearly call out the provisions of such policies that they contend were breached. Plaintiffs' allegations of breach are addressed individually in turn below. While Plaintiffs have not included copies of the policies at issue as exhibits to the Complaint, the policies are "integral to the complaint" and thus "may properly be considered under Rule 12(b)(6)." *Patel v. Univ. of Vt. and State Agric. Coll.*, 526 F. Supp. 3d 3, 16 (D. Vt. 2021). Accordingly, UVM has attached copies of the policies as exhibits to this Motion and requests that the Court take judicial notice of them.

### 1. Kendall Ware

Ms. Ware alleges that UVM breached its contractual obligations to her in two related respects: (1) by "[f]inding alternative resolution appropriate for Ware's complaint given the severity and nature of the conduct reported and high level of harm" and (2) by "[f]ailing to

---

[20] On August 13, 2020, the Discrimination, Harassment and Sexual Misconduct Policy replaced the Discrimination and Harassment Policy and the Sexual Harassment and Misconduct Policy. *See* Ex. B-E. Some of the events alleged occurred after this change, but Defendants refer to the "SHM Policy" to align with the allegations in the Complaint.

conduct a thorough investigation into Ware's report of sexual misconduct."  These claims fail for several reasons.

First, there is no contractual obligation for UVM to pursue a Formal Investigation upon receiving a given report.  Ware suggests that, under the governing UVM policies, the AAEO could not recommend the Informal Resolution process—and, impliedly, had to pursue a Formal Investigation—absent a determination that Informal Resolution was appropriate upon consideration of various criteria, including "the nature of the conduct reported and whether it presents an ongoing safety risk to the UVM community," the "level and type of harm reported," and the "severity of conduct reported."  Compl. ¶ 99.  This is incorrect.  For starters, the Complaint relies on the wrong policy: the provisions quoted come from UVM's **current** Operating Procedure for Handling and Resolving Discrimination, Harassment, and Sexual Misconduct Complaints ("Resolution Procedure"),[21] *see* Ex. K (Current Resolution Procedure), whereas the operative Resolution Procedure is the version that was in effect at the time of Ware's complaint in 2019.[22]  *See* Ex. H (2019 Procedural Guidelines).  The 2019 Procedural Guidelines, unlike the current procedure, do not enumerate any particular criteria to be used in determining whether to proceed with Informal Resolution of a given complaint.

 More to the point, the 2019 Procedural Guidelines are clear that the University's decision on the form of resolution to pursue is wholly discretionary, subject only to the agreement of the parties involved.  The policy states as follows:

> In appropriate cases, and upon the agreement of the Complainant and Respondent (collectively, "the parties"), AAEO may attempt to facilitate a resolution to the issue presented without a formal investigation. The informal resolution process is intended to be flexible, and undertaken in **the reasonable discretion of the**

---

[21] The Resolution Procedure is incorporated by reference in UVM's SHM Policy.

[22] *See* Ex. K (Current Resolution Procedure) at 12, listing revision history.

> **AAEO Office**, so as to address an individual's situation in the most effective and expeditious manner possible.

Ex. H at 5 (emphasis added).[23]   The policy emphasizes that "[p]articipation in an informal resolution process . . . is strictly voluntary," that both the parties and the University are free to decline Informal Resolution, and that the process can be terminated by any of the parties at any time, which may result in the matter being referred for Formal Investigation.  *Id.* at 5-6.

It is well established that, where a university's handbook reserves discretion in determining how to proceed with resolving or investigating a complaint, the exercise of that discretion cannot support a claim for breach of contract.  In *Feibleman v. Trustees of Columbia University in the City of New York*, No. 19-CV-4327 (VEC), 2020 WL 3871075 (S.D.N.Y. July 9, 2020), for example, the court dismissed a claim for breach of Columbia's sexual misconduct policy based upon the university's exercise of discretion not to investigate the plaintiff's complaint of retaliation.  The court noted that the policies—which provided that the university "*may* initiate the investigative process" upon receipt of a complaint—"reserve significant discretion" to the university in determining whether to conduct an investigation, and thus the plaintiff could not establish the breach of any "express promise" by the university.  *Id.* at *2 (emphasis in original); *see also Doe v. Syracuse Univ*., No. 518CV1100BKSTWD, 2022 WL 798058, at *7 (N.D.N.Y. Mar. 16, 2022) (dismissing breach of contract claim for failure to investigate plaintiff's complaint of sexual assault where policy afforded university discretion on whether to investigate); *Z.J. v. Vanderbilt Univ*, 355 F. Supp. 3d 646, 694-95 (M.D. Tenn. 2018) (no breach of contract where university failed to interview accused student's roommates, as policy gave university "discretion to conduct interviews as it sees fit"); *Tsuruta v. Augustana*

---

[23] This is also the case under the current Resolution Procedure, which states that "[t]he decision as to whether the use of the alternative resolution process is appropriate is at the **sole discretion** of the Director or designee."  Ex. K at 4 (Current Resolution Procedure) (emphasis added).

*Univ.*, No. 4:15-CV-04150-KES, 2015 WL 5838602, at *7 (D.S.D. Oct. 7, 2015) (university's

decision to exercise discretion to delay grievance proceeding, as it had discretion to do under a

policy in its handbook, was not a breach of its policies).  Likewise here, where UVM had explicit

discretion to pursue the Informal Resolution process, Ms. Ware cannot establish that UVM

violated her contractual rights in doing so.

Second, unlike the cases cited above, this was not just a discretionary decision made by

the University unilaterally; engaging in the Informal Resolution process required Ms. Ware's

consent.  It was entirely within Ms. Ware's control to insist on proceeding via the formal

process, which would have involved a full investigation, but—as she necessarily

acknowledges—she agreed to proceed with the Informal Resolution process instead.  At the

conclusion of the process, Ms. Ware was presented with a Resolution Agreement stating

explicitly that signing constituted "a full and final resolution of issues raised in [her] complaint"

and that she "underst[ood] that AAEO is prepared to move forward as outlined by University

policy if [she did] not agree to accept the terms outlined" in the Agreement.  *See* Ex. L (Informal

Resolution Agreement).  Ms. Ware signed.  Thus, to the extent that UVM's discretionary

decision to allow the Informal Resolution process to proceed could be construed as a breach of a

contractual obligation—which, as explained above, it was not—Ms. Ware's course of conduct in

participating in the process, signing the Resolution Agreement, and explicitly acknowledging

that the University would proceed with the investigation under its policies if she declined to sign,

unambiguously waived any such breach.  *See Lynda Lee Fashions, Inc. v. Sharp Offset Printing,

Inc.*, 352 A.2d 676, 677 (Vt. 1976) (waiver "is the intentional relinquishment or abandonment of

a known right, and the act of waiver may be evidenced by express words as well as by conduct");

*cf. Lemnah v. Am. Breeders Serv., Inc*., 482 A.2d 700, 706 (Vt. 1984) (noting that it is "widely

recognized" that "an executory contract may be waived if one party continues performance under the contract knowing that the other party has failed to perform").

Third, Ms. Ware has not alleged facts showing—and indeed, cannot show—that she was harmed by any breach of a contractual obligation. The harms she claims, to the extent that they relate to UVM at all and not to the underlying assault alleged, relate to the fact that her complaint was resolved by the Informal Process and not by Formal Investigation. But Ms. Ware was expressly advised, at the time she signed the Resolution Agreement, that if she did not sign the University would proceed with her complaint pursuant to its policies. As Ms. Ware had the chance to elect to proceed with a Formal Investigation and declined to do so, it was her choice to decline those procedures—and not any breach of any alleged contractual obligation to conduct a Formal Investigation—that was the cause of her claimed harm. That is dispositive of her claim. *See Levy v. Estate of McKenna*, No. 2009-431, 2010 WL 7799820, at *2 (Vt. May 21, 2010) (claim for breach of contract fails absent showing that "the breach caused the harm" complained of); *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 655 (E.D. Pa. 2012), *aff'd*, 565 F. App'x 88 (3d Cir. 2014) (dismissing claim for breach of handbook where student failed to establish that breach resulted in her claimed damages). For this and the other reasons set forth above, the Court should dismiss Ms. Ware's contract claims.

### 2.  Sydney Partin

Ms. Partin alleges four distinct breaches of contractual obligations by UVM, addressed in turn below. As none states a colorable claim for breach, the claim should be dismissed.

First, Ms. Partin alleges that UVM breached its obligations in "[f]ailing to conduct an official inquiry following Partin's report of Gender-Based Stalking." Compl. ¶ 345. There are several fatal problems here. To begin with, the alleged incident reported by Ms. Partin did not

actually qualify as "Gender-Based Stalking" under the SHM Policy, as on its face it involved a single incident rather than a "course of conduct" as would constitute stalking.[24]  More importantly, the alleged conduct occurred off-campus and was carried out by an individual unaffiliated with the University.  As the SHM Policy expressly acknowledges, there are significant limitations to UVM's ability—and obligation—to act on such reports:

> In cases where the Respondent is not affiliated with the University through academic enrollment, employment, or other affiliation, the University's ability to take direct action against that individual may be limited. However, the University is committed to conducting an inquiry into what occurred, and taking steps to provide appropriate remedies and support, as appropriate.

Ex. A (2016 SHM Policy) at 15.  Ms. Partin's assertion that UVM had a contractual obligation to undertake a "formal inquiry" into her report plainly stems from the above provision, but the statement that UVM "is committed to conducting an inquiry into what occurred" is far too vague, aspirational, and discretionary in nature to support a claim.  *See Knelman*, 898 F. Supp. 2d at 709 ("Language in a college handbook or other official statement that is merely aspirational in nature . . . is not enforceable.").  At a minimum, the language reserves UVM substantial discretion in determining the extent of its "inquiry into what occurred," and there is nothing to suggest that UVM's alleged course of action—receiving Ms. Partin's account of what occurred, and referring her to campus police for follow-up—was a violation of any specific and enforceable parameters

---

[24] The SHM Policy in effect at the time of the report in 2018 defined "Gender-Based Stalking" as follows:

> Engaging in a course of conduct directed at a specific person based on their gender, sexual orientation, gender identity, and/or gender expression that would cause a reasonable person to (1) fear for their safety or the safety of others; or (2) suffer substantial emotional distress. A course of conduct means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.

Ex. A (2016 SHM Policy) at 4.

for the "inquiry" required.  *See Feibleman*, 2020 WL 3871075, at *2 (university's exercise of discretion under policy not actionable).

Finally, Ms. Partin has not alleged with adequate specificity any harm she suffered as a result of UVM's alleged breach of the policy.  Ms. Partin alleges broadly that Dean Russell failed to "direct [her] towards any other resources or support UVM could offer her," Compl. ¶ 113, but she does not identify any specific resources or support to which she contends she was entitled and which would have aided her.  Again, the language of the policy gives UVM discretion to "tak[e] steps to provide appropriate remedies and support, as appropriate," and it would certainly have been within its discretion to determine that the most appropriate remedy under the circumstances was a referral to the police.[25]

Second, Ms. Partin alleges that UVM breached its obligations by "[f]ailing to provide Partin written information about UVM's complaint and resolution processes after her report of drugging and possible sexual assault" in January 2020.  Compl. ¶ 345.  Ms. Partin is correct that, upon receipt of a report that an individual has "experienced acts of Sexual Harassment or Misconduct," the SHM Policy requires that "the Complainant . . . be provided written information about the University's complaint and resolution processes by AAEO and invited to make a report."  Ex. A (2016 SHM Policy) at 9-10.  However, Ms. Partin's 2020 report was not a report that she had "experienced acts of Sexual Harassment or Misconduct" such as would trigger this requirement.

Ms. Partin alleges that she reported to Dean Russell that she "had experienced a 'series of traumatic events'" the prior year, including specifically that "she had been drugged at a party,

---

[25] To be clear, UVM firmly disputes the allegations regarding, among other things, the failure to offer other supports to Ms. Partin.  However, for purposes of the present Motion, those allegations are accepted as true—and, accepting them, Ms. Partin has nonetheless failed to make out a viable claim.

'completely blacked out,' 'could barely stand up or walk' and that she had no memories of the rest of the evening until she woke up, 'confused and scared,' the next morning."  Compl. ¶ 140. Ms. Partin also complained that UVM's emergency department staff had allegedly refused to test her for anything, offering neither a drug test or rape kit.  *Id.*  Nowhere among these facts is any affirmative indication or report of sexual assault or harassment.

Ms. Partin nonetheless asserts that these allegations put UVM on notice that she had been the subject of sexual exploitation—on the ground that she said she was drugged—and that she had been "possibly . . . raped as well."  *Id.* ¶ 141.  As to the former, the SHM Policy defines "Sexual Exploitation" to mean "[n]on-consensual use of another individual's nudity or sexuality," which does indeed include "[c]ausing the incapacitation of another person (through alcohol, drugs, or any other means)," but **only** when done specifically "for the purpose of compromising that person's ability to give consent to sexual activity."  Ex. A (2016 SHM Policy) at 6.  Ms. Partin's bare report that she had been "drugged," without any indication that it was for the purpose of compromising her ability to give consent to sexual activity, did not constitute a report of sexual exploitation.  Likewise, Ms. Partin's complaint that UVM Medical Center had not given her a rape kit was not a report that she had, in fact, been subjected to sexual assault.  In short, while Ms. Partin's report was concerning, it did not trigger a contractual obligation to provide her information about the complaint and resolution processes.

Third, Ms. Partin alleges that UVM breached its obligations by "[f]ailing to conduct a thorough and prompt investigation into Partin's report of sexual misconduct and exploitation." Compl. ¶ 345.  It is unclear whether this allegation refers to Ms. Partin's January 2020 email to Dean Russell or her email exchange and videoconference with Taryn Moran, but the claim fails regardless.  As discussed immediately above, the 2020 email did not constitute a report of sexual

exploitation or assault, and hence it did not trigger any contractual obligation to investigate. With regard to the 2021 interaction with Ms. Moran, the Complaint alleges that (a) on April 29, 2021, Ms. Partin provided an account of her alleged assault on Instagram (not in a report to UVM or any employee thereof), (b) that same day, Ms. Moran reached out to Ms. Partin to offer to meet and provide resources and support options, and (c) Ms. Partin had a videoconference with Moran on May 11, 2021, but she "elected not to pursue an investigation." *Id.* ¶¶ 153-55. Under the SHM Policy then in effect, where a complainant declined to participate in an investigation or resolution process, UVM "reserve[d] the right to investigate," *see* Ex. C-D (2020-2021 SHM Policy) at 11, but nothing in the policy **affirmatively required** UVM to investigate under those circumstances. Rather, the policy expressly left the decision to the discretion of UVM's AAEO Director. *See id.* ("The decision as to whether the University will proceed with an investigation or pursue other appropriate action under these circumstances ultimately rests with the AAEO Director."). UVM thus breached no obligation in declining to unilaterally investigate.

Fourth and finally, Ms. Partin asserts that UVM violated its policies by "[f]ailing to offer . . . reasonable and appropriate measures to facilitate her continued access to UVM's educational programs and activities." Compl. ¶ 345. The SHM Policy does indeed provide, as a general matter, that UVM "will offer reasonable and appropriate measures to Complainants, Respondents, and third parties that are designed to protect individual and community safety, and facilitate continued access to University employment or education programs and activities." Ex. C-D (2020-2021 SHM Policy) at 8. Such measures—which are available regardless of whether a student pursues a resolution process—"may include issuance of no-contact directives, residence modifications, academic modifications and support, work schedule modifications, Transportation

and Parking Services modifications, interim administrative suspension, suspension from

employment, and pre-disciplinary leave (with or without pay)." *Id.*

Other than broadly alleging that UVM failed to offer any measures, the Complaint fails to

identify what "reasonable and appropriate measures" Ms. Partin contends were needed and UVM

did not provide.  Moreover, the policy does not require the AAEO to provide services unbidden;

rather, it expressly directs students to "[p]lease contact the AAEO Intake and Outreach

Coordinator . . . for assistance with obtaining remedial or protective measures." *Id.* at 9.  The

Complaint acknowledges that Ms. Moran advised Ms. Partin of the available resources and

support options, *see* Compl. ¶ 154, and there is no allegation that Ms. Partin asked for a

particular accommodation—or, certainly, that she was denied a requested accommodation.

Absent any such allegation, Partin has failed to make a colorable claim that UVM violated a

contractual obligation to offer her remedial or protective measures, and the claim must be

dismissed.

### IV.     Plaintiffs' Request for Exemplary Damages Lacks Support in the Allegations and Should Be Dismissed.

A request for punitive damages is not a standalone claim, and to the extent it is pled that

way it in the Complaint, it should be dismissed.  *Cf. Neviaser v. Mazel Tec, Inc.*, No. 1:12-CV-

48, 2012 WL 3028464, at *4 (D. Vt. July 25, 2012).  More to the point, Plaintiffs have failed to

support their request for punitive damages with evidence that would permit such an award.  At a

minimum, the Court should dismiss the Complaint to the extent it seeks this relief.

"In Vermont, punitive damages are reserved for especially egregious conduct, and thus

the party seeking them must overcome a very high standard of proof." [26]  *Beaudoin v. Feldman*,

---

[26] Defendants focus on the standard for punitive damages under Vermont law rather than either federal
claim for two reasons.  First, punitive damages are not available under Title IX.  *See Barnes v. Gorman*,

196 A.3d 768, 776 (Vt. 2018) (internal citation, quotation, and alteration omitted).  "[T]he trial court must decide in the first instance whether punitive damages are warranted as a matter of law," and may dismiss a request for punitive damages under Rule 12 where the allegations in the complaint do not meet the standard.  *Thompson v. Hosp. Mgmt. of Rutland, Inc.*, No. 2:20-CV-00159, 2021 WL 6802988, at *2 (D. Vt. June 16, 2021).

"Punitive damages require a showing of essentially two elements. The first is wrongful conduct that is outrageously reprehensible."  *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.*, 996 A.2d 1167, 1173 (Vt. 2010).  This element requires proof that the defendant engaged in "truly reprehensible conduct" that "has the character of outrage frequently associated with crime."  *Id*. (citations omitted).

"The second [element] is malice, defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like."  *Id*.  Because the purpose of punitive damages is to punish conduct that is morally culpable and truly reprehensible, a high bar is set for plaintiffs seeking such damages.  *Id*.  Vermont law makes clear that intentional, wrongful and even illegal conduct is insufficient to justify punitive damages unless it is established by a preponderance of the evidence that the defendant acted with "bad spirit and wrong intention."  *Id*. (quoting *Brueckner*, 730 A.2d at 1095).  Thus, even a willful violation of the law cannot, in and of itself, support an award of punitive damages.  *Id*.; *see also id*. n.3 ("[S]trict liability offenses, such as regulatory violations without malice or consumer fraud without actual intent to deceive, have not

---

536 U.S. 181, 187-88 (2002).  Second, the standard for punitive damages for individuals under 42 U.S.C. § 1983 requires conduct "shown to be motivated by evil motive or intent" or involving "reckless or careless indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Because Plaintiffs' Equal Protection claim does not include any allegations about the motivation or conduct of any individual Defendant, *see* Section II *supra*, and Count VIII should be dismissed, Defendants do not separately analyze this standard.  To the extent Plaintiffs seek punitive damages under Count VIII, however, any such request should fail for the same reasons as under Vermont law.

been deemed sufficient to warrant an exemplary award.").  There must be evidence that the defendant's conduct, however wrongful, was infused with the required degree of bad motive.

Punitive damages cannot be awarded in Vermont based solely on a showing that a defendant recklessly disregarded the rights of the plaintiff or heedlessly disregarded the consequences of its actions.  *Id.* at 1174-75 (citing *Brueckner*, 730 A.2d at 1096-97).  Thus, the Vermont Supreme Court has specifically concluded that a plaintiff who was injured in a car accident by a drunk driver could not recover punitive damages based on the defendant's willful DUI violation because that violation, alone, proved nothing more than reckless disregard of the rights of others and so failed to meet the standard for malice.  *See Bolsta v. Johnson*, 848 A.2d 306, 308-309 (mem.) (Vt. 2004).  Accordingly, under Vermont law, Plaintiff must prove by a preponderance of the evidence that Defendants' acts were malicious or infused with bad faith in order to recover punitive damages.  *Fly Fish Vermont, Inc.*, 996 A.2d at 1173-75.

Plaintiffs have come nowhere close to alleging that any individual Defendant acted with the *mens rea* required to award punitive damages.  While the individual actions of each Defendant as alleged may have been imperfect, the Complaint falls far short of alleging malice towards any Plaintiff by any Defendant.  There is no allegation that any individual Defendant had any personal spite or ill will towards any Plaintiff.  Nor have Plaintiffs alleged that any individual Defendant engaged in reprehensible, outrageous misconduct with the character of a crime.  *Cf. Kuphal ex rel. Estate of Kuphal v. Spring Lake Ranch, Inc.*, No. 5:18-CV-2, 2018 WL 11469979, at *5 (D. Vt. June 26, 2018) ("These allegations do not rise to the level of willful violation or conscious disregard of the risk of harm.  Instead, they are better described as allegations of incompetence and a failure to take adequate precautions.  These are allegations of negligence only.").

As for UVM as an institution, a "corporation may be held liable for punitive damages if the malicious act is that of the governing officers of the corporation or one lawfully exercising their authority, or, if . . . that of a servant or agent of the corporation, it must be clearly shown that the governing officers either directed the act, participated in it, or subsequently ratified it." *Cole v. Foxmar, Inc.*, No. 2:18-CV-00220, 2022 WL 842881, at *8 (D. Vt. Mar. 22, 2022) (internal quotation and citation omitted).  Because no individual Defendant is alleged to have engaged in outrageous conduct or acted with malice, that should end the inquiry, but, regardless, the only allegation that concerns any governing officer of UVM states that Ms. Sommer and Ms. Partin found the Board of Trustees "apathetic" during a meeting where they spoke about their "rape experiences."  Compl. ¶ 196.  Even in the light most favorable to Plaintiffs, this allegation does not demonstrate that UVM as an institution directed, participated in, or subsequently ratified any act that would rise to the level of imposing punitive damages if proven.

## CONCLUSION

Plaintiffs have each alleged they experienced significant harm—harm Defendants do not seek to minimize in this Motion.  While Defendants are sympathetic to Plaintiffs' experiences, they are not legally responsible for that harm.  UVM was not aware of any specific risk to which any Plaintiff was vulnerable before the harmful incidents alleged.  After the harm occurred, Ms. Sommer and Ms. Partin declined to participate in the processes that UVM made available to them.  Ms. Ware voluntarily participated in a process that, at the time, reasonably met her needs, and subsequent regrets about that choice do not establish UVM's liability.  The allegations in the Complaint do not state a claim upon which relief can be granted and Defendants therefore ask the Court to dismiss the Complaint.

Dated at Burlington, Vermont this 10th day of February, 2022.

By:      /s/  Kendall Hoechst
         Justin B. Barnard, Esq.
         Ritchie E. Berger, Esq.
         Kendall Hoechst, Esq.
         Anne Rosenblum, Esq.
         Dinse P.C.
         209 Battery Street, P.O. Box 988
         Burlington, VT  05402
         802-864-5751
         jbarnard@dinse.com
         rberger@dinse.com
         khoechst@dinse.com
         arosenblum@dinse.com

         *Counsel for Defendants*