# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

CLERK

BY

Civil Action No. 2:22-cv-212

KENDALL WARE,
SYDNEY PARTIN,
HALEY SOMMER, and
CASSIA HARTING-SMITH,

**JURY TRIAL DEMANDED**

*Plaintiffs*,

v.

THE UNIVERSITY OF VERMONT AND
STATE AGRICULTURAL COLLEGE, THE
BOARD OF TRUSTEES OF THE
UNIVERSITY OF VERMONT AND STATE
AGRICULTURAL COLLEGE, NICHOLAS
STANTON, KATHERINE SPENCE, TARYN
MORAN, JEFFREY SCHULMAN, KRISTA
BALOGH, JOSEPH RUSSELL, JOHN
BECKER and OTHER UNIDENTIFIED
DEFENDANTS,

*Defendants*.

## PLAINTIFFS' FIRST AMENDED COMPLAINT AND
## DEMAND FOR JURY TRIAL

Plaintiffs Kendall Ware, Sydney Partin, Haley Sommer, and Cassia Harting-Smith

(collectively, "Plaintiffs"), by and through their undersigned attorneys, file this complaint against

defendants University of Vermont and State Agricultural College ("UVM"), the Board of Trustees

of the University of Vermont and State Agricultural College (the "Board of Trustees" and together

with UVM, the "UVM Defendants"), UVM employees Stanton, Spence, Moran, Schulman,

Balogh, Russell, and Becker, and other unidentified defendants (collectively, "Defendants"), and

respectfully allege as follows:

## PRELIMINARY STATEMENT

1.     Plaintiffs each chose to attend the University of Vermont as undergraduates for different reasons: its Division I swimming program; its beautiful campus; its academic credentials in relevant subject areas; and its reputation for being a supportive and inclusive school. While these four women had few similarities before enrolling at UVM, they now have at least two things in common. First, they are survivors of sexual assault, each having been raped while a student at UVM. Second, they are suing UVM and some of its administrators and staff, because Defendants' deliberate indifference to student-on-student sexual misconduct, harassment, and assault created a discriminatory and sexually hostile environment in which female students faced a heightened risk of sexual assault and, once assaulted, lacked any meaningful avenue of redress.

2.     For over a decade, UVM has been on notice that underage alcohol abuse, drugging incidents, sexual misconduct, and sexual assault are widespread on and off campus, particularly among student athletes and fraternities.

3.     In March 2019, a male UVM fraternity member drugged Plaintiff Partin at a party. Later that evening, Partin was raped in her UVM dorm room. What UVM knew, but Partin did not learn until later, was that her assailant's "unrecognized" fraternity had a long rap-sheet of alcohol and drug infractions.

4.     That same month, Plaintiff Harting-Smith was assaulted in her on-campus residence by a student in the same dorm, following a party where she had been drinking heavily.

5.     In May 2019, at the urging of survivors' advocacy groups concerned about poor in-state university responses to sexual misconduct, the Vermont Legislature created a Campus Sexual Harm Task Force (the "Task Force") to address known issues at state universities related to "transparency, safety, affordability, accountability of outcomes, and due process in campus

conduct adjudication processes for sexual harm." UVM's Office of Affirmative Action and Equal Opportunity ("AAEO" or "Title IX Office") Director, Defendant Nicholas Stanton ("Stanton"), served on the Task Force.

6. In October 2019, Plaintiff Ware reported to AAEO that she had been anally raped by a popular athlete from one of UVM's most profitable official sports teams. Ware included two additional prior instances of sexual violence by the same perpetrator in her Title IX report.

7. That same month, Stanton summarized UVM's Title IX reporting processes for the Task Force ("Stanton Memo"). Outlining the process for addressing allegations of sexual abuse, Stanton noted that "informal resolution," an approach to resolving Title IX complaints that was prohibited under the Obama Administration, was now an option at UVM. However, in certain circumstances where the alleged conduct is sufficiently serious, it may be deemed inappropriate to address the charges alleged.

8. Despite this, UVM's Intake and Outreach Coordinator, Defendant Taryn Moran ("Moran"), investigator Defendant Katherine Spence ("Spence"), and UVM Athletics staff Defendants Jeffrey Schulman ("Schulman") and Krista Balogh ("Balogh"), pressured Ware into informally resolving her complaint, despite the seriousness of the conduct alleged. As a result, Ware's assailant never faced any meaningful consequences for his actions.

9. In January 2020, Partin reported that she had been drugged at a party, took herself to the ER the next morning to be tested for date rape drugs, and been denied a rape kit at the UVM Hospital, to Defendant Joseph Russell ("Russell"), UVM's Deputy Title IX Coordinator for Students. Nobody followed up with Partin about her assault for over a year and three months.

10.     In February 2020, a student named Athena Hendrick[1] reported to the Title IX Office that they had been raped by a UVM student and club sports athlete named Austin Weiland. On information and belief, UVM conducted a flawed investigation that did not discover that Weiland had a history of predatory sexual behavior before he raped Hendrick. As a result, UVM's Title IX Office found Weiland not responsible for Hendrick's rape.

11.     On September 23, 2020, Harting-Smith reported her assault to AAEO.

12.     In November 2020, Weiland raped Plaintiff Sommer.

13.     On December 16, 2020, Spence found Harting-Smith's assailant not responsible for violating UVM's Title IX Policy due to insufficient evidence.

14.     In April 2021, frustrated by UVM's institutional indifference towards their sexual assault, Hendrick posted about it on Instagram. Later that week, Partin also publicly shared her assault, and AAEO's lethargic response, on Instagram. Only then did Moran reach out to Partin, with a boilerplate, non-personalized email summarizing UVM's Title IX Policies and Procedures.

15.     Through Hendrick's post, Sommer learned of UVM's flawed investigation, which had allowed Weiland unfettered access to campus and the opportunity to rape her. Sommer posted about her assault in solidarity. Again, Moran sent her the same boilerplate email summarizing UVM's Title IX Policies and Procedures. With no trust in UVM's Title IX Office, Sommer opted not to report her assault and, ultimately, dropped out of UVM.

16.     These posts triggered a broader protest movement, where students documented hundreds of stories of sexual assault on UVM's campus and its broken Title IX process in a social media campaign known as @ShareYourStoryUVM.

---

[1] On information and belief, Hendrick uses they/them pronouns.

17. Defendants' deficient responses to Plaintiffs' sexual assault complaints, alongside their unreasonable response to sexual misconduct and violence on campus generally and within athletics and fraternities specifically, systemically deprived Plaintiffs of equal access to educational opportunities in violation of Title IX of the Education Amendments of 1972 ("Title IX") and the United States Constitution, pursuant to 42 U.S.C. § 1983. Defendants' behavior also violated state common law, inflicted emotional distress, breached contracts, and caused the Plaintiffs significant emotional, physical, and economic harm.

## **PARTIES**

18. Plaintiff Ware is female and is and was, at all material times, a resident of the State of Vermont. At the time of the events complained of herein, Ware was a student at UVM.

19. Plaintiff Partin is female and is and was, at all material times, a resident of the State of Vermont, and tenant of UVM, from Fall 2018 to Spring 2019. From Fall 2019 to Spring 2020, Partin took a leave of absence. In August 2020, Partin resumed her undergraduate coursework at UVM and became again a resident of the State of Vermont.

20. Plaintiff Sommer is female and is and was, at all material times, a resident of the State of Vermont. Sommer was a student at UVM, until August 2021 when she withdrew from her accelerated master's program as a result of the events complained of herein.

21. Plaintiff Harting-Smith is female and is and was, at all material times, a resident of the State of Vermont and a student at UVM.

22. Defendant UVM is a public educational institution organized under the laws of the State of Vermont and located in Burlington, Vermont. During all material times, UVM received federal funding for its academic programs and activities, within the meaning of Title IX, 20 U.S.C. § 1681(a).

23. Defendant Board of Trustees, composed of twenty-five members, is an entity responsible for the management of UVM and controls its property and policies. The Board operates in keeping with UVM's corporate bylaws, which are governed by the laws of the State of Vermont.

24. Defendant Stanton is an individual who was, at all material times, a resident of the State of Vermont. At all material times, Stanton was the Director of UVM's Title IX Office, the Office of Affirmative Action and Equal Opportunity, and acted or failed to act within the scope, course and authority of his employment and employer. He is sued in his individual capacity.

25. Defendant Spence is an individual who was, at all material times, a resident of the State of Vermont. At all material times, Spence was an Investigator and Alternative Resolution Facilitator with UVM's Title IX Office and acted or failed to act within the scope, course and authority of her employment and employer. She is sued in her individual capacity.

26. Defendant Moran is an individual who was, at all material times, a resident of the State of Vermont. At all material times, Moran was the Title IX Office Intake and Outreach Coordinator and acted or failed to act within the scope, course and authority of her employment and employer. She is sued in her individual capacity.

27. Defendant Schulman is an individual who was, at all material times, a resident of the State of Vermont. At all material times, Schulman was the Director of Athletics at UVM and acted or failed to act within the scope, course and authority of his employment and employer. He is sued in his individual capacity.

28. Defendant Balogh is an individual who was, at all material times, a resident of the State of Vermont. At all material times, Balogh was the Associate Athletic Director for External

Relations and Communications at UVM, and acted or failed to act within the scope, course and authority of her employment and employer. She is sued in her individual capacity.

29. Defendant Russell is an individual who was, at all material times, a resident of the State of Vermont. At all material times, Russell was an Assistant Dean of Students and a Deputy Title IX Coordinator and acted or failed to act within the scope, course and authority of his employment and employer. He is sued in his individual capacity.

30. Defendant Becker is an individual who was, at all material times, a resident of the State of Vermont. At all material times, Becker was the UVM Men's Basketball Head Coach, and acted or failed to act within the scope, course and authority of his employment and employer. He is sued in his individual capacity.

31. Other unidentified defendants may be discovered in the course of this litigation, and Plaintiffs reserve the right to amend this Complaint to add them as Defendants as they become known.

## JURISDICTION

32. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives federal district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

33. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343.

34. Plaintiffs bring this action in part to redress discrimination, heightened risk, and a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as more fully set forth herein. This action is also brought pursuant to 42 U.S.C. § 1983 and § 1988, and the First and Fifth Amendments to the United States Constitution, made

applicable to Defendants through the Fourteenth Amendment to the United States Constitution, to address the deprivation of Plaintiffs' constitutional rights.

35.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), as the claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

36.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the Plaintiffs are residents of the State of Vermont; Defendants UVM and the Board of Trustees are situated in this district; all individual defendants are residents of Vermont; and the events or omissions giving rise to the claims occurred in this District.

## FACTS

37.     UVM is a large public university located in Burlington, Vermont. Its 460-acre campus is home to over 11,000 undergraduate students and over 1,400 graduate students.

38.     UVM has been the subject of numerous media reports concerning sexual assault and the use of date rape drugs on campus, often perpetrated by fraternity members and student athletes.  These reports are further detailed in Section II.

### I.     Plaintiffs Are Sexually Assaulted At UVM

#### A. Kendall Ware

##### i.     UVM's Star Athlete Rapes Ware

39.     Kendall Ware enrolled at UVM in Fall 2018.  She is an accomplished swimmer who was actively recruited by UVM's Division I Women's Swimming and Diving team and awarded an athletic scholarship.

40.     In January 2019, Ware began dating Anthony Lamb, a fellow UVM athlete.

41.    Lamb was a junior at the time, playing small forward for the UVM Men's Basketball team, one of UVM Athletics' most popular and financially successful sports. From the beginning of his career, Lamb piled on the accolades for UVM Basketball, winning several individual awards as well as critical games for the team.

42.    UVM Athletics doted on Lamb. Teammates and coaches described him as "tremendous" and their "best player" embodying the team's "toughness" as a "team leader." Lamb now plays for the Golden State Warriors in the NBA.

43.    Ware and Lamb broke up in the summer of 2019. When Ware returned to campus next, she struggled with her mental health and met with her swim coaches to discuss support options. Ware shared with her coaches that her break-up with Lamb was taking a toll on her. One coach asked Ware whether she thought Lamb might hurt her. Ware said no, but was surprised that her coach had expressed concern about potentially violent behavior from Lamb.

44.    On September 7, 2019, Ware attended an off-campus Men's Basketball party hosted at Lamb's residence. Lamb resided in the "Basketball House," so-called due to its historic affiliation with UVM Men's Basketball. For more than a decade, the Basketball House has been a campus institution and the team's social hub. According to residents, the tradition began with Defendant John Becker ("Becker"), Head Coach of Men's Basketball and a friend of the landlord, who facilitated the passage of the house from one team generation to the next.

45.    That evening, Lamb screamed and insulted Ware in the driveway outside the Basketball House. Ware and Lamb later went to Lamb's bedroom, where Ware believed that they would discuss Lamb's rage. While making up from the fight, Lamb began to have sex with Ware.

46. During the encounter, without Ware's consent, Lamb forcefully anally penetrated Ware as she repeatedly pleaded with him to stop, telling him "no" over and over. Ignoring her unequivocal demands, he told her to "just take it" and continued to rape her.

47. In the aftermath, Ware felt frozen. At first, she dissociated. Then, she began to cry uncontrollably. One thought played through her mind on loop: "I think Anthony just sexually assaulted me."

48. Ware attempted to leave Lamb's room, but he forced her back inside. She spent the night in his room, forced to lie inches away from him, sore and in pain.

49. The assault shattered Ware. Over the next few days, Ware suffered from suicidal ideation and, at one point, reached out to a suicide hotline. She fell into a deep depression and withdrew from all attempts at outreach from friends and family.

### ii. Ware Reports Her Assault to Title IX

50. Ware's friends, family, teammates, and coaches from her swim team were concerned about Ware's withdrawal, loss of appetite, emotional fragility, frequent uncontrollable crying, and suicidality. Five of Ware's friends submitted "C.A.R.E." – "Concerning And/Or Risky Event" – forms on her behalf, in order to alert school authorities to her crisis.

51. Ware was terrified of reporting Lamb, who was a bona fide celebrity both on and off campus. However, she eventually grew sick of being plagued by constant replays of her rape, and of being confined to her room out of fear of running into Lamb at the gym or on campus.

52. On October 7, 2019, Ware went to Judy Rickstad, the campus victim's advocate, and told her about the rape. Rickstad told Ware that she could either report the incident to the police or request a formal investigation through UVM's Title IX Office.

53. As Ware began processing her rape, she began to recognize that the relationship had been abusive and toxic even before Lamb raped her. She eventually reported three separate incidents to the Title IX Office: the September 2019 rape, as well two prior incidents, one where Lamb had removed his condom, non-consensually, during sexual intercourse; and another, at Lamb's family home, where Lamb had filmed her during sexual intercourse without her consent. On October 17, 2019, Spence contacted Ware to follow up on these incidents for her investigation into Lamb's alleged pattern of sexual abuse.

54. In a letter to Ware dated October 21, 2019, UVM implicitly acknowledged that all *three* of these incidents were within its jurisdiction as, if proven true, they would together constitute violations of the Sexual Assault and/or Sexual Exploitation provisions of UVM's 2016 Sexual Harassment and Misconduct Policy (the "2016 SHM Policy").[2]

55. Ware worried that because she had not gone to the police to get a rape kit immediately after the fact, no one would believe her. At the time, she had more trust in UVM's administration than the police, which she worried would not be neutral given her assailant's position of popularity and power.

56. On October 15, 2019, Ware asked Rickstad to pursue a formal investigation of Lamb. Rickstad reported the rape to the Title IX Office.

### iii. UVM Inexplicably Involves the Athletics Department

57. That same day, Ware met with her coaches to tell them that she had been assaulted and would be going through a formal reporting process. Ware's coaches told her that because they

---

[2] Plaintiffs will refer to numerous UVM's sexual harassment policies and procedural guidelines for resolving discrimination complaints throughout this Complaint. Where possible, Plaintiffs will cite to the relevant operative policy or procedure in place during the time of the claim. When talking about guidance common across several or all of the relevant policies and procedures, Plaintiffs will refer generally to UVM's "SHM Policies and Procedures" or "Title IX Policies and Procedures."

were mandatory reporters, she would need to speak with Balogh, the Athletics Department's Associate Athletic Director for External Relations & Communications.

58. On information and belief, there is no UVM policy or mandated reporting law that required a survivor to tell the Athletics Department Communications Director about their rape.

59. Nonetheless, Ware was brought to Balogh's office and directed to tell Balogh about her rape. After Ware told Balogh about her rape and her intention to request a formal investigation, Balogh left to speak with Schulman, the Director of UVM's Athletics Department, and Cathy Osmers Rahill, the Associate Director of Athletics for Student Athlete Development. Ware sat alone in a conference room in the Athletic Administration Office, crying.

60. Balogh then brought Ware into Schulman's office, again requiring her to explain that she had been raped at a party and was filing a Title IX complaint. As Ware left the Athletic Administration Office, she saw Becker, the UVM Men's Basketball coach, sitting in the waiting room. On information and belief, someone in UVM Athletics called him immediately.

61. On October 16, 2019, UVM's Title IX Intake and Outreach Coordinator, Moran, contacted Ware over email. Moran reiterated Rickstad's statement that her only options were a formal Title IX investigation ("Formal Process") or a police report. In her nearly 750-word email to Ware, Moran, like Rickstad, *never mentioned any informal or alternative resolution process*. Indeed, Moran outlined that according to the 2016 SHM Policy, there are circumstances "under which the University may have to pursue an investigation even if [Ware did] not wish to make a formal complaint," stating that she would "let [Ware] know should the University decide to proceed in this manner."

62. UVM assigned Spence to be the "neutral" Title IX investigator for Ware's complaint. On October 17, 2019, Spence spoke with Ware and walked her through her options

- 12 -

under Title IX. Spence informed Ware that there were actually not only two options, but also a third: an "informal resolution" or "alternative resolution" process ("Informal Process"), which would be more flexible and take less time, but that Lamb would face only minimal consequences if found responsible. Specifically, Spence told Ware that if Lamb were found "guilty" under the Informal Process, his only punishment would be mandatory counselling.

63. On information and belief, the option for the Informal Process in cases like Ware's had only become available in late 2017, when the Department of Education formally repealed the Obama Administration's 2011 Dear Colleague Letter (the "2011 Letter"), which disallowed informal resolution, even on a voluntary basis, in cases involving sexual assault. Allowing informal resolution in cases of sexual assault was widely understood to be a "tilt" towards enhancing the rights of the accused in Title IX investigations.

64. So new was this option at UVM, that UVM's form emails to those reporting sexual assault – such as Ware – did not discuss the Informal Process. On information and belief, language regarding the Informal Process, stating: "*Please note that in lieu of an AAEO investigation, the alternative resolution process might be an option for you, as deemed appropriate by UVM's Title IX Coordinator. You do not need to disclose anything about your situation to get more information. Please contact me to learn more*" was only subsequently introduced in UVM's form Title IX emails in or around 2021.

65. Ware knew that she would not be satisfied with mandatory counselling as the only potential outcome. Even though she understood that the Formal Process would be more time consuming and onerous, it was the only way she could get what she sought: punishment proportionate to the wrong; justice for herself; and protection for fellow female students.

66. Ware told Spence that she wanted to move forward with the Formal Process and provided a statement. Rickstad attended the meeting, and Spence recorded the conversation.

67. Later that same day, Ware received an email from Spence, writing that it "had come to [her] attention" that Ware's "goal" was "not necessarily to get [Lamb] in trouble." Spence outlined the potential pitfalls of the Formal Process, including severe sanctions for Lamb that would "impact his ability to play basketball and/or remain at UVM, either temporarily or permanently." Ware began to feel the school was pressuring her to change her mind.

68. Spence then called Ware, leaving her a voicemail when she did not respond. On the voicemail, Spence urged Ware to reconsider her decision to formally investigate Lamb, on the grounds that Ware didn't seem to know what she wanted.

69. While determined to pursue an option that offered meaningful consequences, Ware worried about being responsible for someone's expulsion from school, and about backlash from a community where she intended to live and study for the next four years. She texted Balogh, telling her she did not wish to "ruin [Lamb's] life" or "get him kicked off the team." Ware also asked to speak with her again. Balogh suggested that they both meet with Title IX Office staff.

### iv. UVM Misleads Ware to Protect Her Assailant

70. On October 18, 2019, Balogh and Moran met with Ware at the Title IX Office.

71. In direct contradiction to everything Spence had told Ware previously, Balogh and Moran reassured Ware that the Informal Process actually *could* result in meaningful consequences for Lamb, including game suspensions and mandatory counselling. They also told Ware that she would be allowed to confront Lamb and read him a victim impact statement during any such proceeding.

- 14 -

72. Throughout the meeting, Ware was worried that her private texts to Balogh regarding her concerns about reporting Lamb were being shared with Spence.

73. Balogh forwarded detailed notes documenting the meeting to members of UVM Athletics, including Team Physician Matthew Lunser, Schulman, and Rahill.

74. Ware believed Balogh and Moran. Relying specifically on their promises that she would be allowed to read Lamb a victim impact statement and that he could face game suspensions, she dropped her previous request for a formal investigation and elected the Informal Process.

75. UVM brought in a consultant attorney, Peter Lim, to serve as the impartial mediator for the Informal Process.

76. On November 4, 2019, Ware, Lim, and Balogh met for almost four hours. UVM had seemingly assigned Balogh, a UVM Athletics employee, to take the role of Ware's informal victim's advocate. Ware was never asked whether she agreed to this role for Balogh.

77. Ware told Lim about her rape and asked questions about the Informal Process. Lim told Ware that her case was strong and expressed surprise that she was not pursuing the Formal Process after enduring such an abusive relationship and rape.

78. The Informal Process, Lim explained, could *not* legally include any of the consequences she had explicitly been promised by Balogh and Moran. He told Ware that not only were game suspensions impossible within the Informal Process, but the school could not even order Lamb to undergo mandatory counselling. Critically, he also explained that UVM's SHM Policies and Procedures would not allow her to read Lamb her victim impact statement. Ware was crushed.

79.     UVM's own policies at the time contradicted Lim. Under the 2019 Procedural

Guidelines for Handling and Resolving Discrimination Complaints (the "2019 Procedural

Guidelines"), remedies under the Informal Process could include any:

> actions designed to maximize the Complainant's access to educational,
> extracurricular, and/or University employment activities; increased monitoring,
> supervision, and/or security at locations or activities where discrimination or
> harassment occurred or is likely to reoccur; targeted or broad-based educational
> programming or training for relevant individuals or groups; academic and/or
> University housing modifications for Student Complainants; workplace
> modifications for Employee Complainants; and/or any other remedial or protective
> measures that can be tailored to the involved individuals to achieve the goals of the
> Policy at issue.

80.     Not only was Ware misadvised on the differences between and implications of the

Formal and the Informal Process, but she was also denied "remedial or protective measures ...

tailored to [her] to achieve the goals of the Policy"– such as mandatory counselling and game

suspensions – under even the Informal Process.

81.     Eventually, Lim told Ware that delivering a video statement to Lamb might be

possible. Ware said she would consider this route if UVM promised her that she could deliver the

statement live. Lim again told Ware that this would not be permissible.

82.     Ware was at her wit's end. She had already recounted the story of her sexual assault

multiple times. She felt she had committed to the Informal Process. Despite this, she considered

abandoning all the work she had put into pursuing the Informal Process and starting over with the

Formal Process.

83.     Ware's mother called Balogh on or around November 5, 2019, seeking clarity on

why Lim had stated that certain outcomes were not available within the Informal Process, when

UVM staff had explicitly promised Ware that they were available.

84.     Balogh used the conversation with Ware's mother to pressure her to convince Ware not to switch to the Formal Process. She told Ware's mother that the Formal Process could take "as long as five months." According to UVM's own SHM Policies and Procedures, UVM cannot take more than 60 days to complete an investigation under the Formal Process, absent good cause.

85.     Balogh also told Ware's mother that the Formal Process would result in Lamb's immediate and indefinite suspension and that he would be automatically banned from the campus gym. She bemoaned that, if Lamb were suspended, it would "have a negative impact on the community" which was eager to see him play. She also stated that it would be "unfair" to Lamb's teammates to lose his talent.

86.     When Ware learned this, she worried that her athletic community would blame and ostracize her for causing them to lose their star player. She was at a crossroads: either choose the Formal Process, which would have irreversible and drastic consequences for both Lamb and herself, or choose the safer option of the Informal Process. With the pressure mounting, Ware decided to continue with the Informal Process she had been steered into under false pretenses.

87.     On November 7, 2019, while Ware agonized over this choice, UVM published an article about Lamb on its website. The article, entitled "Can, Will, Must," showered praise on Lamb. Ware texted Balogh, expressing how hurt she felt by UVM's publication of the article and decision to feature it on the website. Balogh responded that Ware should remember that nobody except Balogh and Schulman knew about Ware's allegations. Balogh neglected to mention Becker, who was present outside Schulman's office when making her complaint, or Team Physician Lunser, to whom she had personally forwarded her meeting notes with Ware.

88.     Eventually, after Ware expressed her frustration with being repeatedly denied what she had previously been promised, UVM conceded to let Ware read her impact statement to Lamb over Zoom.

89.     UVM Athletics, however, remained concerned that Ware would change her mind. On November 15, 2019, Schulman insisted that Ware meet with him to "put his eyes on her."

90.     Schulman asked Ware to meet him in his office during a jam-packed evening hockey game. He came late to the meeting, causing Ware to wait outside while students and staff of the Athletics Department passed by.  The noise of the crowd was clearly audible during their conversation.  Schulman did not express any concern about Ware's assault, and was clearly focused on not losing his prize asset Lamb.  The context once again made Ware feel improperly pressured.

91.     On November 18, 2019, after a two-week pressure campaign from Balogh, Schulman and others, Stanton asked Ware to commit to an informal resolution in writing ("Resolution Agreement").  Feeling like she had no choice, on November 19, 2019, Ware signed the Resolution Agreement.

92.     Lamb also signed the Resolution Agreement, which allowed him to escape any meaningful consequences for his actions.  Instead of facing game suspensions or mandatory counselling, the Resolution Agreement merely required Lamb to not contact Ware, refrain from using the athletic facilities for certain limited hours, complete a generic "healthy masculine identity program," and refrain from attending a handful of isolated sports related events, including the UVM sports celebration event (that was ultimately held virtually due to the global pandemic). The Resolution Agreement then closed the investigation into Lamb "without making any finding

as to whether he violated UVM Policy." At the virtual sports celebration event, UVM presented Lamb multiple awards.

93.    With the Resolution Agreement delivering no satisfactory justice to Ware in response to her ordeal, she grew increasingly frustrated by the many misrepresentations UVM staff had made to her. On December 2, 2019, Ware met with Balogh, Stanton, and Moran to detail all the ways that she believed the Title IX process had retraumatized her. Moran thanked her for what she termed constructive "feedback."

94.    On January 6, 2020, Ware presented a powerful victim impact statement over video to Lamb. In that statement, Ware described how Lamb had hurt her when she was at her most vulnerable. She contrasted the pain of her ordeal to his unbothered and nonchalant demeanor when she saw him around campus. She insisted he acknowledge what he had done, and expressed her hope that the Informal Process would "help [Lamb] to see what [he does] hurts people," so that what he did to her would never happen again.

95.    Ware explained her fears about reporting: that she wouldn't be believed; that the Athletics Department wouldn't protect her; and that she would face retaliation. Ware also described the pressure she felt to choose the Informal Process: UVM "play[ed] a tug-of-war game with my emotions and decisions, pulling me towards the way that protected their best interest: you." She shared copies of her statement with Schulman and UVM Athletics, hoping that they would understand the depth of the trauma her rapist had caused and the role they had played in exacerbating it.

96.    Minutes after hanging up the Zoom call and while still sitting in the Title IX Office, Balogh commented to Ware that her swim team "wouldn't be at UVM" without the UVM's

- 19 -

basketball team, implying that Ware should be grateful for everything Lamb and his team had done for her and her team.

97.    On January 10, 2020, Ware met with Schulman in his office. Ware asked Schulman why, if she had pursued the Formal Process, Lamb would have been immediately suspended from games and banned from the gym as Balogh had said. She said that this extreme sanction had presented her with a Hobson's choice because the backlash to her would have been severe. Schulman told her that Lamb would never have been suspended just because she used the Formal Process; this would only happen in cases of an arrest or public crime.

98.    Emotionally defeated by yet another conflicting representation, Ware challenged Schulman, saying that at least the Resolution Agreement proved that Lamb had accepted responsibility for raping her. Schulman was unmoved, responding in a matter-of-fact tone: "you're wrong." Schulman did not believe Lamb accepted any responsibility for his actions, and he wanted Ware to know it.

99.    Ware was so angry that she left the meeting shaking. The next day, she told both Balogh and her swim coach about how much the meeting had upset her.

100.    Desperate to believe that the reporting process had not been for nothing, Ware contacted Stanton on January 11 to ask if he agreed with Schulman. When they later spoke on January 13, Stanton confusingly replied only that it was "reasonable to assume" that Lamb had accepted responsibility by signing the Resolution Agreement, but that this was "case by case" and "subjective."

101.    On January 15, 2020, one of Ware's friends contacted Balogh to alert her that UVM was prominently advertising a press article featuring Lamb. Alongside his picture, the advertisement said, "Lead by Example" and was displayed on televisions throughout campus and

on the MyUVM student portal homepage. Ware and her fellow students asked UVM to pull the ad, which seemed to publicly affirm that UVM did not care about, or did not believe, its own student survivors of sexual assault. Balogh said that "given the process chosen," there was "nothing [she] could do" about the advertisement, in which Ware's rapist became the face of UVM Athletics.

102. Around that same time, UVM placed a poster featuring Lamb prominently in the gym, such that Ware had to walk by it whenever she used the athletic facilities. As of filing, the poster still hangs there, and Ware unavoidably encounters it whenever she uses the UVM gym.

103. Ware and her mother tried to contact Stanton, Balogh and Schulman to demand accountability for the Athletics Department's inappropriate intervention in the Title IX process.

104. On January 22, 2020, Ware's mother emailed Stanton, Schulman and Balogh requesting a meeting to discuss UVM's lack of transparency and unacceptable handling of her daughter's case. Ware's mother sought clarity on UVM's compliance, or lack thereof, with its own Title IX Policies and Procedures.

105. Under the 2019 Procedural Guidelines, UVM may not recommend an allegation for the Informal Process unless it finds it appropriate, and only upon agreement of both the complainant and the respondent. Participation in the Informal Process is, in all cases, strictly voluntary. Although the 2019 Procedural Guidelines do not define the circumstances under which the Informal Process is inappropriate, the circumstances under which UVM is entitled to investigate even absent complainant participation shed some light, with factors including, *inter alia,* "the seriousness of the alleged conduct, including whether force was used," and "whether

the circumstances suggest there is an increased risk of future acts under similar circumstances at a given location or by a particular group."[3]

106.     Although Ware had reported three extremely serious incidents of non-consensual sexual conduct, including anal rape, demonstrating a pattern, UVM found the Informal Process appropriate, and actively pressured Ware into foregoing the Formal Process, so much so that her consent was no longer informed or "strictly voluntary."

107.     Schulman and Balogh, who had constantly been in contact with Ware when they feared she might choose the Formal Process, ignored Ware's mother's email. Only Stanton wrote back, ignoring the substantive questions and stating only that because UVM Athletics "does not and did not have a role in the AAEO" (Title IX) process, "it would not be productive to hold a meeting with Jeff Schulman and Krista Balogh."

### v.     Ware Tells Her Story

108.     In Summer 2020, Ware decided to speak publicly to the Burlington Free Press about her Title IX experience at UVM. Though Schulman had refused to speak to Ware's mother after the Informal Process concluded, he found time to respond to the Burlington Free Press article, which examined whether the Athletics Department had influenced the handling and outcome of Ware's complaint against Lamb. Schulman declined to comment on Ware's case, but he admitted that the Athletics Department provides "personal support" both when student athletes report sexual

---

[3] Less than a year later, in August 2020, UVM implemented new interim procedural guidelines (the "August 2020 Interim Resolution Procedure") which clarified that the Director or a designee must determine "that the nature of the reported conduct is appropriate for alternative resolution." It codified, on information and belief, the factors that UVM needed to consider in making an appropriateness determination, including "the power dynamics present between the parties," "the nature of the conduct reported," "the level and type of harm reported, subjectively and objectively," "the severity of the conduct reported, subjectively and objectively," and "the conduct history of the Respondent."

misconduct or are accused of it, and that the "administrator-student athlete relationship" can be "very tight."

109.    Schulman also defended the practice of allowing Athletics staff to "advise students through the [Title IX] process," including those accused of misconduct, arguing that "it "[didn't] feel aligned" with UVM athletics' policies to "push them away."

110.    That fall, a group of UVM students created an Instagram account, @JusticeForKendall, highlighting the injustices that she had endured. Other female athletes reported feeling "helpless, terrified, and betrayed" by UVM's approach to sexual assault.

111.    This provoked UVM to retaliate against Ware. According to at least one report on social media, alumni "spanning nearly 20 yrs [*sic*]" who played for "3 different coaches" were all told that Ware "made it up" and was an "angry ex." On information and belief, at least some of these false and defamatory rumors originated through the UVM Men's Basketball official channels, including through Becker.

112.    UVM's repeated and sustained protection of Lamb at Ware's expense has damaged her mental health. As a direct and proximate result of UVM's actions, Ware's grades declined, and she experienced acute emotional and physical distress, panic attacks, depression, insomnia, isolation, anxiety and suicidal ideation. Ware withdrew for the 2019-2020 season, in part because she was terrified that any panic attacks while she was swimming would put her life in danger. Ware's difficulty in pursuing swimming eventually blocked her from renewing her swimming scholarship to partially fund her masters' degree.

113.    Ware's physical and emotional distress, mental health issues, and fear of entering campus spaces due to the fear of encountering Lamb also affected her educational experience, and Ware was forced to change school, work, and appointment schedules, avoid the gym and social

- 23 -

spaces, change her planned Spanish minor, drop courses that were necessary for her professional development, and alter her career plans. At bottom, Ware also lost her opportunity to be a regular college student, enjoying student life and her education at UVM in the usual way.

114. UVM's priorities were transparent throughout Ware's Title IX investigation: its star athlete had to be protected, no matter the cost. For Ware, the cost was justice, accountability and her safety and well-being.

### B. Sydney Partin

#### i. Russell Gains Partin's Trust

115. Sydney Partin grew up in Waterford, Virginia. She visited UVM during her senior year of high school and fell in love with the beautiful campus and its seemingly tolerant and accepting culture. She enrolled in UVM in Fall 2018, intending to study English.

116. In December 2018, early in her freshman year, a middle-aged Burlington man stalked Partin on UVM's campus. Partin and her friends ordered a car through a ridesharing service and got out at their destination. Hours later, Partin ordered another car through a different ridesharing service to return to campus. The same driver pulled up alongside her and insisted that he was her driver again. Partin did not think much of it until, once she was inside his car, the man engaged her in sexually explicit conversation, including asking if Partin was a virgin, offering to pay her for sex and nude photos of her, and putting his hand on her thigh without her consent.

117. Frightened by the encounter, Partin reported the encounter to Russell, the Assistant Dean of Students for Retention and the Deputy Title IX Coordinator for Students. During orientation, Partin and other students had been encouraged to reach out to Russell and the Student Affairs Office staff with safety issues.

118. Under the 2016 SHM Policy, the operative policy at the time, any "Responsible Employee," including Russell, who receives a disclosure about "an incident of sexual harassment or sexual misconduct" "<u>MUST</u> **immediately send an email**" with all information the individual knows… to the Title IX Coordinator in AAEO," "**Fill out a CSA form**" and "**Make the individual with whom they are in contact aware of their option to report the incident to local law enforcement…and that UVM makes confidential and non-confidential resources available**." (emphasis in original). Further, UVM's 2016 SHM Policy also commits UVM to conducting an inquiry, and "taking steps to provide appropriate remedies and support" even if the perpetrator is not affiliated with the University.

119. Russell informed Partin that as her stalker was not a student, her best option for redress was to file a report with campus police. He copied UVM's Title IX Office in his response. The Title IX Office, however, never reached out to Partin, and neither they nor Russell provided Partin with information in writing on how to lodge an official Title IX complaint, nor confidential and non-confidential resources that she could access. On information and belief, Russell also did not fill out a CSA form with respect to Partin's report.

120. UVM Police, too, were reticent to offer help and dismissed her experiences from the outset. The officer told Partin that her stalker was likely "just an asshole" and that they could do nothing further to help. However, Partin later learned that the UVM Police had received several other complaints about the same man, and UVM issued a six-month ban on him driving on campus.

121. On information and belief, neither UVM nor campus police monitored or kept a record of individuals driving onto campus, rendering the ban functionally useless.

### ii. Partin Is Drugged and Raped

122.    In March 2019, Partin left her dorm room to attend an off-campus party attended by members of the Alpha Epsilon Pi fraternity ("AEPi").

123.    Unbeknownst to Partin, AEPi was not a sanctioned fraternity at UVM, having received a five-year suspension in 2014 after several members were hospitalized for excessive alcohol and drug use. AEPi also has a long history of being a dangerous place for women, with at least six separate posts on the @ShareYourStoryUVM page documenting incidents of alcohol-or drug-related sexual assaults at AEPi parties, going back as far as 2015. The fraternity has a reputation for drugging, with rumors circulating around campus that they even have a device used to make previously opened bottles appear sealed in order to fool attendees into believing that drinks will be safe and untouched.

124.    In both 2018 and 2019, the UVM Director of Student Life acknowledged in emails sent to all students that UVM knew a dangerous environment existed at AEPi and listed the fraternity among the student groups they had disciplined "due to serious safety and misconduct concerns." In these emails, UVM also acknowledged that "AEPi ...continue[d] to operate without University recognition."

125.    Partin arrived at the AEPi party only "lightly buzzed," having had two or three low-alcohol canned drinks she had opened herself. At the party, she poured herself a small glass of alcoholic juice from a large Gatorade cooler and was approached by Nolan Donovan ("Donovan"), an AEPi member she had never met. After starting a conversation, he put his arm around her. At that time, Partin was able to speak as if she were sober, stand and walk normally, and think clearly. Partin sipped only a small amount of the juice. Shortly thereafter, she began stumbling, and was

unable to stand, slurring her speech, experiencing a disorienting change in eyesight, and losing her grasp on her surroundings.

126.     Though unable to recall all details with clarity, she remembers being approached by Donovan, groped, and forcibly kissed. Feeling nauseous and dazed, Partin struggled to find her friends. Partin vomited repeatedly and was helped by strangers when she attempted to leave the party. She was later informed by another party attendee that when outside, she fell face first into the snow and was unable to get up. Even when pulled up, Partin was too visibly incapacitated to stay upright on her feet.

127.     The next morning, Partin awoke on top of her dorm bed, shaking violently, with a powerful headache, covered in bruises and caked in dirt, and feeling a distinct physical sensation that something had roughly touched her vagina the night before. Partin's clothes and shoes were on, but she was disheveled, her body and face were bruised and covered in dirt, and she had a $150 Uber charge on her phone. The bed beneath her was neatly made, although she was certain that she had left the bed unmade before going to the party. She threw up several times that morning.

128.     After an emotional phone call with her mother, Partin went to the UVM Medical Center's Emergency Room, accompanied by two friends. Partin explained to the triage nurse that she was sure that Donovan had drugged her at the fraternity party. She also explained that she believed the drugging was motivated by his intent to commit sexual assault. The triage nurse recommended she receive IV fluids and be tested for date rape drugs such as Rohypnol, which could only be detected within a 24-hour window of being administered. The triage nurse also suggested a rape kit was available if there was an instance of sexual assault.

129.     The triage nurse called Deborah Governale, the on-call Physician Assistant. Governale was dismissive, and then refused to order Partin a blood test for Rohypnol or a rape kit.

She suggested that Partin had simply been drinking excessively, despite all the evidence Partin's narrative offered to the contrary. She diagnosed her with a "feeling of being drugged" and discharged her without treatment or referral to additional campus services.

130. At that time, Partin believed that the hospital and UVM were sufficiently linked that a report to one of the UVM doctors was equivalent to a report made directly to UVM. She also believed that Governale was a mandated reporter.

131. Partin felt deeply distressed and spent several days struggling with basic tasks like showering, eating, or sleeping.

132. Partin spoke with friends about the evening, even though she found it difficult. Two women who remained at the party after she left saw Partin change quickly from seemingly sober to violently ill. These women also saw Donovan kiss and grope Partin repeatedly.

133. Partin found it challenging to access UVM's student therapy office ("CAPS") in the immediate aftermath of the assault. Without mental health support from UVM, she developed severe anxiety and depression. When she returned home for the summer, her parents were deeply worried about her. They suggested that she take time off from school and remain home.

134. Partin's mental health continued to decline, and she developed anxious compulsions, panic attacks, trichotillomania, and agoraphobia. Partin also struggled with emotional, physical and sexual relationships. At the end of that summer of 2019, Partin conceded that her deteriorating mental health did not allow her to return to UVM and took both the Fall 2019 and Spring 2020 terms off.

135. On July 27, 2020, Partin attempted suicide. After a severe panic attack, during which she was unable to speak or breathe steadily, sobbing profusely, and feeling severe mental

and physical distress, Partin had decided she never wanted to experience such a debilitating attack again, and attempted to overdose on her prescribed tranquilizer pills.

136. During Partin's time off, she began working with off-campus therapists, footing the expensive co-pay bill herself because she saw no other choice. She was diagnosed with Post Traumatic Stress Disorder.

137. After extensive discussion with another therapist, almost three years later in Spring 2022, Partin discovered, to her horror, the memory she had been repressing. She began to recall a silhouette of a man leaning against her bed, and a weight pressed on her body when she was too incapacitated to understand what was happening. She began to piece together why she had woken up with such severe distress, feeling violated, and why she feared sexual contact since. In addition to being drugged and assaulted that night by Donovan, she realized that she had also been raped in her campus dorm. To this date, Partin cannot confirm the identity of her rapist.

### iii. The Title IX Office Fails to Act

138. Under the relevant operative SHM Policies and Procedures, the definition of "Sexual Exploitation" includes "[c]ausing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give consent to sexual activity."

139. The SHM Policies and Procedures apply to behavior occurring off-campus, and UVM has jurisdiction for off-campus events when off-campus conduct threatens the safety of a UVM community member or creates a hostile environment on campus.

140. As noted in Paragraph 118 above, when sexual harassment/misconduct incidents are disclosed to a "Responsible Employee," UVM and the Responsible Employee are required to take various steps, including filling out certain forms, contacting the AAEO, and giving the

- 29 -

complainant resources and support. UVM is further required to "provide [individuals who have experienced sexual harassment and misconduct] written information about UVM's complaint and resolution processes"; invite the individual to make a report; "conduct a thorough, prompt and impartial investigation" into any reports made to AAEO or investigations initiated by UVM; and "offer reasonable and appropriate measures to protect" complainants and "facilitate [their] continued access to University . . . educational programs and activities," "regardless of whether [they] pursue[] a complaint, investigation or resolution."

141. As described above, the drugging continued to haunt Partin throughout her year away from UVM. With time, she decided to seek redress.

142. On January 13, 2020, Partin emailed Russell. Because Russell had previously assisted her with the stalking incident, Partin believed that he would help her.

143. In her email, Partin told Russell that she had experienced a "series of traumatic events" that resulted in her "taking this whole year off of school because of intense emotional anguish." She related that she had been drugged at a party, "completely blacked out," "could barely stand up or walk" and that she had no memories of the rest of the evening, until she woke up, "confused and scared," the next morning. She then said she had taken herself to the ER "to be tested for any date rape drugs in my system." She further told Russell that the doctor had refused to test her for anything, and had offered her neither drug testing, nor a rape kit.

144. Russell was not only a "Responsible Employee," but also, as the Deputy Title IX Coordinator for Students, was listed in UVM's SHM Policies and Procedures as one of the four individuals under the "Confidential Resources." Partin's email put a Deputy Title IX Coordinator at UVM on notice that she had been drugged for the purposes of sexual assault, which under the

SHM Policies and Procedures constitutes sexual exploitation and indicated that she had possibly been raped as well, explicitly using the words "date rape drugs" and "rape kit" in her email report.

145. Russell told Partin that, since the hospital was a separate entity from the university, there was nothing UVM could do to help. In doing so, Russell misinformed Partin about her options to further report the incident, accommodations she was entitled to under Title IX, and further investigatory actions that UVM could take. Russell also failed to follow up on Partin's report of drugging, even though her email indicated that it was for a sexually motivated purpose.

146. Russell did tell Partin, however, that he was a mandatory reporter and would pass the incident on to the Title IX Office. He also told her that she could expect to be contacted by the Title IX Office within the week. On January 16, 2020, Russell sent Partin a link for a UVM Medical Center complaint form and told her that she could submit a complaint about Governale online, which Partin proceeded to do.

147. Following this report, neither AAEO nor UVM's Title IX staff contacted Partin in 2020. Sexual harassment and misconduct complaints made to "Responsible Employees," such as Russell should trigger a response from AAEO including "written information about the University's complaint and resolution processes," and an "invit[ation] to make a report." No such options were offered to Partin. Moran would later inform Partin that she and the Title IX Office became aware of her assault in January 2020, but did nothing.

148. Although putting Rohypnol in a drink is both a violation of UVM's SHM Policies and Procedures and a state crime, neither UVM police nor Burlington police were called to take a report.

149. The lack of knowledgeable staff and the failure of the Title IX Office to contact Partin substantially impaired her educational experience, physical and mental health and well-being.

150. Partin returned to UVM for her sophomore year in Fall 2020, a year behind schedule. Soon after her return, she learned that one of her roommates had been drugged by the same AEPi member who had drugged Partin. This realization triggered immense anxiety and prompted Partin to seek emergency support from CAPS. It was only after she explained the extent of her distress, anxiety, and suicidal ideation that CAPS finally offered her access to therapy.

### iv. UVM Students, Including Partin, Share Their Stories

151. On April 26, 2021, a UVM student named Athena Hendrick shared their story of sexual assault and UVM's consequent mishandling of their report on Instagram.

152. Hendrick turned to social media after reaching a point of utter exhaustion with UVM's Title IX Office. Hendrick reported that, on February 1, 2020, a UVM student named Austin Weiland ("Weiland") had raped them. On February 12, 2020, Hendrick reported the assault to their RA, who is a mandatory reporter, but the RA did not connect them with Title IX. Over the next few weeks, desperately seeking guidance and support, Hendrick contacted the Women's Center, Student Legal Services, and the UVM Police. Finally, in early March, Hendrick received an email from a Title IX representative stating that a meeting would be scheduled after the upcoming spring break.

153. According to Hendrick's social media post, UVM's Title IX Office began an investigation on April 16, 2020, but even though Weiland originally "admit[ted] to lack of consent" in his first statement, UVM closed the investigation in August 2020 due to a "lack of evidence." UVM granted Hendrick a No Contact order, which Weiland broke on April 24, 2021,

by walking up to Hendrick and trying to engage in conversation when they were walking their dog on campus. When Hendrick reported the violation to the Title IX Office, staff told Hendrick that they would call Weiland in case he had "forgotten" about the order, and then put the onus on Hendrick to call the police, file an incident report, "or never walk without a friend."

154. According to UVM's SHM Policies and Procedures, "[a]ll individuals are encouraged to report concerns about the failure of another individual to abide by any restrictions imposed as a protective measure to UVM Police Services and AAEO. The University will take *immediate and responsive action* to enforce a previously implemented measure" (emphasis added).

155. On information and belief, no further action was taken to discipline Weiland for the violation. Weiland remained a student at UVM until he transferred voluntarily to Northern Michigan University in Fall 2021.

156. Hendrick's story infuriated UVM's student body, and "a staggering number of other survivors at UVM and other Burlington colleges [came] forward" with their own stories of rape and assault. Students formed an anonymous Instagram account, @ShareYourStoryUVM, that allowed assault survivors at UVM to post their narratives publicly.

157. On April 28, 2021, Partin recounted her assault, and AAEO's failure to reach out, on her personal Instagram account.

158. Only then, over a year and three months after Partin had first emailed Russell about her assault and after a public accusation, did Moran, UVM's Title IX Intake & Outreach Coordinator, finally contact her and offer to meet with her. The offer came in the form of a boilerplate email, devoid of any personalization, listing AAEO's resources and support options on April 29, 2021.

- 33 -

159. On May 7, 2021, Partin responded saying she would like to have a call over Teams. Partin spoke with Moran on May 11, 2021.

160. By this time, protests were galvanizing UVM's campus, with multiple survivors circulating accounts about the Title IX Office's incompetence. Although Partin agreed to meet with Moran, she no longer had any faith in UVM's ability to protect her and elected not to pursue an investigation.

161. On the call, Moran admitted that she had received Partin's report from Russell in January 2020. Moran claimed to have mistakenly believed that Partin only wanted to know how to file a complaint against a doctor at UVM Medical Center. She asserted that she had spoken with Russell about Partin's options but admitted that in retrospect she should have reached out to Partin in 2020. While she wished she had sent Partin some outreach and not relied on another person, Moran told Partin that at the time she had been confident that Russell would tell complainants about all of the supports available. This contradicted Russell's own representation to Partin that AAEO would do their own distinct outreach. While both Russell and Moran had believed Partin's report deserved immediate outreach and support measures from the AAEO, neither of them, and as a result nobody, had reached out to Partin as required by UVM's SHM Policies and Procedures.

162. In addition, Moran informed Partin that she had checked on Donovan's student status and, by the time Moran had gotten around to reaching out to Partin, he was no longer enrolled at UVM. While this would not prohibit the university from launching an investigation, Moran made clear that it would seriously limit the university's ability to enforce any meaningful consequences.

- 34 -

163. Moran's year-late explanation was little consolation to Partin. UVM's failure to engage with her report of sexual misconduct and assault caused her serious, sustained long-term harm, including to her academics and physical, mental, and sexual health. Partin was forced to withdraw from school for a full academic year, causing a delayed graduation, lost earnings and reduced lifetime earning potential. She has also struggled to maintain her scholarship; saw a decline in her grade average and was forced to alter her courseload, including dropping classes she was passionate about and sacrificing a minor in Gender, Sexuality, and Women's Studies.

164. Partin's PTSD has caused several mental and physical health problems including agoraphobia, obsessive compulsive tendencies, panic attacks, sexual dysfunction, suicidal ideation, self-harm, anxiety, depression, trichotillomania, vaginismus, dermatillomania, night terrors, sleep paralysis, insomnia, intense travel anxiety, and anger issues.

165. Partin has also suffered anxiety related to the media controversy about UVM's rampant policy of ignoring sexual violence. Although she has taken part in public protests, she suffers depression and anxiety over UVM's failure to take effective action.

## C. Cassia Harting-Smith

### i. Harting-Smith is Sexually Assaulted

166. Harting-Smith enrolled at UVM in the fall of 2018 to study English, drawn by its welcoming community and progressive outlook.

167. On the evening of March 22, 2019, Harting-Smith drank heavily at a party hosted by a friend to welcome Jane Doe ("Doe"),[4] a fellow student who had recently moved into Harting-Smith's dorm hall.

---

[4] Jane Doe is a pseudonym.

168.    At the party, Doe approached Harting-Smith and, during their conversation, asked whether Harting-Smith had ever been sexual with a woman. Throughout the conversation, Doe made advances towards Harting-Smith, which made Harting-Smith uncomfortable. As Harting-Smith attempted to withdraw, Doe kept advancing closer into her personal space.

169.    Doe then suggestively asked Harting-Smith if her roommate was home. Though her roommate was not home, Harting-Smith replied that she was in order to defuse Doe's advances.

170.    Harting-Smith was eventually so incapacitated with alcohol that she doesn't remember large parts of the night that followed. She does remember, however, eventually finding herself in a bathroom in the dormitory hall alone with Doe.

171.    Doe began undressing Harting-Smith in the bathroom, even though Harting-Smith was clearly too drunk to consent to sexual activity. Harting-Smith ended up on the floor of the bathroom, completely naked, as Doe began touching her intimate areas. Doe put her fingers and mouth on Harting-Smith's breasts and inside her vagina, and rubbed her vulva against Harting-Smith's own. Harting-Smith did not consent to any of this sexual contact, and was scared and confused.

172.    Harting-Smith expressed that she was in pain when Doe penetrated her with her fingers.

173.    Throughout the assault, Harting-Smith repeatedly said that she was so drunk she needed to vomit. Although Doe allowed Harting-Smith to move away and sit by the toilet several times, she would eventually pull Harting-Smith back into non-consensual sexual contact.

174.    Harting-Smith felt "like a zombie" during this sexual encounter and was confused about what happened afterwards. She returned home after the assault and cried in the shower.

175. The next morning, Doe sent Harting-Smith text messages, writing that she hoped Harting-Smith "didn't feel uncomfortable" after what had happened and that they could "pretend it didn't happen" if she wished.

176. Over the year following the assault, Harting-Smith was traumatized by frequent encounters with Doe in McAuley residence hall, which revived painful memories of her sexual assault. As documented in UVM's own Title IX investigation, in or around April 2019, she began to suffer violent panic attacks, including falling "on the ground panicking and re-living the whole incident while shaking and screaming . . . or simply sobbing" when she saw Doe.

177. Harting-Smith was diagnosed with several psychological and mental health disorders due to the trauma of the sexual assault. She experienced intrusive memories, nightmares, flashbacks, dissociative behaviors, and negative moods in addition to the panic attacks.

178. Before the sexual assault, Harting-Smith was a bright and engaged student. Following the assault, Harting-Smith began to develop severe anxiety, terrified of being sexually assaulted again. Harting-Smith's social life suffered, as her friends continued to spend time with Doe, and she rapidly became socially isolated. Her grades began to fall, as she became too anxious to participate in class. She began to frequently ask for extensions on projects and essays due to mental health struggles. She also withdrew from participation in campus activities and rarely, if ever, attended on-campus events.

### ii. UVM's Title IX Office Investigates Doe's Sexual Assault of Harting-Smith

179. On or around spring break in the Spring semester of 2020, UVM suspended in-person classes due to the COVID-19 pandemic, and Harting-Smith went home to Westfield, New

Jersey. When UVM partially resumed in-person education for the Fall semester of 2020, she returned to Burlington, where she lived off-campus.

180. On September 23, 2020, Harting-Smith reported Doe's assault to UVM's AAEO.

181. The AAEO contacted Harting-Smith shortly thereafter, assigning Spence to investigate Harting-Smith's complaint.

182. Spence investigated Harting-Smith's complaint between September 24, 2020, and December 16, 2020, and issued her findings on December 16, 2020.

183. Spence concluded that Harting-Smith credibly alleged that she was "very, very drunk" during the night of the March 22, 2019, party, could not meaningfully consent to sexual contact, and did not remember much of the sexual encounter. However, in part due to Harting-Smith's alcohol-induced memory gaps, Spence determined that there was insufficient evidence to find Doe responsible for violating UVM's Title IX Policy.

### iii. Harting-Smith Files for a Restraining Order and Faces Retaliatory Action

184. Devastated that UVM absolved Doe, Harting-Smith suffered a mental health breakdown. Not only did UVM's process fail her, but she was forced to live in constant fear of seeing her assailant again on campus and in the small community of Burlington. Her social life, which was already diminished due to the impact of the assault, all but disappeared. She rarely left her apartment and went on campus only when absolutely necessary. She largely withdrew from campus activities that were not required by her enrolled classes.

185. At or around this time, Harting-Smith was prescribed anti-depressants.

186. By this time, in or around the Fall semester of 2021, COVID-related restrictions on UVM's campus had begun to ease, increasing the likelihood that Harting-Smith would encounter

Doe in public spaces around the university and off-campus, including the popular "Roxy" movie theatre in Burlington where Harting-Smith worked, and which Doe's friends frequented. The anxiety Harting-Smith felt from the prospect of encountering Doe left her in crippling fear.

187. On September 24, 2021, Harting-Smith filed a complaint requesting an order of protection against stalking or sexual assault ("SSA order") against Doe in Vermont Superior Court. In her motion, Harting-Smith disclosed the details of her sexual assault and told the court that she was terrified of encountering Doe after returning to campus following over a year of remote education. The same day, the Superior Court granted her a temporary order of protection and scheduled a hearing for October 13, 2021

188. On September 27, 2021, Doe was served papers relating to Harting-Smith's request for an SSA order.

189. On October 1, 2021, Harting-Smith received an email from Stanton notifying her that UVM had issued a mutual no-contact order against her (the "October NCO") mandating that she refrain from making any contact with Doe through "any means (verbal, electronic, physical, or telephone," or "through a third party." The email directed that if she had any "incidental contact" with Doe in common spaces, she should "not engage" with Doe.

190. Stanton's email contained no other information about the October NCO.

191. The October NCO directed Harting-Smith to report any violations to either the University Police Services or the AAEO and that, if any violation occurred, the University may "take further appropriate action, including disciplinary action."

192. The October NCO was signed by Stanton, and listed Moran as a contact should Harting-Smith have questions "about AAEO process or support measures."

193.     Harting-Smith was shocked and terrified to receive this email. She had never done anything to harm Doe and did not understand why she would be ordered to stay away from Doe.

194.     Neither Spence, Stanton, nor any other AAEO personnel involved in Harting-Smith's initial October 2020 Title IX investigation had informed Harting-Smith that a mutual no-contact order was an available option, or had ever been put in place. On information and belief, there was no original mutual no-contact order in place between Harting-Smith and Doe.

195.     Indeed, Harting-Smith would not have been aware that a mutual no-contact order was possible if she had not consulted a Vermont legal aid lawyer who assisted with her Title IX claim. When the lawyer informed Harting-Smith this was an option, Harting-Smith dismissed a "mutual" no-contact order, as "mutual" no-contact implied mutual fault.

196.     Immediately after receiving Stanton's email, Harting-Smith responded and again stated that she did not want a mutual no-contact order, questioning how a "renewed" mutual no-contact order could be issued when there had been no original mutual no-contact order.

197.     Stanton responded that mutual no-contact orders were issued at the start of all investigations and parties were offered renewals when investigations conclude. This was not consistent with Harting-Smith's experience, when she had clearly not been offered, accepted, or ever been informed of, a mutual no-contact order.

198.     Stanton also told Harting-Smith that the October NCO had been issued at Doe's request.

199.     Harting-Smith was confused and scared. She had done nothing wrong and did not understand how Doe could be allowed to have a no-contact order placed against her. Harting-Smith told Stanton that Doe's request for the October NCO came shortly after she was served with Harting-Smith's complaint requesting an SSA order and that she believed the October NCO was

- 40 -

made in retaliation for Harting-Smith's original complaint against Doe. Doe had no nonretaliatory reason to request such an order.

200.    Harting-Smith later learned that when Doe purportedly requested the October NCO, she was neither enrolled in classes at UVM nor physically in the country. |Its only purpose was to cause Harting-Smith the distress associated with the prospect of violating it.

201.    Between October 2021 and February 2022, Harting-Smith had a series of ultimately futile discussions with both Stanton and Moran to challenge the October NCO. With Doe returning to campus the following semester, Spring 2022, Harting-Smith lived in fear of encountering her assailant, and now also of triggering disciplinary consequences herself if she happened to run into her abuser. As a result, she felt unsafe, intimidated, and unsupported by the AAEO, and her grades, relationships, and mental health continued to suffer.

202.    On February 21, 2022, Harting-Smith officially reported Doe's request for a mutual no-contact order to Moran as an act of retaliation that was prohibited under UVM's SHM Policies and Procedures. She requested it be immediately revoked.

203.    On March 4, 2022, Harting-Smith had a videoconference meeting with Moran to again challenge UVM's issuance of the October NCO. Moran told Harting-Smith that while she knew Doe's actions were retaliatory, nothing would come of Harting-Smith bringing forward retaliation claims.

204.    UVM's failure to properly respond to Harting-Smith's report of retaliation further increased the severity of Harting-Smith's fear and anxiety and triggered traumatic memories of her assault.

205.    On April 5, 2022, Harting-Smith sent an email to Stanton stating that the AAEO office had "jeopardized [her] safety and security on campus" by issuing the October NCO, that

the issuance of the October NCO was a retaliatory act "to attempt to control and intimidate [her] after [she] filed for a restraining order," and that she was formally requesting that UVM take corrective action.

206. On April 6, 2022, Stanton replied to Harting-Smith once again refusing to investigate her report of retaliation. He also said that Doe's conduct was permissible under UVM's SHM Policy.

207. Ultimately, as her efforts were futile, Harting-Smith stopped trying to get redress from UVM's AAEO.

## iv. Harting-Smith's Speech, Expression, and Movement Are Unlawfully Restrained

208. By sanctioning Doe's retaliation against Harting-Smith, UVM caused Harting-Smith significant fear, distress, and anxiety. These feelings became so overwhelming that Harting-Smith began routinely avoided public places where she might Doe, including the library, where she regularly went to study and use the printers.

209. Harting-Smith also avoided the Davis Center, UVM's main hub for student activities and social engagement, for fear of seeing Doe and potentially being found in violation of the October NCO.

210. Harting-Smith even opted out of one of her graduation ceremonies – the larger commencement ceremony that included all of the separate schools of UVM – because she was worried about running into Doe at this event. Harting-Smith attended only a smaller ceremony for the College of Arts and Sciences.

211. Prior to the issuance of the October NCO, Harting-Smith had shared the story of her sexual assault on her Instagram account and would also repost MeToo content related to sexual

assault. After the October NCO was issued, Harting-Smith became terrified that her social media activities might result in further retaliation from Doe and disciplinary action from UVM. As a result, Harting-Smith stopped posting about her sexual assault on social media from the issuance of the October NCO until early 2022, when the resurgence of student activism on campus gave Harting-Smith the courage to resume speaking out about sexual assault on campus despite fearing retaliation.

212.    Doe's sexual assault and UVM's failure to properly respond to the retaliation against Harting-Smith caused Harting-Smith to experience even more severe emotional and psychological symptoms such as further panic attacks, chronic anxiety, post-traumatic stress disorder, and chronic pain.

213.    The failures of UVM's AAEO forced Harting-Smith to try to protect herself through seeking a restraining order through the Vermont Court system. As a result, Harting-Smith's coursework was further disrupted as she tried to juggle court appointments, therapy sessions, managing her health conditions, and avoiding spaces on campus where Doe was present due to the October NCO. Harting-Smith was forced to abandon internships, extracurricular activities, social activities, and classes that were critical to her professional aspirations.

214.    In Spring 2022, Harting-Smith also became severely depressed, and her panic attacks increased in severity.

215.    In or around the Spring of 2022, she found herself unable to handle a full courseload, and took only two classes, instead of her usual average of three to four classes, which were the minimum required credits to be counted as a full-time student. Harting-Smith did so not only because of the cumulative impacts of the broken AAEO process on her mental health, but also because her fear of running into Doe and facing disciplinary action meant that she wanted to

minimize her time spent on campus. As a result of her reduced course load, Harting-Smith was forced to forego a scholarship for that semester, and also needed to downgrade her Film major to a minor.

### D. Haley Sommer

#### i. Weiland Rapes Sommer

216.    Haley Sommer enrolled in the Rubenstein School of Environment and Natural Resources ("Rubenstein") at UVM in Fall 2017. Although Sommer grew up abroad, moving from Beijing, China to attend high school in South Africa, Sommer held a deep affection for the school since childhood because both her parents and sister are UVM alumni.

217.    In Fall 2020, Sommer began an accelerated master's program in Natural Resources, which required her to remain at UVM for an additional year.

218.    In November 2020, the day before Thanksgiving break, Sommer attended a small party in her neighbor's apartment. Weiland, the student whom Hendrick reported to UVM as having assaulted them six months earlier, also attended the party. Sommer had seen Weiland before in her neighbor's apartment, but they had never engaged in one-on-one conversation. All she knew about him was that he was a club tennis member at UVM.

219.    Weiland quickly took an interest in Sommer, encouraging her to play beer pong with him and pressuring her to drink large amounts. By the end of the night, Sommer was incapacitated, and her memories began to blur.

220.    Sommer remembers that it had gotten to be quite late, and there were only four people left in her neighbor's apartment: their host, one other woman, Weiland, and Sommer. At some point after midnight, Sommer remembers that Weiland seemed to be annoying their host.

Sommer suggested that maybe their host wanted to be alone with the woman and stepped out of her neighbor's apartment. This is one of her last memories of the night.

221.    Though Sommer does not remember how, Weiland ended up in her apartment. Sommer made them both drinks, but Weiland did not drink his.

222.    Sommer remembers regaining consciousness while Weiland was having penetrative sex with her. Distressed, Sommer remembers that she struggled to stand and made her way to the bathroom. When she returned from the bathroom, Weiland had disappeared.

223.    The next morning, Sommer was distraught and uncomfortable, but, due to the amount of alcohol Weiland had encouraged her to drink at the party, did not immediately classify the incident as an assault. She knew that something about the sexual encounter had been wrong but did not yet know how to name it.

224.    Shortly thereafter, Sommer entered a deep depressive state, unhappy and unsure why. She developed an intense and sudden fear of walking home alone at night, and at times felt fervently that an intruder was in her apartment. Months later, she would connect these subconscious physical reactions to her assault.

225.    In April 2021, Sommer ran into Weiland at a beach on Lake Champlain with another male club tennis team member. Weiland and Sommer said hello to each other and then continued on their way. Sommer felt uncomfortable about the interaction. One month later, a crowd-sourced list of UVM students who had been accused of sexual assault surfaced online. The male club tennis player who accompanied Weiland at the beach was on the list. So was Weiland.

226.    On April 26, 2021, Hendrick publicly shared that Weiland had raped them. When Sommer read about Hendrick's experience, she felt physically ill, overcome with a horrifying realization: he had raped her too.

227. In the days following Hendrick's post, Sommer would learn that Weiland had a history of predatory behavior even before he raped Hendrick. After the furor following Hendrick's public revelation, the Student Government Association held a meeting condemning Weiland's behavior. Multiple students, including Sommer, submitted experiences of abuse at the hands of Weiland. Hendrick read each of these experiences aloud at the meeting.

228. Sommer began to come to terms with the true nature of the rape, and, a few days later, she decided to post her own story. In her April 29, 2021 post, Sommer recounted how, after Weiland assaulted her, she had initially blamed herself, but through the publication of numerous stories that resembled hers, came to realize that Weiland's behavior was a pattern.

229. Sommer was furious at UVM. Weiland's pattern of assault with other victims was so similar to her own, yet, despite investigating Hendrick's claim, UVM had either not uncovered, or chosen to ignore their stories.

230. Like Partin, Sommer received a message from Moran after publishing her Instagram post. Moran emailed Sommer on April 29, 2021, the same date she had contacted Partin, with near identical boilerplate text regarding UVM's Title IX Policies and Procedures. The email did not acknowledge the fact that UVM had received a prior complaint about Sommer's rapist. Nor was the email personalized in any manner for Sommer.

231. As a student who had grown up abroad, Sommer knew very little about Title IX. All she knew was that this was the same organization that had dismissed Hendrick's rape report, neglected stories of numerous other survivors, and allowed Weiland to return to campus and rape her. Unsurprisingly, Sommer did not trust Moran or the Title IX Office.

232. Sommer responded to Moran, noting that her "assailant, Austin Weiland, assaulted [her] after already having gone through the Title IX process and being found not responsible....I'm

- 46 -

sure you can understand my frustration over knowing that this could have been prevented if he had been found responsible and expelled the first time around." She continued, "[a]ll of the women who have shared their stories of sexual assault on campus have shared negative experiences about the Title IX process." She said she had concluded that going through a Title IX process in light of all this would "further her trauma." She also noted to Moran that she would be at UVM "for another year" to complete her Master's Program.

233. Moran responded by expressing her regret that Sommer did not "feel comfortable working with [her] or the Office of Affirmative Action and Equal Opportunity," and assuring her that she "take[s] [her] work very seriously." She did not directly acknowledge or address any of Sommer's substantive criticisms.

234. On information and belief, Defendants UVM and Moran never investigated Sommer's rape, and Weiland could have returned to campus in Fall 2021 had he not chosen to transfer of his own accord out of state. According to UVM's SHM Policies and Procedures at that time, UVM's Title IX Coordinator and/or Title IX Director is not foreclosed from investigating a potential Title IX violation if a complainant does not wish to participate in the UVM's process; indeed, they are explicitly authorized to do so if it would be in keeping with "UVM's responsibility to provide a safe and nondiscriminatory environment for all members of the campus community." One of the factors in making such a determination is "whether there have been other complaints and/or disciplinary outcomes about the same individual."

235. Due to these revelations about Weiland and UVM, Sommer struggled to focus on her year-end assignments, many of which were due in the next few weeks. She felt constantly nauseous and anxious. For weeks, she could barely bring herself to eat. Sommer contacted Anna Smiles-Becker, the Director of Student Success and Experiential Learning. Smiles-Becker

contacted some of Sommer's professors for her, but overall, Sommer felt unsupported, alone, and betrayed by a community and school for which, as a legacy student, she had previously held deep respect.

236.    Sommer wrote an end-of-year reflection for one of her classes about her assault and her desire to hold UVM accountable for its Title IX failures. On information and belief, although the professor who read this essay would have been a mandatory reporter, it does not seem that the essay was passed on to Title IX, because Moran never contacted Sommer again.

## ii.    Sommer Learns More About Title IX's Incompetence

237.    Through the @ShareYourStoryUVM account, Sommer learned that Weiland had exhibited worrisome, predatory behavior even before he raped Hendrick. Three separate posts on the @ShareYourStoryUVM page, for example, reported sexual assaults by Weiland.

238.    In Fall 2018, according to a @ShareYourStoryUVM post, a female UVM student attended a party with Weiland. He "had a backpack full of beer" and was "constantly offering it" to the student. Although the student does "not remember the events" that led to this result, she left the party upset after Weiland slapped her "in the face."

239.    In Spring 2019, according to a @ShareYourStoryUVM post, Weiland met a female UVM student at a party. He offered her a drink, but she politely declined because she did not know him. The student ended up drinking more at the party, becoming intoxicated, and going back to Weiland's apartment. In retrospect, she believes that she was "in a much deeper" state of intoxication than Weiland was in. The two began having consensual sex, at which point Weiland asked if he could engage in anal sex. The student said no. Weiland persisted. The student said she was not comfortable with anal sex. Weiland did not take no for an answer. He "'accidentally slipped' in there and he continue despite [the student] telling him to stop." When Weiland refused

- 48 -

to respond to her verbal instructions, the student "dissociated" and lay there, in "shock of what was happening." When "he finished," she got up and left, returning to her dorm room where she "cried in the shower with blood covering [her] lower half." The student "never reported" the rape because she "couldn't believe it actually happened," and tried to "pretend it hadn't."

240. Also in 2019, according to another social media post, a UVM student attended her "first college party" at UVM's "tennis club." Somehow the student ended up "in the tennis club shower" with Weiland. The student was intoxicated and "audibly said no" as Weiland "crossed multiple physical boundaries." The student remembers that Weiland "didn't care" about her objections and "brushed [them] off." She can still "easily recall how it felt to have his hands roam [her] body without [her] consent." Luckily, the student's "friend found [them]," "shut the situation down," and took her home. Weiland responded by harassing the student on Snapchat about how she was "rude" and a "tease," until she blocked him.

241. On May 5, 2021, Sommer sent an email about her sexual assault to, among others, Defendants Stanton and Moran, detailing her anger and disappointment with UVM for failing to protect her, and explaining the trauma that it had inflicted on her to learn that her "assailant ha[d] assaulted at least three students within the Rubenstein school." Sommer explained that as a result, she was "increasingly frustrated over [her] decision to extend [her] education" at UVM.

242. Sommer received a perfunctory response thanking her for "having the courage to share [her] story," and again reminding her that she could reach out should she require access to the very resources that her email had cogently explained were failing students.

243. That summer, Sommer worried that she would see Weiland around campus again in the fall. She had multiple nightmares about running into her assailant on campus.

244. Sommer decided to leave her master's program in August 2021. UVM's failure to prioritize her safety, and the administration's tone deaf responses to her pleas for help, created a hostile environment that Sommer could no longer endure.

245. On October 29, 2021, Sommer and Partin spoke at a UVM Board of Trustees meeting about their rape experiences. Each found the Board of Trustees apathetic and the experience incredibly traumatic.

246. Once she withdrew from UVM, Sommer contacted Smiles-Becker on December 15, 2021, and another UVM Professor, Amy Seidl, on or around January 15, 2022, to see if they would help with her job search or serve as references. Neither professor replied. Both knew that Sommer had spoken out publicly about how the school handled sexual assault cases, and Smiles-Becker had been copied on Sommer's May 5 email detailing UVM's failures to Stanton and Moran.

247. Prior to Sommer's public statements regarding UVM's failures and subsequent withdrawal from the school, Sommer held deep admiration for Smiles-Becker and Seidl and considered them professional and personal mentors. She was in frequent contact with them for academic and professional advice. Smiles-Becker and Seidl usually replied promptly to Sommer's emails, but pointedly ignored her once she had spoken up and dropped out of the program.

248. As a result of UVM's actions, Sommer was unable to use any references from UVM in her job search after withdrawing from her graduate program. She also felt unable to use the other job search resources and supports available to UVM alumni. This undermined Sommer's ability to find suitable employment.

249. Sommer struggles with anxiety and depression due to remembering her rape, as well as knowing that UVM failed to control and sanction her rapist.

250.     Sommer has suffered from suicidal ideation.

251.     Sommer has suffered financially as a result of her rape as a result of having to drop out of her master's program, which further denied her access to alumni networks and job opportunities to which she would otherwise have had access as a UVM graduate student.

252.     Defendants knew why Sommer felt forced to withdraw from her graduate program but failed to offer her any meaningful medical or psychological support.

## II.     UVM Ignores Known and Obvious Risks To Female Students

### A.     Federal and State Investigations

253.     UVM has been the subject of multiple Department of Education ("DOE") and Office of Civil Rights ("OCR") investigations for failing to follow Title IX policies and for violating the reporting requirements established by the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act").

#### i.     Federal Investigations

254.     In 2009, the DOE began a compliance audit of UVM's Clery Act reporting data dating back to 2007.

255.     In 2012, the DOE fined UVM $65,000 for Clery Act violations including a failure to include 20 sex offenses in its publicly reported sexual assault statistics. UVM had misclassified these sexual offenses as having been reported to professional counsellors, which do not have to be publicly disclosed. In reality, these assaults had been reported to staff at the Women's Center who were not licensed counsellors, and UVM should have publicly reported them.

256.     In 2013, a UVM student filed a complaint with the DOE alleging "that one of her male professors had sexually harassed her during a conference they attended the previous year." At the time of the conference, the professor was already under investigation because of another

student's claim of sexual harassment. The OCR investigated and, in June 2013, UVM and the complaining student "signed a voluntary resolution agreement" ("VRA"), under which UVM was able to avoid further Title IX scrutiny by agreeing to "review its processes for investigating complaints of sexual harassment brought forward by students." On information and belief, UVM has never publicly elaborated on exactly what types of changes it implemented.

257. In the years directly following the 2009 Clery Act audit and 2012 DOE fine, UVM reported a notably higher number of forcible sexual offenses than in previous years. In 2014, UVM reported 27 rapes on campus compared with only 15 in 2013. This put UVM in the top ten schools in the United States for the number of rapes reported on main campuses for 2014 and generated significant negative press.

258. In 2015, the American Psychological Association published an article—relying in part on data from UVM—concluding that campus sexual assault reports increase by approximately 44% when schools are under investigation or audit for Clery Act violations ("2015 Study"). The 2015 Study concluded that its results were "consistent with the hypothesis that the ordinary practice of universities is to undercount incidents of sexual assault."

259. During its investigation for Clery Act violations, UVM exhibited a large increase in reported sexual assaults—from 99.9% of the national average to 305.9% of the national average—corroborating the author's view that higher educational institutions were systemically underreporting (and only properly reporting once forced by auditing scrutiny).

260. The 2015 Study also found that after audits are completed, the number of sexual assaults universities report tends to decrease "to levels statistically indistinguishable from the preaudit time frame," and that there was "no long-term effect on the reported levels of sexual assault." Consistent with this, UVM did not sustain its audit-era spike in reported rapes, which

fell sharply in its post-audit years: 19 in 2015; 19 in 2016; 13 in 2017; 22 in 2018; 16 in 2019; and 9 in 2020 (likely due to the pandemic).

261.     UVM publicly attributed the 2014 spike in rape numbers to improved reporting practices, even going so far as to instruct its student tour guides to give potential students and their parents this explanation. This damage-control message—that the high reports were "due to an increase in media coverage on sexual assaults and the quality of support UVM provides to victims"—has been repeated by UVM across various mediums. In reality, as demonstrated by the 2015 Study, it is much more likely that UVM had systematically underreported sexual assaults before the audit caught them red-handed.

262.     Despite attributing the spike in rape reports to substantive changes in its own policies, on information and belief, UVM has provided little public information on what these policy changes were or how they were implemented. The Burlington Free Press noted in 2016 that, three years after the VRA, UVM officials had declined to confirm that any policy changes had been implemented after the 2013 investigation. As late as 2019—five years after UVM's alleged policy improvements—UVM still exhibited a "severe lack of resources for survivors of sexual assault and harassment," falling well below comparator institutions. Indeed, as late as 2021, UVM told students campaigning for sexual harm reduction policy improvements that it was "just too expensive" to improve UVM's sexual assault policies and directed them to off-campus resources.

263.     UVM has since been subject to a further Title IX sex discrimination charge. In August 2017, the OCR opened an investigation "when an individual filed a complaint" stating "that UVM failed to respond promptly and equitably" to an allegation of sexual violence by a UVM student.

### ii. State Legislative Action

264. In April 2019, advocacy groups such as the Vermont Network Against Domestic and Sexual Violence urged the Vermont legislature to insist upon greater accountability from state higher education institutions about campus sexual violence.

265. In May 2019, the Vermont legislature responded by creating the Campus Sexual Harm Task Force ("Task Force"). The legislature charged the Task Force with tackling known issues at state universities related to "transparency, safety, affordability, accountability of outcomes, and due process in campus conduct adjudication processes for sexual harm." Stanton participated in the Task Force as UVM's representative.

266. At an early meeting, the Task Force said it would focus on Vermont higher education's "institutional responses" to sexual assault and "current practices for preventing and responding to sexual harm."

267. During the time that Stanton and the Task Force were discussing the widely known deficiencies in Vermont's higher education campus sexual harm policies, Ware and Partin sought support from UVM after their assaults, and Sommer was raped by an assailant known to UVM. To Plaintiffs, the deficiencies that spurred the Vermont legislature to create the Task Force were all too clear.

268. In October 2019, Stanton summarized UVM's Title IX reporting processes for the Task Force in the Stanton Memo. The Stanton Memo noted several stated policy imperatives of the Title IX Office from which Plaintiffs did not benefit in practice: formal investigations into sufficiently serious allegations of sexual misconduct; mandatory reporting responsibilities; and necessary procedural requirements to be followed when sexual misconduct is alleged. The Stanton Memo also listed the Dean of Student's Office as one of UVM's official resources for students,

and included a broad list of employees who were "mandated to report incidents of sexual harassment and misconduct," including directors, deans, and employees with "oversight responsibilities.

269.    The Task Force released a final report in May 2020 that pointed to several problems with the way Vermont colleges and universities handled campus sexual assault, including lack of transparency in investigations, poor preventative measures, and inadequate training for staff to "effectively implement violence prevention programming and initiatives to impact students." It also noted that Vermont lacked "any publicly available data on higher education campus sexual harm, either by institution or statewide."

### B.  Sexual Assault Within UVM Student Activities

270.    UVM sponsors at least 18 official sports, all of which compete at the NCAA Division I level, as well as around 60 club sports and roughly 15 affiliated fraternities and sororities. UVM's Department of Student Life, which oversees Club Sports and Greek Life, notes that Greek Life enhances the "UVM experience by contributing to students' development of . . . life-long friendships." Similarly, some UVM club sports "host events and travel to competitions on weekends," which helps students to "establish a great social network with other students." Unsurprisingly to anyone familiar with college "social networks," UVM's club sports and fraternities regularly host parties for participants.

271.    According to campus-wide emails circulated yearly by UVM, student organizations can "have their recognition removed for various reasons, including hazing, alcohol and drug use, risk management violations, sexual misconduct and/or assault, and the failure to comply with University policies and expectations."

### i. Fraternities

272. It is well known among UVM students that the school's fraternity culture is unsafe for women. Rather than attack this problem at the root, UVM engages in a dangerous game of suspending particularly troublesome fraternities from campus, only to allow them to continue to operate elsewhere in an "unrecognized" capacity. According to an article in the UVM student paper, UVM's leadership has turned a blind eye to fraternity events that have been reported, saying only that events of that nature are prohibited and leaving students to fend for themselves.

273. Additionally, UVM has set different standards for fraternities and sororities, holding sororities to a higher standard with respect to alcohol violations and allowing fraternities to slip under the radar. This has created a system in which sororities are unable to host parties without risking disciplinary action while fraternities are able to maintain a monopoly over the campus social life through parties that are dangerous for all attendees, particularly women.

274. Students report that UVM's Sigma Phi fraternity members are widely known to drug female students at their parties. On information and belief, Sigma Phi even refers to their fraternity house's attic space as "the chicken coop"—a place where fraternity brothers take "chicks" attending their parties for sex—with or without their consent.

275. Some fraternities, including Phi Mu Delta, are said to have "sexual assault alibi pacts," meaning that if one of the members is accused of sexual assault, the other members will provide him with a false alibi.

276. UVM knows about the dangers fraternities present in terms of drinking, drugs and sexual assault, but chooses to ignore it. Students complain that UVM's monitoring lacks "transparency and clarity." For example, in 2021 the Fraternity and Sorority Life Chapter Misconduct webpage on UVM's website mistakenly listed some fraternities as not in good

standing and another as unrecognized when this information was outdated and false. Even this official university site could not be relied upon by students to tell them what fraternities were officially sanctioned by UVM. Given that fraternities that are "on probation" or unaffiliated with the university may continue to conduct their events off-campus, this causes significant "confusion" for students.

277.    Dean of Students David Nestor acknowledged these reporting errors, explaining that the "system in place to address fraternity misconduct is still fairly new and remains a work in progress."

278.    This fundamental lack of organization pervades the entirety of the fraternity system at UVM. In fact, one of the reasons fraternities are able to so openly flout the University's rules is because the body meant to oversee fraternity life has remained in such disarray. In an article in UVM student paper, the UVM Inter-Fraternity Council ("IFC") is described as "struggle[ing] to hold fraternities to one standard due to a lack of organization," a "lack of unity" which "creates challenges in enforcement."

279.    Students also claim that UVM uses "vague language" about sanctioning fraternities and is not transparent with the student body or the sanctioned fraternities about the details of alleged infractions. As a result, it is challenging for even well-intentioned fraternities to take meaningful action to prevent further violations, and students are left largely unable to avoid dangerous fraternity events.

280.    On information and belief, off-campus activities, including those of suspended fraternities, are not monitored or regulated by UVM. There is also no formal process in place to deter students from attending such events. For example, AEPi, which has been suspended since 2014 for alcohol and drug infractions, throws parties and recruitment events each year.

281. UVM has been on long-standing notice of the obvious risk of alcohol abuse, drugging, and sexual assault at these parties. As early as 2002, the "use of date rape drugs" was reported as being "steadily on the rise throughout Vermont." The UVM student newspaper acknowledged that the "targets of these debilitating drugs are, generally, young women of college age or in their early 20s."

282. In 2004, a UVM campus advice column, "Tuesdays with Martha," advised students who believed they might have been drugged with Rohypnol to "get medical attention immediately" and to make "sure that your urine is tested for the presence" of drugs. In 2004, Seven Days Vermont reported on a UVM student who had likely been drugged but could not secure the appropriate date-rape-drug testing to prove it.

283. In 2008, fraternity Lambda Iota was alleged to have been "distributing date rape drugs at parties" as far back as 2003. In 2006, in likely connection with the same fraternity, "Burlington and UVM Police reported on 'several incidents' where females drank only a small amount of alcohol and became unconscious shortly after," which suggested Rohypnol drugging.

284. In 2013, UVM's Collegiate Recovery Community Director, Amy Boyd Austin, noted that female students often binge drank before going out to ensure that the "alcohol they're drinking hasn't been doped with a 'rape drug' such as Rohypnol."

285. On information and belief, in 2019, UVM's administration admitted that UVM was "well aware" of the existence of the "chicken coop" and the drugs in the jungle juice at certain fraternities.

286. In December 2019, according to a @ShareYourStoryUVM post, UVM's Fraternity and Sorority Life Coordinator encouraged a student to come to his apartment, where he "ejaculate[ed] in [the student's] mouth," when the student was too intoxicated to consent.

287.    In 2021, a Pi Kappa Phi member reported that his fraternity had circulated a "survey about brotherhood" to test the members' loyalty, with an "entire section of … questions centered around sexual assault." The survey included questions like the following, with a five-point scale for responses: "If a member of a sorority accused one of my fraternity brothers of raping her, and he promised she was lying, I would believe him and support him." A public Instagram post on @ShareYourStoryUVM stated that this survey was brought to the attention of UVM, but the University took no action in response.

288.    In 2022, the UVM Police received an anonymous report of multiple Rohypnol druggings by an unknown perpetrator at an off-campus, "unrecognized" fraternity party. In response, UVM Police Chief Tim Bilodeau acknowledged, "A party where there's a drug dropped into a drink impacts, historically, young women." He also stated that he didn't "think [he had] seen" something like "this for a couple of years." As described in above in Section I(B), Partin was drugged at an off-campus party in March 2019, but UVM, Russell, and Moran never reported the incident to UVM Police.

### ii.    Club Sports

289.    UVM club sports operate much like fraternities, throwing ticketed parties in designated "sports houses" and serving "jungle juice" that is known to be dangerous to drink. On popular online forums like Reddit, students warn incoming freshmen that "[s]ome sports/frat houses are known to sometimes be a little weird…(ie: guys are being really creepy)," and before attending a party at one, the students should "make sure [they] or someone with [them] can get [them] out if the vibe just feels off."

290.    It is common knowledge among students and the administration alike that many students join club sports teams not only for the athletic opportunities, but also to find a social

group on campus. Many students have come to favor the parties hosted at the sports houses, as reflected in their answers to questions posed by incoming freshman about social life at UVM.

291. As with fraternities, while all the "sports houses" are social hubs, some are known to throw particularly wild parties.

292. One of these club sports parties, hosted by the Rugby Club, became the center of a lawsuit filed against UVM in 2017, when a male club sports player was found responsible for sexual assault and punished with a one-month suspension.

293. The Ski and Snowboarding Club is also well-known for a culture of heavy drinking and assault. In 2018, a freshman was raped by a fellow member of the club ski team following a party. When the survivor ultimately told the club President about what had happened, she responded that stories of assault could hurt the team's reputation and shouldn't be shared. She went on to tell the survivor that she may have misremembered the encounter since she had been drinking. The message was clear that the club prioritized its reputation over her safety. The survivor concluded she could not share her story without risking her position as a skier and significantly harming her social standing in the club.

294. As noted in Paragraph 240 above, at least one social media report suggests that Weiland used alcohol-fueled tennis club events to assault women.

295. Because club sports operate with little adult oversight, their parties and trips breed cultures that encourage sexual assault. UVM knows this, but the clubs remain largely self-regulating. Although the Club Sports Coordinator is responsible for "ensur[ing] that clubs operate in a safe manner" and "adhere to the policies of the school," there is no clear system for identifying clubs known for violating codes of conduct.

### iii.    Official Athletics

296.    As with most Division I NCAA programs, UVM's varsity athletics are a financial focal point for the university, both in terms of the revenue they bring in and the prestige they confer.  As a result, some students perceive that star athletes get dispensation from the rules that restrict other students.  UVM's "history of covering up controversies rather than fixing the underlying problems with the [Athletics] department" is commonly known to "[a]nyone who attended UVM and was involved in athletics," and discussed on online forums devoted to the broad topic of college basketball.  Athletes on the more well-regarded teams, such as Men's Basketball, are allowed to continue playing and participating in school activities despite multiple widely circulated accounts naming different team members as perpetrators of sexual assault.

297.    The problem goes well beyond just Men's Basketball and extends throughout the culture of the UVM Athletics Department.  Like club sports, some of the varsity sports teams have unofficial houses, many of which are known to be dangerous for women.  The "Basketball House," for example, has housed members of UVM Men's Basketball for the last decade, a practice which began when Becker "passed it down from generation to generation," facilitating this long-lasting residency, on information and belief, through his friendship with the landlord.

298.    Encouraging the players to spend time together outside of official practices is an important component of Becker's strategy for the team, and he "has marked the team's solidarity on several occasions as a reason for one of the best program years in history," a solidarity which he has told the Burlington Free Press that he feels can, at least in part be "attribute[d]…to the guys living together and spending time together."  When a new student arrived on campus in 2019 and struggled to connect with the other members of his team, Becker suggested that he "wander by the basketball house to watch games in his off-time," a strategy which he felt paid off.

299. The Basketball House is known on campus to be associated with parties and sexually predatory behavior.

300. There was at least one other UVM Men's Basketball player who resided at the "Basketball House" with Lamb who has been allegedly accused, on multiple occasions, of sexual misconduct and sexual assault. These allegations occurred prior to Ware's assault. At least one individual put Becker on notice that this UVM Men's Basketball Player had acted sexually inappropriate towards women.

301. Many posts from the @ShareYourStoryUVM Instagram account document assault and coercion from Men's Basketball players. Posts include descriptions and reports of: multiple sober UVM Men's Basketball players coercing "intoxicated" woman into having sex with them; Anthony Lamb being a "serial abuser who was protected by" UVM; a UVM Men's Basketball player pushing a woman's head and shoulders down to his penis; a UVM Men's Basketball player removing a condom mid-sexual intercourse; multiple reports of UVM Men's Basketball players aggressively sexually harassing and attempting to sexually assault women; a potential drugging and assault by a UVM Men's Basketball player; UVM Men's Basketball staff, including former assistant coach Kyle Cieplicki and former head coach John Becker engaging in a "smear campaign" to silence Ware, including telling alumni that Ware "lied and made it up."

302. On February 18, 2022, UVM posted on its official Instagram account that it "congratulate[d] its men's basketball team on their sixth straight America East Regular Season Title." In the same post congratulating its male players, UVM wrote that sexual assault "accusations on social media" posts "are not helpful to victims or to anyone impacted by sexual violence."

- 62 -

303.     Despite accusations by the student body of sexual misconduct by student athletes and Men's Basketball players, UVM doubled down on this position in an email sent out to all students by Provost Patricia A. Prelock. In this email, Prelock expressed that while she regretted the University's failure to properly communicate its response, it was in response to "numerous harmful comments accusing the entire team of sexual misconduct." The email presumed without explanation that accusations against the Men's Basketball team were harmful and unfounded, and did not include any language indicating that the University would investigate any of the accusations, or provide those who alleged sexual abuse with Title IX support and resources. Prelock further doubled down on her support of the basketball team in a handwritten note delivered days later to one player congratulating him for "a great season" despite a "tough few weeks for men's BB [basketball] personally."

304.     The Basketball House is not the only one of its kind. In online blog posts, for example, freshwomen are warned that they should "look out for the hockey parties," where "[u]ndergrad girls are said to make some of their finest mistakes" while "drinking with the team." Other students have warned incoming female freshmen to "NEVER go to the varsity [lacrosse] house," because they "WILL get roofied."

305.     Further, the @ShareYourStoryUVM Instagram account has received dozens of posts describing assaults committed by varsity athletes. For example, in November 2021, according to a @ShareYourStoryUVM post, a female student was drugged and raped at a UVM Men's Lacrosse team event. She later tested positive for gamma hydroxybutyric acid, a common date rape drug.

306. In many of these posts, students name not only their assailants, but the Athletics staff who consistently sweep allegations under the rug to protect their players' futures over other students' safety.

### C. UVM Students Begin to Organize

307. In 2017, a UVM student was arrested for repeatedly assaulting female students. In the wake of the arrest, students and survivors spoke out against UVM's systemic failure to provide sexual assault survivors meaningful resources or support. The students reported that they did not feel that the school "represented" their interests "at all" while they were seeking support.

308. In 2018, a UVM sophomore named Sydney Ovitt founded an organization to advocate for campus sexual assault policy reform after she was raped and UVM inadequately responded to her Title IX report. Ovitt's experience bears sharp similarity to those of Plaintiffs. Ovitt was pressured into intoxication, and then forcibly raped by her assailant. When Ovitt reported the rape, in February 2018, to UVM's Title IX office and Spence, she found that the investigation was not conducted effectively, and the process did not give her vindication or justice.

309. Despite the flawed investigation, the Title IX Office offered to issue a No Contact and No Trespass order for Ovitt's assailant, as he lived in off-campus housing. The order was ineffective, as Ovitt regularly saw him on UVM's campus. Whenever she reported his violations, UVM demanded time-stamped photos or videos before it would take her reports seriously. Spence also made comments to Ovitt during the investigation that suggested Spence did not find her credible. Additionally, although her assailant had a lawyer, UVM staff discouraged Ovitt from seeking counsel. The Title IX Office found Ovitt's assailant not responsible for her rape.

310. Over the next year, Ovitt's organization became highly visible on campus and pressured the administration to provide additional resources to sexual assault prevention and investigatory processes on campus.

### D. Ongoing UVM Protests

311. Because UVM has continued to fail to address this rape culture, students took matters into their own hands.

312. Hendrick's Instagram post in April 2021 galvanized the student body. As of filing, the @ShareYourStoryUVM account has accumulated 533 posts, each detailing an individual student's experience of sexual assault in various contexts, including but not limited to drugging and alcohol fueled sexual abuse, harassment, and rape occurring at UVM fraternity and club sports parties.

313. That same month, UVM students began to circulate student demands in response to UVM's "systemic" failure to "support survivors and prioritize the safety of all students."

314. In 2021, thousands of UVM students "participated in one of the largest protests the institution [had] seen in recent years," protesting against the "widely-perceived repeated administrative mishandling of sexual assault cases at UVM."

315. Students also issued a petition, noting UVM's Title IX Office's repeated failings, including: employing only one Campus Victims advocate for 11,000 undergraduate students, unlike similar institutions, lacking a campus sexual violence response team and a 24/7 hotline for survivors, and inadequate trainings for staff.

316. After months of sustained student pressure, UVM finally agreed to an independent investigation to "restore the UVM student body's trust" in its Title IX process.

317. UVM hired Grand River Solutions, a company that advertises itself as committed to lowering the "cost of compliance," to conduct the audit of its Title IX "policies and procedures."

318. While UVM initially agreed to release its independent investigation, it back-pedaled a few months later. The news outraged students. Caroline Shelley, the chair of the Title IX Student Advisory Committee, said, "I think the failure to release this report to the public does beg the question, what is the university hiding?" Shelley continued, "If you have nothing to hide, you should release the report to the public."

319. Although UVM never released a thorough audit, it did bow to the pressure and released a two-and-a-half-page summary of "recommendations." In that document, Grand Rivers Solutions concluded that "[a]lmost all students" that it interviewed "did not fully understand" UVM's Title IX investigation process. Almost "all cases" were delayed "beyond the target timeline of 60 days." Title IX reports were written in a "complicated and legalistic manner," and some of the language in the reports "caused significant confusion."

320. Students continue to express frustration with UVM's broken sexual violence reporting and investigatory processes. In February 2022, hundreds of students gathered on campus to protest UVM's continued reluctance to improve its Title IX procedures, which "yet again show[ed]," in the words of one student, that UVM "only care[s] about protecting rapists and sexual assault perpetrators."

321. Students did not and do not trust UVM's Title IX Office *for good reason.* UVM's deliberate indifference fueled this consequence-free environment, creating the known and obvious conditions that led to Plaintiffs' sexual assaults.

## CLAIMS FOR RELIEF

## COUNT I

## Deliberate Indifference to Heightened Risk of Unlawful Sex Discrimination and Hostile Educational Environment ("Pre-Assault")
## (20 U.S.C. § 1681 *et seq.*)

### (All Plaintiffs against the UVM Defendants)

322. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

323. UVM is an educational institution that, at all relevant times, received federal financial assistance from the United States government.

324. UVM Defendants maintained a policy of deliberate indifference to sexual misconduct on campus. Relevant instances include, but are not limited to:

- a. UVM was investigated by the OCR, entered into a VRA, and had to pay a DOE fine for, among other things, underreporting sexual assaults;

- b. Stanton took part in the Task Force as UVM's representative to discuss higher educational failings and UVM policies in regard to campus sexual harm while at the same time failing to apply those very same policies in practice;

- c. UVM Defendants failed to proactively and transparently discuss its policy changes in response to investigations and fines;

- d. UVM Defendants, Russell, Spence, and Moran, at minimum, were on actual notice of sexually motivated druggings on campus at athletic, club sports, and fraternity parties, and on information and belief, the "chicken coop," but failed to properly regulate, monitor, or increase oversight;

- e. UVM Defendants and Russell, at minimum, were on actual notice of sexual harassment against Partin on campus;

f.  UVM Defendants required survivors to carry the onus and responsibility for their own safety, such as when Hendrick and Ovitt's rapists violated No Contact Orders and UVM Defendants did not, pursuant to their own policy requirements, "immediate[ly] and responsive[ly]" act to address these violations;

g.  As early as 2017, UVM had actual knowledge of vast student discontent and distrust regarding its Title IX Office and policies, indicating that its Title IX reporting, investigation, and redressal processes were not fit for purpose, but unreasonably failed to improve or modify its sexual assault policies and procedures.

325.  Additionally, or in the alternative, UVM Defendants maintained an official policy of deliberate indifference to sexual harassment within its Athletic department and by student athletes, and, in particular, its Men's Basketball Team, and had actual knowledge of heightened risk to female students within this context.

326.  Additionally, or in the alternative, UVM Defendants maintained an official policy of deliberate indifference to sexual assault within Greek life, including in recognized and unrecognized fraternity social events and parties, and had actual knowledge of heightened risk to female students within this context.

327.  Additionally, or in the alternative, UVM Defendants maintained a policy of deliberate indifference to known and repeat assailants and had actual knowledge of heightened risk to female students within this context.

328.  Additionally, or in the alternative, UVM Defendants maintained a policy of deliberate indifference to the risk of sexual misconduct due to alcohol abuse within on and off-

campus social events and had actual knowledge of heightened risk to female students within this context.

329.    The UVM Defendants' policy of deliberate indifference created a heightened risk of sexual harassment on campus that was known and/or obvious to UVM and the UVM Defendants.

330.    Plaintiffs' assaults occurred in a context that was subject to the UVM Defendants' control, and in which the UVM Defendants could have taken remedial action. The UVM Defendants had both actual and constructive knowledge of the university's obvious systematic failures and could have chosen to prevent or respond to instances of sexual assault, sexual violence, sexually motivated drugging, and sexual harassment. Instead, the UVM Defendants failed to act, which was clearly unreasonable under these known circumstances.

331.    The UVM Defendants were on notice that UVM's existing procedures and practices surrounding sexual assault were deficient in holding assailants accountable for their actions and disciplining them appropriately.

332.    As a direct and proximate result of UVM Defendants' actions, Plaintiffs were sexually harassed and assaulted.

333.    Plaintiffs' sexual assaults constituted harassment because of their sex that was so severe, pervasive, and objectively offensive that it deprived them of access to educational opportunities and benefits provided by UVM.

334.    As a direct and proximate result of UVM Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, those described in Paragraphs 424 to 425 below.

## COUNT II

## Deliberate Indifference to Unlawful Sex Discrimination and Hostile Educational Environment
## (20 U.S.C. § 1681 *et seq*.)
## (Ware and Partin against the UVM Defendants)

335. Ware and Partin repeat and reallege the foregoing paragraphs as if fully set forth herein.

336. As females, Ware and Partin were members of a protected class.

337. By the actions above, the UVM Defendants subjected Ware and Partin to sex discrimination in the form of sexual misconduct, sexual harassment, and sexual assault.

338. Ware and Partin were subjected to discrimination because of sex.

339. Ware was sexually assaulted by Lamb and, after her assault, put UVM Defendants on actual notice on October 15, 2019.

340. Partin was drugged for the purpose of sexual exploitation, forcibly groped and kissed, and subsequently raped. Partin put UVM on actual notice of her sexual exploitation, sexual harassment, and conduct in violation of UVM's own SHM Policy when she emailed Russell on January 13, 2020. Additionally, or in the alternative, UVM's AAEO, through Moran, had actual notice of Partin's complaint in January 2020 through Russell's report to the Title IX office.

341. The UVM Defendants' lack of effective action to prevent, investigate, address, and remedy the sex discrimination against Ware and Partin properly and promptly subjected them to a hostile educational environment.

342. UVM Defendants' responses to Ware and Partin's reports of sexual assault were so clearly unreasonable in light of the known circumstances that they constituted deliberate indifference.

343. Relevant actions include, but are not limited to:

a. allowing the Athletics Department to improperly involve itself in and exert influence over Ware's Title IX investigation;

b. misleading Ware about her Title IX options;

c. pressuring Ware into foregoing the Formal Process;

d. denying Ware remedies for her assault that she was rightfully entitled to under UVM's own Title IX Policies and Procedures;

e. repeatedly demonstrating to Ware through retaliatory statements, press articles, posters, advertisements, and social media posts, that UVM does not believe that she was raped and values her assailant, Lamb, over her;

f. failing to follow their own Title IX Policies and Procedures when Partin reported her sexually motivated drugging to UVM;

g. unreasonably and unjustifiably waiting for over a year and three months, and after one of Partin's assailants was no longer enrolled at UVM, and only after Partin had publicly spoken out, to respond to Partin's Title IX report; and

h. failing to provide Partin any meaningful support after being put on notice of her assault

344. As a result of their experience of sexual misconduct, sexual violence, and sexual assault, Ware and Partin experienced harassment because of their sex that was so severe, pervasive, and objectively offensive that it deprived them of access to educational opportunities and benefits provided by UVM.

345. Further, UVM Defendants' failure to promptly and appropriately respond to the sex discrimination experienced by Ware and Partin resulted in their being excluded from

participation in, denied the benefits of, and subjected to discrimination on the basis of their sex in UVM's education program in violation of Title IX.

346. UVM Defendants' deliberately indifferent response denied Ware and Partin access to educational opportunities and benefits including academics and on-campus events and activities and inflicted damages as described in Paragraphs 424 to 425 below.

## COUNT III

### Retaliation by Withholding Protection Otherwise Conferred by Title IX (20 U.S.C. § 1681 *et seq.*)

### (Ware and Sommer against the UVM Defendants)

347. Ware and Sommer repeat and reallege the foregoing paragraphs as if fully set forth herein.

348. Ware engaged in a protected activity when she reported her sexual assault allegation to the Title IX Office and requested a formal investigation.

349. Sommer engaged in a protected activity when she reported her sexual assault allegation to Moran and spoke publicly regarding UVM's failures to protect her from sexual assault, including when she (1) posted on Instagram on April 29, 2021, (2) emailed Stanton and Moran on May 5, 2021, and (3) spoke at the Board of Trustees' meeting on October 29, 2021.

350. UVM Defendants had knowledge of Ware and Sommer's protected reporting activities when it received or viewed these various communications.

351. UVM Defendants engaged in adverse, school-related retaliatory action, including, but not limited to:

> a. Providing Ware misleading information regarding available sanctions, warning her that she would face social consequences from the community as a result of a formal investigation, repeatedly lying to her about the

consequences of a formal investigation, improperly pressuring her into foregoing a formal investigation under UVM's Title IX procedures, and continuing to publicly laud, advertise, and defend its star athlete, Lamb, on campus and to alumni;

b. Engaging in a false and defamatory smear campaign to discredit Ware to UVM alumni as having made up her allegations as an angry ex;

c. Failing to provide Sommer references when she requested job-seeking supports and professional recommendations from Smiles-Becker and Seidl, who both had actual knowledge of Sommer's assault and statement to the Board of Trustees.

352.     UVM Defendants' adverse actions were causally related to Ware and Sommer's protected reporting activities. UVM Defendants misled, misdirected, and mistreated Ware's Title IX complaint, and further engaged in a smear campaign to discredit Ware and promote Lamb due to Lamb's high-profile and profitable status as one of UVM's star Men's Basketball Athletes. UVM Defendants. Smiles-Becker and Seidl did not provide letters of recommendation to Sommer mere months after she had emailed and spoken out at the Board of Trustees meeting about her assault.

353.     As a direct and proximate result of UVM Defendants' acts and omissions, Ware and Sommer have sustained injuries and damages, including, but not limited to, those described in Paragraphs 424 to 425 below.

## COUNT IV

### Denial of Equal Protection
### (42 U.S.C. § 1983 and the Fourteenth Amendment of the U.S. Constitution)

### (All Plaintiffs against Stanton, Spence, Moran, Schulman, Balogh, and Russell

**in their individual capacities)**

354.    Plaintiffs hereby reallege and incorporate the allegations of the preceding paragraphs herein.

355.    The above-named Defendants are state actors and at all relevant times were acting under color of law.

356.    The above-named Defendants knew or should have known that female students are substantially more likely to suffer sexual harassment and sexual violence than similarly situated male students.

357.    The above-named Defendants subjected Plaintiffs to discrimination based on their sex which deprived them of their rights to life, liberty, or property by:

        a. on information and belief, treating complaints of sex discrimination differently than other types of complaints filed at UVM;

        b. failing to provide Partin with written information on how to make a formal complaint of sex discrimination for over a year and three months;

        c. failing to timely respond to Partin's report of sexual harassment and sex discrimination and responding only after the window to take meaningful action against one of Partin's assailants had closed;

        d. failing to provide Ware with appropriate remedial measures and support following her report of sexual assault;

        e. failing to provide all Plaintiffs with adequate and appropriate supportive measures;

f. failing to adequately and appropriately address Plaintiffs' complaints of sex discrimination and acting clearly unreasonable in light of the known circumstances to Plaintiffs' reports of sexual assault and discrimination;

g. failing to adequately train and supervise their staff with respect to the handling of Title IX complaints; and

h. creating a hostile educational environment through its patently inadequate and deliberately indifferent treatment of allegations and reports of sexual harassment, misconduct, discrimination, and violence on and off campus perpetrated by students of UVM.

358. The above-named Defendants' discrimination against Plaintiffs on the basis of sex endangered their safety, privacy, security, and well-being.

359. The above-named Defendants' selective treatment was not substantially or rationally related to any legitimate government interest.

360. Plaintiffs' right to equal protection under the law is one of which reasonable officials in Defendants' positions would have known.

361. The above-named Defendants' actions violated clearly established Constitutional law.

362. As a direct and proximate result of the above-named Defendants' acts and omissions, Plaintiffs suffered damages as described in Paragraphs 424 to 425 below.

**COUNT V**
**Denial of Procedural Due Process**
**(42 U.S.C. § 1983 and the Fourteenth Amendment of the U.S. Constitution)**

**(Ware against Stanton, Balogh, Schulman, Becker, and Moran**
**in their individual capacities)**

**(Partin against Russell and Moran in their individual capacities)**

363. Ware and Partin hereby reallege and incorporate the allegations of the preceding paragraphs herein.

364. Ware and Partin have a clearly established property right in accessing the full educational opportunities and benefits offered by UVM.

365. Ware and Partin were deprived of their property right in accessing the full educational opportunities and benefits offered by UVM when:

> a. As a result of the mishandling of Ware's Title IX complaint, Ware, *inter alia*, experienced a decline in grades, could not renew a swimming scholarship, avoided gym and social spaces on campus, changed a planned Spanish minor, dropped courses necessary for her professional development, and altered her career plans.
>
> b. As a result of the mishandling of Partin's Title IX complaint, Partin, *inter alia*, was forced to withdraw from school for a full academic year, struggled to maintain her scholarship, saw a marked decline in her grade average, was forced to alter her academic courseload, and sacrificed a minor in Gender, Sexuality, and Women's Studies.

366. Ware and Partin were deprived of these rights without the appropriate due process as the above-named Defendants failed to follow UVM's own Title IX policies, failed to act reasonably and appropriately in resolving their Title IX complaints, and failed to offer adequate and appropriate remedial measures after Ware and Partin were sexually harassed and assaulted.

367. Stanton, as director of UVM's Title IX office; Russell, as Deputy Title IX Coordinator; Moran, as Title IX office intake and outreach coordinator; and Spence, as Title IX

investigator were responsible for oversight of the Title IX policies, procedures, and systems throughout the university and ensuring that UVM complied with its legal obligations.

368.     Stanton, Balogh, Schulman, Becker, and Moran violated Ware's rights by, *inter alia*, misleading Ware regarding their own Title IX processes and the Formal and Informal Process and sanctions available under each; improperly pressuring Ware into electing the Informal Process; denying Ware remedial measures she required in order to fully access the benefits of her UVM education; and further retaliating against Ware as outlined in Paragraphs 347 to 353 above.

369.     Russell and Moran violated Partin's rights by, *inter alia*, failing to treat Partin's initial email as a Title IX report despite her inclusion of the fact that she had been denied a rape kit by the hospital, resulting in a significant delay to the point where one of her assailants was no longer enrolled at UVM by the time an investigation was initiated; failing to comply with timelines and procedures outlined in their own policy documents; failing to timely investigate and respond to Partin's complaint of sex discrimination; and failing to ensure the effects of sex discrimination against her was fully remedied.

370.     Ware and Partin's right to procedural due process under the law is one of which reasonable officials in the above-named Defendants' positions would have known.

371.     The above-named Defendants' actions violated clearly established Constitutional law.

372.     As a direct and proximate result of the above-named Defendants' acts and omissions, Plaintiffs suffered damages as described in Paragraphs 424 to 425 below.

**COUNT VI**
**Denial of Right to Free Speech and Expression and Prior Restraint**
**(42 U.S.C. § 1983 and the First Amendment of the U.S. Constitution)**

**(Harting-Smith against Stanton and Moran**

373. Harting-Smith hereby reallege and incorporate the allegations of the preceding paragraphs herein.

374. Harting-Smith alleges violations of 42 U.S.C. § 1983 against the above-named Defendants in their individual capacities due to deprivation of her constitutional right to free speech and expression via the October NCO, which constitutes both a content-based restriction on her speech and a presumptively unconstitutional prior restraint on her speech and expression.

375. As a result of the October NCO, Harting-Smith has been chilled from exercising her right to free speech and expression protected by the First and Fourteenth Amendments to the United States Constitution, by limiting her online speech, avoiding public areas at her school, changing her courseload, reducing or eliminating her engagement in classes and campus activities, and opting out of a graduation ceremony.

376. The October NCO against Harting-Smith served no significant UVM interest, as UVM had no legitimate reason to believe Doe needed protection from Plaintiff Harting-Smith.

377. Harting-Smith's rights to free speech and expression under the law is one of which reasonable officials in the above-named Defendants' positions would have known.

378. The above-named Defendants' actions violated clearly established Constitutional law.

379. As a direct and proximate result of the above-named Defendants' acts and omissions, Harting-Smith has suffered damages as described in Paragraphs 424 to 425 below.

## COUNT VII
### First Amendment Retaliation
### (42 U.S.C. § 1983 and the First Amendment of the U.S. Constitution)

### (Harting-Smith against Stanton and Moran in their individual capacities)

380. Harting-Smith hereby realleges and incorporates the allegations of the preceding paragraphs herein.

381. Harting-Smith engaged in speech protected by the First Amendment when she (i) reported her sexual assault to UVM's AAEO and (ii) filed a complaint requesting an SSA order against Doe in Vermont Superior Court.

382. Harting-Smith experienced adverse action in retaliation for her protected speech when UVM issued the October NCO. Harting-Smith was shocked and dismayed at being issued the October NCO, which functioned as a disciplinary sanction as it implied mutual fault to Harting-Smith, chilled her movement around campus and engagement in academic and social life, and resulted in her feeling unsafe, intimidated, and unsupported by the AAEO, while her grades, relationships, and mental health all declined. Harting-Smith was also chilled from sexual assault-related speech and was fearful of posting about her sexual assault on social media.

383. Harting-Smith's constitutionally protected activity was a substantial and motivating factor for the October NCO, as Moran acknowledged.

384. Stanton and Moran's conduct in issuing the October NCO would deter similarly situated individuals of ordinary firmness from exercising his or her constitutional rights.

385. Harting-Smith's right to be free from retaliation is one of which reasonable officials in the above-named Defendants' positions would have known.

386. Stanton and Moran's actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.

387. As a direct and proximate result of Stanton and Moran's acts and omissions, Harting-Smith suffered damages as described in Paragraphs 424 to 425 below.

## COUNT VIII

## Unlawful Sex Discrimination Under the Vermont Public Accommodations Act
### (9 V.S.A. § 4502 *et seq.*)

### (Ware, Partin, And Sommer against the UVM Defendants)

388.    Ware, Partin, and Sommer repeat and reallege the foregoing paragraphs as if fully set forth herein.

389.    UVM is a place of public accommodation within the meaning of the Vermont Public Accommodations Act ("VPAA").

390.    Ware, Partin, and Sommer were subject to sexual harassment so severe, pervasive, and objectively offensive that it deprived them of access to educational opportunities and benefits provided by the school. Ware was subject to three incidents of sexual violence by a UVM student, including sexual assault. Partin was subject to sexual harassment, sexual exploitation, and sexual assault by two separate assailants, at least one of whom was a UVM student. Sommer was subject to sexual assault by a UVM student.

391.    UVM had actual knowledge of Ware, Partin, and Sommer's assaults and failed to take prompt and appropriate remedial action reasonably calculated to stop the harassment.

392.    UVM's SHM Policies and Procedures defines sexual assault, including rape and sodomy, as a form of "Sexual Harassment and Misconduct." They also require, and at all material and relevant times required, UVM to conduct a "thorough, prompt and impartial investigation" to any allegations of sexual misconduct.

393.    UVM's internal policies and procedures require, in certain instances, that "alternative," or "informal" resolution should not be found appropriate in instances where the nature and type of conduct alleged is highly severe, dangerous, or harmful.

394.    UVM also defines sexually motivated drugging in its own SHM Policy as a form of "Sexual Harassment and Sexual Misconduct." It also requires that, in response to allegations

of sexual misconduct, UVM conduct an inquiry into what occurred, take steps to provide appropriate remedies and support, provide victims with written information about complaint and resolution processes and offer reasonable and appropriate measures to protect students.

395. UVM Defendants failed to take appropriate remedial action in response to Ware's allegations and instead improperly pressured and misled her into foregoing remedies she was rightfully entitled to against her assailant.

396. Ware exhausted all available internal administrative remedies.

397. Despite actual knowledge of Partin's experience, UVM Defendants failed to take timely and appropriate remedial action in response to Partin's harassment and complaint.

398. Partin exhausted all available internal administrative remedies.

399. Despite actual knowledge of Sommer's experience and allegations against Weiland, UVM Defendants failed to take timely and appropriate remedial action regarding Weiland in response to Sommer's Instagram post.

400. UVM Defendants' prior mishandling of Hendrick's report and repeated failures to sanction Weiland or protect the community against him rendered Sommer's resort to all available administrative remedies futile.

401. UVM Defendants acted with evident insult and oppression toward Plaintiffs and engaged in actions against them having the character of outrage frequently associated with a crime; conduct that was reprehensible, egregious, and patently outrageous.

402. UVM Defendants' breach of the VPAA directly and proximately caused injury to Plaintiffs, who suffered damages as described in Paragraphs 424 to 425 below.

403.    Plaintiffs are entitled to all legal and equitable remedies available for violations of

the VPAA, including compensatory damages, injunctive relief, punitive damages, attorneys' fees

and costs, and other appropriate relief.

## COUNT IX
## Negligence
## (Vermont Common Law)

**(Ware against the UVM Defendants, Stanton, Balogh, Moran, and Spence)**

**(Partin against the UVM Defendants, Moran, and Russell)**

**(Sommer against the UVM Defendants)**

404.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

405.    UVM encouraged students to reach out to certain services and organizations on

campus for support in relation to issues of campus sexual harm. As stated in the Stanton Memo

and UVM's Title IX Policies and Procedures, those services included UVM's Responsible

Employees, Campus Security Authorities, the Title IX Office, the Dean of Student's Office,

CAPS, and the Campus Victim's Advocate.

406.    In reliance on this encouragement, Ware reached out to Rickstad, who contacted

Moran and Stanton. Moran then assigned Spence as the neutral investigator. Ware also reached

out to her coaches, who contacted Balogh. The Title IX Office then allowed and encouraged

Balogh to serve as a victim's advocate to Ware.

407.    Similarly, in keeping with encouragement from UVM, Partin reported her sexual

harassment to UVM through Russell in 2018. Russell's encouragement and apparent support

made Partin believe he was a reliable party to whom she could report her subsequent sexually

motivated drugging in January 2020. After she did so, Russell subsequently led Partin to believe

that he would inform the Title IX Office, and that she would be given the information needed to

make a report or open an investigation into her sexual harassment and exploitation. Russell contacted Moran, who did not reach out to Partin for over a year.

408.    In creating official institutional mechanisms through which sexual assault could be reported and remedied, encouraging students to report allegations sexual misconduct through these channels and taking affirmative steps to control and supervise its sexual assault reporting policies and practices, UVM Defendants created for itself and its Title IX Staff and owed a special duty to students, including Ware, Sommer, and Partin, to reasonably, promptly and appropriately investigate reported acts of sexual assault.

409.    UVM Defendants, Stanton, Balogh, Moran, Spence, and Russell breached these special duties towards Plaintiffs and acted negligently with actions including, but are not limited to, the following:

> a.  Allowing Spence, Moran, and Balogh to give Ware incorrect advice about the Title IX Formal and Informal Processes;
>
> b.  Allowing the Athletics Department to unduly influence Ware's investigation;
>
> c.  Authorizing the Informal Process against Lamb despite countervailing UVM guidance;
>
> d.  Allowing Ware to be retraumatized by posters and advertisements featuring her rapist;
>
> e.  Failing to respond to Ware's report in a just, appropriate, and impartial manner;
>
> f.  Failing to respond to Partin's report in a reasonable manner;

g. Failing to respond to Hendrick's report in a reasonable manner, and in the process failing to recognize Weiland's obvious pattern of abuse and predation, thereby putting Sommer at foreseeable risk;

h. Failing to respond to, despite actual knowledge of, sexually motivated druggings and sexual assaults on campus committed by fraternities (including AEPi) and club sports members; and

i. Applying a different set of rules to important male athletes accused of sexual assault than to other accused assailants.

410. Once Ware and Partin reported their assault, Defendants owed them a special duty of care to investigate them reasonably, promptly and appropriately.

411. Additionally, or in the alternative, UVM Defendants breached their duty towards Ware, Partin, and Sommer by acting unreasonably given the foreseeable risk of sexual assault in general, and by the Men's Basketball Team, student athletes, fraternity members, and/or Weiland in particular. As a direct and proximate result, Ware, Partin, and Sommer were sexually assaulted.

412. Defendants' breach of these obligations directly and proximately caused Plaintiffs injuries, as described in Paragraphs 424 to 425 below.

### COUNT X
### Negligent Infliction of Emotional Distress
### (Vermont Common Law)

### (All Plaintiffs against the UVM Defendants, Stanton, and Moran)

413. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

414. Defendants were on actual notice of the known and foreseeable risks presented by certain actors and groups on its campus, including known risks of sexual abuse among UVM athletes, the known risks of drugging and assault in fraternity and club sports parties, the known

risks of sexual abuse due to underage alcohol abuse and the known risk of credibly accused repeat assailants, such as Weiland.

415. Despite such actual knowledge of foreseeable risks, as further described herein and in Count IX (Negligence), Defendants failed to act reasonably to improve sexual assault monitoring policies and practices, monitor and regulated unauthorized fraternity activity, increase oversight over club sports, or investigate and discipline credibly accused assailants.

416. As a result of Defendants' negligent actions, Plaintiffs each suffered physical injury which amounts to physical impacts from an external force, in the form of sexual assault. As a result of being sexually assaulted, Plaintiffs experienced damages, including emotional distress damages, as described in Paragraphs 424 to 425 below.

417. In addition, Plaintiffs experienced physical symptoms in the wake of their assaults.

## COUNT XI

### Breach of Contract
### (Vermont Common Law)

### (Ware and Partin against the UVM Defendants)

418. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

419. Through their enrollment agreements, brochures, course offering bulletins, and other official statements, policies, and publications, Ware and Partin, respectively, entered into a binding enforceable contract with the UVM Defendants.

420. Ware and Partin, respectively, fully performed their contractual duties to the UVM Defendants.

421. UVM's relevant operative SHM Policies and Procedures, and all procedures and policies therein incorporated by reference, formed part of a binding contract with Ware and Partin. Guidance on the institutional procedures with respect to sexual misconduct made within the SHM

Policies represent express promises made to Ware and Partin as to how UVM will act in the event that they experience sexual assault, exploitation, and harassment.

422. UVM Defendants failed to perform their contractual obligations by, *inter alia*:

    a. finding the Informal Process appropriate for Ware's complaint given the severity and nature of the conduct reported and high level of harm;

    b. failing to conduct a thorough investigation into Ware's report of sexual misconduct and offer her appropriate remedies that she was entitled to;

    c. failing to conduct an official inquiry following Partin's report of sexual harassment and misconduct;

    d. failing to provide Partin written information about UVM's complaint and resolution processes after her report of sexually motivated drugging and possible sexual assault;

    e. failing to conduct a thorough and prompt investigation into Partin's report of sexual misconduct and sexual exploitation; and

    f. failing to offer Partin reasonable and appropriate measures to facilitate her continued access to UVM's educational programs and activities.

423. UVM Defendants' breaches of contract have caused Plaintiffs substantial consequential and expectation damages, including, but not limited to, physical, emotional, educational, and financial injuries and lost future earnings. Plaintiffs' damages are further described in Paragraphs 424 to 425 below.

## DAMAGES AND EXEMPLARY DAMAGES

424. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

425.     As a direct and proximate result of the above-described conduct, Plaintiffs suffered general, special, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to:

     a.  Physical injury and suffering, including chronic pain and headaches;

     b.  Pain, suffering, mental, and emotional distress;

     c.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliation;

     d.  Loss of their constitutional rights;

     e.  Loss of educational and employment opportunities;

     f.  Damage to their professional reputations;

     g.  Medical ailments and associated past and future medical expenses;

     h.  Weight loss;

     i.  Panic attacks;

     j.  Post-traumatic stress disorder;

     k.  Anxiety;

     l.  Depression;

     m.  Sleep disturbances and nightmares;

     n.  Hypervigilance;

     o.  Suicidal ideation;

     p.  Economic loss, including loss of scholarship tuition, lost earnings and diminished earning capacity;

q. Loss of the ordinary pleasures of everyday life, including social isolation and loss of access to public spaces;

r. Loss of relationships;

s. Travel and travel-related expenses;

t. All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

426. The action of Defendants as described in this Complaint were done by Defendants recklessly or wantonly without regard for the rights of Plaintiffs, were outrageously reprehensible, had the character of outrage frequently associated with a crime and were done with malice, thereby entitling Plaintiffs to exemplary damages.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiffs hereby demand a trial by jury for all issues triable of right by a jury in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

a) assume jurisdiction over this action and all parties;

b) award Plaintiffs economic and noneconomic compensatory damages against each Defendant in an amount to be established at trial, including, without limitation, damages for past, present, and future physical, mental, educational, and financial harm;

c) award Plaintiffs general, special, incidental, and consequential damages against each Defendant in an amount to be established at trial, including, without limitation, damages for past, present, and future physical, mental, educational, and financial harm;

d) award Plaintiffs punitive damages against each Defendant;

e) award Plaintiffs any appropriate statutory damages against each Defendant;

f) award Plaintiffs the reasonable incurred attorneys' fees, pre- and post-judgement interest, and litigation costs and expenses associated with prosecuting this matter;

g) order declaratory judgement that UVM's policies, practices and procedures challenged herein are illegal and in violation of the rights of the Plaintiffs under, *inter alia*, Title IX; the First, Fifth, and Fourteenth Amendments of the U.S. Constitution; and the Vermont Public Accommodations Act and other applicable Vermont state law and doctrines as set forth above;

h) award Plaintiffs injunctive relief against UVM's improper policies and procedures and order UVM to put in place and abide by appropriate and legal policies and procedures with respect to sexual misconduct response; and

i) award Plaintiffs any such other and further relief as the Court may deem just and proper.

Dated: Burlington, Vermont

May 16, 2022

Respectfully submitted,

John F. Evers, Esq.
SHOUP EVERS & GREEN, PLLC
84 Pine Street, 4th Floor
Burlington, VT 05401
(802) 861-6666
jevers@seglawyers.com

and

/s/ Meghna Sridhar

Meghna Sridhar, Esq.
MCALLISTER OLIVARIUS

641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 433-3456
msridhar@mcolaw.com

and

John F.O. McAllister, Esq.*
MCALLISTER OLIVARIUS
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 433-3456

and

Karen Truszkowski*
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
(844) 534-2560
karen@temperancelegalgroup.com

*Attorneys for Plaintiffs*

*\* Pro Hac Applications Forthcoming*