UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

KENDALL WARE, SYDNEY PARTIN,       :
HALEY SOMMER, and                  :
CASSIA HARTING-SMITH,              :
                                   :
          Plaintiffs,              :
                                   :
                                   :
v.                                 :   Case No. 2:22-cv-212
                                   :
THE UNIVERSITY OF VERMONT AND      :
STATE AGRICULTURAL COLLEGE, THE    :
BOARD OF TRUSTEES OF THE           :
UNIVERSITY OF VERMONT AND STATE    :
AGRICULTURAL COLLEGE, NICHOLAS     :
STANTON, KATHERINE SPENCE, TARYN   :
MORAN, JEFFREY SCHULMAN, KRISTA    :
BALOGH, JOSEPH RUSSELL, JOHN       :
BECKER, and OTHER UNIDENTIFIED     :
DEFENDANTS,                        :
                                   :
          Defendants.              :

## OPINION AND ORDER

Plaintiffs Kendall Ware, Sydney Partin, Haley Sommer, and

Cassia Harting-Smith – current and former students at the

University of Vermont ("UVM" or "University") – each allege that

they were sexually assaulted while at UVM. Individually and

collectively, they bring Title IX claims against several

defendants including UVM, its Board of Trustees, and various

administrators. Plaintiffs also assert constitutional claims

under the First Amendment and the Due Process Clause of the

Fourteenth Amendment; several violations of the Vermont Public

Accommodations Act ("VPAA"); and Vermont common law claims for
negligence and breach of contract. Defendants filed a motion to
dismiss Plaintiffs' Amended Complaint. For the following
reasons, Defendants' motion is **granted** in part and **denied** in
part.

## I.    Background

### Collective Allegations

The four plaintiffs each state that they were sexually
assaulted at UVM. They allege that UVM – a recipient of federal
funding covered under 20 U.S.C. § 1681(a) – was "deliberately
indifferent" to the risk of sexual violence on campus in several
specific contexts.

Plaintiffs submit that UVM has been on notice of a risk of
underage alcohol abuse and sexually-motivated drugging incidents
"for over a decade." ECF No. 22 at 2. They state that these
risks are especially pronounced in fraternity environments. ECF
No. 22 at 2, 56 (claiming that certain fraternities are known
for sexually-motivated druggings); 58 (stating that one
fraternity is known for its sexual assault alibi pact).
Plaintiffs essentially allege that UVM plays whack-a-mole with
troublesome fraternities, suspending them from official
recognition on campus but allowing them "to continue to operate
elsewhere in an 'unrecognized' capacity." ECF No. 22 at 56.
According to the Amended Complaint, UVM knows of the sexual

assault-related danger posed by these fraternities but "chooses to ignore it," including by failing to update a website detailing which fraternities have been officially sanctioned by the school. ECF No. 22 at 56. UVM also allegedly does not monitor off-campus fraternity activities, including those of suspended fraternities, and does not take action to deter students from engaging with suspended fraternities.

Next, Plaintiffs claim that UVM is specifically aware that drug and alcohol abuse and sexual misconduct are particularly widespread among student-athletes. ECF No. 22 at 2. They state that the Athletics Department has "a history of covering up controversies." ECF No. 22 at 61. Plaintiffs allege that the basketball team[1] has a history of sexually predatory behavior. They note that the team is outwardly close-knit, ECF No. 22 at 62, and that multiple members of the team have been accused of sexual assault. *Id.*

The list of problematic athletics programs allegedly includes club sports, which are apparently known for throwing parties with dangerous alcoholic juice. ECF No. 22 at 59. Plaintiffs submit that club sports – particularly club rugby and skiing/snowboarding – operate with "little adult oversight," creating an environment that encourages sexual assault. They

---

[1] Plaintiffs also state that the hockey and lacrosse teams are known for sexually inappropriate behavior. ECF No. 22 at 63.

also claim that UVM has "no clear system for identifying clubs known for violating codes of conduct." ECF No. 22 at 60.

The Amended Complaint also submits that UVM's Title IX policies were generally deficient. Plaintiffs argue that UVM should have improved its Title IX policies following several investigations by regulatory entities. They point to a report published by the Campus Sexual Harm Task Force ("the Task Force"), which was created by the Vermont Legislature to address issues regarding the "transparency, safety, affordability, accountability of outcomes, and due process in campus conduct adjudication processes for sexual harm." ECF No. 22 at 55. That report concluded that Vermont colleges (ostensibly including UVM) fell short in several fashions including "lack of transparency in investigations, poor preventative measures, and inadequate training for staff." *Id*. Plaintiffs note that one UVM administrator, Nicholas Stanton, served on the Task Force. Stanton was also the Director of UVM's Office of Affirmative Action and Equal Opportunity ("Title IX Office"), responsible for ensuring UVM's compliance with Title IX's requirements. ECF No. 22 at 3.

Plaintiffs state that UVM has been investigated by the Department of Education ("DOE") and Office of Civil Rights ("OCR") multiple times for failing to follow Title IX policies. According to the Amended Complaint, OCR investigated several

4

claims of sexual harassment at UVM in 2013 and 2017. ECF No. 22
at 51-53. UVM was able to "avoid further Title IX scrutiny"
after the 2013 investigation by promising to "review its
processes for investigating complaints of sexual harassment" but
allegedly never publicized any changes to its processes.
Plaintiffs also state that UVM's pattern of reporting under the
Clery Act, 20 U.S.C. § 1092(f), indicates apathy towards sexual
assault on campus. ECF No. 22 at 51. They claim that DOE audited
UVM's compliance with the Clery Act's reporting requirements in
2009 and imposed a fine for inadequate reporting in 2012. *Id.* In
the years immediately following this Clery Act scrutiny, UVM
allegedly "reported a notably higher number of forcible sexual
offenses than in previous years," but those numbers fell in the
"post-audit years." ECF No. 22 at 52-53. Plaintiffs cite
literature suggesting that universities under Clery Act scrutiny
tend to increase their reporting numbers, and argue that the
subsequent decline (corresponding with decreased regulatory
scrutiny) indicates that UVM accurately reported sexual assault
numbers when under the microscope but regressed to improper
practices afterwards. ECF No. 22 at 52-53.

Following widespread student protests regarding sexual
assault on UVM's campus in 2021 – including publication of many
incidents (and allegedly inadequate institutional responses) on
an Instagram account called @ShareYourStoryUVM, ECF No. 22 at 4

– UVM hired a consultant company called Grand River Solutions to audit the University's Title IX policies. Plaintiffs allege that UVM did not release the results of the audit but published a condensed summary of findings, including that "almost all students interviewed did not fully understand" UVM's Title IX investigation process. ECF No. 5 at 66 (cleaned up). It also found that almost all Title IX investigations took longer than the target 60 days and that legalistic language in the reports caused "significant confusion." ECF No. 22 at 66.

### Individual Allegations

In addition to these collective allegations, the four plaintiffs each describe their own experiences with sexual assault and UVM's Title IX Office.

**1.** Kendall Ware

Kendall Ware enrolled at UVM in the fall of 2018. She was recruited to join UVM's women's swim team on a scholarship. In January 2019, Ware allegedly began dating Anthony Lamb, a member of the UVM men's basketball team. Lamb was a star of the team and a "bona fide celebrity both on and off campus," ECF No. 22 at 10. Ware states that Lamb sexually assaulted her twice during their relationship, once by non-consensually removing his condom during sexual intercourse and once by non-consensually filming her during sexual intercourse at his family home. ECF No. 22 at

11. She states that she did not recognize that the relationship was "abusive and toxic" until later. *See* ECF No. 22 at 11.

Ware and Lamb broke up in the summer of 2019. On September 7, 2019, Ware attended a party at a house occupied by several members of the UVM men's basketball team (the "Basketball House").[2] Ware states that after "Lamb screamed and insulted" her in the driveway outside of the House, the two ended up in Lamb's bedroom. Ware believed that they would "discuss Lamb's rage," but during the encounter "Lamb began to have sex with [her]." ECF No. 22 at 9. Plaintiffs allege that while in Lamb's bedroom, Lamb non-consensually "forcefully anally penetrated Ware as she repeatedly pleaded with him to stop." ECF No. 22 at 10. Plaintiffs further submit that Lamb ignored Ware's "unequivocal demands," told Ware to "just take it," and "continued to rape her." *Id.* After the incident, Ware felt "frozen" and "dissociated" and began to cry uncontrollably.

Plaintiffs state that Ware immediately recognized that she had been sexually assaulted, but that when she attempted to leave Lamb's room, he "forced her back inside" for the night. They also state that the assault caused Ware to suffer from

---

[2] Plaintiffs state that the Basketball House has been a "campus institution" and "the team's social hub" for more than a decade. They further allege that John Becker, Head Coach of the men's basketball team (and a defendant in this case), "facilitated passage of the house from one team generation to the next" through his friendship with the landlord. ECF No. 22 at 9.

suicidal thoughts and deep depression; over the course of the
next few days she allegedly reached out to a suicide hotline and
"withdrew from all attempts at outreach from friends and
family." *Id.* Ware's friends, family, and coaches knew that she
was in crisis. They saw her "withdrawal, loss of appetite,
emotional fragility, frequent uncontrollable crying, and
suicidality." Plaintiffs state that five of Ware's friends
submitted forms to school authorities alerting them that Ware
was in crisis. *Id.*

Ware contacted Judy Rickstad, the campus victim's advocate,
on October 7, 2019, and reported the three incidents discussed
above. Rickstad told Ware that she could either report the
incident to the police or request a formal investigation through
UVM's Title IX office. *Id.* On October 15, 2019, Ware asked
Rickstad to commence a formal investigation. Rickstad referred
the matter to the Title IX Office. On the same day, Ware told
her swim coaches that she was assaulted and explained that she
would be going through a formal reporting process. *Id.* Ware's
coaches explained that they were mandatory reporters, so Ware
needed to speak with Krista Balogh (the Athletics Department's
Associate Athletic Director for External Relations &
Communications). Plaintiffs allege that there is no UVM policy
requiring sexual assault victims to communicate with the
Athletics Department. ECF No. 22 at 12. However, Ware told

Balogh what happened. Balogh then contacted Jeff Schulman,
Director of UVM's Athletics Department, and Cathy Rahill,
Associate Director of Athletics for Student Athlete Development.
Ware spoke with Schulman, told him her story, and explained that
she was filing a Title IX complaint. Ware alleges that she saw
Coach Becker in Schulman's waiting room as she left the office
and infers that "someone in UVM Athletics called him
immediately." ECF No. 22 at 12.

The following day, October 16, 2019, Taryn Moran, UVM's
Title IX Intake and Outreach Coordinator, contacted Ware via
email. Moran told Ware that her options were to proceed with a
formal Title IX investigation or file a police report. UVM
assigned Katherine Spence – an Investigator and Alternative
Resolution Facilitator with UVM's Title IX Office, ECF No. 22 at
6 – to be the Title IX investigator for Ware's complaint. On
October 17, 2019, Spence contacted Ware to discuss the three
incidents. Spence then told Ware that she had three options for
how to proceed: via police report, formal investigation, or
"informal resolution," which "would be more flexible and take
less time, but which would also limit the potential consequences
facing Lamb if found responsible." ECF No. 22 at 13. Ware states
that she knew that she would not be satisfied with mandatory
counseling as the only potential consequence and wanted
heightened punishment along with commensurate "justice" and

"protection for fellow female students." *Id.* Accordingly, Ware told Spence and Rickstad that she wanted to proceed with a formal investigation.

Ware alleges that the University then pressured her into changing her mind. She received an email from Spence stating Spence's awareness that Ware's goal was "not necessarily to get [Lamb] in trouble," and that the formal investigation could "impact his ability to play basketball and/or remain at UVM." ECF No. 22 at 14. Spence also left Ware a voicemail "urging" Ware to "reconsider her decision to formally investigate Lamb, on the grounds that Ware didn't seem to know what she wanted." *Id.* Ware alleges that she was "worried about being responsible for someone's expulsion from school, and about backlash from" the UVM community. Ware sent a text message to Balogh explaining that she did not wish to "ruin [Lamb's] life" or "get him kicked off the team." *Id.*

On October 18, 2019, Balogh and Moran met with Ware at the Title IX Office. The two administrators told Ware that the informal process could result in meaningful consequences for Lamb, including game suspensions and mandatory counselling, as well as Ware's opportunity to confront Lamb and "read him a victim impact statement." ECF No. 22 at 14. Plaintiffs state that Balogh forwarded notes of the meeting to other members of the Athletics Department, including Schulman.

After this conversation, Ware dropped her request for formal investigation and elected to pursue informal resolution. Ware states that she relied specifically on the promises that she could "read Lamb a victim impact statement" and that Lamb might face game suspensions. ECF No. 22 at 15.

Attorney Peter Lim served as the impartial mediator for this informal process. On November 4, 2019, Ware, Lim, and Balogh met to discuss the informal complaint. Ware explained the assault to Lim and asked questions about the informal procedure. In this meeting, Lim allegedly expressed surprise that Ware was not pursuing a formal investigation. He also told Ware that informal resolution could not result in game suspensions or mandatory counselling and would not allow Ware to read her victim impact statement. Lim purportedly later reneged on this and told Ware that she could deliver her impact statement via video, but that it could not be done live.[3]

On November 5, 2019, Ware's mother called Balogh to ask about the ambiguous remedies available under informal resolution. In this phone call, Balogh told Ware's mother that formal investigation could take as long as five months. Balogh

---

[3] Lim was, apparently, wrong about all of this. Plaintiffs submit that UVM's 2019 Procedural Guidelines for Handling and Resolving Discrimination Complaints authorized remedies under the informal process to include "any [] remedial or protective measures that can be tailored to the involved individuals." ECF No. 22 at 16.

also allegedly stated that formal investigation would result in Lamb's immediate and indefinite suspension and automatic ban from the campus gym – which, according to Balogh, would have a "negative impact on the community" and would be "unfair" to Lamb's teammates. ECF No. 22 at 17. Ware perceives this as pressure from Balogh to reject formal investigation. She also states that she was worried that "her athletic community would blame and ostracize her for causing them to lose their star player." *Id.*

Plaintiffs allege that on November 15, 2019, Schulman insisted that Ware meet with him in his office during an evening hockey game. Plaintiffs state that Schulman was late to the meeting, forcing Ware to wait in the hallway with other students and members of the athletics department. During the meeting, Schulman "did not express any concern about Ware's assault, and was clearly focused on not losing his prize asset Lamb." ECF No. 22 at 18.

On November 18, 2019, Stanton asked Ware to commit in writing to informal resolution. *Id.*; *id.* at 22 (UVM "actively pressured Ware into foregoing the Formal Process"). Lamb also signed the agreement – which required him "to not contact Ware, refrain from using the athletic facilities for certain limited hours, complete a generic 'healthy masculine identity program,' and refrain from attending a handful of isolated sports related

events, including the UVM sports celebration event." ECF No. 22
at 18.

The aftermath of the resolution was dissatisfying for Ware.
She grew frustrated with the "misrepresentations" UVM staff made
to her about the informal process, and on December 2, 2019, met
with Balogh, Stanton, and Moran to detail the ways she believed
the Title IX process "retraumatized" her. On January 6, 2020,
Ware presented a victim impact statement over video to Lamb. In
that statement, she described feeling pressured to choose
informal resolution by the UVM Athletics department. She shared
copies of her statement with Schulman and UVM Athletics. ECF No.
22 at 19. On January 10, 2020, Ware met with Schulman, and asked
why the formal investigation would have led to Lamb's immediate
suspension. Schulman allegedly told her that Lamb would not have
been automatically suspended, and that such suspensions were
only in cases of "arrest or public crime." ECF No. 22 at 20.

Ware states that her complaint provoked UVM to retaliate.
According to one report on social media, nearly 20 classes of
alumni[4] were told that Ware "made it up" and was an "angry ex."
Ware states that some of these rumors originated through UVM
basketball official channels, including Becker. ECF No. 22 at
23. Plaintiffs allege that UVM extolled Lamb's athletic

---

[4] Ostensibly alumni of the UVM Men's Basketball Team, although
the Amended Complaint is unclear.

accomplishments and competitive mentality throughout the
process, celebrating him as a "team leader" with respected
toughness and publicly praising his athletic and personal
achievements. ECF No. 22 at 20-21.

Ware states that she suffered severe harm from UVM's
mishandling of her Title IX complaint. According to the Amended
Complaint, her grades declined and she experienced acute
symptoms including panic attacks, depression, insomnia,
isolation, anxiety, and suicidal ideation. Ware allegedly
withdrew from the swim team for the 2019-2020 season and did not
renew her swimming scholarship, which would have funded her
master's degree. Ware was also forced to change schedules and
spaces to avoid Lamb, including dropping classes and her Spanish
minor.

**2.**   Sydney Partin

Sydney Partin enrolled at UVM in the fall of 2018,
intending to study English. Partin alleges that she was stalked
on UVM's campus in December of that year. She and her friends
ordered a rideshare to get off campus. Hours later, Partin
ordered another car through a different ridesharing service to
return to campus and the same driver arrived, stating that he
was her driver. Partin believed him until she got into the car
and the man engaged her in sexually explicit conversation:
asking if Partin was a virgin, offering to pay her for sex and

nude photos, and putting his hand on her thigh without consent. ECF No. 22 at 25.

Partin reported the encounter to Joseph Russell, UVM's Deputy Title IX Coordinator for Students. Russell allegedly told Partin – in an email with the Title IX Office copied – that because the perpetrator was not a student, her best option was to file a report with campus police. Plaintiffs allege that he did not inform Partin of how to file a Title IX complaint or provide her with further resources. ECF No. 22 at 25. The Title IX Office did not follow up with Partin.

In March of 2019, Partin attended an off-campus party also attended by members of the fraternity known as Alpha Epsilon Pi ("AEPi").[5] According to the Amended Complaint, AEPi was suspended in 2014 for excessive drug and alcohol use and "has a long history of being a dangerous place for women." ECF No. 22 at 26. Plaintiffs allege that UVM administrators knew that AEPi continued to operate despite its suspension. *Id.*

Partin states that she was slightly intoxicated upon arriving at the party and poured herself a small glass of alcoholic juice from a large Gatorade cooler. She was then

---

[5] The Amended Complaint does not state that the party was hosted by AEPi. It says that the "off-campus party [was] attended by [AEPi] members." ECF No. 22 at 26. The extent of AEPi's involvement with the party may be the subject of further discovery.

approached by Nolan Donovan, an AEPi member, who put his arm around her. Partin alleges that shortly after sipping the juice she "began stumbling, and was unable to stand, slurring her speech, experiencing a disorienting change in eyesight, and losing her grasp on her surroundings." EXC No. 22 at 27. Plaintiffs state that two women later corroborated that Partin quickly changed from "sober to violently ill." ECF No. 22 at 28. Partin alleges that she was then groped and forcibly kissed – also ostensibly corroborated by other women at the party. After trying to find her friends, Partin vomited repeatedly and "was helped by strangers" when she attempted to leave the party. Another partygoer saw her fall in the snow upon exiting.

Partin awoke the next morning on top of her dorm bed with "a distinct physical sensation that something had roughly touched her vagina the night before." ECF No. 22 at 27. She then went to the UVM Medical Center's Emergency Room and explained to the nurse that she believed she had been drugged by Donovan at the party, motivated by an intent to commit sexual assault. The nurse recommended IV fluids, a test for date rape drugs, and a rape kit. Partin alleges that the on-call Physician Assistant, Deborah Governale, was dismissive and refused to order Partin a drug test or drug kit. Partin was discharged. She states that at that time, she believed that the hospital and UVM were sufficiently linked that a sexual assault report made to the UVM

doctor would be considered a report made directly to UVM. She also thought that Governale was a mandatory reporter. ECF No. 22 at 28.

Partin developed anxiety and depression in the aftermath of the assault. On advice from her parents, she took two semesters off (fall 2019 and spring 2020), during which she experienced panic attacks, anxious compulsions, trichotillomania, agoraphobia, and on one occasion attempted suicide. ECF No. 22 at 29. While not at UVM, Partin worked with off-campus therapists. Through this process, she allegedly recalled the memory of a man leaning against her bed, pressing on her body while she was "too incapacitated to understand what was happening." She realized that she was raped in her dorm room, although she cannot confirm the identity of her rapist. ECF No. 22 at 29.

On January 13, 2020, Partin emailed Russell, the same Title IX representative that assisted her with the stalking incident. She told him that she had been drugged at a party and blacked out for the rest of the evening. Partin also stated that the ER staff "refused to test her for anything, and had offered her neither drug testing, nor a rape kit." ECF No. 22 at 30. Partin alleges that this email put Russell on notice that she was alleging "sexual exploitation."

Russell responded to Partin that, since the hospital was a separate entity from the University, UVM could not help. Plaintiffs allege that this response "misinformed Partin about her options to further report the incident, accommodations she was entitled to under Title IX, and further investigatory actions that UVM could take." ECF No. 22 at 31.

Plaintiffs also state that despite Russell's obligations as a mandatory reporter, he failed to follow up on Partin's report of drugging even though her email indicated that it was for a sexually motivated purpose. Russell told Partin that he would pass the incident on to the Title IX Office, and that she would be contacted by the Office within the week. On January 16, 2020, he sent Partin a link to submit a complaint against UVM Medical Center. Partin received no follow-up contact from the Title IX Office in 2020.

Partin returned to UVM in the fall of 2020. That semester, students began sharing stories of sexual assault on social media. *See* ECF No. 22 at 32-33. Plaintiffs allege that this motivated Partin, who "recounted her assault, and [the Title IX Office]'s failure to reach out, on her personal Instagram account" on April 28, 2021. ECF No. 22 at 33. On April 29, 2021, Moran contacted Partin about her complaint via a "boilerplate email." *Id.*

18

Partin and Moran spoke on May 11, 2021. On the call, Moran "admitted that she had received Partin's report" in January 2020 and explained that she mistakenly believed that Partin only wanted to know how to file a complaint against UVM Medical Center. Moran also expressed her belief that Russell would have provided Partin with information on Title IX procedures. Finally, Moran explained that Donovan was no longer a student at UVM which would "seriously limit the university's ability to enforce any meaningful consequences." ECF No. 22 at 34. Partin decided not to pursue a Title IX investigation.

Partin states that she was substantially harmed by UVM's failure to "engage with her report of sexual misconduct and assault." She states that she suffered long-term harm including withdrawal from school for a year, delayed graduation, lost earnings, a reduced GPA, and difficulty maintaining her scholarship. She also alleges physical harm such as panic attacks, agoraphobia, anxiety, and several other physical and mental illness conditions. ECF No. 22 at 35.

**3.**   Cassia Harting-Smith

Harting-Smith enrolled at UVM in the fall of 2018. On March 22, 2019, she drank heavily at a party hosted by a friend to welcome Jane Doe to her dorm hall. At the party, Doe approached Harting-Smith and made several verbal and physical advances, which made Harting-Smith uncomfortable. ECF No. 22 at 36.

19

Harting-Smith later found herself in a bathroom alone with Doe, at which time Doe began undressing Harting-Smith even though Harting-Smith was "clearly too drunk to consent to sexual activity." *Id.* Doe then began to touch Harting-Smith's "intimate areas" in a sexual manner. This non-consensual touching caused Harting-Smith pain. *Id.* Harting-Smith periodically sat by the toilet because she "needed to vomit," but Doe eventually pulled Harting-Smith "back into non-consensual sexual contact." Harting-Smith claims that she was confused by the incident and returned home and cried in the shower. *Id.*

Over the course of the following year, Harting-Smith frequently encountered Doe at UVM. Harting-Smith began to suffer "violent panic attacks," including falling to the ground and shaking, screaming, and sobbing. ECF No. 22 at 37. She was diagnosed with psychological and mental health disorders. Her grades dropped and she rarely attended on-campus events.

Harting-Smith reported her assault to UVM's Title IX Office on September 23, 2020. Spence was assigned to investigate Harting-Smith's complaint. ECF No. 22 at 38. Spence's investigation determined that Harting-Smith could not have meaningfully consented to sexual contact that night due to intoxication, but because of Harting-Smith's "alcohol-induced memory gaps," Spence concluded that there was insufficient

evidence to find Doe responsible for violating UVM's Title IX
policies. ECF No. 22 at 38.

On September 24, 2021, Harting-Smith filed a complaint in
Vermont Superior Court requesting an order of protection against
Doe for stalking or sexual assault. Harting-Smith's request
detailed the assault and expressed fear of encountering Doe on
campus. The court granted a temporary order of protection and
scheduled a hearing for October 13, 2021. On October 1, 2021,
Harting-Smith was notified by Stanton that UVM had issued a
mutual no-contact order ("NCO") against her, requiring that she
"refrain from making any contact with Doe through 'any means.'"
ECF No. 22 at 39. Harting-Smith reports that she was "shocked
and terrified" to receive this email because she had never done
anything to harm Doe and did not understand why she had been
ordered to stay away from Doe. ECF No. 22 at 40.

Harting-Smith "immediately" asked Stanton about the source
of the NCO. Although not clear from the Amended Complaint, it
appears that the order was designated as "renewed," implying
that it originated prior to Stanton's email. Stanton responded
that mutual NCOs were issued at the start of all investigations,
and that "parties were offered renewals when investigations
conclude." ECF No. 22 at 40. Harting-Smith reports that she
"clearly had not been offered, accepted, or ever been informed
of, a mutual no-contact order." *Id*. Stanton also allegedly told

Harting-Smith that the NCO was issued "at Doe's request." *Id.*
Harting-Smith also allegedly told Stanton that Doe's request for
an NCO "was made in retaliation for Harting-Smith's original
complaint against Doe." ECF No. 22 at 41.

Plaintiffs state that Doe was off campus when Harting-Smith
received the NCO. When she returned, Harting-Smith "lived in
fear of" encountering Doe and triggering disciplinary
consequences. On February 21, 2022, Harting-Smith reported Doe's
NCO request to Moran as an act of retaliation, prohibited under
UVM guidelines. In a March 4, 2022 meeting, Moran allegedly told
Harting-Smith that while Doe's actions were retaliatory, nothing
would come of Harting-Smith bringing retaliation claims.
Harting-Smith states that this increased her fear and anxiety,
and triggered traumatic memories of the assault. She also claims
that she began to avoid places where she might find Doe,
including common public spaces. Harting-Smith also feared that
her social media activity – including sharing the story of her
assault and reposting content relating to sexual violence –
might result in "further retaliation from Doe and disciplinary
action from UVM." ECF No. 22 at 43. She states that she halted
her social media presence until early 2022. *Id.*

**4.**   Haley Sommer

Sommer enrolled at UVM in the fall of 2017 and began an
accelerated master's program in the fall of 2020. In November of

2020, Sommer attended a party in her neighbor's apartment.
Austin Weiland also attended the party. Sommer alleges that
Weiland "took interest in" her and pressured her into drinking
large amounts of alcohol. By the end of the evening, Sommer was
incapacitated. ECF No. 22 at 44. Although her recollections are
hazy, Sommer recalls that her host was "annoyed" with Weiland.
Sommer suggested that the host may have wanted to be alone with
another guest at the party. She stepped out of the gathering and
ended up back in her apartment with Weiland. Sommer recalls
regaining consciousness "while Weiland was having penetrative
sex with her." She also remembers that she struggled to stand
and made her way to the bathroom, and when she returned, Weiland
had disappeared. ECF No. 22 at 45. Sommer did not immediately
classify the event as assault, but quickly entered a "deep
depressive state" and felt fear of being alone at night –
including in her apartment. *Id.*

In April of 2021, Sommer ran into Weiland at a beach on
Lake Champlain. On April 26, 2021, another student – Athena
Hendrick – shared on social media that Weiland raped them.[6] ECF
No. 22 at 45. Sommer then realized that Weiland raped her too.

Plaintiffs allege that Weiland had a "history of predatory
behavior." After Hendrick publicized her assault, the UVM

---

[6] Hendrick uses they/them pronouns.

Student Government Association held a meeting condemning Weiland's actions and multiple students shared stories of abuse "at the hands of Weiland." ECF No. 22 at 46. Empowered by these voices, Sommer shared her own story on Instagram on April 29, 2021. After her post, Sommer received a message from Moran with "boilerplate text" regarding UVM's Title IX procedures. Sommer responded that Weiland had gone through Title IX proceedings after assaulting Hendrick and expressed frustration that "this could have been prevented if he had been found responsible and expelled the first time around." ECF No. 22 at 47. Sommer also stated that "going through a Title IX process" would have "further[ed] her trauma." *Id.*

Plaintiffs state that UVM's Title IX Office did not conduct a follow-up investigation into Weiland's actions and argue that it should have done so notwithstanding Sommer's reticence to satisfy "UVM's responsibility to provide a safe and nondiscriminatory environment." They note that one factor in determining whether to conduct an investigation is "whether there have been other complaints and/or disciplinary outcomes about the same individual." *Id.*

On May 5, 2021, Sommer sent an email to Moran and Stanton detailing her assault and expressing disappointment in UVM's Title IX procedures. She received a "perfunctory" response,

24

reminding her how to access Title IX resources. ECF No. 22 at
49.

Sommer left her master's program in August of 2021. She
alleges that UVM's response to her complaint created a "hostile
environment" that she could no longer endure. On October 29,
2021, Sommer and Partin spoke at a UVM Board of Trustees meeting
about their rape experiences. They found the Board "apathetic."
ECF No. 22 at 50. In the following months, Sommer contacted a
UVM professor and student services staff member to "see if they
would help with her job search or serve as references." *Id.*
Neither replied. ECF No. 22 at 50. Sommer states that both knew
that she had spoken publicly about UVM's handling of Title IX
cases.

Sommer states that her assault and UVM's mishandling of her
case caused her to suffer from "anxiety and depression," and
that she was "unable to use any references from UVM" in her job
search after withdrawing from the program. ECF No. 22 at 50. She
also alleges financial harm "as a result of having to drop out
of her master's program." ECF No. 22 at 51.

## II.  Discussion

### A.  Legal Standard

To withstand a motion to dismiss under Rule 12(b)(6), "a
complaint must contain sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

In deciding a motion to dismiss filed under Rule 12(b)(6), a court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, a court need not accept as true "[l]egal conclusions, deductions or opinions couched as factual allegations." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

### B.  Pre-Assault Title IX Liability

1.  Legal Standard

Title IX of the Education Amendments Act of 1972 states that "[n]o person in the United States shall, on the basis of sex, be ... subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has been clear that Title IX

does not mean that "recipients can avoid liability only by purging their schools of actionable peer harassment." *Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 648 (1999). However, the text of Title IX and relevant Supreme Court precedents require recipient institutions to proactively reduce known risks of sexual assault and effectively investigate and remedy incidents of gender-based discrimination. When presented with information revealing that students do not know how to engage with Title IX procedures, recipient entities must at least attempt to improve awareness of Title IX policies to establish an expectation of enforcement.

The Supreme Court has interpreted Title IX on several occasions. First, in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), the Court reviewed comparable anti-discrimination statutes, administrative regulations, and the legislative intent underlying Title IX to resolve whether Title IX liability may lie when a recipient of federal funds does not have actual notice of discriminatory conduct. *Id.* at 288. It answered that question in the negative, concluding that in cases "that do not involve official policy of the recipient entity," Title IX liability requires "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" to have "actual knowledge of discrimination" and to inadequately respond. *Id.* at

27

290. It also explained that the response must "amount to deliberate indifference to discrimination" – or, in other words, "an official decision not to remedy the violation." *Id.*

The Court expanded on that holding in *Davis,* 526 U.S. 629. That case held that student-on-student harassment qualifies as actionable "discrimination" under the statute. *Id.* at 650. The Court again clarified that institutions are not liable under Title IX pursuant to a mere negligence standard, but only when they "intentionally act[] in clear violation of Title IX by remaining deliberately indifferent" to acts of harassment. *Id.* (citing *Gebser*, 524 U.S. at 290 (1998)). This high standard ensures that entities covered by Title IX will be liable only for their own "official decisions," not for the decisions of teachers or students. *Id.* at 643 (quoting *Gebser*, 524 U.S. at 290-91). The Supreme Court carefully explained that its conclusion in *Davis* did not mean that "recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648. Instead, it held that liability will only lie when the recipient responds to harassment in a manner that is "clearly unreasonable in light of the known circumstances." *Id.* at 649.

Plaintiffs claim that Title IX creates a cause of action against a university's "deliberate indifference" to a risk of

sexual misconduct on campus before assault has occurred. ECF No.
22 at 67. Defendants argue that Title IX does not allow actions
against universities for inaction despite mere known risk of
sexual misconduct, or alternatively, that such liability should
only be imposed in narrow circumstances. ECF No. 27 at 16-17
(arguing that liability should not be imposed "where the
institution [] responded adequately upon receiving notice of the
specific acts of harassment") (citing *Karasek v. Regents of
Univ. Calif.*, 956 F.3d 1093 (9th Cir. 2020); *Simpson v. Univ.
Colo. Boulder*, 500 F.3d 1170 (10th Cir. 2007)). The Second
Circuit has not directly addressed this question. *JD1 v.
Canisius College*, 21-cv-521, 2022 WL 2308902 at *8 (W.D.N.Y.
2022) ("The Second Circuit has not addressed 'pre-assault' Title
IX claims."). This Court agrees with the Sixth, Ninth, and Tenth
Circuits that Title IX countenances "pre-assault" liability,
imposed on a recipient of federal funding for actions taken
prior to an incident of discrimination.

*Davis* and *Gebser* both explained that under *Pennhurst State
Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), recipients of
federal funding become liable for violations of the conditions
attached to that funding only when they have "adequate notice
that they could be liable for the conduct at issue." *Davis*, 526
U.S. at 640. Those cases held that recipients can only be found
liable "for [their] own misconduct;" in other words, recipient

29

entities must know of their responsibilities and knowingly
violate those responsibilities to be held liable under Title IX.
*Id.* at 641. But *Davis* and *Gebser* also held that a recipient's
misconduct can include the decision *not* to act – via deliberate
indifference to discriminatory actions taken by third parties –
as well as the decision *to* act in a discriminatory fashion. *Id.*
at 641-41; *Gebser*, 524 U.S. at 290 (finding that liability could
arise from "an official decision by the recipient not to remedy
the violation."). *Davis* also noted that a recipient entity can
only be held liable under Title IX "where the funding recipient
has some control over the alleged harassment." *Davis*, 526 U.S.
at 644. In short, the Supreme Court's decisions in *Davis* and
*Gebser* reveal the principle that recipients can be held liable
for acts or omissions under Title IX when they make decisions
that condone or contribute to a discriminatory environment.

Nothing in *Davis*, *Gebser*, or any other Supreme Court
decision discussing Title IX supports the notion that a
recipient entity cannot be held liable for actions taken prior
to an assault. The Supreme Court has long held that "whether
viewed as discrimination or subjecting students to
discrimination, Title IX 'unquestionably place[s] on [recipient
entities] the duty not' to permit [ ] harassment in its
schools." *Davis*, 526 U.S. at 643 (quoting *Franklin v. Gwinnett
Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)) (cleaned up). That

duty stems from the text of Title IX, which provides that no person shall "be subjected to discrimination under any education program" on the basis of sex. 20 U.S.C. § 1681(a). Inadequate pre-assault action clearly "subjects" victims to discriminatory harassment. This is consistent with the express terms of *Davis*, which explained that the recipient's "deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it" for liability to attach. *Davis*, 526 U.S. 629 at 645. Liability stemming from recipient actions which *result* in third-party discrimination clearly contemplates pre-assault liability.

Disallowing pre-assault liability under Title IX could lead to absurd results. As the Sixth Circuit explained, cabining Title IX liability to deficient actions *after* funding recipients are notified of an assault "would allow schools to remain deliberately indifferent to widespread discrimination as long as the same student was not harassed twice." *Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 35 F.4th 459, 465 (6th Cir. 2022), *cert. denied sub nom. Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Doe*, 143 S. Ct. 574, (2023). Such a holding would "defeat Title IX's purpose of eliminating systemic gender discrimination from federally funded schools." *Id.* at 466. And while the Second Circuit has not yet weighed in on the validity of Title IX pre-assault

claims,[7] several courts in the Circuit have allowed such claims to proceed past the motion to dismiss phase. *See, e.g.*, *JD1*, 2022 WL 2308902 at *8 ("[T]hese allegations are sufficient to nudge JD1's pre-assault claim across the line from conceivable to plausible."); *Posso v. Niagara Univ.*, 518 F. Supp. 3d 688, 701 (W.D.N.Y. 2021) (same); *Tubbs v. Stony Brook Univ.*, No. 15 CIV. 0517 (NSR), 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016) ("Plaintiff's pre-assault Title IX claim cannot be dismissed."). The purpose of Title IX is to eliminate discrimination in education, which includes taking proactive steps to remedy discriminatory situations when the recipient entity is aware of danger, even when acute assault has not yet occurred. *Doe*, 35 F.4th at 465.

The next issue is what a plaintiff must allege to state a claim for pre-assault liability under Title IX. The parties dispute whether a different standard applies for plaintiffs seeking to prove pre-assault liability through an institution's

---

[7] The Second Circuit has only addressed pre-assault liability stemming from deliberate indifference in one unpublished opinion: *Doe v. Syracuse Univ.*, 22-2674, 2023 WL 7391653 (2d Cir. 2023). In that case, the plaintiff alleged that Syracuse University was "deliberately indifferent" to a risk of abusive conduct by a fellow student, and that she was assaulted as a result. *Doe* is largely inapposite, because that plaintiff engaged with the Title IX process prior to her assault and subsequently claimed that Syracuse's Title IX policies were inadequate – making the claim more like one for post-assault indifference than for pre-assault indifference.

"official policy" supporting discriminatory environments versus
via deliberate indifference. The standard for deliberate
indifference is well-established in the Second Circuit: a
funding recipient will be liable for the actions of third
parties under Title IX if a plaintiff establishes "(1)
substantial control, (2) severe and discriminatory harassment,
(3) actual knowledge, and (4) deliberate indifference." *Zeno*,
702 F.3d at 665 (citing *Davis*, 526 U.S. at 643-50); *see also*
*Posso*, 518 F. Supp. 3d at 696. An institution has "actual
knowledge" when "a school official with authority to address the
alleged discrimination had actual knowledge ... of the
discrimination." *Posso*, 518 F. Supp. 3d at 696 (citing *Carabello
v. New York City Dept. of Educ.*, 928 F.Supp.2d 627, 638
(E.D.N.Y. 2013)). As outlined above, deliberate indifference
must be "clearly unreasonable" in light of the circumstances –
more than mere negligence. *Davis*, 526 U.S. at 649.

Several courts have found that *Gebser* and *Davis* condone
Title IX liability without actual knowledge of discrimination
when the recipient entity has an "official policy" of
discrimination. *Karasek*, 956 F.3d at 1093; *Simpson*, 500 F.3d at
1170. This Court agrees. An official policy encouraging
discrimination – such as a university "sanction[ing],
support[ing], even fund[ing], a program that, without proper
control, would encourage young men to engage in opprobrious

acts," *Simpson*, 518 F.3d at 1177 – can support Title IX

liability even when the recipient entity does not have actual

knowledge of an acute instance of harassment.[8]

The Tenth Circuit's holding in *Simpson* serves as a useful

example. In that case, the University of Colorado paired

football recruits with female "ambassadors" who were supposed to

show the recruits "a good time." *Id.* at 1173. The Tenth Circuit

found that the University's active encouragement of this

practice, combined with the obvious risk that arose from the

policy and the University's failure to take preventative action,

violated Title IX. *Id.* at 1178. Even though the University may

not have known of particular assaults, it knew that pairing

recruits with female "ambassadors" was likely to create an

environment that created a substantial risk of sexual assault,

providing a basis for liability under Title IX.

---

[8] This point finds support in the Second Circuit's recent *en banc*
decision *Soule v. Connecticut Ass'n of Sch., Inc.*, No. 21-1365,
2023 WL 8656832 (2d Cir. Dec. 15, 2023). In that case, the
Second Circuit reiterated that liability stemming from
violations of Spending Clause legislation requires knowledge of
the conditions attached to the funding. *Id.* at *10. It also
juxtaposed cases involving discriminatory "official policies,"
such as a choice "not to stop a teacher's sexual harassment of a
student" or retaliation against a report of sex discrimination,
with cases "that do not involve official policy" and which
therefore require "actual knowledge." *Id.* at *10 (citing
*Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992);
*Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 182 (2005)).
According to the court, both provide adequate notice to satisfy
*Pennhurst*, 451 U.S. at 17.

This is not to say that an entity can be found liable under Title IX without actual knowledge of a serious risk of "severe, pervasive, and objectively offensive" harassment. *Davis*, 526 U.S. at 650. For an "official policy" encouraging or allowing discrimination to confer liability, a plaintiff must prove that the institution had knowledge of specific facts "which created a heightened risk of sexual harassment" and either failed to act*, Karasek*, 956 F.3d at 1114, or encouraged the practice, *Simpson*, 500 F.3d at 1177. As other courts in this circuit have held, a plaintiff must allege that the school had notice "of a heightened risk that is specific enough to allow it to remedy such a policy." *Posso*, 518 F. Supp. 3d at 699 (citing *Tubbs*, 2016 WL 8650463 at *8).

The Ninth Circuit formulated a standard for "official policy" pre-assault liability in *Karasek*. It explained that liability will follow if a plaintiff can prove that

> (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was 'so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school.'

*Karasek*, 956 F.3d at 1112 (quoting *Davis*, 526 U.S. at 650). This Court adopts the Ninth Circuit's articulation of official policy liability under Title IX. The *Karasek* standard is consistent

with the central point of both *Gebser* and *Davis*: that an entity can only be found liable under Title IX for its own actions. *See Gebser*, 524 U.S. at 289 (requiring that institutions "have an opportunity to take action to end the harassment or to limit further harassment" before imposing liability). When an institution imposes a policy that "creates a heightened risk of sexual harassment," liability is properly imposed for its decision to take that action despite knowledge of the associated discriminatory risks. This does not impose strict liability on universities for *any* sexual assault on campus. As the *Karasek* court explained, Title IX does not "require [schools] to purge [their] campus[es] of sexual misconduct to avoid liability." *Karasek*, 956 F.3d at 1114. But when a university adopts a particular policy that substantially increases the risk of sexual assault on campus – a risk of which it knows, or which is obvious – it must bear the consequences of that decision.

    2.   Analysis

    Plaintiffs allege that UVM took certain actions prior to their assaults that make the University liable under Title IX. Specifically, they allege that UVM "maintained an official policy of deliberate indifference to sexual misconduct on campus." ECF No. 22 at 67. As part of this policy, Plaintiffs allege that UVM underreported sexual assaults, failed to address Title IX deficiencies, and did not publicize Title IX policy

changes. *Id.* They also state that UVM maintained official
policies of deliberate indifference to (1) "sexual harassment
within its Athletic department," in particular within its Men's
Basketball Team; (2) "sexual assault within Greek life" in both
recognized and unrecognized fraternities; (3) "known and repeat
assailants" that posed heightened risks to female students; and
(4) "sexual misconduct due to alcohol abuse within on and off-
campus social events," along with actual knowledge of resulting
"heightened risk to female students." *Id.* at 67-69.

    a.   Campus-wide risk

Plaintiffs have plausibly stated that UVM maintained an
official policy supporting a heightened risk of sexual assault
on campus. They provide several allegations of UVM's general
indifference to sexual assault, including several investigations
by federal agencies for underreporting and mishandling sexual
assaults; failure to change UVM's Title IX policies despite
Stanton's participation in a statewide Task Force to improve
policies regarding sexual harm on campuses; "failure to
proactively and transparently discuss its policy changes;"
failure to properly regulate, monitor, or increase oversight of
campus parties; and a general policy of "deliberate indifference
to the risk of sexual misconduct due to alcohol abuse within on

and off-campus social events."[9] ECF No. 22 at 68-69. According to Plaintiffs, these actions — taken as true — create "a heightened risk of sexual harassment on campus that was known and/or obvious to UVM." ECF No. 22 at 69.

Courts disagree over whether a general "campus-wide" policy of indifference to sexual assault can support Title IX liability. Many have concluded that a viable pre-assault claim must involve allegations of misconduct in "a particular context or program or by a particular perpetrator or perpetrators." *Tubbs,* 2016 WL 8650463 at *9; *see also Roskin-Frazee v. Columbia Univ.*, 17-cv-2032, 2018 WL 6523721, at *5 (S.D.N.Y. 2018) (general allegation of deficient response to conditions supporting sexual assault insufficient to support Title IX claim). Others have allowed pre-assault claims past motions to dismiss only when they focus on narrow campus contexts. *See, e.g.*, *JD1,* 2022 WL 2308902 at *9-*10 (allowing pre-assault claim to proceed because of plausible allegation of a policy of indifference towards sexual assault on the track and field team); *Posso*, 518 F. Supp. 3d at 698 (concluding that pre-assault claim for rampant sexual misconduct on a swim team could

---

[9] Plaintiffs offer UVM's "policy of indifference to the risk of sexual misconduct due to alcohol abuse within on and off-campus social events" as a separate example of an official policy that supports liability. ECF No. 22 at 68-69. Due to the generality of this allegation, it is considered as part of Plaintiffs' campus-wide indifference claim.

proceed); *Simpson*, 500 F.3d at 1184-85 (reasonable jury could find Title IX violation based on official policy of misconduct on football team); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007) (university knew specific facts about perpetrator's history, supporting liability).

Other courts have held that complaints alleging campus-wide policies of indifference can survive motions to dismiss. The most notable of these is *Karasek.* In that case, the Ninth Circuit held that Title IX supports imposition of liability "when a school's official policy is one of deliberate indifference to sexual harassment in any context subject to the school's control." *Karasek*, 956 F.3d at 1113. The court offered the caveat that "it may be easier to establish a causal link between a school's policy of deliberate indifference and the plaintiff's harassment when the heightened risk of harassment exists in a specific program," but declined to "foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus." *Id.*

The Ninth Circuit then remanded the case for consideration of whether the plaintiffs' allegations plausibly stated a claim for an official policy of campus-wide indifference. It pointed to several facts that could support such a claim. First, a state

audit of the University of California ("UC") found deficiencies
in UC's approach to sexual misconduct. These included improper
reliance on informal resolution, inadequate and opaque
explanation of Title IX policies, failure to provide case
updates, and inadequate education of employees and students. *Id.*
at 1113-14. The audit also noted that, according to plaintiffs,
reliance on informal resolution allowed UC to avoid reporting
sexual assaults under the Clery Act.

The Court agrees with the *Karasek* approach. Title IX
prohibits recipients of federal funding from acting with
deliberate indifference towards gender-based discrimination in
educational contexts, including across school campuses. But
lawsuits alleging that a recipient entity's failure to address
general campus-wide conditions creates a "discriminatory"
environment should only proceed when plaintiffs plausibly allege
that the institution's policy "created a heightened risk of
sexual harassment." *Karasek*, 956 F.3d at 1114. This standard is
consistent with the rigorous knowledge standards imposed by
*Gebser* and *Davis* as well as the text of Title IX, which
prohibits recipient entities from "subject[ing]" students" to
discrimination." 20 U.S.C. § 1681(a); c*f. Davis*, 526 U.S. at
644-45 (explaining that deliberate indifference requires that
plaintiffs prove causation).

In the instant case, Plaintiffs have plausibly alleged that UVM was deliberately indifferent to campus conditions that created a substantial risk of severe and pervasive discrimination. On-campus environments are clearly under UVM's control, and the University controls its Title IX policies which are the subject of Plaintiffs' allegations. *Zeno*, 702 F.3d at 665. Second, Plaintiffs have stated that they were sexually assaulted because of UVM's failure to remedy unsafe conditions on campus, and that these assaults resulted in their inability to effectively participate in campus life. Taken as true, these actions clearly constitute "severe and discriminatory" harassment that deny Plaintiffs "the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 652. Finally, Plaintiffs have alleged that UVM administrators had actual knowledge of the University's deficient Title IX policies and that UVM knew that those deficiencies resulted in discriminatory conditions on campus. *See* ECF No. 22 at 67-68 (claiming that Stanton participated in a task force outlining university Title IX deficiencies; Russell, Spence, and Moran knew about sexually-motivated drugging on campus; and UVM administrators failed to address known violations of no-contact orders); ECF No. 22 at 66 (UVM hired outside consultant Grand

River Solutions to audit its Title IX procedures and learned that few students understood Title IX investigation processes).[10]

Whether UVM acted with deliberate indifference, *Zeno*, 702 F.3d at 665, and whether that indifference *caused* Plaintiffs' assaults are more difficult questions. Plaintiffs point to a mosaic of incidents that they claim indicate that UVM was deliberately indifferent to discriminatory conduct on campus. First, Plaintiffs note that since 2009, "administrative bodies have scrutinized UVM's inadequacies in preventing sexual misconduct." ECF No. 39 at 13. This includes a 2013 DOE audit of UVM's compliance with reporting standards under the Clery Act and a resulting fine stemming from misclassification of 20 reported assaults, ECF No. 22 at 51, a subsequent increase in reported rapes, and a reduction in reported assaults when regulatory scrutiny abated. *Id* at 53.

Plaintiffs also point to a 2013 complaint to DOE regarding a professor's misconduct, a resulting OCR investigation, and another 2017 OCR investigation into UVM's failure to "promptly and equitably" investigate a complaint. ECF No. 38 at 15. The

---

[10] Plaintiffs also allege that UVM was aware of its defective Title IX policies because of large-scale student protests. ECF No. 22 at 64-65. Student dissatisfaction with administrative procedures itself does not subject recipient entities to Title IX liability. But it may be probative of UVM's knowledge of a campus-wide issue regarding sexual assault.

Amended Complaint states that following the 2013 OCR investigation, UVM agreed to "review its processes for investigating complaints of sexual harassment brought forward by students," ECF No. 22 at 52, but failed to publicize revised policies and did not confirm whether it made changes. ECF No. 22 at 53. Plaintiffs allege that UVM similarly failed to revise (or publicize changes) to its policies after the state Task Force recommended changes, ECF No. 22 at 54, and after Grand River solutions audited the University's policies. ECF No. 22 at 66. That audit allegedly concluded that "almost all students that it interviewed did not fully understand UVM's Title IX investigation process." It also concluded that "almost all cases were delayed beyond the target timeline of 60 days," ECF No. 22 at 66, and that "Title IX reports were written in a complicated and legalistic manner" which caused some "significant confusion." *Id.* (internal quotations omitted).

Taking Plaintiffs' allegations as true, UVM could be considered deliberately indifferent to a heightened risk of sexual assault on campus. While "the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX," *Gebser*, 524 U.S. at 292, failure to alter remedial policies that are *known* to be defective can constitute deliberate indifference. *See Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (finding deliberate

indifference "where a school district has knowledge that its
remedial action is inadequate and ineffective," yet "continues
to use those same methods to no avail.") (citing *Davis*, 526 U.S.
at 633; *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1243 (10th
Cir. 1999); *Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir.
1999); *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 60-64
(D. Me. 1999)). The failure to respond to regulatory scrutiny,
outlined above, plausibly indicates UVM's "failure to alter
remedial policies that are known to be defective." *Id.*

    To be sure, "the fact of [a regulatory] investigation is
insufficient to support a plausible pre-assault claim." *JD1*,
2022 WL 2308902 at *9-*10. But Plaintiffs have done more than
point to a governmental investigation as proof UVM's deliberate
indifference. They have alleged that upon three separate
occasions, regulatory entities recommended changes to UVM's
Title IX policies – and that each time UVM either failed to make
the recommended changes or failed to publicize those changes to
the student body. ECF No. 22 at 51. In *Karasek*, the Ninth
Circuit concluded that a state audit finding deficiencies in the
University of California's Title IX policies served to plausibly
allege an official policy of deliberate indifference to
discrimination. 956 F.3d at 1113. Among the issues revealed by
that audit were the University's improper reliance on informal
resolution, inadequate transparency regarding investigation

policies, failure to complete investigations in a timely manner, and failure to educate employees and students – issues mirrored by the allegations in Plaintiffs' Amended Complaint in this case. *See id.*

The *Karasek* complaint alleged greater factual specificity than the instant Amended Complaint. For instance, plaintiffs there alleged that only two of five hundred cases of sexual misconduct reported to UC's Title IX Office were resolved through a formal process. *Id.* at 1114. They also insinuated that the University did this to avoid reporting the complaints as mandated by the Clery Act. *Id.* Plaintiffs here have not provided comparable data indicating improper reliance on informal resolution. But this is not a death knell. Plaintiffs have alleged that UVM's reporting numbers increased when the University was placed under federal regulatory scrutiny, ECF No. 22 at 52-53, and that its Title IX investigation procedures were opaque enough to confuse students. *Id.* at 65. They also claim that the University improperly pressured students to informally resolve their claims rather than proceed through formal investigation (although without comparative data). ECF No. 22 at 3. These allegations, taken as true, support Plaintiffs' claim that UVM was deliberately indifferent to a risk of sexual assault on campus.

This deliberate indifference could have substantially increased the risk of discrimination. It is a "reasonable inference," *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008), that if UVM's investigation policies were clearer, sanctions were more formal, and students and teachers received increased sexual assault prevention training, conditions on campus may have been less conducive to sexual misconduct. *Cf. Karasek v. Regents of Univ. of Calif.*, 534 F. Supp. 3d 1136, 1155 (N.D. Cal. 2021) (district court opinion following remand). Plaintiffs are entitled, at this early stage, to the assumption that improved transparency regarding investigatory procedures would have encouraged increased reporting and, therefore, accountability for assailants.

UVM responds that several of these allegations – including the private audit, campus protests, and Instagram posts alleging sexual misconduct – postdate Plaintiffs' assaults and are therefore irrelevant to the pre-assault claim. ECF No. 27 at 12. But that external audits and student complaints from after the assaults support the notion that UVM's policies were inadequate for an extended period, including prior to the assaults. These incidents are probative of UVM's alleged indifference to a discriminatory environment on campus, which is what Plaintiffs claim caused the increased risk of discrimination.

UVM is wrong that recognition of pre-assault liability will establish a rule of strict liability for universities when there is a history of sexual assault on campus. *See* ECF No. 27 at 14. For liability to lie, plaintiffs must highlight the school's allegedly defective policies with sufficient specificity for it to remedy the issue. ECF No. 27 at 20. When universities are on notice that their policies are inadequate to prevent sexual assault on campus, they must change those policies. Plaintiffs' allegations here – inadequate transparency, improper reliance on informal procedures, and improper delay – clear that threshold.

b.   Men's Basketball Team

Plaintiffs also allege that UVM "maintained an official policy of deliberate indifference to sexual harassment within its Athletic department and by student athletes and, in particular, its Men's Basketball Team." ECF No. 22 at 68. Plaintiffs have not alleged pre-assault deliberate indifference with sufficient particularity to support this claim.

Plaintiffs' claim fails the "actual notice" prong of deliberate indifference test. *Gebser*, 524 U.S. at 290. The Amended Complaint does not allege that an official with "authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" had "actual knowledge of discrimination" in the Athletics Department or the Men's Basketball program. Plaintiffs simply state that

online forums discussed UVM's known propensity for covering up
controversies. ECF No. 22 at 61. The Amended Complaint also
asserts that "the Basketball House is known" to be associated
with sexually predatory behavior but does not specify who knew,
what happened, or when it occurred. *Id.*

Plaintiffs' only tie to UVM itself is that Coach Becker
facilitated the maintenance of the off-campus House as a
residence for basketball players through his friendship with the
landlord, and that he encouraged players to spend time together
off the court. ECF No. 22 at 61. This is insufficient to situate
Becker as an official with "actual knowledge" of discriminatory
conduct within the Men's Basketball Team or the Athletics
Department: Plaintiffs have not alleged that Becker's tie to the
House came with knowledge of inappropriate actions taking place
there.

Plaintiffs also state that another basketball player who
resided at the Basketball House was accused of sexual
misconduct, and that "[a]t least one individual put Becker on
notice that this [player] had acted sexually inappropriate (sic)
towards women." ECF No. 22 at 62. Anonymity concerns may deter
more precise factual allegation, but a bare assertion that
Becker was aware of a single individual's sexual misconduct is
insufficient to impose pre-assault liability. Plaintiffs have
not stated what Becker knew or how he responded, both important

considerations for a finding of deliberate indifference. *Gebser*, 524 U.S. at 290.

Next, Plaintiffs allege that UVM's Athletics Department made several public comments diminishing allegations levied against the team. *See* ECF No. 22 at 62-63. These include an Instagram post celebrating the basketball team's success and stating that "sexual assault accusations on social media" are "not helpful to victims" as well as a student-wide email explaining that the Instagram post was made in response to "numerous harmful comments accusing the entire team of sexual misconduct." ECF No. 22 at 63. These communications do not support a finding of deliberate indifference because they do not indicate any actual knowledge of sexual misconduct on the basketball team.

Finally, Plaintiffs state that posts on internet forums and Instagram support a broader picture of the UVM Athletics Department as a toxic environment conducive to sexual assault. Even drawing all reasonable inferences in favor of Plaintiffs, these posts are only probative of UVM's constructive knowledge of generalized sexual misconduct. The *Gebser* Court made very clear that *actual* knowledge is required for a finding of deliberate indifference. *Gebser*, 524 U.S. at 290.

To the extent that Plaintiffs allege UVM held an "official policy" supporting sexual misconduct in the Athletics Department

– reducing the "actual knowledge" threshold, as outlined above –
they have failed to allege that policy with sufficient
specificity to survive the motion to dismiss. Similar cases
evaluating misconduct on sports teams have relied upon highly
specific allegations of repeated harassment that thoroughly
"engrained the overall environment" of the team. *Posso*, 518 F.
Supp. 3d at 700-03 (outlining specific instances of male
athletes physically and verbally harassing women in a manner
that established "dominance and control," and concluding that
the school "supported" this culture for more than two years);
*Simpson*, 500 F.3d at 1181 (football team had a lengthy
documented history of sexual assault involving extensive legal
action, and head coach knew of the risk but decided not to
change policy); *Williams*, 477 F.3d at 1296-97 (university knew
of player's history of sexual misconduct and did not exercise
any control or oversight). Plaintiffs' claim for pre-assault
liability relating to the Men's Basketball Team has not
presented such specific allegations.

        c.   Fraternities

     Plaintiffs next state that UVM should incur pre-assault
liability for its "official policy of deliberate indifference to
sexual assault within Greek life," in both recognized and
unrecognized fraternity events. ECF No. 22 at 68, 56-59. The
parties dispute whether the focus should be on Greek life

50

broadly or on AEPi, the suspended fraternity allegedly
responsible for Partin's assault. *Compare* ECF No. 38 at 22
(Plaintiffs focusing on school-wide fraternity misconduct) *with*
ECF No. 44 at 13 (Defendants arguing that "[t]he Court's focus
should be on AEPi.").

Plaintiffs have not stated a plausible claim for relief
stemming from UVM's official policy of deliberate indifference
as applied to Greek life generally. While the Amended Complaint
offers troubling allegations regarding conduct in Greek life
organizations, it does not state that UVM failed to remedy those
in a manner that was "deliberately" indifferent to the
misconduct either via an official policy or actual knowledge and
failure to remedy. Plaintiffs claim that UVM administrators were
aware of a fraternity attic where members brought women
attending parties for sex "with or without consent," but do not
specify who knew, how that individual responded, or whether
supporting that environment was part of an official UVM policy.
The Amended Complaint does not allege that UVM officials were
aware of – or complicit in – many of the other more serious
allegations, especially regarding the use of "date rape" drugs
at fraternity parties. The presence of news stories reporting
prevalence of date rape drugs on UVM's campus does not situate
the University as an entity that made a deliberate choice to
allow this practice, which is required to establish Title IX

liability. *Gebser*, 524 U.S. at 290 (explaining that Title IX liability attaches when the institution is deliberately indifferent or the discrimination results from an "official policy"). In fact, Plaintiffs note that UVM Police received a report of date rape druggings in 2022 and apparently investigated the incident, counseling against finding a plausible official policy of deliberate indifference. *See* ECF No. 22 at 59.

Plaintiffs also state that "the body meant to oversee fraternity life" is disorganized and struggles to "hold fraternities to one standard." ECF No. 22 at 57. But the Amended Complaint does not specify how the regulatory body is disorganized, how this resulted in a lack of accountability, or how it specifically increased the risk of sexual assault on campus. Similarly, while Plaintiffs state that sanctions for violations are frequently "vague," they do not provide examples of these and do not state why this increases the risk of sexual misconduct.[11] In sum, Plaintiffs have failed to show that UVM's "actions amount to an official decision not to remedy a

---

[11] The Amended Complaint also states that UVM's Fraternity and Sorority Life Coordinator committed a serious act of sexual misconduct. ECF No. 22 at 58. This allegation, taken as true, does not contribute to the image of UVM as an entity with an "official policy" of deliberate indifference to sexual misconduct in Greek life organizations because the Coordinator's actions are not tied to any official school policy towards fraternities more broadly. *Cf. Gebser*, 524 U.S. at 290.

violation" with regard to Greek life generally. *Karasek*, 500 F. Supp. 3d at 984.

However, Plaintiffs have plausibly alleged that UVM's official policy of derecognizing troublesome fraternities is deliberately indifferent to a heightened risk of sexual misconduct. They state that UVM's policy is to suspend "particularly troublesome fraternities from campus, only to allow them to continue to operate elsewhere." ECF No. 22 at 56. This "out of sight, out of mind" approach – taken as true – satisfies the pleading requirements for an official policy of deliberate indifference.

The first and second prongs of the "official policy" framework are that (1) the school maintained a policy of deliberate indifference to reports of sexual misconduct and (2) this created a "heightened risk of sexual harassment that was known or obvious." *Karasek*, 956 F.3d at 1112. Plaintiffs have pleaded that UVM's policy for dealing with problematic fraternities is suspension without further oversight or enforcement of the suspension. Plaintiffs allege that off-campus activities of suspended fraternities are not monitored or regulated by UVM, and that students are not deterred from attending such events. Plaintiffs also state that UVM's list of fraternities in "good standing" is improperly maintained. ECF No. 22 at 56-57; *see also* ECF No. 22 at 57 (explaining that one

UVM administrator "acknowledged these reporting errors"). This contributes to the plausible allegation of deliberate indifference because if suspension is to be an effective sanction, it must be effectively communicated to the student body.

If suspended fraternities are simply moved off campus and allowed to continue operations without oversight, the suspension simply pushes rules violations underground and enables further bad behavior. This makes suspension a largely toothless sanction, exemplified by Plaintiffs' allegation that AEPi holds annual recruitment events despite its 2014 suspension. ECF No. 22 at 57. This plausibly increases the risk of sexual misconduct on campus, especially when fraternities are suspended for "alcohol and drug infractions," ECF No. 22 at 57, conditions related to sexual assault. Plaintiffs also allege that one "unrecognized" fraternity party recently resulted in multiple date rape drug reports, ECF No. 22 at 59, contributing to the inference – for purposes of the motion to dismiss – that UVM's official policy of suspension increases risk of sexual misconduct. Plaintiffs have satisfied the first two prongs of the "official policy" framework.

Third, this misconduct takes place in a context subject to the University's control. While off-campus parties may not be directly subject to UVM's control, the fraternity recognition

and suspension process is directly within UVM's discretion. Plaintiffs' allegation, with all plausible inferences drawn in their favor, is that UVM's suspension policy has the effect of making it so that the misconduct occurs in an environment beyond its control (that is, off campus). Because UVM has control over its own suspension practices, Plaintiffs have satisfied the third prong of the "official policy" analysis.

Finally, there is no dispute that sexually-motivated drugging, ECF No. 22 at 59, is "severe and discriminatory" harassment. *Zeno*, 702 F.3d at 665. Accordingly, while Plaintiffs have failed to state a claim for pre-assault liability with regard to UVM's management of Greek life generally, they have plausibly alleged an official policy of deliberate indifference as applied to suspended fraternities.

d.   Club sports

Plaintiffs have failed to allege that UVM maintained an official policy of deliberate indifference to sexual misconduct in club sports contexts. The only evidence offered in support of this claim in the Amended Complaint is a Reddit post about "some sports/frat houses" known to be "a little weird," ECF No. 22 at 59, two specific instances of sexual misconduct on the club rugby and club ski and snowboarding teams, ECF No. 22 at 60, and an assertion that "because club sports operate with little adult oversight," their cultures "breed cultures that encourage sexual

assault." *Id.* None of this supports the notion that the risk of
sexual assault in club sports contexts resulted from deliberate
action by UVM, or that UVM was aware that there was a serious
and heightened risk of misconduct in club sports environment and
intentionally did not act.

The most serious allegation in the Amended Complaint is
that in 2018, a freshman on the club ski and snowboarding team
was raped by another club member and that the club president
suppressed her claim. This does not attribute any intentional
action to UVM itself, or that UVM was ever aware of the assault.
While Plaintiffs assert that UVM had knowledge of club sports
cultures that "encourage sexual assault," they have not stated
how UVM's policies facilitated that culture or that it knew of
the risk with sufficient specificity "to allow it to remedy such
a policy." *Posso*, 518 F. Supp. 3d at 699. Accordingly, UVM's
motion to dismiss Plaintiffs' claim for pre-assault liability
stemming from misconduct in club sports contexts is granted.

e.   Repeat offenders

Finally, Plaintiffs allege that UVM should incur pre-
assault liability for its failure to adequately resolve risks
presented by "repeat assailants." ECF No. 22 at 68. In support,
they point to repeated assaults allegedly committed by Austin
Weiland. *Id.* at 4. Plaintiffs have not plausibly alleged that
UVM maintained "a policy of deliberate indifference to reports

of sexual misconduct" as applied to individuals considered likely to re-commit sexual assaults. *Karasek*, 956 F.3d at 1112.

Plaintiffs' allegations regarding repeat assailants center around assaults committed by Weiland. According to the Amended Complaint, Athena Hendrick reported that they were assaulted by Weiland to a mandatory reporter – who did not connect Hendrick with the Title IX Office – before following up with several UVM institutions and eventually contacting the Title IX Office in February of 2020. ECF No. 22 at 4, 32. Plaintiffs also allege that Weiland initially admitted to a lack of consent, but that UVM ultimately closed the investigation due to a "lack of evidence" of sexual misconduct. They also state that Weiland violated a no-contact order protecting Hendrick, and that UVM took no further disciplinary action. *Id.* at 33. Because these events preceded Sommer's rape in November of 2020, Plaintiffs claim that UVM maintained an official policy of indifference towards Weiland's propensity to re-commit acts of sexual misconduct.[12]

---

[12] Plaintiffs also state that the UVM Student Government Association "held a meeting condemning Weiland's behavior" during which multiple students submitted experiences involving Weiland's misconduct. Because this meeting occurred after Sommer's assault, and because Plaintiffs do not allege that UVM was aware of any of these allegations prior to the assault, they do not support the pre-assault official policy claim.

While Plaintiffs are certainly correct that an institution's "notice of an assailant's predatory behavior" may support the imposition of liability, ECF No. 28 at 26, such notice does not *require* a finding of liability without deliberate indifference to known risk. As the Sixth Circuit has noted, deliberate indifference may be found "where a school district has knowledge that its remedial action is inadequate and ineffective," yet "continues to use those same methods to no avail." *Vance*, 231 F.3d at 261. That court also cited several other decisions for the premise that for a remedial action to constitute deliberate indifference, the institution must know that its actions do not address continued misconduct. *Id.* at 261-62 (citing *Davis*, 526 U.S. at 633; *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1243 (10th Cir. 1999); *Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999); *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 60-64 (D. Me. 1999)).

Here, Plaintiffs have not alleged that UVM knew that its investigation of Weiland would be "inadequate and ineffective." *Vance*, 231 F.3d at 261. UVM investigated Hendrick's complaint. While Plaintiffs state that the investigation was "flawed" and failed to discover Weiland's history of predatory sexual behavior, ECF No. 22 at 4, they have not stated how or why the investigation was flawed or what UVM should have discovered about Weiland's history. They offer three separate Instagram

posts detailing assaults by Weiland as evidence that Weiland was
dangerous, but do not allege that UVM knew of these incidents
prior to investigating Hendrick's complaint or that the
investigation into Hendrick's complaint should have revealed the
incidents. Plaintiffs essentially ask the Court to impose
liability upon UVM for failing to discover information that did
not become publicly available until after the time of the
investigation. UVM's actions were not "clearly unreasonable in
light of known circumstances." *Davis*, 526 U.S. at 648; *see also
Vance*, 231 F.3d at 260.

Plaintiffs cite authority for the principle that "notice of
an assailant's predatory behavior" can support liability, but
those cases all involved officials that knew of past sexual
misconduct and deliberately failed to act. *See Roe ex rel.
Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008,
1031 (E.D. Cal. 2009) (gym coach knew of harassment and failed
to act); *Michelle M. v. Dunsmuir Joint Union Sch. Dist.*, No.
204-CV-2411, 2006 WL 2927485, at *5 (E.D. Cal. Oct. 12, 2006)
(school officials knew of assailant's prior assaults against
other students and did nothing); *Doe A. v. Green*, 298 F. Supp.
2d 1025, 1036 (D. Nev. 2004) (co-coach failed to report
inappropriate teacher-student relationship); *Johnson v. Galen
Health Institutes, Inc.*, 267 F. Supp. 2d 679, 689 (W.D. Ky.
2003) (lack of actual notice meant no deliberate indifference).

Here, UVM conducted an investigation after learning of Hendrick's assault. Title IX does not oblige institutions to "engage in particular disciplinary action," *Davis*, 526 U.S. at 648, or "expel every student accused of misconduct," *Vance*, 231 F.3d at 260 (6th Cir. 2000). The Supreme Court has explained that school disciplinary decisions in the Title IX context are evaluated under a more rigorous standard than mere "reasonableness;" Plaintiffs have not pleaded that UVM's investigation into Hendrick's assault violates that heightened standard. *Davis*, 526 U.S. at 649.

UVM's alleged failure to adequately remedy Weiland's violation of the no-contact order also does not support liability for two reasons. The first is that Plaintiffs have not alleged that it caused Sommer's later assault. *Cf. Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 9 (1st Cir. 2020) (funding recipient's actions must at least increase the risk of discrimination). Second, this isolated incident does not point to a broader policy of indifference towards repeat offenders. While it is certainly true that recipient entities can incur liability for merely investigating allegations and taking no further action, *Vance*, 231 F.3d at 260, cases that impose liability for official policies of deliberate indifference involve pervasive and widespread examples of inadequate institutional response. *Cf. Simpson*, 500 F.3d at 1177. *Simpson*

and *Karasek*, for instance, turn on the institutions' support for a school climate that enables sexual misconduct. Here, Plaintiffs have not alleged that UVM had any notice – actual or constructive – that particular individuals were likely to recommit acts of sexual misconduct, or that they took deliberate actions that enabled second attacks by initial assailants. Plaintiffs' claims turn on one instance of an assailant committing multiple assaults, and it is undisputed that UVM conducted an investigation upon learning of the first assault. That is inadequate to support "official policy" liability.

Plaintiffs also state that UVM's email contacting Sommer about Title IX policies did not "acknowledge the fact that UVM had received a prior complaint about [Weiland]." ECF No. 22 at 46. This also does not support "official policy" liability. To rule otherwise would be to hold that any time an accusation has been leveled against an assailant, any response to a complaint about that assailant must disclose the prior allegation – which could jeopardize the confidentiality of the investigation, a detail that might be important to both parties involved. To be sure, the fact of a prior assault may be quite relevant to a subsequent investigation, but UVM's failure to automatically disclose that assault upon receipt of a subsequent complaint does not support the presence of an "official policy of deliberate indifference." *Karasek*, 956 F.3d at 1112.

C.   **Post-Assault Title IX Liability**

Plaintiffs Ware and Partin allege that UVM was deliberately indifferent to their reported sexual assaults.

1.   Legal Standard

The Second Circuit has long held that Title IX supports liability when recipients of federal funding are deliberately indifferent to "known acts of student-on-student sexual harassment," *Davis*, 526 U.S. at 646-47, and that deliberate indifference creates a "hostile educational environment." *Hayut*, 352 F.3d at 750. To state a claim for post-assault deliberate indifference, plaintiffs must allege that (1) the institution had substantial control over both the harasser and the context in which the known harassment occurs; (2) the harassment was severe, pervasive, and objectively offensive; (2) someone at the institution with authority to take corrective action had actual knowledge of the harassment; and (4) the institution was deliberately indifferent to the harassment. *Zeno*, 702 F.3d at 665 (citing *Davis*, 526 U.S. at 643-50).

2.   Analysis

a.   Kendall Ware

Ware states that UVM was deliberately indifferent to her assault by Lamb. Taking all facts in the Amended Complaint and drawing all reasonable inferences in favor of Ware, Ware has stated a plausible claim for deliberate indifference subjecting

her to a hostile educational environment that interfered with her educational opportunities. *Boucher v. Trs. of Canisius Coll.*, No. 1:22-CV-00381, 2023 WL 2544625, at *8 (W.D.N.Y. Mar. 17, 2023).

The Amended Complaint states that on October 7, 2019, Ware notified Rickstad of her rape. She later told UVM about two prior incidents of sexual assault, one at Lamb's family home and one at an unspecified location. ECF No. 22 at 10-11. The first issue is whether UVM had substantial control over both the alleged harasser (Lamb) and the context in which the harassment occurred (the off-campus Basketball House, Lamb's family home, or the unspecified location). *See* ECF No. 27 at 28; ECF No. 38 at 28. The *Davis* Court emphasized that because Title IX requires "harassment to occur 'under' 'the operations of' a funding recipient, the harassment must take place in a context subject to the [institution's] control." *Davis*, 526 U.S. at 645. The standard is "substantial control," which is easily found when harassment occurs on lower and secondary school campuses but which is more nebulous in higher education. *Cf. id.*; *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 511 (D. Conn. 2020), *aff'd in part, vacated in part sub nom. McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc.*, No. 21-639-CV, 2021 WL 5286647 (2d Cir. Nov. 15, 2021).

Off-campus locations are generally not considered within the "substantial control" of institutional defendants. *See, e.g.*, *Ostrander v. Duggan*, 241 F. Supp. 3d 1154 (8th Cir. 2003); *Samuelson v. Oregon State Univ.*, 162 F.Supp.3d 1123, 1131-32 (D. Or. 2016). An institution's "substantial control" is a fact-specific inquiry. *See, e.g.*, *Weckhorst v. Kansas Stat Univ.*, 241 F. Supp. 3d 1154, 1169-70 (D. Kan. 2017) (distinguishing cases declining to find substantial control because the defendant fraternity was "subject to oversight by the Office of Greek Affairs, rules promulgated by KSU, and potential discipline of the chapter and its members for conduct that takes place at the fraternity house."); *Doe v. Univ. of Memphis*, No. 2:18-CV-2032-MSN-CGC, 2019 WL 13131407, at *8 (W.D. Tenn. Nov. 27, 2019); *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 n.1 (10th Cir. 2008) (directly rejecting the notion that "harassment occurring off school grounds cannot as a matter of law create liability under Title IX."). Regulations promulgated pursuant to Title IX acknowledge that the statute prohibits gender discrimination in programs regulated by the university, not just physical on-campus spaces.[13]

---

[13] *See* 34 C.F.R. § 106.44(a):

> A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent ... "education

Courts evaluating the question of substantial control focus on factors such as whether the school exercises comprehensive disciplinary authority over the organizations operating off-campus, its disciplinary authority over the individuals, and its institutional support for the organizations operating off-campus. *See, e.g.*, *Weckhorst*, 241 F. Supp. 3d at 1167; *Roe v. Marshall Univ. Bd. of Governors*, No. CV 3:22-0532, 2023 WL 2799733, at *3 (S.D.W. Va. Apr. 5, 2023). For instance, in *Weckhorst* – a case cited by both parties – the District of Kansas explained that because the defendant fraternity was "subject to oversight by the [administration], rules promulgated by [the university], and potential discipline of the chapter and its members for conduct that takes place at the [off-campus] house," the context of the assault was within the substantial control of the defendant university. *Id.* at 1169-70.

One court in this district held that universities do not necessarily exercise "substantial control" over off campus parties thrown by Greek life organizations associated with the school. *McNeil*, 436 F. Supp. 3d at 511. However, that court also

___

program or activity" includes locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution.

noted that Yale's disciplinary authority over individual
students may still suffice to bring the harassment within the
"control" of the institution:

> [I]f a currently enrolled Yale student sexually harasses
> another currently enrolled Yale student, and the alleged
> sexual harassment has been properly reported to Yale for
> discipline, Yale may have substantial control over the
> circumstances in which that student can remain enrolled at
> Yale, whether the underlying conduct occurred on Yale's
> campus or off of it.

*Id.* at 512. As a result, the court concluded that deliberate
indifference could be found even if the harassment occurred off-
campus. *Id.*; *see also Nungesser v. Colum. Univ.*, 244 F. Supp. 3d
345, 368 (S.D.N.Y. 2017) (noting that even when harassing events
took place on social media – unambiguously beyond school's
control – the school may still exercise control because alleged
harassers were university students). And substantial control is
more likely to be found in situations where institutions
exercise "disciplinary authority over the harasser in the
setting in which the harassment takes place." *Brown v. Arizona*,
82 F.4th 863, 875 (9th Cir. 2023) (en banc).

The Amended Complaint plausibly alleges that UVM exercised
"substantial control" over both Lamb and the context in which
the harassment occurred – namely, the Basketball House.
Plaintiffs state that the Basketball House "has housed members
of UVM's Men's Basketball for the last decade," a practice
facilitated by Coach Becker, who "passed it down from generation

to generation." ECF No. 22 at 61; *see also* ECF No. 22 at 9. Plaintiffs have plausibly alleged that Coach Becker coordinated members of the Men's Basketball Team living in an off-campus house with deep ties to the Athletics Department. Contrary to UVM's protestations, this is not simply an allegation that Becker was friends with the landlord. ECF No. 27 at 28. It is a claim that Becker helped create an environment controlled by the Men's Basketball Team, for purposes of developing team camaraderie. ECF No. 22 at 61.[14]

Here, like in *Weckhorst*, Plaintiffs have asserted that an organization closely controlled by the University – the Men's Basketball Team – occupied an off-campus house with the knowledge and permission of University authorities. Additionally, Plaintiffs have claimed that Coach Becker directly encouraged players to spend time at the House, contributing to the image of the House as a place for official University activities. ECF No. 22 at 61. Further contributing to this conclusion, Plaintiffs also state that "UVM implicitly acknowledged that all *three*" reported incidents together could constitute violations of UVM's sexual harassment policy. ECF No.

---

[14] This is not inconsistent with the conclusion that UVM did not have an official policy condoning sexual misconduct in the Athletics Department. Here, the sole question is whether UVM had control over the Basketball House, which plaintiffs have plausibly alleged. That is not to say that UVM adopted an official policy supporting sexual misconduct in that context.

22 at 11. Taken as true, and drawing all inferences in favor of Plaintiffs, this response by UVM indicates its belief that it exercised disciplinary authority over Lamb for all three incidents, weighing in favor of a finding of substantial control at least at the motion to dismiss stage.

Defendants have not disputed the second and third prongs of the post-assault deliberate indifference framework, and Ware's assault plausibly constitutes "severe, pervasive, and objectively offensive" harassment. *See Soper v. Hoben*, 195 F.3d 845, 854-55 (6th Cir. 1999) (holding that rape "obviously qualifies as being severe, pervasive, and objectively offensive sexual harassment."); *see also Tubbs*, 2016 WL 8650463 at *6 ("[A] single instance of sexual assault may satisfy the severe, pervasive, and objectively offensive standard."). Additionally, Plaintiffs have directly pled that multiple UVM officials "with authority to take corrective action had actual knowledge of the harassment." *Zeno*, 702 F.3d at 665; ECF No. 22 at 11 ("Ware asked Rickstad to pursue a formal investigation of Lamb. Rickstad reported the rape to the Title IX Office.").

The only remaining question is whether Plaintiffs have plausibly alleged that UVM's response to Ware's complaint was so "clearly unreasonable" as to constitute deliberate indifference. *Roskin-Frazee*, 2018 WL 6523721 at *7 ("[T]he first step in the inquiry is to determine if and when defendant had actual

knowledge of the alleged assault. Only then can it be determined whether defendant acted with deliberate indifference in responding to the assault."). The Court concludes that they have.

Like in the pre-assault context, a defendant acts with post-assault deliberate indifference when its "response to known discrimination is *clearly* unreasonable in light of the known circumstances." *Gant ex rel. Gant v. Wallingford Bd. Of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999); *see also Boucher*, 2023 WL 2544625 at *9 (quoting *Posso*, 518 F. Supp. 3d at 697). Courts in this Circuit have explained that a school's failure to fully explain the complainant's rights can constitute deliberate indifference "if such failure transcends mere negligence." *Id.* at *10. This high standard intends to eliminate the risk that an institution will be held liable for third party actions, and seeks to ensure that they will be held liable for "official decision[s]." *Roskin-Frazee v. Colum. Univ.*, 2018 WL 6523721 at *4 (S.D.N.Y. 2018).

UVM states that "it was not clearly unreasonable to rely on Ms. Ware's decision" to participate in informal resolution of her complaint. ECF No. 22 at 30. Certainly, an institution's adherence to a complainant's wishes in a Title IX proceeding detracts from a deliberate indifference claim. *Roskin-Frazee*, 2018 WL 6523721 at *8 ("This particular response by Defendant

was not clearly unreasonable because Defendant acted in a manner
that merely respected Plaintiff's wishes."). But the Amended
Complaint makes two central allegations that plausibly support
the notion that UVM was deliberately indifferent to Ware's
assault, despite her nominal selection of informal resolution:
that it pressured Ware into selecting informal resolution via
threat of social sanction, and that it misled Ware of the
consequences available via informal resolution.

First, Plaintiffs allege that Ware was improperly pressured
into informally resolving her complaint. Ware has alleged that
as soon as she told her swim coaches of the assault, she was
told to inform Balogh, the Athletics Department Communications
Director. ECF No. 22 at 11-12. Other high-level officials in the
UVM Athletics Department were then involved, including Schulman
and Rahill. Ware states that after she told Schulman her story
she saw Becker sitting in Schulman's waiting room, which she
takes as evidence that Becker was immediately informed of her
complaint. Plaintiffs also state that in a later news story,
Schulman acknowledged the Athletics Department's involvement in
Title IX proceedings. ECF No. 22 at 23. Dispersion of
information throughout the Athletics Department does not prove
that the Department sought to improperly influence Title IX
proceedings, but drawing all reasonable inferences in favor of

Ware, it could indicate an effort to coordinate a response and conduct institutional damage control.

Several additional facts support the notion that UVM pressured Ware into informal resolution. Plaintiffs state that after Ware initially decided to proceed with a formal investigation, Spence reached out stating that "it had come to her attention that Ware's goal was not necessarily to get Lamb in trouble." ECF No. 22 at 14 (cleaned up). Spence directly explained that the formal process could impact Lamb's "ability to play basketball and/or remain at UVM." Spence apparently then called Ware, leaving a voicemail and encouraging her to reconsider her decision to proceed with a formal investigation. *Id.* Ware later became aware that "her private texts to Balogh regarding her concerns about reporting Lamb were being shared with Spence." ECF No. 22 at 15. Perhaps most concerningly, Plaintiffs allege that while Ware was deciding how to proceed, Balogh told Ware's mother that formal investigation "would result in Lamb's immediate and indefinite suspension" from the basketball team and a ban from the campus gym. This, she stated, would "have a negative impact on the community" and "would be 'unfair' to Lamb's teammates." ECF No. 22 at 17. Ware apparently later learned that pursuit of a formal investigation would not have resulted in an automatic suspension. ECF No. 22 at 20.

These allegations plausibly allege that the UVM Athletics Department coordinated a response to Ware's complaint and pressured her into proceeding with an informal resolution. Plaintiffs have pleaded that Athletics Department officials were in contact with Title IX investigators, and that despite Ware's initial decision to proceed with a formal investigation, Title IX staff contacted her about changing her mind. They have also stated that Athletics Department officials incorrectly advised Ware and her mother that pursuit of a formal process would result in severe and immediate sanction, jeopardizing Ware's standing on campus. Accepted as true, this pressure could be considered "clearly unreasonable." *Davis*, 526 U.S. at 649.

Relatedly, Plaintiffs have plausibly alleged that UVM misled Ware regarding the consequences of her options. The Amended Complaint states that Ware was initially told that the only punishment available via the informal process was "mandatory counselling." ECF No. 22 at 13. She was later told that it could lead to "game suspensions and mandatory counselling," as well as the ability for her to read a victim impact statement. ECF No. 22 at 14. Peter Lim, a consultant attorney and impartial mediator, later told Lamb that informal resolution could not result in any of these consequences. ECF No. 22 at 15.

This belies UVM's assertion in this litigation that "[t]here were practical reasons the informal resolution process has appeal to Ms. Ware," ECF No. 27 at 30 – namely, that the informal process would provide her with a way to "process her experiences with Mr. Lamb" without formal disciplinary consequences or the possibility that Lamb would be found not responsible. ECF No. 22 at 30. While the informal investigation may have come with some disciplinary consequences, Ware has alleged that UVM administrators inflated the magnitude of those consequences to induce her to select informal resolution.

"Disagreement with disciplinary decisions of the school does not lead to 'a right to specific remedial measures.'" *Syracuse Univ.*, 2023 WL 7391653 at *2 (quoting *Zeno*, 702 F.3d at 666). But Ware has alleged more than bare disagreement with UVM's disciplinary decisions. She has stated that UVM improperly pressured her into selecting an investigatory option that would result in the fewest consequences for her assailant and deliberately provided her with false information regarding Title IX procedures. At this stage of the proceedings, this is adequate to state a plausible claim that UVM was deliberately indifferent to Ware's assault.[15]

_____

[15] In post-assault claims, plaintiffs must plausibly allege that the institution's deliberate indifference at a minimum causes "students to undergo harassment or make them liable or

b.  Sydney Partin

Partin's assault can be broken down into two separate incidents: the initial groping and forced kissing at an off-campus location and the later rape in her dorm room. ECF No. 22 at 27.[16] UVM states that it lacked control over the harassment, lacked actual notice of the assault, and that its response was "not clearly unreasonable under the circumstances." ECF No. 27 at 33. Plaintiffs have plausibly alleged that both incidents were within UVM's substantial control.

Plaintiffs have adequately pleaded UVM's substantial control over the harassment at the party. As discussed above, *Davis* instructs that an institution must exercise "substantial control over both the harasser and the context in which the

---

vulnerable to it." *JD1*, 2022 WL 2308902 (citing *Posso*, 518 F. Supp. 3d at 703). Neither party has addressed this issue in briefing on the motion to dismiss, and it is reasonable for the Court to presume, for purposes of the motion, that Ware's physical and emotional distress was caused by UVM's alleged deliberate indifference to Ware's complaint. *See* ECF No. 22 at 23-24 ("As a direct and proximate result of UVM's actions, Ware's grades declined, and she experienced acute emotional and physical distress, panic attacks, depression, insomnia, isolation, anxiety and suicidal ideation.").

[16] The Amended Complaint alleges that Partin was sexually harassed twice during her tenure at UVM, once by an unnamed rideshare driver and later at an off-campus party. ECF No. 22 at 31. Count II of the Amended Complaint, which alleges post-assault deliberate indifference, references Partin's assault at the party but not the assault by the rideshare driver. ECF No. 22 at 70-72. Accordingly, the Court considers Plaintiffs' claim for post-assault deliberate indifference as applied to the off-campus party incident and not the rideshare driver incident.

known harassment occurs" in order to be exposed to liability.
*Davis*, 526 U.S. at 645. And again, the fact that harassment
occurs off-campus does not necessarily mean that the harassment
takes place in a context beyond the school's control. *Cf.*
*Weckhorst*, 241 F. Supp. 3d at 1169-70. Plaintiffs have asserted
that Partin was harassed by a UVM student, Donovan, satisfying
the "harasser" element. And for purposes of the motion to
dismiss, they have also alleged that UVM exercised substantial
control over the context in which the harassment occurred. As
noted in the pre-assault discussion, UVM's derecognition of AEPi
suggests (1) that it knew of AEPi's propensity for bad behavior;
and (2) that it had the authority to discipline AEPi for
inappropriate conduct. The fact that UVM continued to issue
warnings that students avoid AEPi's events even after its
suspension indicates that UVM was aware of an ongoing risk. The
claim may proceed to discovery so that the Court can evaluate a
more developed factual record regarding the extent of UVM's
control over off-campus parties and suspended fraternities.

Plaintiffs have also adequately pleaded that UVM exercised
control over Partin's rape. UVM does not dispute that a dorm
room is a context over which it exercises substantial control.
*See generally* ECF Nos. 27, 44. And while Partin's inability to
specify the identity of her assailant creates issues with the
"control over the harasser" analysis, the Court draws the

"reasonable inference" that the assailant was a member of the student body and was therefore subject to UVM's control. *Chambers*, 282 F.3d at 152.[17]

The next issue is whether UVM had actual notice of Partin's assault on January 13, 2020, when Partin emailed Dean Russell regarding her experience at UVM Medical Center.[18] Partin's email raises a "reasonable inference" of a complaint of sexual harassment. While the email primarily alleges improper conduct by a nurse at UVM medical center, it also explains that Partin was not tested for "date rape" drugs or offered a rape kit, implying Partin's belief that she was raped. ECF No. 27-14 at 2. The email's failure to outline specific details does not defeat this inference. It concludes by requesting that Partin and Russell further discuss how UVM can educate employees "regarding assault." *Id.* For purposes of the motion to dismiss, the email

---

[17] UVM's briefing does not dispute that it had control over this harasser. *See generally* ECF Nos. 27, 44.

[18] The email is not attached to the Amended Complaint but is attached as an exhibit to UVM's motion to dismiss. However, it is directly referenced by and "integral to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a court may consider documents incorporated by reference or documents that are integral to the complaint); ECF No. 22 at 30 (describing the email); ECF No. 38 at 41 (stating that the email provided UVM with actual notice of Partin's assault). Plaintiffs have not disputed the Court's consideration of the email or disputed the "authenticity or accuracy of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). The Court will consider the email without converting this motion into one for summary judgment.

plausibly suggests that Partin was assaulted and that the assault was motivated by sexual violence. This is not to say that Russell "should have known" that Partin was assaulted – an approach to "actual notice" squarely foreclosed by *Davis*.[19] Instead, drawing reasonable inferences in favor of Plaintiffs, Partin's email reveals a complaint of sexual assault. *Cf. Doe v. Fairfax County Sch. Bd.*, 1 F.4th 257, 269–70 (4th Cir. 2021) (Title IX's actual notice standard is objective).

This read of Partin's email is underscored by Plaintiffs' allegation that Russell told Partin that he would "pass the incident on to the Title IX office" and that a Title IX official would reach out within the week. ECF No. 22 at 31. Plaintiffs also state that Moran later acknowledged that she actually received Partin's report, ECF No. 22 at 34, but (mistakenly) believed that Russell would have provided Partin with more information on Title IX procedures. This altogether indicates Russell's awareness that Partin's email fell within the purview of Title IX.

Finally, Plaintiffs have plausibly alleged that UVM's response to Partin's complaint constituted deliberate

---

[19] The Second Circuit has noted that information indicating that the defendant "should have known" of an allegation of assault can create an assumption that the defendant "did know." *Gant*, 195 F.3d at 141 n.6. Because Partin's email directly claims "assault," the Court need not rely on the "should have known" language from *Gant*.

indifference. While delayed investigation does not necessarily
qualify as deliberate indifference, *Tubbs v. Stony Brook Univ.*,
343 F. Supp. 3d 292, 311 (S.D.N.Y. 2018), it can when that delay
is "lengthy and unjustified." *Hayut*, 352 F.3d 733. Plaintiffs
have alleged that Russell "misinformed Partin about her options
to further report the incident, accommodations she was entitled
to under Title IX, and further investigatory actions that UVM
could take." ECF No. 22 at 31. They have also alleged that
despite Russell's statement that he would pass Partin's
complaint along to the Title IX Office, nobody from the Title IX
Office reached out to Partin about her investigatory options.
*Id.* UVM's alleged failure to act on Partin's complaint plausibly
constitutes "clearly unreasonable" conduct – especially given
that the University allegedly failed to provide Partin with her
options under the school's Title IX protocols. *JD1*, 2022 WL
2308902 at *10 (holding that, for purposes of a motion to
dismiss, a college's failure to so much as investigate a report
of sexual assault could constitute deliberate indifference).

Accordingly, UVM's motion to dismiss (ECF No. 27) is denied
as to Plaintiffs' post-assault deliberate indifference claims
(Count II).

### D.   Prohibited Retaliation Under Title IX

Ware and Sommer allege that UVM improperly retaliated
against them when Ware reported her rape to the Title IX Office

and requested a formal investigation, and when Sommer (1) posted on Instagram, (2) contacted Stanton and Moran, and (3) spoke to the UVM Board of Trustees. ECF No. 22 at 72. UVM's motion to dismiss is denied as to Plaintiffs' retaliation claims.

A plaintiff claiming unlawful retaliation under Title IX must first establish a *prima facie* case by showing "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) (*citing Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)). "Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice." *Id.* at 92 (citing *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 113-14 (2d Cir. 2000)). Finally, a plaintiff claiming retaliation is required to prove only that "retaliatory motive play[ed] a part in adverse [] actions," not that it was the sole cause. *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003)).

1.   Kendall Ware

UVM does not dispute that Ware (1) engaged in protected activity by reporting her assault or (2) that UVM knew of this

protected activity. Ware asserts that UVM retaliated against her in three ways: misleading her about available sanctions and otherwise improperly pressuring her into foregoing a formal Title IX investigation, discrediting her to UVM alumni, and publicly praising Lamb despite her claims.

As noted in the post-assault discussion above, Ware has plausibly alleged that UVM improperly pressured her into selecting informal resolution of her complaint. UVM responds that "retaliation and sex discrimination are distinct legal concepts," and that only events distinct from the formal Title IX process should be considered when evaluating a Title IX retaliation claim. ECF No. 44 at 30. But Ware has plausibly alleged that UVM officials pressured her into foregoing formal investigation as a direct response to the possibility that her complaint might result in a public formal investigation into Lamb's conduct. This case is unlike several of the cases cited by UVM, in which procedural errors in the Title IX process failed to constitute retaliation because those errors were not motivated by the making of complaint. *See S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 805 (W.D. Pa. 2016) (finding no plausible retaliation due to lack of causation when retaliation claim is based upon failure to resolve campus conditions that gave rise to the complaint); *Doe v. Univ. of Kentucky*, 5:15-CV-296, 2022 WL 9408672, at *5 (E.D. Ky. Oct. 14, 2022).

Plaintiffs' additional claims of retaliatory action
contribute to a plausible inference of retaliation. First, they
have alleged that Becker and other UVM administrators knew of
and contributed to an online "smear campaign" denigrating Ware.
ECF No. 22 at 23, 62. Plaintiffs' claims on this point are
sufficient to survive a motion to dismiss. They have stated with
specificity which UVM employees contributed to the statements
(Becker and assistant coach Kyle Cieplicki, ECF No. 22 at 62),
that nearly 20 years of alumni received this information, and
that multiple sources corroborated the presence of the rumors.
ECF No. 22 at 23. UVM responds that the rumors are not "school-
related." ECF No. 38 at 35. While allegedly defamatory
rumormongering is not classically school-related retaliation
like grade deflation or suspension, it is plausible that
criticism in the UVM Athletics community would "dissuade a
reasonable [student] from making or supporting a charge of
discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801
F.3d 72, 90 (2d Cir. 2015).

Finally, Plaintiffs claim that UVM's public praise for Lamb
constituted retaliatory action. Ware has not alleged sufficient
causation tying these public statements to her protected
activity for the public statements to constitute retaliatory
action. Plaintiffs have not stated whether Lamb was the subject
of positive media coverage before Ware's complaint – and in

fact, the Amended Complaint notes that prior to Ware's assault, Lamb "was a bona fide celebrity both on and off campus." ECF No. 22 at 10. This makes it seem unlikely that, even drawing all reasonable inferences in favor of Plaintiffs, UVM's positive press coverage of Lamb was made as retaliation against Ware's protected activity. But because Plaintiffs have plausibly alleged that UVM engaged in other retaliatory actions, its motion to dismiss Count III is denied.

    2.   Haley Sommer

    Plaintiffs claim that Sommer was the subject of prohibited retaliation because after publicizing her complaint of sexual assault, two individuals – Sommer's former mentors – failed to provide Sommer with "references" and "professional recommendations." ECF No. 22 at 73. UVM does not dispute that Plaintiffs have shown that (1) Sommer engaged in protected activity and (2) UVM had knowledge of that protected activity. *Papelino*, 633 F.3d at 91. It argues that because Sommer voluntarily withdrew from her graduate program, she "was no longer participating in any education program or activity to which Title IX applies." ECF No. 27 at 36. The Court disagrees: a recipient of federal funding can take "retaliatory" action after a complainant has withdrawn from the institution.

    The Second Circuit has instructed that adverse retaliation is actionable when it is "school-related." *Papelino*, 633 F.3d at

91. Actions can be school-related when a student is no longer formally enrolled. Educational benefits extend beyond mere classroom education and include mentorship and continued support. At least one other court in this Circuit has found plausible retaliation based upon an institution's alleged refusal to provide ongoing support to alumni that allege sexual harassment. *See Novio v. N.Y. Acad. Of Art*, 286 F. Supp. 3d 566, 574 (S.D.N.Y. 2017) ("Faculty and staff at the school continued to shun the Plaintiff and deprive her of the benefits she had paid for and was promised as a student and alumna of the school."). And the Second Circuit itself has allowed retaliation claims to proceed based upon negative (or nonexistent) references post-enrollment. *Irrera v. Humpherys*, 859 F.3d 196, 198 (2d Cir. 2017).

Temporal separation from enrollment at the institution does not allow for carte blanche retaliation against protected activity. If this were the case, institutions could wait for complainants to graduate before taking adverse action as a shield to liability. This "might well [] dissuade[] a reasonable person from making or supporting a charge of or complaint about discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (cleaned up); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180 (2005).

Sommer has alleged that two UVM individuals had knowledge of her assault and her subsequent public discussion of the assault. She has also alleged that those people failed to provide her with references and professional support upon her request. ECF No. 22 at 73. Sommer has stated that she had close relationships with both people prior to her public discussion, allowing for an inference of causation. ECF No. 22 at 50. This is sufficient to satisfy the "exceedingly low burden of demonstrating a plausible minimal inference" of retaliation based upon the alleged protected activity. *Novio*, 286 F. Supp. 3d at 578.

### E.   Equal Protection

Plaintiffs voluntarily withdrew Count IV, which alleges discrimination on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment. *See* ECF No. 22 at 74-74 (Count IV); ECF No. 38 at 50 n.10 (withdrawing Count IV). Plaintiffs' Equal Protection claim is dismissed without prejudice.

### F.   Procedural Due Process

Ware and Partin assert that they were deprived of their "clearly established property right[s] in accessing the full educational opportunities and benefits offered by UVM" when UVM mishandled their complaints. ECF No. 22 at 76. "A procedural due process claim is composed of two elements: (1) the existence of

a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022).

Resolution of procedural due process claims first requires definition of the property interest involved. *Id.* at 124 (citing *Taravella v. Town of Wolcott*, 599 F.2d 129, 133 (2d Cir. 2010)). "For a plaintiff to have a protected property interest, she 'must have more than an abstract need or desire for it. She must have more than a unilateral expectation of it. She must instead, have a legitimate claim of entitlement to it.'" *Id.* at 125 (cleaned up) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Such property interests are typically created by state statutes or rules entitling citizens to certain benefits. *Radwan*, 55 F.4th at 124-25 (quoting *Goss v. Lopez*, 419 U.S. 565, 572-73 (1975)).

The parties dispute whether higher education is a constitutionally protected property right. UVM concedes that a public university student may have "some constitutionally protected interest in avoiding suspension or dismissal," which entirely deprive students of their education by removing them from educational institutions. ECF No. 22 at 42. The Court agrees. "The Vermont Constitution and the Vermont Education Law clearly establish the plaintiffs' legitimate claim of entitlement to a public education." *Ouimette v. Babbie*, 405 F.

Supp. 525, 529 (D. Vt. 1975) (citing Constitution of Vermont, Ch. II Sec. 68; 16 V.S.A. § 1073); *see also Handberry v. Thompson*, 436 F.3d 52, 71 (2d Cir.), opinion amended on reh'g, 446 F.3d 335 (2d Cir. 2006) (holding that New York constitutional and statutory law provides a "property interest in education protected by the Fourteenth Amendment"). While *Ouimette* dealt with primary education, this court has explained that plaintiffs have property interests in university credits and degrees. *Merrow v. Goldberg*, 672 F. Supp. 766, 771 (D. Vt. 1987).

Even if UVM is correct and the constitutionally protected right to education is violated only in cases involving "total deprivations" of that right – typically via suspension or expulsion – Plaintiffs have plausibly alleged such deprivations. Partin alleges that "[a]s a result of the mishandling of [her] Title IX complaint, [she] was forced to withdraw from school for a full academic year . . . and sacrificed a minor in Gender, Sexuality, and Women's Studies." ECF No. 22 at 76. This claim ties Partin's inability to attend school to UVM's actions, situating her comparably to suspended or expelled students.

While Ware does not state that she was forced to withdraw from UVM, she alleges that as a result of the mishandling of her complaint, she "could not renew a swimming scholarship." *Id.* The Second Circuit recently ruled that an athletic scholarship can

be a constitutionally protected property right. *Radwan*, 55 F.4th at 125-28. In *Radwan*, the court held that the scholarship at issue was protected by the Due Process Clause "because it was for a fixed period and terminable only for cause, and because Radwan reasonably expected to retain the scholarship's benefits for that set period." *Radwan*, 55 F.4th at 125. Ware has plausibly alleged facts that meet those criteria. She has stated that UVM's actions caused her "difficulty in swimming" and therefore prevented her from renewing a scholarship for a definite term (her master's degree). While the *Radwan* court was clear that "subjective expectancy of renewal is not protected by due process,"[20] *id.* at 126-27 (citing *Perry v. Sindermann*, 408 U.S. 593, 603 (1972)), Ware has alleged more than a subjective expectation. She has plausibly stated that UVM's actions prevented her from exercising a right to renewal. An option to exercise a contractual right is a protected property right when it cannot be terminated except for cause. *Helvering v. San Joaquin Fruit & Investment Co.*, 297 U.S. 496, 498 (1936) ("The option itself was property, and doubtless was valuable."); *Franklin v. Austin Inner City Redevelopment-Phase I, Ltd.*, 14-

---

[20] The Second Circuit overtly declined to resolve "whether the prospective renewal of an athletic scholarship would rise to the level of a protected property interest." *Radwan*, 55 F.4th at 128.

CV-176, 2015 WL 1534534, at *11 (W.D. Tex. Apr. 6, 2015).[21] Ware
has also pleaded that she was relying upon this scholarship to
"partially fund her masters' (sic) degree," ECF No. 22 at 23,
satisfying *Radwan*'s "reasonable expectation of benefits" prong.

UVM asserts in a footnote that its administrators should be
entitled to qualified immunity because the asserted
constitutional right to education is not "clearly established."
ECF No. 27 at 43. Neither party has briefed the qualified
immunity issue with any level of detail. Consequently, UVM's
qualified immunity defense is denied pending further briefing.

The second prong of the due process analysis is whether the
constitutionally protected property interest was deprived
without due process. *Radwan,* 55 F.4th at 123. Due process
requires "the opportunity to be heard at a meaningful time and
in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333
(1976). When the deprivation is conducted via an "established
state procedure," a court evaluates the process due by balancing
three factors: (1) "the private interest that will be affected
by the official action"; (2) "the risk of an erroneous
deprivation of such interest through the procedures used, and
the probable value, if any, of additional or substitute
procedural safeguards"; and (3) "the Government's interest,

---

[21] The Amended Complaint does not make clear whether UVM had any
discretion over the extension of Ware's scholarship.

including the function involved and the fiscal and
administrative burdens that the additional or substitute
procedural requirement would entail." *Drew v. City of N.Y.*, 21-
1194, 2023 WL 3083188 at *1 (2d Cir. 2023) (quoting *Mathews*, 424
U.S. at 335).

UVM does not contest the first prong of the *Mathews*
balancing test, and the Court concludes that Ware has pleaded a
significant interest in effective resolution of her Title IX
complaint (enabling her to maintain her swimming scholarship).
UVM argues that Ware and Partin "both received an adequate
opportunity to be heard" because Ware voluntarily participated
in informal resolution and Partin dialogued with Russell before
deciding not to pursue a Title IX investigation. ECF No. 27 at
43. But reasonable inferences in Plaintiffs' favor allow for the
plausible conclusion that neither plaintiff had an adequate
opportunity to be heard. As discussed above, Ware has stated
that UVM improperly pressured her into foregoing formal
investigation and signing an informal resolution. The risk of an
erroneous deprivation resulting from a Title IX proceeding
influenced by the Athletics Department is not insignificant,
especially considering Plaintiffs' allegation that the
Department especially prioritized Lamb. *See* ECF No. 22 at 18.
Plaintiffs also state that UVM's provision of confusing and
misleading information regarding available sanctions under

informal resolution reduced the "meaningfulness" of Ware's

hearing, a conclusion that the Court finds plausible.[22]

Similarly, Partin has plausibly alleged that UVM's Title IX

complaint intake protocols were procedurally inadequate under

the *Mathews* framework. The Amended Complaint states that Russell

and Moran lost track of her complaint and did not adequately

communicate who was responsible for providing Partin with her

notice under Title IX. ECF No. 22 at 34. The risk of an

erroneous deprivation of protected interests is high when

administrators are uncertain of who will provide required notice

under Title IX. The "probable value of an additional safeguard,"

*Drew*, 2023 WL 3083188 at *1, is also high; UVM could clarify how

administrators are to coordinate response to complaints,

allowing for more effective and efficient Title IX

investigations. It is possible that UVM's guidelines on this

---

[22] The cases that Plaintiffs cite on the question of
"meaningfulness" of a hearing are not directly on point. All
three stand for the principle that notice to an affected
individual must convey sufficient information for that
individual to understand the charges and allow for a response.
*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314
(1950); *Soberal-Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir.
1983); *Scheiner v. New York City Health & Hosps.*, 152 F. Supp.
2d 487, 500 (S.D.N.Y. 2001). The information provided to an
aggrieved claimant by the institution providing process is a
relevant consideration in evaluating the adequacy of the
process, and overtly false or misleading statements could
violate the Due Process Clause. This conclusion is also relevant
to the question of whether Partin received adequate process,
because she too claims that UVM provided her with inadequate
information regarding her options under Title IX.

question are adequate – but resolution of this question will require additional factual development.

UVM does not defend the adequacy of the procedures that it used with either Ware or Partin in its reply brief. See ECF No. 44 at 34-36. Consequently, the Court cannot evaluate the "government's interest" in the existing procedure, including the function involved and additional logistical or fiscal burdens of further safeguards.

UVM's final argument is that Plaintiffs' due process claims are simply Title IX claims under a different label. ECF No. 27 at 43-44. It argues that because Title IX does not allow suits against private individuals, Plaintiffs may not use 18 U.S.C. § 1983 to access new defendants. *See id.* (citing *Wilkerson v. Univ. of N. Texas*, 223 F. Supp. 3d 592, 608 (E.D. Tex. 2016); *Doe #1 v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 21-564-SDD, 2022 WL 16701930, at *23 (M.D. La. Nov. 3, 2022)). The Supreme Court foreclosed this argument in *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009), where it held that Title IX "was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights." *Id.* at 258. The cases cited by UVM emphasize that plaintiffs may not sue under § 1983 for *violations of Title IX.* Doing so would augment Title IX with an

additional cause of action that skirts sovereign immunity. But here, Plaintiffs assert that their due process rights – not their Title IX rights – were violated by UVM's actions, and that they should be able to recover damages under § 1983 for those violations. In other words, Plaintiffs do not ask the Court to condition due process liability on a finding of Title IX liability. The factual overlap between the two claims is irrelevant.

Plaintiffs have plausibly alleged violation of their due process rights. UVM's motion to dismiss (ECF No. 27) is denied as to Plaintiffs' due process claims. ECF No. 22 at 75 (Count V).

### G.  **First Amendment**

**1.**  Speech Restriction

It is axiomatic that neither "teachers [n]or students shed their constitutional rights to freedom of speech of expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). This is true in university contexts as well as primary education settings, even if the contours of the speech rights may be different. *Cf. Healy v. James*, 408 U.S. 169, 171 (1972). In Count VI, Plaintiffs assert that UVM violated Plaintiff Harting-Smith's First Amendment rights by restricting protected speech. ECF No. 22 at 77-79.

Specifically, they assert that the October NCO was a content-based restriction on speech.

The parties dispute whether the NCO is a content-based speech restriction. *Compare* ECF No. 27 at 44-45 *with* ECF No. 38 at 57. The distinction is important because content-based restrictions on speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Content-neutral restrictions that impose incidental burdens on speech are constitutional if they (1) advance important governmental interests unrelated to the suppression of free speech and (2) do not burden substantially more speech than necessary to further those interests. *Clementine Company, LLC v. Adams*, 74 F.4th 77, 88 (2d Cir. 2023) (quoting *Turner Broadcasting Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997)).

Regulation of speech is content-based "if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Even an ostensibly content-neutral law can be deemed content-based if "there is evidence that an impermissible purpose or justification" underpins the restriction. *Id.* at 164. "The principal inquiry in determining whether a regulation is content-based or content-neutral 'is whether the government has adopted a regulation of

93

speech because of agreement or disagreement with the message it conveys.'" *Clementine Co., LLC v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) (quoting *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 155 (2d Cir. 2013)).

The seminal case defining the standard of review for content-based speech restrictions is *Reed v. Town of Gilbert, Arizona. Reed* struck down as impermissibly content-based a city regulation that "singled out a specific subject matter for differential treatment." 576 U.S. at 169. The Court explained that "a law banning the use of sound trucks for political speech — and only political speech — would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* The regulation singled out a category of speech for censorship based upon its content.

UVM's NCO does not discriminate "based on the topic discussed or the idea or message expressed." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022) (citing *Reed*, 576 U.S. at 171). The NCO simply bars Harting-Smith and Doe from contacting one another, regardless of whether they wish to discuss the Title IX process, politics, or the weather. They are not at all precluded from discussing these subjects so long as the discussion is not with one another. Unlike the ordinance in *Reed*, UVM's NCO is content-neutral. It

imposes some limits on the contexts in which Harting-Smith may speak, but does not restrict what she may speak about.

The fact that the NCO restricts *individual* speech places it in a somewhat unconventional First Amendment posture. Most regulations constrain speech generally, like the ordinance in *Reed* which regulated the content of municipal signs without reference to who posted the signs. This NCO directly singles out one individual's speech for regulation, raising special First Amendment questions due to the concern that speaker-based distinctions will function as a "subtle means of exercising a content preference." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 645 (1994). Here, though, UVM's "overriding objective in enacting [the NCO] was not to" restrict speech on a particular subject matter or viewpoint. *Id.* at 646. It was to prevent escalation of a tense situation involving a serious allegation of sexual misconduct. The fact that the NCO narrowly restricted Harting-Smith's speech does not undermine the conclusion that the regulation was content-neutral. *Cf. Clementine Co.*, 74 F.4th at 87–88 ("It makes no difference that Key to NYC may have incidentally affected some speakers more than others because there is no allegation or plausible argument that Key to NYC's manifest purpose was to regulate speech because of the message it conveys.").

Two comparable cases merit discussion. The first is *Perlot v. Green*, 609 F. Supp. 3d 1106, 1111 (D. Idaho 2022). In that case, Christian students and professors at the University of Idaho received no-contact orders against Jane Doe after she articulated concern with their belief against same-sex marriage. *Id.* at 1114. The court concluded that the no-contact orders were issued "because Plaintiffs discussed their sincerely held religious beliefs about marriage" and noted that the no-contact order only restricted the Christian group, contributing to a finding that the university saw "only one viewpoint [as] worthy of intervention and discipline." *Id.* Importantly, the court noted that the case was "not a Title IX harassment case," and noted that the university likely[23] issued the NCO based solely on disagreement with speech content, not in response to harassing conduct. *Id.* at 1121.

Second, Plaintiffs rely on *Hancock v. Idaho Falls Sch. Dist. No. 91*, cv-04-537, 2006 WL 1207629 (D. Idaho 2006). In that case, a teacher was issued an NCO preventing him from "contacting the school, students, parents, or other school personnel" after he allegedly threatened a school employee and wrote an inappropriate note to a female student. *Id.* at *2. The court found that the NCO was an impermissible prior restraint

---

[23] *Perlot* involved a preliminary determination of likelihood of success on the merits for purposes of a preliminary injunction.

because the "all-encompassing order necessarily prohibits speech on matters of public concern." *Id.* The court concluded that the restricted audience had an interest in engaging in speech with the teacher, and that the district had not justified the restriction by showing a deleterious impact on the school district's operation from continued speech. *Id.*

Harting-Smith's case is unlike *Perlot* and *Hancock*. UVM's NCO was not issued in response to a clearly protected conversation regarding religion, as was the case in *Perlot*. That case made very clear that it did not involve Title IX harassment, and noted that when Title IX is implicated, NCOs are likely justified. *Perlot*, 609 F. Supp. 3d at 1125. Unlike *Hancock*, this NCO is limited to the two parties involved in a serious incident of sexual assault. It does not restrict Harting-Smith's speech on matters of public concern (including Title IX) when directed at anyone other than Doe. As a result, the court need not weigh the speech rights of a large group of people in discussing matters of public concern against the school's interest in continued effective operations.

UVM's NCO was content-neutral. Content-neutral restrictions that impose incidental burdens on speech may be sustained if they are "narrowly tailored to serve a significant governmental interest," and if they leave open "ample alternative channels for communication of the information." *Lederman v. New York City*

*Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013). The Second Circuit has explained that the government interest at play must be unrelated to free speech, and that a regulation's burden on speech is justified if the government interest "would be achieved less effectively absent the regulation." *Clementine Co.*, 74 F.4th at 88 (quoting *Turner Broad. Sys., Inc.*, 520 U.S. 180 at 189; *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 67 (2006)).

UVM's NCO clears this threshold. UVM had a legitimate interest in issuing the NCO: de-escalating a tense situation in the aftermath of an incident of sexual assault. The Court recognizes that UVM's interest in issuing an NCO against Harting-Smith (the alleged victim) is less compelling than its interest in issuing an NCO against Doe (the alleged assailant). Nonetheless, UVM's asserted interest in providing "procedural protection for both parties" is an important interest unrelated to free speech, and preventing further contact between the two parties supports that interest. Indeed, federal regulations authorize the issuance of "mutual restrictions on contact between the parties" to support Title IX proceedings. 34 C.F.R. § 106.30(a). Plaintiffs protest that the NCO was unduly punitive and disciplinary, ECF No. 38 at 58, but the NCO itself did not impose any consequences upon Harting-Smith – it only notified her that violation of the Order could result in future

disciplinary action. The Order served to support UVM's interest in preventing further conflict stemming from interaction between the parties. And finally, it clearly leaves open alternate channels for communication: the NCO specifies that Harting-Smith and Doe "may not intentionally contact each other" or "initiate contact with each other through a third party," which does not regulate any other communication. The NCO did not affect the parties' rights to discuss any aspect of the Title IX process or the underlying events with other people. ECF No. 27 at 45. Even drawing all plausible inferences in Plaintiffs' favor, UVM's NCO survives First Amendment scrutiny.

**2.**   Prior Restraint

A prior restraint is a government action that restricts speech on the basis of "the speech's content and in advance of actual expression." *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005). Courts have held that "[a] regulation may constitute a prior restraint even if it is not content-based." *Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999). Prior restraints are considered "the most serious and the least tolerable infringement" on free speech. *Id.* (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)).

UVM's NCO is not a constitutionally invalid prior restraint. As the Seventh Circuit noted in *MacDonald v. City of Chicago*, 243 F.3d 1021, 1030 (7th Cir. 2001), licensing schemes

that allow for restriction of speech with "unfettered discretion" are considered unconstitutional prior restraints, while the presence of "neutral criteria" in the licensing decision allows for judicial review of whether the restriction is impermissibly content-based. Here, there are "content-neutral criteria" that determine whether Harting-Smith's speech is allowed or disallowed: whether she initiates contact with Doe.

This case is, in some ways, similar to *Hill v. Colorado*, 530 U.S. 703 (2000), in which the Supreme Court evaluated a statute making it unlawful for a person to approach within eight feet of another person at a healthcare facility (without that person's consent) "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." *Id.* at 707. The Court held that the law did not constitute an improper prior restraint. It explained that concerns about prior restraints "relate to restrictions imposed by official censorship," *id.* at 734, and emphasized that the regulations at issue only applied if the pedestrian did not consent to the approach. *Id.* "Private citizens have always retained the power to decide for themselves what they wish to read, and within limits, what oral messages they want to consider." *Id.* at 734. Because the statute empowered citizens in healthcare facilities to prevent speakers from communicating unwanted messages in close proximity – and

did not impact "any other activity at any other location or
relating to any other person" – the law did not constitute an
unlawful prior restraint. *Id.* at 735.

Similarly here, the NCO only applies because Doe requested
not to be contacted – just like Harting-Smith requested not to
be contacted. This reveals that the foundational concern
surrounding prior restraints – official censorship – applies
with less force than if UVM had acted unilaterally to prevent
Harting-Smith from speaking. Also like the statute in *Hill*, the
NCO has a limited scope. It only prohibits communications
directed at Doe, and does not affect "any other activity at any
other location or relating to any other person." *Hill*, 530 U.S.
at 735.

While the NCO does not constitute a prior restraint, "that
does not end the question." *MacDonald*, 243 F.3d at 1032. Time,
place, and manner restrictions must still pass constitutional
muster. But for the reasons outlined above, UVM's NCO survives
intermediate scrutiny.

**3.**   First Amendment Retaliation

Plaintiffs also claim that UVM's issuance of the NCO
against Harting-Smith was impermissible retaliation against
protected speech. ECF No. 22 at 78-79 (Count VII). To plead a
First Amendment retaliation claim, a plaintiff must show "(1)
that the speech or conduct at issue was protected, (2) that the

defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *de Leon-Garritt v. State Univ. of New York at Buffalo*, 785 F. App'x 896, 899 (2d Cir. 2019) (quoting *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 106-07 (2d Cir. 2001)). An action is adverse, for school purposes, if it would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Cox v. Warwick Valley Central Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011) (citations omitted).

Drawing all plausible inferences in favor of Plaintiffs allows for the initial conclusion that Harting-Smith's speech was protected. But UVM contests whether the action was sufficiently adverse to deter a similarly situated individual of ordinary firmness from exercising constitutional rights. *Id.* Even drawing all plausible inferences in favor of Harting-Smith, the Court concludes that it was not.

Plaintiffs have stated that Harting-Smith was "shocked and terrified to receive" the NCO and did not understand why she was ordered to stay away from Doe. ECF No. 22 at 40. She also states that she lived in fear of "triggering disciplinary consequences" if she "happened to run into her abuser." ECF No. 22 at 41. Harting-Smith's central allegation is that UVM administrators did not adequately explain the process for issuing mutual NCOs

and did not explain why this particular NCO was ordered. ECF No. 22 at 40-42.

However, the NCO explained that Harting-Smith could contact Moran for further information about the Title IX process. Harting-Smith did, and Moran explained why the NCO was issued and how UVM typically handles NCO requests. ECF No. 22 at 40. The NCO also included an express disclaimer noting that it was not disciplinary (while explaining that violations may lead to further disciplinary action). ECF No. 27-15 at 2. Moran's availability to explain these procedures, as well as the text of the NCO, support the conclusion that a similarly situated individual would not have had their speech chilled by the NCO.[24]

Additionally, Plaintiffs have not plausibly alleged that the NCO was issued as retaliation against Harting-Smith's protected speech. Harting-Smith essentially claims that she was caught off-guard by the issuance of the NCO because she was unaware of UVM's NCO procedures. This contributes to Plaintiffs' plausible allegation (outlined above) that UVM inadequately

---

[24] While the question of whether adverse action is sufficiently adverse to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" is a "heavily fact-specific, contextual determination," *Kiernan v. Town of Southampton*, 734 F. App'x 37, 41 (2d Cir. 2018) (quoting *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006)), the text of the NCO along with the information provided by Moran makes clear that further factual development would not aid in the resolution of this question.

disseminated information regarding its Title IX procedures, but
it does not support the conclusion that the NCO was issued in
retaliation against Harting-Smith's protected speech. By the
Amended Complaint's own admission, UVM issued the NCO in
response to Doe's request, not in response to Harting-Smith's
complaint. ECF No. 22 at 40 ("Stanton also told Harting-Smith
that the October NCO had been issued at Doe's request.").[25] UVM's
motion to dismiss is granted as to Plaintiffs' First Amendment
retaliation claim.

### H.   Vermont Public Accommodations Act[26]

Count VIII alleges that UVM violated the Vermont Public
Accommodations Act ("VPAA"), 9 V.S.A. § 4502. The VPAA regulates
harassment in schools, including colleges and universities. 9
V.S.A. § 4501(1); 16 V.S.A. § 570f. The statute requires
institutions that receive "actual notice of alleged conduct that
may constitute harassment" to "promptly investigate to determine

---

[25] In the alternative to its merits arguments against Plaintiffs'
First Amendment retaliation claims, UVM asserts a qualified
immunity defense. ECF No. 27 at 50. Because Plaintiffs have not
stated a claim for retaliation, the Court need not reach the
qualified immunity issue.

[26] UVM urges the Court to decline to exercise supplemental
jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §
1367(a). ECF No. 27 at 52-55. Because several of Plaintiffs'
federal-law claims survive UVM's motion to dismiss, the Court
concludes that Plaintiffs' remaining state law claims "are so
related to the claims in the action within original jurisdiction
that they form part of the same case or controversy." 28 U.S.C.
§ 1367(a).

whether harassment occurred." 16 V.S.A. § 570f(a)(1). After receiving such notice, it must provide a copy of its harassment policy and investigation procedure to both the alleged victim and the alleged perpetrator. *Id.* If the school finds that harassment did occur, it must take "prompt and appropriate remedial action reasonably calculated to stop the harassment." 16 V.S.A. § 570f(a)(2).

Vermont law authorizes private lawsuits against colleges for "unwelcome conduct based on the student's . . . membership in" a protected class when that conduct is "so severe that when viewed from an objective standard of a similarly situated reasonable person, it substantially and adversely affected the targeted student's equal access to educational opportunities or benefits provided by the educational institution." 16 V.S.A. § 570f(c)(1-2). The VPAA also requires plaintiffs to show that they have exhausted "administrative remedies available . . . under the policy adopted by the educational institution." 16 V.S.A. § 570f(b). The statute also provides that the exhaustion requirement may be waived in certain circumstances.

UVM does not dispute that Ware, Partin, or Sommer were subjected to "unwelcome conduct" that, from the perspective of a similarly situated person, substantially and adversely affected their access to educational opportunities. *See* 16 V.S.A. § 570f(c)(1-2); ECF No. 27 at 55-62; *Blondin v. Milton Town Sch.*

*Dist.*, 2021 VT 2, ¶ 49 (2021) (explaining that the Vermont legislature amended the VPAA in 2011 to clarify that a single instance of conduct can qualify as harassment under the statute); *Soper*, 195 F.3d 845, 854-55 (6th Cir. 1999) (holding that rape specifically "qualifies as being severe, pervasive, and objectively offensive sexual harassment [under Title IX].").

Instead, UVM disputes that any of the three plaintiffs adequately exhausted their administrative remedies prior to filing this lawsuit.

### 1. Kendall Ware

Kendall Ware has plausibly stated a claim under the VPAA. UVM argues that it "fulfilled its statutory obligations" because it promptly initiated a resolution process upon receiving Ware's report. ECF No. 27 at 57. It then states that it never concluded that the alleged harassment actually occurred, and therefore did not incur an obligation to "take prompt and appropriate remedial action reasonably calculated to stop the harassment." *Id.*; 16 V.S.A. § 570f(a)(2).

Ware's initial submission to the Title IX Office clearly constitutes "actual notice" to UVM of "alleged conduct that may constitute harassment." ECF No. 22 at 11; 16 V.S.A. § 570f(a). In *Allen v. Univ. of Vermont*, 2009 VT 33, ¶ 17 (2009), the Vermont Supreme Court concluded that a complainant failed to provide UVM with actual notice of conduct that may constitute

harassment because she filed a quasi-criminal rape complaint with a UVM office other than the Title IX Office, while UVM's publicized policy designated the Title IX Office as responsible for complaints of harassment. *Id.* Conversely, here, Ware filed her complaint directly with the Title IX Office, and UVM does not dispute that it was aware that Ware was complaining of harassment. The ensuing question is whether UVM responded to Ware's complaint to "investigate whether harassment occurred," as is required under 16 V.S.A. § 570f(a)(1).

Ware has plausibly alleged that UVM did not. The Amended Complaint states that rather than conduct an honest investigation into the truth of Ware's complaint, UVM (1) pressured her into foregoing a formal investigation, ECF No. 22 at 14; (2) misled her as to what sanctions might be available under the informal resolution process, ECF No. 22 at 18; and (3) deliberately avoided making any factual findings or reaching any conclusions as to whether Lamb's conduct constituted harassment. ECF No. 22 at 18-20. For purposes of the VPAA analysis, this last allegation is the most important: Ware alleges that UVM avoided conducting a formal investigation into Lamb's conduct or making factual findings as to the presence of harassment – a statutory obligation under the VPAA – because it wanted to protect Lamb and the Athletics Department. Taken as true, Plaintiffs have plausibly alleged that UVM failed to properly

"investigate whether harassment occurred." 16 V.S.A. §
570f(a)(1).

UVM next argues that it nonetheless satisfied its statutory
obligation to "take prompt and appropriate remedial action
reasonably calculated to stop the harassment" because the
Amended Complaint does not allege further harassment after Ware
and Lamb underwent informal resolution. ECF No. 27 at 57.[27] The
Court need not evaluate this argument because it finds that
Plaintiffs have plausibly alleged that UVM violated the VPAA's
requirements by failing to investigate Ware's complaint
regardless of whether Lamb continued to harass Ware.

Finally, UVM argues in its reply brief that the institution
must take an act or omission in order to incur liability. ECF
No. 44 at 46. Ware has alleged both an action (pressure to

---

[27] The parties dispute whether plaintiffs asserting claims under
the VPAA must plead that defendants did not take "prompt and
appropriate remedial action" upon receiving a complaint in order
to state a claim. 16 V.S.A. § 570f(a)(2). *Compare* ECF No. 38 at
69 (arguing that the statute does not impose such a pleading
requirement) *with* ECF No. 44 at 45 (stating that a plaintiff
cannot state a claim under the VPAA unless they plead that the
institution failed to take remedial action, and that UVM met its
obligations under the provision). A commonsense read of the
statute makes clear that 16 V.S.A. § 570f(a)(1) requires
institutions to investigate whether harassment occurred (via
administrative procedures) and if it concludes that it did, it
must take prompt and appropriate remedial action under §
570f(a)(2). In other words, the statute requires that plaintiffs
first give institutions a chance to (1) investigate and (2)
respond pursuant to their own policies before filing lawsuits.
Here, Ware alleges that UVM did not adequately investigate, so
her failure to challenge the subsequent response is not fatal.

forego formal investigation) and an omission (deliberate failure to come to any conclusion regarding whether Ware was harassed).[28]

2.   Sydney Partin

Partin has also plausibly alleged a violation of the VPAA. There are two issues raised in the motion to dismiss: whether UVM had actual notice of the allegedly harassing conduct and whether Partin's claim survives the statute's exhaustion requirements.

Plaintiffs have submitted sufficient facts to allow for the inference that UVM had "actual notice of alleged conduct that may constitute harassment." 16 V.S.A. § 570f(a)(1). Again, in *Allen*, the Vermont Supreme Court explained that "actual notice" is most easily satisfied when a plaintiff directly makes a complaint of "harassment" to the University entity responsible for investigating incidents of sexual harassment. *Allen*, 2009 VT 33, ¶ 15, 18. It noted that because the complainant in that case alleged "rape," the University reasonably "perceived the complaint to be one of rape rather than harassment." *Id.* It also noted that the plaintiff brought her claim to the Victim's

---

[28] This raises the question of whether informal resolution – with no admission of fault or finding of fact – could ever satisfy the VPAA. The Court need not address this question at this stage of the litigation, because Plaintiffs have alleged that UVM pressured Ware into involuntarily undergoing informal resolution and foregoing a factual finding. That improper pressure is the focus of Plaintiffs' VPAA claim, and is the reason why the VPAA claim may proceed beyond the motion to dismiss.

Advocate and the Center for Student Ethics and Standards rather than the Title IX Office (publicly charged with investigating claims of harassment). *Id.* at ¶ 15-18. The *Allen* court concluded that the VPAA's statutory exhaustion requirement focuses on actual investigation in cases of alleged harassment in order to avoid "subjective examination of what school officials knew, or should have known." *Id.* at ¶ 15.

Plaintiffs' claims satisfy *Allen* and plausibly state that UVM had sufficient notice of allegedly harassing conduct to trigger its obligation to conduct an investigation. First, as explained *supra*, Partin's email to Russell raises a "reasonable inference" of a complaint of sexual harassment. Further, Russell told Partin "that he was a mandatory reporter and would pass the incident on to the Title IX Office." ECF No. 22 at 31; *see also* ECF No. 22 at 34 ("Moran admitted that she had received Partin's report from Russell in January 2020.").[29] Russell's response reveals actual knowledge that Partin's email constituted a report of sexual harassment. And Russell's response to that report – passing it along to the Title IX Office – is exactly

---

[29] The Amended Complaint also notes that Moran "mistakenly believed that Partin only wanted to know how to file a complaint against a doctor at UVM Medical Center." ECF No. 22 at 34. This may be true – and may refute Partin's claim of actual notice – but drawing all reasonable inferences in favor of Plaintiffs, the Court assumes that it instead indicates that Moran actually knew of Partin's complaint of harassment which should have triggered an investigation.

what the *Allen* court specified should trigger administrative proceedings under the VPAA. *Allen*, 2009 VT 33, ¶ 18 (explaining that notice to "the officials statutorily designated by UVM to handle sexual harassment claims" is required for institutional remedies to be considered exhausted).

As with Ware, the next question is whether after receiving actual notice of the alleged conduct UVM "promptly investigate[d] to determine whether harassment occurred." 16 V.S.A. § 570f(a)(1). Plaintiffs have plausibly alleged that it did not. After Partin contacted Russell – and Russell passed that report on to Moran in the Title IX Office – UVM did not follow up with Title IX information for more than fifteen months. ECF No. 22 at 33. This delay is sufficient for the Court to conclude (for purposes of the motion to dismiss) that UVM failed to adequately "investigate whether harassment occurred" as it was obliged to do under the statute. *See* 16 V.S.A. § 570a(5) (requiring Vermont schools to adopt harassment response policies including issuance of a final decision within 30 days).

UVM notes that Partin declined to pursue a Title IX investigation after UVM reached out in April of 2021. *See* ECF No. 22 at 34. It claims that Partin's decision not to participate in administrative proceedings at that time serves as a failure to exhaust institutional remedies. ECF No. 27 at 59. But Partin has alleged that she attempted to engage in Title IX

111

proceedings in January of 2020 and was unable to do so because of UVM's failure to provide her with Title IX resources.

    3.   Haley Sommer

    Plaintiff Sommer has failed to state a claim for violation of the VPAA. The Amended Complaint states that after Sommer posted about her assault on Instagram, Moran reached out with information regarding UVM's Title IX Policies and Procedures. ECF No. 22 at 46. It does not allege that UVM knew of Sommer's assault prior to that Instagram post, and it does not allege any substantial delay between Sommer's post and Moran's email. Indeed, pursuant to UVM's publicized harassment policies, the Title IX Office contacted Sommer and asked – apparently twice, ECF No. 22 at 46 – whether she would like to proceed with a formal investigation. Both times, she declined. *Id.*

    UVM's prior investigation of Sommer's assailant is not sufficient to support the conclusion that it would have been futile for Sommer to proceed with the Title IX process. *Cf. Washington v. Pierce*, 2005 VT 125, ¶ 43 (2005) ("Although plaintiff did supply evidence of complaints having been lodged by other students, she did not furnish any evidence suggesting that the school somehow mishandled those complaints."). It appears that UVM took the prior allegation of misconduct seriously and conducted a formal Title IX investigation. That investigation ended due to a lack of evidence, ECF No. 22 at 32,

which – even drawing all reasonably inferences in favor of Plaintiffs – does not lead to the conclusion that UVM would have disregarded or improperly dealt with Sommer's claims if she had proceeded with a Title IX investigation. And Plaintiffs' claim that there were additional incidents of Weiland's predatory behavior does not indicate that UVM either knew of those allegations or failed to adequately investigate them.

Upon receiving actual notice of Sommer's assault, UVM took steps to initiate its internal investigation process and was rejected by Sommer. Plaintiffs have not alleged that UVM's Title IX process was so inadequate that it would have been futile for Sommer to engage with it. Accordingly, Defendants' motion to dismiss is granted as to Sommer's VPAA claim.

### I. Negligence

Plaintiffs next state that UVM breached a legal duty of care owed under Vermont negligence law. A claim for Vermont common law negligence requires proof of four elements: "a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Stopford v. Milton Town Sch. Dist.*, 2018 VT 120, ¶ 12 (quoting *Demag v. Better Power Equip., Inc.*, 2014 VT 78, ¶ 6). "The existence of a duty is a question of law to be decided by the court." *Montague v. Hundred Acre Homestead, LLC*, 2019 VT 16, ¶ 14.

**1.**   Ordinary Duty of Care

The parties first dispute whether UVM owed Plaintiffs a duty of care at all. In 1987, the Vermont Supreme Court held that "[g]enerally, there is no duty to control the conduct of another in order to protect a third person from harm." *Smith v. Day*, 148 Vt. 595, 597 (1987) (quoting *Peck v. Counseling Service of Addison County, Inc.*, 146 Vt. 61, 64-65 (1985); Restatement (Second) of Torts § 315 (1965)). That court also held that the fact that a university exercises "a large degree of control over the activities of its students does not, of itself, impose a legal duty upon the university to control the volitional criminal acts of its students." *Id.* At 598; *see also id.* at 599 ("[I]t is unrealistic to expect the modern American college to control all of the actions of its students.") (quoting *Bradshaw v. Rawlings*, 612 F.2d 135, 138 (3d Cir. 1979)).

While a university does not owe a student a duty of care solely by virtue of the university/student relationship, it may nonetheless incur a duty under Vermont negligence law in cases when it either "foresee[s] an unreasonable risk of injury, or could have foreseen it" through investigation as a reasonable person. *Stopford*, 2018 VT 120 ¶ 12 ("[T]he scope of the duty is determined by the foreseeability of the consequences of the defendant's acts or omissions.") (quotations omitted). The Vermont Supreme Court has held that generalized knowledge of a

risk posed by third parties is insufficient to expose an entity to liability – instead, it must be "accompanied by some knowledge of specific, similar acts or incidents of harm." *Stopford*, 2018 VT ¶ 19; *see also id.* at ¶ 17 (explaining that crimes committed by a third party may qualify as "foreseeable" when the defendant "had special knowledge or notice which would allow it to anticipate the wrongful act.") (citing *Estate of Sumner v. Dep't of Soc. & Rehab. Servs.*, 162 Vt. 628, 629 (1994). Foreseeability is a question of fact. *Blondin v. Milton Town Sch. Dist.*, 2021 VT 2, ¶ 19.

    a.    Athletics/Basketball

    Plaintiffs first argue that UVM had a duty to protect Ware from "foreseeable sexual assault by male athletes, and male Basketball players in particular." ECF No. 38 at 72. To establish UVM's knowledge of "specific, similar acts or incidents of harm," *Stopford*, 2018 VT ¶ 19, Plaintiffs point to (1) posts on public forums on the internet documenting sexual misconduct "within the Men's Basketball Team and UVM Athletics more broadly," ECF No. 38 at 73; (2) knowledge by Becker that the Basketball House was a site for sexually predatory behavior and that at least one resident had previously acted inappropriately towards women; and (3) that a 2017 lawsuit against UVM centered on a sexual assault committed by a male club sports player. ECF No. 38 at 73. These allegations do not

plausibly establish that UVM knew of a specific risk of foreseeable harm to Ware.

In *Stopford v. Town of Milton*, the Vermont Supreme Court evaluated a negligence claim against a school district for a student's suicide. The plaintiffs claimed that the district had negligently failed to prevent the football team from engaging in hazing and sexual harassment which led to an acute assault upon the victim student, and that its failure to address these conditions led to the student's death. Specifically, the school knew that the football team played a game that it called "no homo," which involved homophobic behavior towards other students. *Stopford*, 2018 VT ¶ 2. The Vermont Supreme Court explained that knowledge of the homophobic game "did not put Milton High School on notice of the subsequent criminal, forcible act of assault." *Id.* at ¶ 19.

Similarly here, Plaintiffs have alleged that UVM had general knowledge of inappropriate behavior in its Athletics Department but has not alleged that it had any specific knowledge that Lamb posed a risk to Ware, or that Ware was under any particular or heightened risk. Plaintiffs' allegations about UVM Athletics in general – stemming from posts on internet forums and the 2017 lawsuit regarding a club sports assault – are like the school district's knowledge of the prior inappropriate conduct in *Stopford*. While concerning, they do not

indicate a foreseeable and predictable future incident of assault. Similarly, Plaintiffs' allegations regarding the Basketball House and Becker's knowledge of another player acting inappropriately fail to prove sufficiently specific knowledge. Neither allegation states that Becker or UVM Athletics knew of a risk of *future* misconduct. While knowledge of past bad actions is relevant to the foreseeability of future misconduct, isolated incidents combined with general knowledge do not suffice to impose a legal duty based on specific knowledge of future risk posed by third parties.

b.   Fraternity Contexts

Plaintiffs next argue that UVM had a duty to prevent assaults by fraternity members because sexually-motivated druggings were directly foreseeable. ECF No. 38 at 74. For purposes of the motion to dismiss, Plaintiffs have provided sufficient factual allegation to create a plausible inference that such assaults were specifically foreseeable, allowing for the possible imposition of a duty of care. As explained above, Section II.B.2.c, Plaintiffs have alleged that UVM administrators were aware of prior assaults – and specifically previous sexually-motivated druggings – and knew of the risks that those posed to women. While Plaintiffs have not alleged sufficient facts to satisfy the rigorous knowledge and "deliberate action" standard imposed by Title IX, they have

stated that there was a general risk of sexual assault from
fraternities and that UVM knew of "specific, similar acts or
incidents of harm." *Stopford*, 2018 VT ¶ 19. Unlike *Stopford*,
in which school authorities did not know of acute assaults and
therefore could not have reasonably foreseen future assaults,
Plaintiffs have stated that UVM was aware of such assaults. *See*
ECF No. 22 at 58 (stating that UVM administrators knew of one
fraternity's propensity for non-consensual sexual activity and
of sexually-motivated druggings). These allegations are
sufficient to allow the case to proceed for further factual
development on the question of whether fraternity-related sexual
assaults were reasonably foreseeable.

Plaintiffs have also alleged that UVM was aware of specific
risks posed by AEPi and failed to adequately resolve those
through its formal disciplinary process. They state that UVM's
practice of derecognizing fraternities allows those fraternities
to continue to violate rules out of the University's view. ECF
No. 22 at 56. Because Plaintiffs have alleged that AEPi was
suspended for "alcohol and drug infractions," ECF No. 22 at 57,
and that UVM knew that AEPi posed "serious safety concerns," ECF
No. 22 at 26, Plaintiffs have adequately pleaded that UVM had
knowledge of the risks posed by AEPi notwithstanding its
suspension and had reason to know that suspension was inadequate
to resolve the problem. The precise scope of what UVM knew –

and, therefore, the foreseeability of future assaults – will be better evaluated with further factual development.

Plaintiffs have adequately pleaded the remaining elements of a negligence claim with regard to UVM's handling of the risks of sexual assault posed by fraternities (recognized and unrecognized). They have alleged that UVM did not deter students from attending parties hosted by derecognized fraternities or continue to supervise those fraternities, and did not adequately address the concerns posed by sexually-motivated assaults in those contexts. ECF No. 26, 57. They have also stated that Partin's assault was caused by this breach of duty, and that she was harmed as a result. ECF No. 26.

    c.   Repeat Assailant

Finally, Plaintiffs argue that UVM had sufficient knowledge of assaults committed by repeat offenders to impose a duty of care. ECF No. 38 at 76. They state that UVM "knew of the particularized risk posed by Sommer's assailant" and failed to protect her. *Id.* Plaintiffs have not provided specific factual allegations to support this claim. They rely on the fact that UVM closed its investigation into Weiland due to a "lack of evidence" despite his previous admission of "lack of consent," *id.*, and note that later social media reports indicate that "at least three other women had been subject to sexual misconduct by Weiland." *Id.* This lawsuit is not the proper vehicle to

119

challenge UVM's handling of the prior Title IX complaint against
Weiland. It is well-established that courts should "refrain from
second-guessing the disciplinary decisions made by school
administrators." *Davis*, 526 U.S. at 648. And the fact of a prior
investigation alone does not indicate that UVM had specific
knowledge that an assailant was likely to commit another
assault. Second, Plaintiffs have not alleged that UVM knew of
the other assaults allegedly committed by Weiland prior to
Partin's assault – also counselling against imposition of a
legal duty of care upon UVM.

**2.**   Special Duty of Care

Plaintiffs next argue that UVM had a special duty of care
to "reasonably, promptly, and appropriate[ly] investigate
reported acts of sexual assault." ECF No. 38 at 77. The Vermont
Supreme Court recently explained that "[a]n actor who undertakes
to render [] services can be subject to liability to [a] third
person for physical harm resulting from the actor's failure to
exercise due care if the failure increases the risk of harm, the
actor has undertaken to perform a duty owed by another to the
third person, or the harm results from the reliance of the
other, or the third party, upon the undertaking." *Stocker v.
State*, 2021 VT 71 ¶ 41 (citing Restatement (second) of Torts §
324A). It noted that when evaluating whether an undertaking was
negligent, "[t]he standard of comparison . . . is not the risk

of harm created if defendant exercised reasonable care, but the risk of harm that would be present if defendant had never undertaken to render services." *Id.* ¶ 42. A relevant consideration in determining the risk of harm resulting from a defendant's rendering of services is whether it induced the plaintiff to forego other opportunities for assistance. *Sabia v. State*, 164 Vt. 293, 303 (1995).

Plaintiffs claim that UVM incurred a special duty of care when it took affirmative steps to resolve complaints of sexual misconduct (including establishing Title IX procedures in the first place). *See* ECF No. 38 at 77 ("Through creating these mechanisms and processes, [UVM] owed a duty to Plaintiffs to use reasonable care in the performance of its undertaking."). Pursuant to the Vermont Supreme Court's guidance, in order to state a claim for violation of a special duty of care, Plaintiffs must plead that they were made worse off by UVM's actions than if UVM had not imposed Title IX policies in the first place. *Stocker*, 2021 VT at ¶ 42.

Plaintiffs state that UVM's Title IX policies promised to keep students safe from assault and support victims, and that UVM knew that "students who relied on this process would forego other opportunities for help, such as going to the police." ECF

No. 38 at 79.[30] This general assertion is contradicted by several representations in the Amended Complaint. *See, e.g.*, ECF No. 22 at 4 (explaining that Sommer did not trust the Title IX process and elected to drop out instead). However, Plaintiffs Ware and Partin have individually made this showing because both have pleaded that UVM represented that it would investigate their complaints and failed to do so.

Ware asserts that when she approached the Title IX Office with her complaint, she was told that she could either "report the incident to the police or request a formal investigation through UVM's Title IX Office." ECF No. 22 at 10, 11. She elected to proceed with the Title IX investigation and was then allegedly pressured into foregoing formal investigation in order to protect the reputation of UVM's Athletics Department. *See supra* Section II.C.2.a. Plaintiffs have plausibly stated that Ware relied on UVM's Title IX policies to resolve her assault, and that her reliance led to a higher risk of further harm than

---

[30] Plaintiffs cite three cases from other jurisdictions for the principle that schools have a duty to appropriately enforce their anti-harassment policies. *See Furek v. University of Delaware*, 594 A.2d 506 (Del. 1991); *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331 (Mass. 1983); *Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 669 (S.D.N.Y. 2020). All three rely on inapposite negligence law. Additionally, in Vermont, contractual obligations (such as Title IX policies) are generally non-enforceable in tort. *See Breslauer v. Fayston Sch. Dist.*, 163 Vt. 416 (1995). Marginal deviations from promulgated Title IX policies alone are insufficient to support Plaintiffs' negligence claim.

if UVM had not undertaken responsibility for resolving the assault. *See* ECF No. 38 at 81 (stating that a result of UVM's mishandling of Ware's complaint "her grades declined and she experienced acute emotional and physical distress, panic attacks, depression, insomnia, anxiety, and suicidal ideation.").[31] Contrary to UVM's representations, this legal duty does not result from mere "adoption of policies." ECF No. 27 at 65. The duty results from undertaking an investigation and allegedly conducting it negligently.

Partin alleges that she made a complaint to Russell who stated that he would pass it along to the Title IX Office, and that Partin would be contacted by the Title IX Office "within the week." ECF No. 22 at 31. As detailed above, Moran, Russell, and the Title IX Office did not effectively coordinate a response to Partin's complaint, and as a result, nobody contacted Partin. It is plausible, for purposes of the motion to dismiss, that Partin relied on Russell's representation that the Title IX Office would contact her and declined to seek out other support opportunities as a result. UVM's alleged negligence in responding to Partin's complaint led to a dramatic delay in its

---

[31] UVM states that Plaintiffs cast Ware's harm as resulting from "UVM's repeated and sustained protection of Lamb" and not from negligence in the Title IX process, but the two are connected: Plaintiffs have plausibly alleged that UVM's desire to protect Lamb throughout the Title IX process caused it to negligently conduct its investigation, harming Ware.

investigation, allegedly diminishing the consequences available
for Partin's assailant and making UVM incapable of providing
Partin with Title IX support. Plaintiffs have stated that this
caused Partin "serious, sustained long-term harm, including to
her academics and physical, mental, and sexual health." ECF No.
22 at 35. Partin has plausibly stated that UVM's allegedly
negligent miscommunication over who would respond to her
complaint placed her at greater risk of further harm than "would
be present if [UVM] had never undertaken to render services."
*Stocker*, 2021 VT at ¶ 42.

Accordingly, Plaintiffs' negligence cause of action (Count
IX, ECF No. 22 at 82) is dismissed except with regard to UVM's
alleged failure to resolve risks of sexual assault posed by
fraternities and negligence in investigating Partin's and Ware's
Title IX complaints.[32]

### J.   Negligent Infliction of Emotional Distress

Plaintiffs next argue that UVM is liable for negligent
infliction of emotional distress ("NIED"). ECF No. 22 at 84-85.
UVM responds that Plaintiffs cannot prove that it owed a legal
duty, and that they therefore cannot prevail on their NIED claim

---

[32] Plaintiffs assert that UVM's violation of this "special duty"
caused physical, emotional, educational, and financial harm. ECF
No. 22 at 80-81. This allegation is not contested in the motion
to dismiss. Therefore, Plaintiffs have plausibly pleaded
damages.

for the same reason why they cannot prevail on their ordinary negligence claim. ECF No. 27 at 68. The Court agrees.

However, Plaintiffs have adequately pleaded several of their negligence claims. As a result, the Court must evaluate whether those alleged breaches also support an NIED claim. To prevail on an NIED claim, a plaintiff must establish the same facts as to prevail on an ordinary negligence claim, but must also show that the plaintiff either "suffered a physical impact from an external force" or "was within the 'zone of danger' of an act negligently directed at him by defendant." *Brueckner v. Norwich Univ.*, 169 Vt. 118 (1999). Plaintiffs assert that because the sexual assaults at issue in this case were forceful, they have satisfied the "physical impact from an external force" formulation. *See* ECF No. 22 at 85.

Plaintiffs have alleged that UVM breached a duty that led to Partin's assault by a member of an unrecognized fraternity. *See supra* Section II.I.1.a. The assault qualifies as a "physical impact from an external force," and the NIED claim may proceed insofar as it is related to UVM's alleged negligence in failing to prevent Partin's assault.

However, Plaintiffs have not satisfied their burden with regard to UVM's alleged negligence in resolving Ware's and Partin's Title IX complaints. While both assaults likely qualify as physical impacts from external forces, Plaintiffs have not

125

pleaded causation.[33] The assaults themselves undisputedly occurred prior to the commencement of the allegedly negligent Title IX processes, and UVM's ostensible negligence in investigating the complaints did not subject Ware or Partin to any additional physical contact nor did it place them in a zone of danger. *Brueckner*, 169 Vt. 118 (1999). Accordingly, Plaintiffs' NIED claim is dismissed with regard to UVM's alleged mishandling of Ware's and Partin's complaints but may proceed as to the alleged negligence that caused Partin's assault itself.

**K.    Breach of Contract**

In Count XI, Plaintiffs state that UVM breached its contractual obligation to appropriately enforce its Title IX policies and investigate allegations of sexual assault on campus. ECF No. 22 at 86. The parties agree that UVM and its enrolled students had a contractual relationship. They also agree that UVM's Title IX and sexual harassment policies are part of the "terms of such a contract," ECF No. 38 at 83 (citing *Reynolds v. Sterling Coll.*, 750 A.2d 1020, 1022 (Vt. 2000)). and

---

[33] Plaintiffs allege that UVM's negligence allowed for sexual misconduct in the Athletics Department and on the Basketball Team, and that this caused Ware's assault. As explained above, that claim fails for lack of a legal duty. The only alleged breach remaining is UVM's failure to appropriately investigate Ware's complaint, and it cannot be said that this caused any physical contact to Ware.

that the Court may consider UVM's Title IX and sexual harassment policies to determine those terms.

1.   Kendall Ware

Plaintiffs state in the Amended Complaint that UVM violated its contractual obligations to Ware by (1) "finding the Informal Process appropriate for Ware's complaint given the severity and nature of the conduct reported and high level of harm" and (2) "failing to conduct a thorough investigation into Ware's report of sexual misconduct and offer her appropriate remedies." ECF No. 22 at 86. Plaintiffs' reply to UVM's motion to dismiss fashions the contractual violations differently from Count XI of the Amended Complaint and alleges that UVM breached two specific contractual terms with Ware: "her right to have her report treated confidentially and her right to be free from retaliation once she had made it." ECF No. 38 at 84.

UVM argues that Plaintiffs' claimed contractual violations for lack of confidentiality and retaliation are "entirely novel." ECF No. 44 at 54. But Plaintiffs have not alleged any new facts in their reply brief. They have simply stated their legal theory for breach of contract claim differently from Count XI. The Second Circuit has explained that "dismissal on the pleadings never is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343 (2d Cir.

2006) (quoting *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005)). Because the factual allegations underlying Plaintiffs' breach of contract claim are present in the Amended Complaint, the Court will consider the claims.

    a.   Use of the Informal Process

Ware asserts that UVM violated its contractual obligations by resolving her complaint informally rather than proceeding with a formal Title IX investigation. ECF No. 22 at 86. The terms of its Title IX policies support Plaintiffs' claim for breach of contract.

The Amended Complaint explains that UVM may recommend informal resolution when it finds it appropriate, and when both the complainant and the respondent agree. The decision to proceed with informal resolution is vested in "the reasonable discretion of the [Title IX] Office." ECF No. 27-9 at 6.[34] This language clearly vests UVM with a substantial – but not

---

[34] UVM responds that Ware and Lamb voluntarily engaged in informal resolution, and that she therefore waived any claim against UVM for its alleged breach. ECF No. 27 at 72-73. But UVM's decision to proceed with informal resolution in the first place is what gives rise to the alleged breach. In other words, Ware's complaint stems from the fact that she was asked (or pressured) to engage in informal resolution when the circumstances did not support such an approach. Further, the resolution agreement that Ware signed at the end of the informal process does not overtly waive any claims against UVM: even the language cited by UVM says that the agreement constitutes a "full and final resolution of the issues raised," not that Ware agreed not to proceed with claims against the University. ECF No. 22 at 72.

unlimited – amount of discretion. Determination of when to proceed with informal resolution is subject to the boundaries imposed by the phrase "reasonable," making the ultimate question whether the Title IX Office's decision was "reasonable" or not.[35]

The guidelines do not specify when UVM may recommend informal resolution, but counsel that UVM will proceed with a formal investigation notwithstanding the parties' wishes to the contrary based upon "the seriousness of the alleged conduct, including whether force was used," and "whether the circumstances suggest there is an increased risk of future acts under similar circumstances at a given location or by a particular group." ECF No. 22 at 21-22. The question of whether UVM's exercise of its discretion to recommend informal resolution was "reasonable" should be evaluated with reference to these factors. Plaintiffs argue that the informal process was inappropriate for Ware's complaint given the "severity and nature of the conduct reported and high level of harm;" UVM disagrees. ECF No. 22 at 86; ECF No. 38 at 85. Under Vermont law, "[t]he question of reasonableness is ordinarily for the

_____

[35] UVM asserts that Plaintiffs may not maintain a claim for breach of contract in cases where a "university's handbook reserves discretion in determining how to proceed with resolving or investigating a complaint." ECF No. 27 at 71. The issue here is not *whether* UVM had discretion but rather how much discretion it had. The cases cited by UVM are inapposite because they deal with the first question.

factfinder." *State Farm Mut. Auto Ins. Co. v. Colby*, 194 Vt. 532 (Vt. 2013). And because the meaning of the term "reasonable discretion" is ambiguous, dismissal is improper. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("[T]he meaning of the ambiguous contract is a question of fact for the factfinder."). A factfinder could conclude that UVM's decision to proceed with informal resolution was unreasonable under the circumstances.

Finally, UVM argues that because Ware consented to informal resolution, "it was her choice to decline [formal investigation] . . . that was the cause of her claimed harm." ECF No. 22 at 73. This misses the point. Drawing all reasonable inferences in favor of Plaintiffs, Ware has plausibly alleged that her harm stemmed from UVM's decision to recommend informal investigation in the first place. Her subsequent decision to proceed with informal resolution may serve as circumstantial evidence that UVM's exercise of its discretion was reasonable, but it is not an absolute defense to the claim.

b.  Failure to Investigate and Provide Remedies

The Amended Complaint states that UVM breached its contractual obligations by failing to appropriately investigate Ware's claim and failing to adequately provide remedies. Neither party discusses the parameters of this "appropriate investigation" allegation or what "remedies" Ware should have

had access to. Plaintiffs' reply brief simply states that UVM's decision to forego formal investigation thwarted Ware's ability to access appropriate remedies. ECF No. 38 at 86. The Court interprets Plaintiffs' breach of contract claim for failure to conduct a thorough investigation and provide appropriate remedies as an element of UVM's decision to recommend informal investigation. Because Plaintiffs have alleged sufficient facts to allow that claim to proceed, they may also continue to litigate UVM's alleged obligation to formally investigate and provide specific remedies.

c.   Confidentiality

Plaintiffs' reply to UVM's motion to dismiss alleges that UVM breached its contractual obligation to keep her complaint confidential. ECF No. 38 at 84. As noted above, this is not styled as a breach under Count XI of the Amended Complaint, which generally details Plaintiffs' breach of contract allegations. However, because the underlying facts are present in the Amended Complaint, the Court will consider it.

Plaintiffs have not stated a claim for violation of a confidentiality provision for two reasons. First, UVM's Title IX guidelines specify that "[c]onversations with [the Title IX Office] are not privileged, and [it] cannot guarantee the confidentiality of information disclosed." ECF No. 27-9 at 8. Pursuant to this overt disclaimer, Ware did not have a

contractual expectation of confidentiality and cannot state a claim for breach of confidence. It is true that the Title IX guidelines explain that the Title IX Office will treat all information connected to a complaint "as private and will only disclose information as necessary to fully and fairly investigate the allegations." ECF No. 27-9 at 8. But to the extent that Plaintiffs' claims are construed as disclosure beyond what was required for a full and fair investigation, they have still failed to state a claim because none of the individuals that allegedly disclosed information related to Ware's claim were members of UVM's Title IX Office and were therefore not covered by the guidelines. Ware claims that Balogh and Schulman (Athletics Department administrators, ECF No. 22 at 12) disclosed her information without her consent, but the Amended Complaint does not state that either were within the purview of the Title IX Office.

Accordingly, Plaintiffs' claim of breach of contract for disclosure of Ware's confidential information is dismissed.

d.   Retaliation

Plaintiffs' response to UVM's motion also states that UVM violated its contractual obligation not to retaliate against an individual for making a good faith report of discrimination. ECF No. 38 at 84. This claimed contractual provision is overtly labelled as a broad statement of policy. The document – UVM's

Sexual Harassment & Misconduct Policy Statement – begins by explaining that UVM "seeks to maintain a safe learning, living, and working environment," and to that end will refrain from retaliating against complainants. ECF No. 27-2 at 2. The breadth of this representation, along with its overt designation as a statement of policy rather than a precise promise of anticipated conduct, does not allow for a "plausible inference" that the document created a contractually enforceable promise. *Cf. Novio v. N.Y. Acad. of Art*, 317 F. Supp. 3d 803, 812-13 (S.D.N.Y. 2018) ("These three allegations may not form the basis of a breach of contract claim as they are simply 'broad pronouncements of the University's compliance with existing anti-discrimination laws.'") (quoting *Ward v. N.Y. Univ.*, 99-cv-8733, 2000 WL 1448641 at *4 (S.D.N.Y. 2000)). Plaintiffs' claim for breach of contract based upon unlawful retaliation against Ware is dismissed.

2.   Sydney Partin

a.   Rideshare Driver

Plaintiff Partin has plausibly stated a claim for breach of contract resulting from UVM's failure to provide her with campus resources in the aftermath of her alleged harassment in December

of 2018.[36] The parties agree that the relevant part of UVM's 2016
sexual misconduct policy obliged Russell to (1) immediately
contact the Title IX Office with "all the information" he knew;
(2) fill out a Campus Security Authority report form; and (3)
advise the individual of the option to report the incident to
local law enforcement and advise of UVM's confidential and non-
confidential resources. ECF No. 27-2 at 12. Defendants state
that Russell satisfied obligation (1) and part of (3) when he
CCed the Title IX Office on his response to Partin's email and
recommended that she file a report with campus police. ECF No.
44 at 61-62. However, UVM seems to concede that it did not make
Partin aware of available on-campus resources. ECF No. 22 at 62.
It states that Partin did not suffer any harm from its failure
to do so, ECF No. 44 at 62, but drawing all reasonable
inferences in favor of Partin allows for the plausible
assumption that provision of on-campus support options could
have led to remedial resources such as support groups, therapy,
or even an investigation into the identity of the individual.

---

[36] UVM states that this claim is newly formulated in Plaintiffs'
reply brief and should not be considered. Again, the Amended
Complaint contains factual allegations regarding Partin's
harassment in December of 2018, *see* ECF No. 22 at 24, and Count
XI simply states that UVM violated its contractual obligation by
failing to "conduct an official inquiry." ECF No. 22 at 86.
While the Amended Complaint is not a model of clarity regarding
which facts support the alleged breach, it serves to place UVM
on notice that Plaintiffs are dissatisfied with UVM's response
in December of 2018.

UVM also submits that it had no obligation to investigate
claims against individuals not affiliated with the University.
ECF No. 27 at 74 (citing ECF No. 27-2 at 16). The relevant
language states that "the University's ability to take direct
action against that individual may be limited," but explains
that the University "is committed to conducting an inquiry into
what occurred, and taking steps to provide appropriate remedies"
nonetheless. ECF No. 27-2 at 16. The Court agrees that this
language is too vague to be directly enforceable. However, it
does not absolve UVM of its obligations under the more precise
language promising to provide claimants with confidential and
non-confidential resources whenever they make complaints. ECF
No. 27-2 at 12.

Plaintiffs' claim that UVM breached its contractual
obligation to provide Partin with resources in the aftermath of
her harassment is plausible enough to survive UVM's motion to
dismiss.

b.   Off-Campus Party

UVM again states that it did not incur any particular
obligation to respond to Partin's 2020 email because the email
did not disclose "information that an incident of sexual
harassment or misconduct occurred involving members of the
University community." ECF No. 44 at 63 (citing ECF No. 27-2 at
12). Its arguments turn on Partin's actual knowledge of her

assault at the time that she sent the email. ECF No. 44 at 64.
As noted in Section II.C.ii.2, Partin's email makes multiple
references to the fact that she was not tested for "date rape
drugs" or provided with a "rape kit," and expresses concern
about campus conditions contributing to assault. ECF No. 27-14
at 2. Additionally, the Amended Complaint states that Russell
passed Partin's email on to the Title IX Office, indicating
actual knowledge that the email implicated Title IX issues. ECF
No. 22 at 31. That is sufficient to survive a motion to dismiss.

UVM has not contested the other elements of Partin's breach
of contract claim. Accordingly, UVM's motion to dismiss is
denied as to its failure to investigate Partin's complaint in
January of 2020.[37]

### L.   Punitive Damages

Finally, the parties dispute whether punitive or exemplary
damages are available in this case. They agree that under
Vermont law, plaintiffs seeking punitive damages must prove "(1)
wrongful conduct that is outrageously reprehensible; and (2)
malice." *Carpentier v. Tuthill*, 2013 VT 91 ¶ 12.[38] The standard

---

[37] Plaintiffs have not stated a claim for contractual violations
stemming from Moran's 2021 response to Partin. The Amended
Complaint notes that Moran's contact was prompt, that she
provided Partin with options regarding how to proceed, and that
Partin declined to exercise those options. ECF No. 22 at 34.
[38] Punitive damages are not available under Title IX. *See Barnes
v. Gorman*, 536 U.S. 181, 183 (2002); *Pejovic v. State Univ. of*

for punitive damages is high: the defendant must have engaged in "truly reprehensible conduct," and that conduct must be motivated by "bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Fly Fish Vermont, Inc. v. Chapin Hill Ests., Inc.*, 2010 VT 33 ¶ 18.

The suitability of punitive damages depends on questions of motive, spite, and reprehensibility – all fact-dependent determinations. *Lent v. Huntoon*, 143 Vt. 539, 552 (1983). Plaintiffs have alleged that UVM seriously mishandled allegations of sexual assault on campus in a manner that could support the imposition of punitive or exemplary damages. The Court denies UVM's motion to dismiss and will defer consideration of the issue until the record is more developed.

### III. Conclusion

For the reasons outlined in this opinion, UVM's motion to dismiss (ECF No. 27) is **granted** in part and **denied** in part.

---

*N.Y. at Albany*, 17-cv-1092, 2018 WL 3614169 at *7 (N.D.N.Y. 2018) ("[P]unitive damages are unavailable under Title IX."). The standard for punitive damages under § 1983 is that the defendant's conduct must be "motivated by evil motive or intent" or involve "reckless or careless indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 47 (1983).

DATED at Burlington, in the District of Vermont, this 7th day of March, 2024.

/s/ William K. Sessions III
Hon. William K. Sessions III
United States District Court Judge